1 | PAUL V. SIMPSON, BAR NO. 83878
psimpson@sgilaw.com
2 | TIMOTHY P. O'DONNELL, BAR NO. 185492
todonnell@sgilaw.com
3 | SIMPSON, GARRITY & INNES
Professional Corporation
4 | 601 Gateway Boulevard, Suite 950
South San Francisco, CA 94080
5 | Telephone: (650) 615-4860
Fax: (650) 615-4861
6 |
Attorneys for Defendant
7 | IMR Contractor Corporation

**E-filing    ORIGINAL FILED**

JUL 17 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

8

9            UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

**CW**

11 | GREGORY HALL, FAUSTO AGUILAR,          ) Case No.
GONZALO AGUILAR, CHARLES CHILTON,      )
12 | FELIX CORTES, OMAR FRANCO, DOUGLAS    )
GIVENS, ROBERT IVY, QUINCY MOUTON,     )
13 | LUIS OSUNA, RICHARD RANKIN, HECTOR    )        08   3447
RODRIGUEZ, MARTIN SANDOVAL, HENRY      )
14 | TAYLOR, LLOYD THIBEAUX, MICHAEL       ) **NOTICE TO FEDERAL COURT OF**
BROWN, ASTRIAN CAEL, ARNULFO           ) **REMOVAL OF CIVIL ACTION FROM**
15 | CARRANZA-RIVAS, APOLINAR CORNEJO,     ) **STATE COURT (FEDERAL**
ROY EDWARDS, VICTOR HAMPTON, RANDY     ) **QUESTION)**
16 | KEYS, ANDRE LARRIMORE, TERRY          )
MACKEY, DOUGLAS TURNER, JEFF WEST,     ) [28 U.S.C. §§ 1331, 1337, 1441, 1446]
17 | ROBERT WHITE, MARQUEZ BOYD,           )
                                        )
18 |              Plaintiffs,             )
                                        )
19 |         v.                          )
                                        )
20 | APARTMENT INVESTMENT AND              )
MANAGEMENT COMPANY, AIMCO CAPITAL,     )
21 | INC., FORTNEY & WEYGANDT, INC., IMR   )
CONTRACTOR CORPORATION, BAY            )
22 | BUILDING SERVICES, BAY AREA           )
CONSTRUCTION FRAMERS, INC. and DOES 1- )
23 | 50,                                   )
                                        )
24 |              Defendants.             )
                                        )
25 |                                      )
                                        )
26 | _____      )

27

28

1      TO THE CLERK OF THE UNTIED STATES DISTRICT COURT FOR THE

2  NORTHERN DISTRICT OF CALIFORNIA:

3      PLEASE TAKE NOTICE that Defendant IMR CONTRACTOR CORPORATION

4  (hereinafter "IMR"). with the consent of defendants Apartment Investment And Management

5  Company, AIMCO Capital. Inc., Fortney & Weygandt, Inc. Bay Building Services. and Bay Area

6  Construction Framers. Inc. (collectively "Defendants"), hereby removes to this Court the state

7  court action described below.

8      In support of its Notice To Federal Court Of Removal Of Civil Action From State Court

9  (Federal Question), IMR respectfully submits the following:

10                 **PLEADINGS AND PROCEDURAL HISTORY**

11      1.    On December 14, 2007, Plaintiffs Gregory Hall, Fausto Aguilar, Gonzalo Aguilar,

12  Charles Chilton, Felix Cortes, Omar Franco, Douglas Givens, Robert Ivy, Quincy Mouton, Luis

13  Osuna, Richard Rankin, Hector Rodriguez, Martin Sandoval, Henry Taylor, and Lloyd Thibeaux

14  filed civil action, denominated by case number CGC-07-470047. in the Superior Court of

15  California in the County of San Francisco. A true and correct copy of the complaint, obtained

16  from the San Francisco Superior Court's website, is attached hereto as Exhibit A. Plaintiffs did

17  not serve a copy of this complaint on IMR.

18      2.    On March 12, 2008, Plaintiffs Gregory Hall, Fausto Aguilar, Gonzalo Aguilar,

19  Charles Chilton, Felix Cortes, Omar Franco, Douglas Givens, Robert Ivy, Quincy Mouton, Luis

20  Osuna, Richard Rankin, Hector Rodriguez, Martin Sandoval, Henry Taylor, Lloyd Thibeaux,

21  Michael Brown, Astrian Cael, Arnulfo Carranza-Rivas, Apolinar Cornejo, Roy Edwards, Victor

22  Hampton, Randy Keys, Andre Larrimore, Terry Mackey, Douglas Turner, Jeff West, and Robert

23  White filed a first amended complaint. A true and correct copy of the first amended complaint is

24  attached hereto as Exhibit B.

25      3.    On April 22. 2008, Plaintiffs Gregory Hall. Fausto Aguilar, Gonzalo Aguilar,

26  Charles Chilton, Felix Cortes, Omar Franco, Douglas Givens. Robert Ivy, Quincy Mouton, Luis

27  Osuna, Richard Rankin. Hector Rodriguez. Martin Sandoval. Henry Taylor, Lloyd Thibeaux.

28  Michael Brown, Astrian Cael, Arnulfo Carranza-Rivas, Apolinar Cornejo, Roy Edwards. Victor

1 Hampton, Randy Keys, Andre Larrimore, Terry Mackey, Douglas Turner, Jeff West, Robert

2 White and Marquez Boyd filed a second amended complaint. True and correct copies of the

3 second amended complaint and the amended summons for the second amended complaint are

4 attached hereto as Exhibit C.

5       4.     On May 6, 2008, after Plaintiffs had already filed their second amended complaint,

6 Plaintiffs attempted to serve the superseded first amended complaint on IMR. Under California

7 law, once an amended complaint is filed, the original complaint drops out of the case and ceases to

8 have any effect as a pleading or as a basis for a judgment. *Hayes v. Risk* (1967) 255 Cal.App.2d

9 613, 623. Where a defendant has not appeared in the action, the amended complaint must be

10 served in the manner provided for the service of a summons. *Engebretson & Co., Inc. v. Harrison*

11 (1981) 125 Cal.App.3d 436, 443.

12       5.     On May 23, 2008, the attorneys for iMR wrote to Plaintiffs' attorney to inform

13 them that the service of the first amended complaint had been ineffective. Rather than make

14 Plaintiffs re-serve the second amended complaint, IMR's attorney offered to accept service of

15 process on IMR's behalf and to execute a Notice of Acknowledgment of Receipt. At true and

16 correct copy of the May 23, 2008 letter from IMR's attorneys is attached hereto as Exhibit D.

17       6.     Plaintiffs' attorneys forwarded to IMR's attorneys the second amended complaint,

18 the amended summons for the second amended complaint, and a Notice of Acknowledgment of

19 Receipt. IMR's attorneys executed the Notice of Acknowledgment of Receipt on June 20, 2009.

20 A true and correct copy of the Notice of Acknowledgement of Receipt is attached hereto as

21 Exhibit E. Under California law, when a summons and complaint is served by mail with a Notice

22 of Acknowledgement of Receipt, service is not complete until the Notice of Acknowledgement of

23 Receipt is executed. Cal. Civ. Proc. Code § 415.30(c).

24       7.     Pursuant to 28 U.S.C. Section 1446(a), IMR has attached hereto as Exhibits B and

25 C all pleadings that have been served on IMR.

26       8.     IMR is informed and believes that Defendants Apartment Investment And

27 Management Company, AIMCO Capital, Inc., Fortney & Weygandt, Inc. Bay Building Services.

28 and Bay Area Construction Framers, Inc. have filed answers to Plaintiffs' Second Amended

1   Complaint. As a convenience to the Court, attached hereto as Exhibits I through L are what IMR

2   is informed and believes to be the answers filed by Defendants Apartment Investment And

3   Management Company, AIMCO Capital, Inc., Fortney & Weygandt, Inc, Bay Building Services,

4   and Bay Area Construction Framers, Inc. Exhibits I through L are true and correct copies of the

5   documents obtained on July 15, 2008 by accessing and printing the documents from the register of

6   action for case number CGC-07-470047 on the San Francisco County Superior Court's web site.

7        9.     This Notice To Federal Court of Removal of Civil Action From State Court

8   (Federal Question) is timely filed as it is filed within thirty (30) days after the completion of

9   service of the second amended complaint upon IMR. 28 U.S.C. §1446(b); *Murphy Brothers, Inc.*

10  *v. Michetti Pipe Stringing, Inc.* 526 U.S. 344, 347-348 (1999).

11       10.     By filing the removal of this case to federal court, IMR does not waive any

12  defenses it may have to the allegations in Plaintiff's complaint, including but not limited to

13  jurisdiction and failure to state a claim, and expressly reserves the right to submit such defenses

14  against Plaintiffs' claims.

15       11.     By submitting this Notice To Federal Court of Removal of Civil Action From State

16  Court (Federal Question), IMR consents to the removal of the case to federal court. Additionally,

17  Defendants Apartment Investment And Management Company, AIMCO Capital, Inc., Fortney &

18  Weygandt, Inc, Bay Building Services, and Bay Area Construction Framers, Inc. have consented

19  to the removal of this case to federal court. True and correct copies of the consents by these

20  defendants are attached hereto as Exhibit F. Thus, all defendants consent to the removal of this

21  action.

22                       **JURISDICTION**

23       12.     Plaintiffs allege that at all times material herein they were concurrently employed

24  by all Defendants, including IMR, at construction sites and/or rehabilitation sites in connection

25  with the Bayview Hunter's Point Redevelopment Plan ("Hunter's Point Project"). At all times

26  relevant to the Second Amended Complaint, IMR was party to a collective bargaining agreement

27  with the Carpenters 46 Northern California Counties Conference Board of the United Brotherhood

28  of Carpenters and Joiners of America ("Carpenters Agreement") and a collective bargaining

1 | agreement with Roofers Union Local No. 40 ("Roofers Agreement"). Said collective bargaining
2 | agreements covered the terms and conditions of employment, including wages, pay scale, job
3 | classifications and assignments, discipline and termination of employees, including any Plaintiffs
4 | employed by IMR, on the Hunter's Point Project. (See Plaintiffs' Second Amended Complaint,
5 | ¶¶ 23, 29, 32, 34, 38, 74, 81, 97, 107, 110, 114, 135, 144, 167, 277). True and correct copies of
6 | the Carpenters Agreement and the Roofer's Agreement are attached hereto as Exhibits G and H,
7 | respectively.

8 |      13.    As explained herein, this action alleges claims which arise under the laws of the
9 | United States and an Act of Congress regulating commerce. Therefore, this action is within the
10 | Court's original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a), and is one which may be
11 | removed to this Court by IMR pursuant to the provisions of 28 U.S.C. §§ 1441(a), (b), and (c).

12 |      14.    IMR removes this case to federal court on the basis that Plaintiffs' second,
13 | fourteenth, twentieth, and twenty-first causes of action arise under and are preempted by Section
14 | 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. Section 185, because the
15 | resolution of Plaintiffs' claims will require interpretation of a collective bargaining agreement.
16 | See, Lingle v. Norge Div. Magic Chef, Inc. (1988) 486 U.S. 399, 412; Allis-Chalmers Corp. v.
17 | Lueck (1985) 471 U.S. 202, 213). Any suit that requires an interpretation of, and deals with
18 | actions described by a collective bargaining agreement is preempted by Section 301 of the LMRA.
19 | Caterpillar Inc. v. Williams, 482 U.S. 386, 394 (1987); Republic Steel Co. v. Maddox, 379 U.S.
20 | 650 (1965). If the resolution of a state-law claim depends upon the interpretation of a collective
21 | bargaining agreement, the claim is preempted by Section 301, and the defendant can remove the
22 | claim from state court. Associated Builders & Contractors, Inc. v. Local 302 Int'l Brotherhood of
23 | Electrical Workers, 109 F.3d 1353, 1356 (9th Cir. 1997).

24 |      15.    Plaintiffs' second cause of action alleges that Defendants violated California Labor
25 | Code Sections 221, 222 and 223 by making an agreement to pay Plaintiffs at a lower hourly rate
26 | than prescribed by a union agreement. (Plaintiffs' Second Amended Complaint, ¶ 167).
27 | Plaintiffs' twentieth cause of action alleges that Defendants violated California Labor Code
28 | Section 227 by failing to make payments required by a collective bargaining agreement.

1  (Plaintiffs' Second Amended Complaint, ¶ 277). Plaintiffs' twenty-first cause of action alleges

2  that Defendants violated Wage Order No. 16-2001 §5(B) by failing to pay Plaintiffs "reporting

3  time pay" when Defendants furnished Plaintiffs with less than half their usual hours in a day.

4  (Plaintiffs' Second Amended Complaint, ¶¶ 66, 90, 95, 117, 119, 129, 138, 143, 149, 153, 280-

5  286). These claims necessarily require the interpretation of the CBA. *Mendes v. W.M. Lyles Co.*,

6  2008 U.S. Dist. LEXIS 6480, 25-26 (E.D. Cal. 2008) (former employee's claims for violation of

7  Labor Code Sections 222 and 227 preempted by Section 301 of the LMRA); *Cornn v. UPS*, 2004

8  U.S. Dist. LEXIS 20578, *3-*5 (N.D. Cal. 2004) (holding that a claim based on a failure to pay

9  wages in violation of Labor Code §§ 222, 223 was preempted by the LMRA because the collective

10  bargaining agreement would have to be interpreted). Where a state law "in essence create[s] a

11  claim for breach of the collective bargaining agreement . . . the law [falls] squarely within the

12  scope of [LMRA] § 301 complete preemption." *Balcorta v. Twentieth Century-Fox Film Corp.*,

13  208 F.3d 1102, 1108, 1109 n.11 (9th Cir. 2000); *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202,

14  210, 105 S. Ct. 1904, 85 L. Ed. 2d 206 (1985). "State law causes of action for violation of a

15  collective bargaining agreement -- essentially breach of contract claims - are entirely displaced by

16  section 301." *Parham v. Carrier Corp.*, 9 F.3d 383, 390 (5th Cir. 1993); see also *Herman v.*

17  *United Bhd. of Carpenters & Joiners of Am., Local Union No. 971*, 60 F.3d 1375, 1380 n.2 (9th

18  Cir. 1995). Given the allegations and damages claimed, these causes of action arise from a

19  violation of, and depend on, a collective bargaining agreement and require that a collective

20  bargaining agreement be construed. Accordingly, Plaintiffs' claims based on Labor Code sections

21  222, 223, and 227 and section 5 of Wage Order 16 for non-payment of wages are preempted by

22  LMRA § 301. See *Lueck*, 471 U.S. at 210; *Balcorta*, 208 F.3d at 1109 n.11; *Atchley v. Heritage*

23  *Cable Vision Associates*, 101 F.3d 495, 499-500 (7th Cir. 1996) ("Because the CBA must be

24  interpreted, and because the claim of the local depends on the meaning of and is substantially

25  dependent on analysis of the CBA, the claim, even though dressed in state-law clothing, is a

26  federal § 301 claim."); *Antol v. Esposto*, 100 F.3d 1111, 1117, 1119-21 (3d Cir. 1996) (holding a

27  state statute preempted where it in essence created a claim for breach of a collective bargaining

28  agreement); *Wheeler v. Graco Trucking Corp.*, 985 F.2d 108, 112-13 (3d Cir. 1993) (rejecting

argument that a state statute could be utilized to recover unpaid wages and holding that the "claim

is based squarely on the terms of the collective bargaining agreement and therefore is governed

exclusively by federal law."); *Cornn*, 2004 U.S. Dist. LEXIS 20578 at *3-*5.

16.    Claims for intentional infliction of emotional distress fall within the federal

preemptive scope of Section 301 of the LMRA. *Milne Employees Assoc. v. Sun Carriers, Inc.*,

960 F.2d 1401, 1412 (9th Cir. 1992); *See also, Newberry v. Pacific Racing Assoc.*, 854 F.2d 1142,

1149-50 (9th Cir. 1987) (Plaintiff's intentional infliction of emotional distress claim preempted by

Section 301); *Montoya v. Owens Brockway*, 2001 U.S. Dist. Lexis 9741 at *9-12 (N.D. Cal. 2001)

(same). This is because, under California law, to prevail on a claim for intentional infliction of

emotional distress, a plaintiff must establish extreme and outrageous conduct by defendant with

the intention of causing emotional distress. *Wilkins v. Nat'l Broad. Co. Inc.*, 71 Cal.App.4th 1066,

1087 (1999); *Sabow v. United States*, 93 F.3d 1445, 1454 (9th Cir. 1996). Because the tort

requires inquiry into the appropriateness of defendant's behavior, the terms of the CBA become

relevant in evaluating whether defendant's behavior was reasonable. *Miller v. AT&T Network

Systems* (9th Cir. 1988) 850 F.2d 543, 550 (claim for intentional infliction of emotional distress

under Oregon law preempted by Section 301). Actions that the collective bargaining agreement

permits might be reasonable by virtue of the fact that the collective bargaining agreement permits

them. *Id.* Further, where conduct involving working conditions and disciplinary procedures are

covered by the collective bargaining agreement, emotional distress claims related to such actions

are preempted. *Scott v. Machinists Automotive Trades Dist.*, (9th Cir. 1987) 827 F.2d 589, 594. A

plaintiff may not avoid preemption of an intentional infliction of emotional distress claims merely

by also asserting anti-discrimination statutory claims. *Montoya, supra*, 2001 U.S. Dist. Lexis at

*12.

17.    Plaintiffs' fourteenth cause of action for intentional infliction of emotional distress

requires such an interpretation of the CBA. Plaintiffs' base their intentional infliction of

emotional distress claim on "extreme and outrageous" conduct by Defendants. (Plaintiffs' Second

Amended Complaint, ¶ 238). Plaintiffs' incorporate into this cause of action allegations regarding

hiring decisions, job assignments, unjust discipline, layoffs, denials of premium pay, shortened

workweeks. and being sent home before the end of the day. (Plaintiffs' Second Amended Complaint. ¶¶ 25, 26, 27, 29, 30, 32, 34, 35, 46, 48, 51, 59, 64, 66, 78, 81, 88, 90, 95, 100, 117, 119, 122, 125, 127, 129, 135, 138, 143, 147, 149, and 153). Each of these allegations require interpretation of the CBA to determine whether Defendants' conduct was a reasonable and appropriate exercise of authority allowed by the CBA or whether Defendants' conduct was extreme and outrageous. Accordingly, because Plaintiffs' fourteenth cause of action requires direct interpretation of the CBA, the claim falls within the federal preemptive scope of Section 301 of the LMRA. *Caterpillar*, 482 U.S. at 393 n.8; *Stikes v. Chevron U.S.A. Inc.*, 914 F.2d 1265, 1268 (9th Cir. 1990); *Newberry v. Pacific Racing Assoc.*, 854 F.2d 1142, 1194-1150 (9th Cir. 1988).

18.    This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1331, and is one which may be removed to this Court by IMR pursuant to the provisions of 28 U.S.C. § 1441(b) in that it also arises under and is preempted by the federal Employment Retirement and Income Security Act of 1974 ("ERISA"), 29 U.S.C. section 1001, et seq. Plaintiffs' claims are preempted by ERISA, and therefore arise under the laws of the United States and an Act of Congress regulating commerce, because Plaintiffs seek to recover benefits allegedly due under an employee benefit plan. (Complaint, ¶¶ 160, 167, 274, 277). ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . ." 29 U.S.C. § 1444(a). Further, ERISA provides the exclusive cause of action for violations of ERISA (29 U.S.C. § 1132(a)), thus making state law claims preempted by ERISA removable to federal court. *Metropolitan Life Ins. Co.*, 481 U.S. at 60, 65-66.

19.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) and 1441(c). Plaintiffs' state law claims do not raise a novel or complex issue of state law, do not predominate over the federal claims, and there are no exceptional or compelling reasons for this Court to decline jurisdiction.

20.    Pursuant to 28 U.S.C. Section 1446(d), a true and correct copy of this Notice To Federal Court Of Removal Of Civil Action From State Court (Federal Question) (including exhibits) is being filed on this date with the Clerk of the San Francisco County Superior Court.

1  Attached hereto as Exhibit M is a true and correct copy of the Notice to State Court of Removal of

2  Civil Action (excluding exhibits) that will be filed with the Clerk of the San Francisco County

3  Superior Court.

4      21.    Pursuant to 28 U.S.C. Section 1446(d), a true and correct copy of this Notice To

5  Federal Court Of Removal Of Civil Action From State Court (Federal Question) (including

6  exhibits) is being served on Plaintiffs' counsel on this date. Attached hereto as Exhibit N is a true

7  and correct copy of the Notice To Plaintiffs Of Filing Of Notice To Federal Court Of Removal Of

8  Civil Action From State Court (Federal Question) (excluding exhibits) that will be served on

9  Plaintiffs' counsel.

10                          **INTRADISTRICT ASSIGNMENT**

11      22.    IMR is informed and believes that a substantial part of the alleged events giving

12  rise to this action occurred in the County of San Francisco. This action was filed in San Francisco

13  County Superior Court. Accordingly, under Local Rules 3-2(c) and (d), this action is properly

14  assigned to the San Francisco or Oakland Division of the United States District Court for the

15  Northern District of California.

16      23.    In the event the Court should be inclined to remand this action *sua sponte*, IMR

17  requests that the Court issue an Order to Show Cause why the case should not be remanded,

18  giving IMR and Plaintiff an opportunity to present briefing and argument prior to any possible

19  remand.

20      WHEREFORE, Defendant IMR prays that the above-described action be removed from

21  the Superior Court for the State of California, in and for the County of San Francisco, to the

22  United States District Court for the Northern District of California.

23  Date:  July 17, 2008                Respectfully submitted,

24                                      SIMPSON, GARRITY & INNES
25                                      Professional Corporation

26                                      By: _____
                                        PAUL V. SIMPSON
27                                      TIMOTHY P. O'DONNELL
                                        Attorneys for Defendant
28                                      IMR CONTRACTOR CORPORATION

# PROOF OF SERVICE BY U.S. MAIL

I, the undersigned, hereby declare that I am over the age of eighteen years and not a party to the within action. My business address is 601 Gateway Boulevard, Suite 950, South San Francisco, California  94080.

On the date indicated below, I served by First Class U.S. Mail a true copy of the following documents:

## NOTICE TO FEDERAL COURT OF REMOVAL OF CIVIL ACTION FROM STATE COURT (FEDERAL QUESTION)

I am readily familiar with the practice of this business for collection and processing of documents for mailing with the United States Postal Service.  Documents so collected and processed are placed for collection and deposit with the United States Postal Service that same day in the ordinary course of business.  The above-referenced document(s) were placed in (a) sealed envelope(s) with postage thereon fully prepaid, addressed to each of the below listed parties and such envelope(s) was (were) placed for collection and deposit with the United States Postal Service on the date listed below at South San Francisco, California.

## SEE PROOF OF SERVICE LIST ATTACHED

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 17, 2008, at South San Francisco, California.

_____
Diana L. Prisk

# PROOF OF SERVICE LIST

Hall et.al. v. Apartment Investment and Management Company et. al.

Superior Court of California. County of San Francisco Case No.: CGC-07-470047

Robert Salinas. Esq.
Pamela Kong, Esq.
Jorge Aguilar II, Esq.
SUNDEEN SALINAS & PYLE
1330 Broadway, Suite 1830
Oakland, CA 94612
Attorneys for Plaintiffs

Stephen Thomas Davenport, Jr., Esq
Jeffrey G. McClure, Esq.
DAVENPORT GERSTNER & MCCLURE
1990 N. California Blvd., Suite 650
Walnut Creek, CA 94596
Attorneys for Defendants Apartment Investment and Management Company, AIMCO Capital, Inc
and Fortney & Weygandt, Inc.,

Christopher A. Brose, Esq.
400 Geary Blvd., Suite 201
San Francisco, CA 94118
Attorney for Defendant Bay Building Services. Inc.

Joseph E. Powell, Esq.
Paul Michael Vuksich, Esq.
LAW OFFICES OF JOSEPH E. POWELL
582 Market Street, Suite 2001
San Francisco, CA 94104
Attorneys for Defendant Bay Area Construction Framers, Inc.

# EXHIBIT A

ROBERT SALINAS  SBN 184260
PAMELA KONG  SBN 220912
SUNDEEN SALINAS & PYLE
1330 Broadway, Suite 1830
Oakland, CA  94612

Tel: (510) 663-9240
Fax: (510) 663-9241

Attorneys for PLAINTIFFS

F I L E D
San Francisco County Superior Court

DEC 1 4 2007
CASE MANAGEMENT CONFERENCE SET    GORDON PARK-LI, Clerk
                                        Deputy Clerk
MAY 1 6 2008 NO SUMMONS ISSUED

DEPARTMENT 212

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| GREGORY HALL, FAUSTO AGUILAR, GONZALO AGUILAR, CHARLES CHILTON, FELIX CORTES, OMAR FRANCO, DOUGLAS GIVENS, ROBERT IVY, QUINCY MOUTON, LUIS OSUNA, RICHARD RANKIN, HECTOR RODRIGUEZ, MARTIN SANDOVAL, HENRY TAYLOR, LLOYD THIBEAUX, <br><br> Plaintiffs, <br><br> vs. <br><br> AIMCO, INC., FORTNEY & WEYGANDT, INC., IMR CONTRACTOR CORPORATION, BAY BUILDING SERVICES, BAY AREA CONSTRUCTION FRAMERS, INC. and DOES 1-50, <br><br> Defendants. | CGC07 - -470047 <br><br> COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF <br><br> JURY TRIAL DEMANDED |

COMES NOW Plaintiffs, who allege as follows:

## PARTIES

1.      At all times material herein, Plaintiffs were adults and residents of the State of

California. Plaintiffs were all previously employed by Defendants, at construction and/or rehabilitation sites in connection with the BAYVIEW HUNTER'S POINT REDEVELOPMENT PLAN (BHPRP). The BHPRP was approved approximately May 23, 2006 and has been funded using California State Bonds. At all relevant times, Plaintiffs worked at sites under the direct or indirect supervision of Defendants.

2.    Plaintiffs are informed and believe and on that basis allege that Defendant AIMCO, INC., is a Colorado corporation registered with the California Secretary of State to do business in California, and is based in Denver, Colorado. Defendant AIMCO is a developer concerning BHPRP.

3.    Plaintiffs are informed and believe and on that basis allege that Defendant FORTNEY & WEYGANDT, INC., ("F&W") is an Ohio corporation registered with the California Secretary of State to do business in California, and is based in North Olmsted, Ohio. Defendant F&W is the general contractor concerning BHPRP.

4.    Plaintiffs are informed and believe and on that basis allege that Defendant IMR CONTRACTOR CORPORATION ("IMR") is a California corporation registered with the California Secretary of State to do business in California, and is based in Daly City, California. Defendant IMR is a contractor concerning BHPRP.

5.    Plaintiffs are informed and believe and on that basis allege that Defendant BAY BUILDING SERVICES, INC. ("BBS"), is a Nevada corporation registered with the California Secretary of State to do business in California, and is based in San Rafael, California. Defendant BBS is a contractor concerning BHPRP.

6.    Plaintiffs are informed and believe and on that basis allege that Defendant BAY AREA CONSTRUCTION FRAMERS, INC. ("BACF"), is a California corporation registered with the

California Secretary of State to do business in California, and is based in Livermore, California.

Defendant BACF is a contractor concerning BHPRP.

7.     Plaintiffs are informed and believe and on that basis allege that at all times material RICH INGRAM was employed by AIMCO in a supervisory capacity over Plaintiffs. INGRAM is an adult Caucasian male.

8.     Plaintiffs are informed and believe and on that basis allege that at all times material MIKE CUNNINGHAM was employed by F&W in a supervisory capacity over Plaintiffs. CUNNINGHAM is an adult Caucasian male.

9.     Plaintiffs are informed and believe and on that basis allege that at all times material MOISES AVILA and GASPAR (last name unknown) were employed by IMR in a supervisory capacity over Plaintiffs. AVILA and GASPAR are adult Latino males.

10.     Plaintiffs are informed and believe and on that basis allege that at all times material MARSHALL HORNSTEIN, ERNESTO CUNNINGHAM, JESUS "CHEWY" SANDOVAL and QALTEMO "TEMO" ARELLANO were employed by BBS in a supervisory capacity over Plaintiffs. HORNSTEIN is an adult Caucasian male; CUNNINGHAM, SANDOVAL and ARELLANO are adult Latino males.

11.     The true names and capacities of the Defendants named herein as Does 1 through 50, inclusive, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs who therefore sue such Defendants by fictitious names pursuant to California Code of Civil Procedure §474. Plaintiffs are informed and believe that Doe Defendants are California residents. Plaintiffs will amend this complaint to show such true names and capacities when they have been determined.

12.     Plaintiffs are informed and believe, and thereby allege that each of the Defendants

herein, including the Doe Defendants, was at all times relevant hereto the agent, employee or

representative of the remaining Defendants and was acting, at least in part, within the course and scope

of such relationship.

## ALLEGATIONS

Plaintiffs are informed and believe, and thereby allege, the following facts:

13.    Bayview Hunter's Point is an area located in San Francisco, California, that is

predominantly African-American.  BHPRP was approved, in part, to remove blight from this area,

rehabilitate existing affordable residential housing units, and construct new residential housing units.

14.    Defendants have worked in conjunction and according to hierarchy during the

operations of the BHPRP.  That is, representatives from AIMCO, including but not limited to RICH

INGRAM and BOB MALLOY, as well as representatives from F&W, including but not limited to

MIKE CUNNINGHAM, have directed the other Defendants regarding hiring, firing, layoff, and other

decisions concerning construction workers during the operations of the BHPRP.

15.    Although BHPRP is performed in an area which is predominantly African-American in

population, the individuals hired by Defendants to do construction in connection with the BHPRP have

been disproportionately Latino.  At a meeting with representatives from AIMCO, F&W and BBS,

these Defendants were informed that members of the "Community," or African-Americans, were not

being hired.  These Defendants responded as follows: We will give our "core group" (all Latino

workers) a wall to work on and a "Community" group another wall to work on, and if the Community

Group can "keep up" with the Latinos we will hire another Community group.  Defendant BBS,

through MARSHALL HORNSTEIN, protested that if he had to hire another Community Group he

would "lose money."  This race/national origin group competition ensued, with the Community Group

---

Complaint for Damages & Injunctive Relief
HALL v. AIMCO INC., No. _____                                      Page 4

being placed in a position of disadvantage – that group's wall was not prepared and ready to be worked on. There were also mis-instructions for the job, repairs necessary to complete the job were delayed, and materials were withheld. MOISES AVILA of IMR openly cheered on the Latinos, telling them "Rapido!" Defendant AIMCO was later complained to about the unfairness of this situation, including the pitting of groups against each other, but the response was that MARSHALL HORNSTEIN was concerned that he would lose money if he had to hire another Community Group.

16.    Throughout the relevant time period, beginning approximately June, 2007, through the present, Defendants have routinely responded to African-American job applicants that there are no jobs available. At the same time, Defendants dispensed job applications to Latinos and hired them disproportionately to the Community members.

17.    The Latino workers are pushed to work harder, faster and sometimes in unsafe conditions. That is, Defendants press the Latino employees to complete their work as fast as possible, even if this means running while carrying equipment or materials, missing rest periods and not being able to complete their lunch periods. When African-American workers pointed out the need for safety precautions, the foreman would say, "Scared or something?"

18.    The Latino workers have also had portions of their wages withheld or taken from them. On some occasions, agents for Defendants have taken paychecks bearing the names of Latino employees on them and cashed them, without first obtaining these employees' signatures or permission, and then have delivered cash payments to the employees less $100 to $400. On other occasions, the Latino employees are allowed to cash their own checks but must provide the deduction the following Monday (paychecks are issued each Friday). The Latino employees have been told that they must submit to these deductions or they will not be allowed to work. They have also been told

---

Complaint for Damages & Injunctive Relief
HALL v. AIMCO INC., No. _____                                    Page 5

that they "do not deserve" all of the money they earned, "when have you never earned this type of money in your life." Supervisors, foreman, and other agents of Defendants have shared these unlawful deductions amongst themselves.

19.     The African-American workers who have been hired by Defendants have been repeatedly told that they are too slow, that they are not working fast enough, they are not good enough, and that other members of the Community are not qualified to do the work that is why they are not hired.

20.     During the Summer of 2007, Defendants withheld the checks of many Latino employees and required that they attend a meeting at a warehouse with representatives of IMR and BBS. Present were MOISES AVILA, ERNESTO CUNNINGHAM, JESUS "CHEWY" SANDOVAL and GASPAR, during which MOISES AVILA said that "we are at war" with the African Americans, because "African-Americans don't like Latinos and don't like them working here." AVILA also said that African-Americans are lazy and too slow, and that "you should tell them to fuck off." ERNESTO CUNNINGHAM agreed with AVILA, and said we are at "war." CUNNINGHAM also said that African-Americans are "too slow" and that he wanted to fire them. Employees that did not attend this meeting, including African-Americans, were informed of it including that the Latinos were told "niggers on the job don't like you guys, we need to stick together."

21.     Many of the employees, both African-American and Latino, complained either directly to Defendants or to the union, about the unlawful deductions. The complaints were oral and by way of written petition. In response, several of the complainants were terminated from their jobs.

## PLAINTIFFS

22.     GREGORY HALL. Plaintiff, GREGORY HALL, is an African-American male with

---

27 years of experience as a carpenter, and was employed by Defendants IMR and BBS from approximately July through November, 2007. Plaintiff HALL has been subjected to conduct as further described above.

23.    Plaintiff HALL initially applied for a job and was told that they were not "hiring people from the Community" (meaning African-Americans). Plaintiff HALL approached MARSHALL HORNSTEIN and asked why BBS was refusing to hire people from the Community. HORNSTEIN agreed to hire one crew of three African-Americans to "give them a chance" but after obstacles were placed in the Community group's way HALL was written-up several times.

24.    Plaintiff HALL complained to Defendants about the unlawful deductions from the Latino employees' paychecks. Plaintiff HALL passed around a petition for signature to protest the unlawful practice. Subsequently, Plaintiff HALL was told by ERNESTO CUNNINGHAM that HALL had no power or authority to protest how the job site was being run. Still later, during a safety meeting, CUNNINGHAM gave HALL a hard time for talking to another co-worker at which time CUNNINGHAM yelled, "GET THE FUCK OFF MY JOB!" CUNNINGHAM also yelled this a second time. Later, along with everyone else, Plaintiff HALL was laid off in November, 2007, and checked back a week or so later and was told that he was "probably at the bottom of the list" for rehiring, even though the job site did not re-start until a few weeks later.

25.    FAUSTO AGUILAR. Plaintiff, FAUSTO AGUILAR, is a Latino male who is a carpenter, and was employed by Defendants BBS and IMR from approximately June through August, 2007. Plaintiff AGUILAR has been subjected to conduct as further described above. He has also been deprived of one full day of premium pay for working overtime on a Sunday.

26.    Plaintiff AGUILAR attended a meeting at which QALTEMO ARELLANO was asked

why only Latino workers are used and not African Americans. ARELLANO responded, "Don't worry about them [African-Americans] we're going to fire them anyway." Plaintiff AGUILAR also noticed that work materials were not made available to the African-Americans. Once, JESUS SANDOVAL instructed Plaintiff to cover up the doorbell wiring at a living unit. When Plaintiff asked why, SANDOVAL replied: "Fucking black people, they don't deserve it."

27.    Plaintiff AGUILAR went to the union along with other Latinos to complain about the unlawful wage deductions and the racist comments at the worksite. Thereafter, Plaintiff was laid off while others were allowed to work. ERNESTO CUNNINGHAM went to Plaintiff's house and, in reference to the complaints wherein QALTEMO was named as one of those taking unlawful deductions from the Latino employees, CUNNINGHAM told Plaintiff's son, and then Plaintiff himself, that Plaintiff "is not a man."

28.    GONZALO AGUILAR. Plaintiff, GONZALO AGUILAR, is a Latino male who is a carpenter, and was employed by Defendants BBS and IMR from approximately June through August, 2007. Plaintiff AGUILAR has been subjected to conduct as further described above. He has also been deprived of one full day of premium pay for working overtime on a Sunday.

29.    Plaintiff also overheard GASPAR, JESUS SANDOVAL and QALTEMO ARELLANO talking about how MOISES AVILA was correct in what he said at the warehouse meeting. That is, that African-Americans are "stupid" and that they would be fired. Plaintiff AGUILAR felt the tension between the African-Americans and Latinos, and that the foremen mistreated the African-Americans. Plaintiff also felt that Latinos were encouraged to be hostile towards the African-Americans. The African-American employees were not invited to the warehouse parties put on for the Latino employees. When work was slow the African-Americans were the first let go, although they were very

experienced. Plaintiff asked ERNESTO CUNNINGHAM why they couldn't all work together, to which he said they "can't do it."

30.    Plaintiff AGUILAR went to the union along with other Latinos to complain about the unlawful wage deductions and the racist comments at the worksite. Thereafter, GASPAR said, "Why did you go to the union?" Later, when Plaintiff had a question about something, JESUS SANDOVAL said, "Why don't you go take care of it with the union?" Plaintiff was laid off while others were allowed to work.

28.    CHARLES CHILTON. Plaintiff, CHARLES CHILTON, is an African-American male who is a carpenter for 30 years, and has been employed by Defendants BBS and IMR from approximately June through the present (with layoffs at various times). Plaintiff CHILTON has been subjected to conduct as further described above.

29.    When Plaintiff first arrived he worked for one hour and then was told by MARSHALL HORNSTEIN and MOISES AVILA that he was not qualified and was terminated. Plaintiff felt he had been set up to fail and that Defendants did not want to hire African-Americans. Plaintiff CHILTON returned to the union hall and was redeployed to the BHPRA jobsite a few days later as part of 15 African-Americans ready to work. Only a few were kept. It was at this point that Plaintiff was hired as part of the "Community" group along with Plaintiffs HALL and GIVENS to compete with the Latino "core" group. These Plaintiffs were constantly told that they were working too slow, not doing a good job and not keeping up with the "core" crew (of Latinos).

30.    There was tension at the worksite and some Latinos demonstrated hostility towards the African-Americans. Plaintiff heard about the warehouse meeting, including that management said the blacks will not be here that long anyways, and understood why. Plaintiff was laid off at least three

times while the Latinos kept their jobs and were able to work.

28.  FELIX CORTES. Plaintiff, FELIX CORTES, is a Latino male who is a carpenter for 30 years, and was employed by Defendants IMR and BBS for approximately one month from June through July 13, 2007. He was only paid $15 per hour, instead of the prevailing rate of $33.25. Plaintiff CORTES has been subjected to conduct as further described above.

29.  A person named DAGOBERTO LIBORI, a team leader, was taking Plaintiff's paychecks and cashing them. If Plaintiff made $800, LIBORI would keep $400. LIBORI did this with the knowledge and approval of Defendants, in that on information and belief he shared the proceeds with ERNESTO CUNNINGHAM, JESUS SANDOVAL, QALTEMO ARELLANO and MARSHALL HORNSTEIN.

30.  Plaintiff complained about the conduct by way of the union. He also complained to LIBORI, who said if you don't like it you can leave. Plaintiff told the foreman on Friday, July 13, 2007, that he would not come to work any more. On Tuesday, July 17, Plaintiff went to the union again and then back to work Wednesday, July 18. The foreman GASPAR told me I "did wrong" by going to the union and complaining. On August 13, 2007, MOISES AVILA called me and offered a guaranteed job in Oakland for one full year if I would agree to stop complaining to the union. Plaintiff needed the work so he agreed. However, after two weeks on the new job Plaintiff was terminated.

31.  OMAR FRANCO. Plaintiff, OMAR FRANCO, is a Latino male who is a carpenter for 30 years, and was employed by Defendants IMR and BBS from approximately June through August, 2007. Plaintiff was only paid $24.25 during June and part of July, and then was paid $32.25. At all times Plaintiff was not paid the prevailing wage of $33.25. Plaintiff FRANCO has been subjected to conduct as further described above.

32.    Once Plaintiff was paid $32.25, $100 was taken from his paycheck weekly. If he worked on a Saturday, $200 was taken.

33.    Plaintiff always felt that the Latinos were pressured constantly to work faster and harder. The foremen would scream at the workers if they rested, and yell stuff like "move your fucken ass."

34.    DOUGLAS GIVENS. Plaintiff, DOUGLAS GIVENS, is an African-American male who is a carpenter, and was employed by Defendants BBS and IMR from approximately July through the present (after layoffs). Plaintiff GIVENS has been subjected to conduct as further described above.

35.    Plaintiff was hired as part of the "Community" group along with Plaintiffs HALL and CHILTON to compete with the Latino "core" group. These Plaintiffs were constantly told that they were working too slow, not doing a good job and not keeping up with the "core" crew (of Latinos). The Community group, including Plaintiff, was watched more closely and critically than the other workers. Plaintiff had heard about the warehouse meeting and all of the derogatory comments made about African-Americans including the use of the word "nigger."

36.    Plaintiff also saw GREGORY HALL rejected when he asked to be a foreman. Instead, Defendants hired QALTEMO ARELLANO. When African-Americans tried to get work they were told there was no work, then a few minutes later 10 applications would be handed out to Latino job applicants. Plaintiff said to MARSHALL HORNSTEIN, blacks have worked for you before. HORNSTEIN responded, "Not Black siders."

37.    ROBERT IVY. Plaintiff, ROBERT IVY, is an African-American male who is a carpenter, and was employed by Defendant BACF from approximately May through November, 2007. Plaintiff was injured on the job and is temporarily disabled. Plaintiff IVY has been subjected to

---

Complaint for Damages & Injunctive Relief
HALL v. AIMCO INC., No. _____                                     Page 11

conduct as further described above.

38.     The African-Americans are the first to get sent home, sometimes the "core" Latino crew gets "snuck" back onto as jobsite where everyone has been sent home for the day, or the Latinos are sent to another site to work. Negative comments such as that African-Americans are incapable and can't do the work by agents of BACF and F&W have gotten back to Plaintiff.

39.     Plaintiff approached MARSHALL HORNSTEIN about a job in April, but would always say not hiring. Then they'd hire others, Latinos, later. Finally, there was a peaceful demonstration at the Oakdale sight and some Community folks were hired thereafter.

40.     Plaintiff was sent home 10-20 times while the "core" of Latinos kept working.

41.     QUINCY MOUTON. Plaintiff, QUINCY MOUTON, is an African-American male who is a carpenter, and was employed by Defendants BBS and IMR from approximately late June through mid July, 2007. Plaintiff MOUTON has been subjected to conduct as further described above.

42.     Plaintiff kept going back to Defendant BBS asking for work at which time he was told there was no work, we will hire you during phase 3. Yet, Defendant BBS kept hiring new Latino employees. Plaintiff was evicted with his partner and 2-year-old because he had no income.

43.     Plaintiff was regularly nit-picked and told to hurry because he was too slow by MOISES AVILA, who always comes around directing and criticizing.

44.     Plaintiff was finally hired back on October 5, 2007, and works under an African-American foreman. MOISES AVILA and ERNESTO CUNNINGHAM interviewed Plaintiff and asked if he was qualified, did he have 5 years of siding experience (yet some of the Latinos are very young and probably do not have this experience). The group of 10-15 African-Americans, who work with one Latino, are not given enough equipment (two drills and a few cords). The Latinos are given

all of the equipment. There is a very obvious segregation of the African-American and Latino

workers.

45.    Plaintiff also learned of the warehouse meeting and the awful attempt to pit Latinos and

African-Americans against each other.

46.    Plaintiff also signed the petition protesting the unlawful deductions from the Latinos'

paychecks.

47.    LUIS OSUNA. Plaintiff, LUIS OSUNA, is a Latino male who is a carpenter, and was

employed by Defendants BBS and IMR from approximately late June through August, 2007. Plaintiff

OSUNA has been subjected to conduct as further described above.

48.    In addition, Plaintiff had $200 deducted from his paycheck each Monday by

QALTEMO ARELLANO. Plaintiff is informed and believes that these proceeds were shared by

ARELLANO, JESUS SANDOVAL, MOISES AVILA and ERNESTO CUNNINGHAM.

49.    Plaintiff also learned of the warehouse meeting and the awful attempt to pit Latinos and

African-Americans against each other.

50.    RICHARD RANKIN. Plaintiff, RICHARD RANKIN, is an African-American male

who is a carpenter, and was employed by Defendants BBS and IMR from approximately late May 29,

2007 through the present. Plaintiff RANKIN has been subjected to conduct as further described above.

51.    Since he was first hired, Plaintiff has not worked a full 40 hour week. Plaintiff noticed

however, that Latino and Caucasian employees were able to work 40 hours per week.

52.    MOISES AVILA and ERNESTO CUNNINGHAM told African-American employees

that they are not doing a good job.

53.    While Plaintiff worked, CUNNINGHAM bombarded him with questions about his

progression and manner of work. He told Plaintiff and other African-American employees that they were too slow, they needed to hurry up, and called them "ladies."

54. Foremen make it difficult for African-American employees to access materials and tools, fail to provide adequate tools, and are deliberately slow in bringing tools to where African-American employees work.

55. Plaintiff observed that Latino workers do not take all their breaks. Many seem afraid to take breaks. He has observed Latino employees work through lunch.

56. African-American employees are the first to get sent home when there is not enough work. On one occasion, CUNNINGHAM told an African-American employee named ROY EDWARDS that he was being sent home because work was slow. When MR. EDWARDS stated that African-Americans were always the first to be sent home, CUNNINGHAM called him a "motherfucker."

57. AVILA arrived and stated that no one would work and that the whole job at that location would be shut down. However, Plaintiff saw that Latino employees were sent to another site to work.

58. Plaintiff has been sent home six to eight times because "work was slow." However, Latino workers were permitted to continue working.

59. Plaintiff also learned of the warehouse meeting and the awful attempt to pit Latinos and African-Americans against each other.

60. HECTOR RODRIGUEZ. Plaintiff, HECTOR RODRIGUEZ, is a Latino male who is a carpenter, and has been employed by Defendants BBS and IMR since May 207. Plaintiff was supposed to earn $33.25 per hour. However, JESUS SANDOVAL and ERNESTO CUNNINGHAM

informed him that he would only $24.25 per hour. Plaintiff earned $24.25 per hour for approximately

15 days. In or around June 5, 2007, he began receiving $33.25 per hour.

61.     Plaintiff RODRIGUEZ has been subjected to conduct as further described above.

62.     In addition, Plaintiff had $100 deducted from his paycheck each Monday by

QALTEMO ARELLANO. Plaintiff is informed and believes that these proceeds were shared by

ARELLANO and JESUS SANDOVAL.

63.     SANDOVAL told Plaintiff that he and his co-workers did not deserve that much

money.

.64.     Plaintiff was rushed during lunch breaks and told that he did not need that long to eat.

65.     Plaintiff was not permitted to take his full ten-minute rest breaks. He would be yelled

at for trying to take his full ten-minute breaks.

66.     Plaintiff complained to the Union about the unlawful deductions.

67.     SANDOVAL'S brother, ELIAS SANDOVAL threatened Plaintiff that if Plaintiff kept

talking to the union, things "might happen to him outside of work." Plaintiff understood that ELIAS

SANDOVAL was threatening his personal safety.

68.     CARLOS DELGADO, the brother-in-law of CUNNINGHAM grabbed Plaintiff by the

collar and held him by the neck. DELGADO stated to Plaintiff that what he did (talk to union) was not

a thing that a "man" does, only a "fag." He then threatened Plaintiff that if anything happened to

CUNNINGHAM, he would beat him up.

69.     MARTIN SANDOVAL, Plaintiff, MARTIN SANDOVAL, is a Latino male who is a

carpenter, and has been employed by Defendants BBS and IMR from June through August 2007. For

a period of time during his tenure, he was paid approximately $32.00 per hour.

70.    Plaintiff SANDOVAL has been subjected to conduct as further described above.  He has also been deprived of one full day of premium pay for working on a Saturday.

71.    JESUS SANDOVAL told Plaintiff not to leave a space for doorbell wiring of a unit. SANDOVAL told Plaintiff to cover it up and not to do a good job because black people were going to live there, not them.

72.    Plaintiff, along with other Latino employees, discussed the problems Latino workers were experiencing, with African-American employees.

73.    Plaintiff went to went to the Union along with other Latino employees to complain about unlawful deductions and racist comments made at the worksite.  Plaintiff also signed Greg Hall's petition.  Plaintiff was laid off while others were able to work.

74.    HENRY TAYLOR .  Plaintiff, HENRY TAYLOR, is an African-American male who is an apprentice carpenter, and was employed by Defendants BBS and IMR from approximately June through early to mid-November 2007.  Plaintiff TAYLOR has been subjected to conduct as further described above.

75.    Plaintiff continually sought work with MARSHALL HORNSTEIN beginning in April 2007, but HORNSTEIN delayed hiring Plaintiff.

76.    Plaintiff heard MOISES AVILA tell an African-American employee to "get the fuck off the job."

77.    Plaintiff learned that Ernesto referred to African-Americans as "niggers."

78.    Plaintiff felt that African-Americans were treated with animosity and that foreman made it more difficult for African-Americans to do their jobs.

79.    Plaintiff signed Greg Hall's petition.

80.    Plaintiff has been laid-off approximately 6 times.

81.    LLOYD THIBEAUX.  Plaintiff LLOYD THIBEAUX is an African-American male who is a carpenter and was employed by Bay Area Construction Framers from May 2007 through the end of October 2007.  He worked under the supervision of STEVE SOSA.  Plaintiff THIBEAUX has been subjected to conduct as further described above.

82.    During his tenure, Plaintiff was deprived of the opportunity to work 40 hours per week, while Caucasian and Latino workers were permitted to do so.  Plaintiff noticed that African-Americans were the first to be sent home when work shut down.  Caucasian and Latino were sent to other work sites, but not African-Americans.

83.    Plaintiff learned from a co-worker that SOSA made a hangman's noose.

84.    Plaintiff also learned about the warehouse meeting and the awful attempt to pit African-American workers and Latino workers against each other.

### FIRST CAUSE OF ACTION
### FAILURE TO PAY WAGES DUE INCLUDING PUBLIC WORKS PREVAILING WAGE
### (LABOR CODE §§ 204, 1771, 1774)

85.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

86.    Cal. Labor Code § 204 provides that all wages, earned by any person in any employment are due and payable at least twice during each calendar month, on days designated in advance by the employer as the regular paydays.

87.    Cal. Labor Code § 1771 provides that except for public works projects of one thousand dollars ($1,000) or less, not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed, and not less than the general prevailing rate of per diem wages for holiday and overtime work fixed as provided in this chapter,

1  shall be paid to all workers employed on public works.

2      88.     Cal. Labor Code § 1774 provides that a contractor to whom the contract is awarded, and

3  any subcontractor under him, shall pay not less than the specified prevailing rates of wages to all

4  workmen employed in the execution of the contract.

5      89.     Plaintiffs were deprived of earned regular and overtime wages as set forth hereinabove.

6      90.     In depriving Plaintiffs of their earned regular and overtime wages, Defendants failed to

7  pay Plaintiffs all wages due, including the prevailing wage in violation of Labor Code §§ 204, 1771

8  and 1774.

9      91.     As a result of Defendants' unlawful acts, Plaintiffs have been deprived of wages in

10  amounts to be determined at trial, and are entitled to recovery of such amounts, plus interest thereon,

11

12  attorneys' fees, and costs, under Labor Code §§ 218.5 and 1194.

13

14  WHEREFORE, Plaintiff requests relief as hereinafter provided.

15                        SECOND CAUSE OF ACTION
                          UNLAWFUL DEDUCTIONS
16                        (LABOR CODE §§ 221 and 223)

17      92.     The allegations of each of the preceding paragraphs are realleged and incorporated

18  herein by reference.

19      93.     Labor Code § 221 provides: "It shall be unlawful for any employer to collect or receive

20  from an employee any part of wages theretofore paid by said employer to said employee."

21  Labor Code § 223 provides: "Where any statute or contract requires an employer to maintain the

22  designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the

23  wage designated by statute or by contract."

24      94.     These and related statutes, along with California's fundamental public policy protecting

25  wages and wage scales, prohibit employers from subjecting employees to unanticipated or unpredicted

26  reductions in their wages; making employees the insurers of their employer's business losses;

27

28

1   otherwise passing the ordinary business losses of the employer onto the employee; taking deductions

2   from wages for business losses unless the employer can establish that the loss was caused by a

3   dishonest or willful act, or gross negligence of the employee; or taking other unpredictable deductions

4   that may impose a special hardship on employees.

5       95.    Defendants have violated Labor Code §§ 221 and 223 by unlawfully taking deductions

6   from Plaintiffs' compensation as set forth hereinabove.

7   Because Defendants made unlawful deductions from Plaintiffs' compensation, they are liable to

8   Plaintiffs for compensation that should have been paid but for the unlawful deductions, pursuant to

9   Labor Code §§ 221 and 223.

10

11      96.    By unlawfully deducting wages and failing to pay Plaintiffs, Defendants are also liable

12  for reasonable attorneys' fees and costs under Labor Code § 218.5.

13  WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

14
                          THIRD CAUSE OF ACTION
15            FAILURE TO PAY OVERTIME COMPENSATION
                     (LABOR CODE §§ 510,and 1194)
16

17      97.    The allegations of each of the preceding paragraphs are realleged and incorporated

18  herein by reference.

19      98.    By failing to pay overtime compensation to Plaintiffs as set forth hereinabove,

20  Defendants have violated and continue to violate Labor Code § 510 which requires overtime

21  compensation to non-exempt employees.

22      99.    As a result of Defendants' unlawful acts, Plaintiffs have been deprived of overtime

23  compensation in an amount to be determined at trial, and are entitled to recovery of such amounts, plus

24  interest thereon.

25      100.   By violating Labor Code § 510, Defendants are liable for attorneys' fees and costs

26  under Labor Code §1194.

27

28

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.

## FOURTH CAUSE OF ACTION
### UNLAWFUL FAILURE TO FURNISH ACCURATE WAGE STATEMENTS
### (LABOR CODE § 226(a) and (e))

101.   The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

102.   Labor Code § 226(a) requires employers semi-monthly or at the time of each payment of wages to furnish each employee with a statement itemizing, _inter alia_, the total hours worked by the employee, all deductions, and net wages earned.  Labor Code § 226(e) provides that if an employer knowingly and intentionally fails to provide a statement itemizing, _inter alia_, the total hours worked by the employee, all deductions, and net wages earned, then the employee is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial violation and one hundred dollars ($100) for each subsequent violation, up to four thousand dollars ($4000).

103.   Defendants knowingly and intentionally failed to furnish Plaintiffs with timely, itemized statements showing the total hours they worked, all deductions taken, and net wages earned, as required by Labor Code § 226(a).  As a result, Defendants are liable to Plaintiffs for the amounts provided by Labor Code § 226(e).

104.   As a result of Defendants' violation of Labor Code section 226(a), Plaintiffs are entitled to reasonable attorney's fees and costs as provided by Labor Code § 226(e).

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## FIFTH CAUSE OF ACTION
### FAILURE TO PROVIDE ADEQUATE MEAL PERIODS
### (LABOR CODE §§ 226.7, 512)

105.   The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

106.   Plaintiffs regularly worked in excess of five (5) hours a day without being afforded at

least half-hour meal periods in which they were relieved of all duties, as required by Labor Code §§ 226.7 and 512.

107. Defendants did not pay Plaintiffs an additional hour of pay for each day Plaintiffs did not receive an off-duty meal period.

108. Because Defendants failed to afford proper meal periods, Defendants are liable to Plaintiffs for one hour of additional pay at the regular rate of compensation for each workday that the proper meal periods were not provided, pursuant to Labor Code § 226.7(b).

109. By violating Labor Code §§ 226.7 and 512, Defendants are also liable for attorneys' fees and costs under Labor Code §§ 218.5.

110. As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

### SIXTH CAUSE OF ACTION
### FAILURE TO PROVIDE ADEQUATE REST PERIODS
### (LABOR CODE §§ 226.7, 512)

111. The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

112. Plaintiffs regularly worked in excess of four (4) hours a day without being afforded ten-minute rest breaks in which they were relieved of all duties, as required by Labor Code §§ 226.7 and 512.

113. Defendants did not pay Plaintiffs an additional hour of pay for each day Plaintiffs did not receive an off-duty rest break.

114. Because Defendants failed to afford proper rest periods, Defendants are liable to Plaintiffs for one hour of additional pay at the regular rate of compensation for each workday that the proper rest periods were not provided, pursuant to Labor Code § 226.7(b).

115.   By violating Labor Code §§ 226.7 and 512, Defendants are also liable for attorneys' fees and costs under Labor Code §§ 218.5.

116.   As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

### SEVENTH CAUSE OF ACTION
### WAITING TIME PENALTIES
### (LABOR CODE §§ 201 & 203)

117.   The allegations of each of the preceding paragraphs are realleged and incorporated herein by this reference.

118.   Labor Code § 201 requires an employer who discharges an employee to pay all compensation due and owing to that employee immediately upon discharge.

119.   Labor Code § 203 provides that if an employer willfully fails to pay compensation promptly upon discharge, as required by § 201, then the employer is liable for waiting time penalties in the form of continued compensation of up to 30 work days.

120.   Defendants willfully failed and refused to timely pay compensation and wages, including unpaid meal and rest period compensation, sums wrongfully deducted from compensation, and regular and overtime wages to Plaintiffs whose employment Defendants terminated.

121.   As a result of Defendants' unlawful acts, Plaintiffs have been deprived of wages in amounts to be determined at trial, and are entitled to recovery of such amounts, plus interest thereon, waiting time penalties, and attorneys' fees, and costs, under Labor Code §§ 203, 218.5.

WHEREFORE, Plaintiffs prays for judgment against Defendants as set forth below.

### EIGHTH CAUSE OF ACTION
### HARASSMENT IN VIOLATION OF CALIFORNIA PUBLIC POLICY
### RACE- HOSTILE WORK ENVIRONMENT
### (CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(j))

122.   The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

123.   Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin.

124.   Cal. Govt. Code § 12940(j) provides that it shall be unlawful for an employer to harass an employee. Section 12940(j) further provides that harassment of an employee, by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the harassing acts of nonemployees or persons providing services pursuant to a contract in the workplace, where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

125.   Defendants harassed and discriminated against Plaintiffs on the basis of race in violation of Cal. Const. Art. I § 8 and Cal. Govt. code §12940 as set forth hereinabove, including subjecting Plaintiffs to a hostile work environment. The wrongful conduct was offensive and unwelcome. The wrongful conduct was sufficiently severe or pervasive to adversely and materially affect Plaintiffs' ability to perform their job duties. Plaintiffs either experienced the wrongful conduct firsthand or were later informed of it.

126.   Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

127.   As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs pray for judgment and request relief against Defendants as set forth below.

## NINTH CAUSE OF ACTION
## HARASSMENT IN VIOLATION OF CALIFORNIA PUBLIC POLICY
## NATIONAL ORIGIN- HOSTILE WORK ENVIRONMENT
## (CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(j))

128.   The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

129.   Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color or national or ethnic origin.

130.   Cal. Govt. Code § 12940(j) provides that it shall be unlawful for an employer to harass an employee. Section 12940(j) further provides that harassment of an employee, by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the harassing acts of nonemployees or persons providing services pursuant to a contract in the workplace, where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

131.   Defendants harassed and discriminated against Plaintiffs on the basis of national origin in violation of Cal. Const. Art. I § 8 and Cal. Govt. code §12940 as set forth hereinabove, including subjecting Plaintiffs to a hostile work environment. The wrongful conduct was offensive and unwelcome. The wrongful conduct was sufficiently severe or pervasive to adversely and materially affect Plaintiffs' ability to perform their job duties. Plaintiffs either experienced the wrongful conduct firsthand or were later informed of it.

132.   Defendants committed the acts alleged herein oppressively and maliciously, with the

Complaint for Damages & Injunctive Relief
HALL v. AIMCO INC., No. _____

Page 24

wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

133.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs pray for judgment and request relief against Defendants as set forth below.

## TENTH CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF CALIFORNIA PUBLIC POLICY
#### RACE
(CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(a))

134.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

135.    Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color or national or ethnic origin.

136.    Cal. Govt. Code section 12940(a) provides that it is unlawful for any employer to discharge or otherwise discriminate against any person in compensation or terms, conditions, or privileges of employment because of race.

137.    Defendants discriminated against Plaintiffs on the basis of race in violation of Cal. Const. Art. I § 8 and Cal. Govt. code §12940 as set forth hereinabove, including, but not limited to forcing Plaintiffs to work harder, work faster, work unsafely, compete with other employees, and failing to hire Plaintiffs . Defendants' conduct impaired Plaintiffs' job performance and prospects for advancement. The wrongful conduct altered the terms, conditions or privileges of Plaintiffs' employment.

138.   Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

139.   As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## ELEVENTH CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF CALIFORNIA PUBLIC POLICY
### NATIONAL ORIGIN
### (CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(a))

140.   The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

141.   Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color or national or ethnic origin.

142.   Cal. Govt. Code section 12940(a) provides that it is unlawful for any employer to discharge or otherwise discriminate against any person in compensation or terms, conditions, or privileges of employment because of national origin.

143.   Defendants discriminated against Plaintiffs on the basis of national origin in violation of Cal. Const. I § 8 and Cal. Govt. code §12940 as set forth hereinabove, including, but not limited to forcing Plaintiffs to work harder, work faster, work unsafely, compete with other employees, and failing to hire. Defendants' conduct impaired Plaintiffs' job performance and prospects for

Complaint for Damages & Injunctive Relief
HALL v. AIMCO INC., No. _____

Page 26

1  advancement. The wrongful conduct altered the terms, conditions or privileges of Plaintiffs'

2  employment.

3      144.    Defendants committed the acts alleged herein oppressively and maliciously, with the

4  wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and

5  in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages

6  from Defendants.

7

8      145.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an

9  amount according to proof.

10  WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

11

12              **TWELFTH CAUSE OF ACTION**
          **RETALIATION IN VIOLATION OF CALIFORNIA PUBLIC POLICY**
13  **PROTESTING UNLAWFUL FAILURE TO PAY WAGES AND UNLAWFUL DEDUCTIONS**
                    (Labor Code §1102.5(c))
14

15      146.    The allegations of each of the preceding paragraphs are realleged and incorporated

16  herein by reference.

17      147.    Cal. Labor Code §§ 204, 1771, and 1774 require Defendants to pay their employees all

18  earned wages.
19

20      148.    Cal. Labor Code §§ 221 and 223 prohibit Defendants from making unlawful deductions

21  from Plaintiffs' wages.

22      149.    Cal. Labor Code §1102.5(c) provides that, "An employer may not retaliate against an

23  employee for refusing to participate in an activity that would result in a violation of state or federal

24  statute, or a violation or noncompliance with a state or federal rule or regulation."
25

26      150.    Defendants retaliated against Plaintiffs for complaining about and refusing to

27  participate in activities that violated state and federal statutes. In particular, Defendants engaged in

28

conduct that materially affected the terms, conditions and privileges of Plaintiffs' employment, including termination of Plaintiffs for protesting the underpayment of wages and unlawful deduction of wages in violation of state or federal laws.

151.    As a result, Defendants retaliated against Plaintiffs in violation of California public policy.

152.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

153.    As result of Defendants' unlawful acts as alleged herein, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## THIRTEENTH CAUSE OF ACTION
## RETALIATION IN VIOLATION OF PUBLIC POLICY
## PROTESTING RACE AND NATIONAL ORIGIN DISCRIMINATION
## (CAL. CONST. ART. I § 8; CAL. GOVT. CODE § §12940(a),(j)and(h))

154.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

155.    Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin.

156.    Cal. Govt. Code §12940(a) provides that it is unlawful for any employer to discharge or otherwise discriminate against any person in compensation or terms, conditions, or privileges of employment because of race or national origin.

157.    Cal. Govt. Code §12940 (j) provides that it shall be unlawful for an employer to harass an employee. Section 12940(j) further provides that harassment of an employee, "by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the harassing acts of nonemployees or persons providing services pursuant to a contract in the workplace, where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action."

158.    Cal. Govt. Code §12940 (h) provides that it is unlawful for any employer or person to discriminate against any person because the person has opposed any practices forbidden under the Fair Employment and Housing Act, Government Code section 12940, et seq., or because the person has filed a complaint, testified, or assisted in any proceeding under the Fair Employment and Housing Act. Defendants retaliated against Plaintiffs for complaining about and refusing to participate in activities that violated state and federal statutes. In particular, Defendants engaged in conduct that materially affected the terms, conditions and privileges of Plaintiffs' employment, including termination of Plaintiffs for protesting Defendants' unlawful discriminatory practices, including a hostile work environment.

159.    As a result, Defendants retaliated against Plaintiffs in violation of California public policy.

160.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and

in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

161.    As result of Defendants' unlawful acts as alleged herein, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

## FOURTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

162.    The allegations of each of the paragraphs set forth above are realleged and incorporated herein by reference.

163.    Defendants' conduct as set forth hereinabove was so extreme and so outrageous that it exceeded the boundaries of a decent society and lies outside of the compensation bargain. Said conduct was intended to cause severe emotional distress, or was done in conscious disregard of the probability of causing such distress. As a proximate result of Defendants' unlawful acts against Plaintiffs, Plaintiffs have suffered past, present and future losses in income and earnings, medical costs, incidental expenses, and has suffered and continues to suffer embarrassment, humiliation and mental anguish all to damage in an amount according to proof.

164.    Defendants committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiffs, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## DAMAGES

165.    As a proximate result of Defendants' conduct, Plaintiffs have suffered economic loss.

Complaint for Damages & Injunctive Relief
HALL v. AIMCO INC., No. _____

Page 30

(          (

1    As a further proximate result of Defendants' conduct, Plaintiffs have suffered emotional and mental

2    distress, fear, anxiety, humiliation and embarrassment.

3        166.    Plaintiffs were required to retain private counsel to vindicate their rights under law.

4    Plaintiffs are therefore entitled to an award of all attorneys fees incurred in relation to this action for

5    violation of their rights.

6        167.    As a result of the conduct of Defendants, as set forth above, Plaintiffs have been

7    damaged in an amount exceeding twenty-five thousand dollars.

8

9    ### PRAYER FOR RELIEF

10       WHEREFORE, Plaintiffs request relief from Defendants as follows:

11       1.    For compensatory damages for lost wages, earnings, and benefits, according to proof;

12       2.    For general damages for humiliation, mental anguish and emotional distress, according

13   to proof;

14       3.    For consequential damages, according to proof;

15       4.    For punitive damages, according to proof;

16       5.    For reasonable attorneys' fees, according to proof;

17       6.    For reasonable costs, according to proof;

18

19       7.    Injunctive relief to address the wrongs alleged herein; and

20       8.    For such other and further relief as the Court may deem just and proper.

21

22   Dated: December 14, 2007            SUNDEEN SALINAS & PYLE

23

24

25   _____

26   ROBERT SALINAS
     Attorney at Law

27

28

# EXHIBIT B

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<div style="float:right">
FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*
</div>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
AIMCO, INC., FORTNEY & WEYGANT, INC., IMR CONTRACTOR
CORPORATION, BAY BUILDING SERVICES, BAY AREA
CONSTRUCTION FRAMERS, INC., and DOES 1-50

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
GREGORY HALL, FAUSTO AGUILAR, GONZALO AGUILAR,
CHARLES CHILTON,

Additional Parties Attachment form is attached.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>400 McAllister Street<br>San Francisco, California, CA 94102 | CASE NUMBER:<br>*(Número del Caso):*<br>CGC-07-470047 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Robert A. Salinas (Bar # 184260)
SUNDEEN SALINAS & PYLE
1330 Broadway, Suite 1830, Oakland, CA 94612

Phone No. (510) 663-9240
Fax No.  (510) 663-9241

DATE:
*(Fecha)*   MAR 1 2 2008   GORDON PARK-LI   Clerk, by _____ , Deputy
   M. RAYRAY   *(Secretario)*   *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

3. ☐ on behalf of *(specify)*:  *I M R Contractor Corporation*

   under: ☒ CCP 416.10 (corporation)         ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify)*:
4. ☐ by personal delivery on *(date)*:

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Page 1 of 1

Code of Civil Procedure §§ 412.20, 465

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| HALL v. AIMCO, INC. | CGC-07-470047 |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties (Check only one box. Use a separate page for each type of party.):

[X] Plaintiff    [ ] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

FELIX CORTES, OMAR FRANCO, DOUGLAS GIVENS, ROBERT IVY, QUINCY MOUTON, LUIS OSUNA, RICHARD RANKIN, HECTOR RODRIGUEZ, MARTIN SANDOVAL, HENRY TAYLOR, LLOYD THIBEAUX, MICHAEL BROWN, ASTRIAN CAEL, ARNULFO CARRANZA-RIVAS, APOLINAR CORNEJO, ROY EDWARDS, VICTOR HAMPTON, RANDY KEYS, ANDRE LARRIMORE, TERRY MACKEY, DOUGLAS TURNER, JEFF WEST, and ROBERT WHITE

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

Page 1 of 1

LexisNexis® Automated California Judicial Council Forms

ENDORSED
FILED
San Francisco County Superior Court

MAR 1 2 2008

GORDON PARK-LI, Clerk
BY ___ MICHAEL RAYRAY
                          Deputy Clerk

1   **ROBERT SALINAS** SBN 184260
    **PAMELA KONG** SBN 220912
    **JORGE AGUILAR II** SBN 238111
2   SUNDEEN SALINAS & PYLE
    1330 Broadway, Suite 1830
3   Oakland, CA 94612
    Tel: (510) 663-9240
4   Fax: (510) 663-9241

5   Attorneys for PLAINTIFFS

6

7          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8             IN AND FOR THE COUNTY OF SAN FRANCISCO

9

10  GREGORY HALL, FAUSTO AGUILAR,      )
    GONZALO AGUILAR, CHARLES           )   No. CGC-07-470047
11  CHILTON, FELIX CORTES,             )
    OMAR FRANCO, DOUGLAS GIVENS,       )
12  ROBERT IVY, QUINCY MOUTON,         )   FIRST AMENDED COMPLAINT FOR
    LUIS OSUNA, RICHARD RANKIN,        )   DAMAGES AND INJUNCTIVE RELIEF
13  HECTOR RODRIGUEZ,                  )
14  MARTIN SANDOVAL, HENRY TAYLOR,     )
    LLOYD THIBEAUX, MICHAEL BROWN,     )   **JURY TRIAL DEMANDED**
15  ASTRIAN CAEL, ARNULFO CARRANZA-    )
16  RIVAS, APOLINAR CORNEJO, ROY       )
    EDWARDS, VICTOR HAMPTON, RANDY     )
17  KEYS, ANDRE LARRIMORE, TERRY       )
    MACKEY, DOUGLAS TURNER, JEFF       )
18  WEST, ROBERT WHITE,                )
19                                     )
           Plaintiffs,                 )
20                                     )
        vs.                            )
21                                     )
22  AIMCO, INC., FORTNEY & WEYGANDT,   )
    INC., IMR CONTRACTOR               )
23  CORPORATION, BAY BUILDING          )
    SERVICES, BAY AREA CONSTRUCTION    )
24  FRAMERS, INC. and DOES 1-50,       )
25                                     )
           Defendants.                 )
26

27

28

---

First Amended Complaint for Damages & Injunctive Relief
HALL v. AIMCO INC., No. CGC-07-470047                          Page 1

COME NOW Plaintiffs, who allege as follows:

## PARTIES

1.    At all times material herein, Plaintiffs were adults and residents of the State of California.  Plaintiffs were all previously employed by Defendants, at construction and/or rehabilitation sites in connection with the BAYVIEW HUNTER'S POINT REDEVELOPMENT PLAN (BHPRP).  The BHPRP was approved approximately May 23, 2006 and has been funded using California State Bonds.  At all relevant times, Plaintiffs worked at sites under the direct or indirect supervision of Defendants.

2.    Plaintiffs are informed and believe and on that basis allege that Defendant AIMCO, INC., is a Colorado corporation registered with the California Secretary of State to do business in California, and is based in Denver, Colorado.  Defendant AIMCO is a developer concerning BHPRP.

3.    Plaintiffs are informed and believe and on that basis allege that Defendant FORTNEY & WEYGANDT, INC., ("F&W") is an Ohio corporation registered with the California Secretary of State to do business in California, and is based in North Olmsted, Ohio.  Defendant F&W is the general contractor concerning BHPRP.

4.    Plaintiffs are informed and believe and on that basis allege that Defendant IMR CONTRACTOR CORPORATION ("IMR") is a California corporation registered with the California Secretary of State to do business in California, and is based in Daly City, California.  Defendant IMR is a contractor concerning BHPRP.

5.    Plaintiffs are informed and believe and on that basis allege that Defendant BAY BUILDING SERVICES, INC. ("BBS"), is a Nevada corporation registered with the California Secretary of State to do business in California, and is based in San Rafael, California.  Defendant BBS

is a contractor concerning BHPRP.

6.    Plaintiffs are informed and believe and on that basis allege that Defendant BAY AREA CONSTRUCTION FRAMERS, INC. ("BACF"), is a California corporation registered with the California Secretary of State to do business in California, and is based in Livermore, California. Defendant BACF is a contractor concerning BHPRP.

7.    Plaintiffs are informed and believe and on that basis allege that at all times material RICHARD INGRAM and JOHN [last name unknown] were employed by AIMCO in a supervisory capacity over Plaintiffs. INGRAM is an adult Caucasian male; JOHN [LNU] is an adult African-American male.

8.    Plaintiffs are informed and believe and on that basis allege that at all times material MIKE CUNNINGHAM was employed by F&W in a supervisory capacity over Plaintiffs. CUNNINGHAM is an adult Caucasian male.

9.    Plaintiffs are informed and believe and on that basis allege that at all times material MOISES AVILA and GASPAR (last name unknown) were employed by IMR in a supervisory capacity over Plaintiffs. AVILA and GASPAR [LNU] are adult Latino males.

10.    Plaintiffs are informed and believe and on that basis allege that at all times material MARSHALL HORNSTEIN, ERNESTO CUNNINGHAM, JESUS "CHEWY" SANDOVAL and QALTEMO "TEMO" ARELLANO were employed by BBS in a supervisory capacity over Plaintiffs. HORNSTEIN is an adult Caucasian male; CUNNINGHAM, SANDOVAL and ARELLANO are adult Latino males.

11.    Plaintiffs are informed and believe and on that basis allege that at all times material JOHN BENTNER and STEVE SOSA were employed by BACF in a supervisory capacity over

Plaintiffs. BENTNER is an adult Caucasian male; SOSA is an adult Latino male.

12.    The true names and capacities of the Defendants named herein as Does 1 through 50, inclusive, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs who therefore sue such Defendants by fictitious names pursuant to California Code of Civil Procedure §474. Plaintiffs are informed and believe that Doe Defendants are California residents. Plaintiffs will amend this complaint to show such true names and capacities when they have been determined.

13.    Plaintiffs are informed and believe, and thereby allege that each of the Defendants herein, including the Doe Defendants, was at all times relevant hereto the agent, employee or representative of the remaining Defendants and was acting, at least in part, within the course and scope of such relationship.

## ALLEGATIONS

14.    Plaintiffs are informed and believe, and thereby allege, the following facts:

15.    Bayview Hunter's Point is an area located in San Francisco, California, that is predominantly African-American. BHPRP was approved, in part, to remove blight from this area, rehabilitate existing affordable residential housing units, and construct new residential housing units.

16.    Defendants have worked in conjunction and according to hierarchy during the operations of the BHPRP. That is, representatives from AIMCO, including but not limited to RICHARD INGRAM and DON MALOY, as well as representatives from F&W, including but not limited to MIKE CUNNINGHAM, have directed the other Defendants regarding hiring, firing, layoff, and other decisions concerning construction workers during the operations of the BHPRP. Managers and/or supervisors from each Defendant have directed 1) managers and/or supervisors from the other Defendants; and 2) employees from the other Defendants. This has led to the formation of a super-

management team controlling the employees named as plaintiffs in this Complaint.

17.    Although BHPRP is performed in an area which is predominantly African-American in population, the individuals hired by Defendants to do construction in connection with the BHPRP have been disproportionately Latino. At a meeting with representatives from AIMCO, F&W and BBS, these Defendants were informed that members of the "Community," or African-Americans, were not being hired. These Defendants responded as follows: We will give our "core group" (all Latino workers) a wall to work on and a "Community" group another wall to work on, and if the Community Group can "keep up" with the Latinos we will hire another Community group. Defendant BBS, through MARSHALL HORNSTEIN, protested that if he had to hire another Community Group he would "lose money." This race/national origin group competition ensued, with the Community Group being placed in a position of disadvantage – that group's wall was not prepared and ready to be worked on. There were also mis-instructions for the job, repairs necessary to complete the job were delayed, and materials were withheld. MOISES AVILA of IMR openly cheered on the Latinos, telling them "Rapido!" Defendant AIMCO was later complained to about the unfairness of this situation, including the pitting of groups against each other, but the response was that MARSHALL HORNSTEIN was concerned that he would lose money if he had to hire another Community Group.

18.    Throughout the relevant time period, beginning approximately June, 2007, through the present, Defendants have routinely responded to African-American job applicants that there are no jobs available. At the same time, Defendants dispensed job applications to Latinos and hired them disproportionately to the Community members.

19.    The Latino workers are pushed to work harder, faster and sometimes in unsafe conditions. That is, Defendants press the Latino employees to complete their work as fast as possible,

even if this means running while carrying equipment or materials, missing rest periods and not being able to complete their lunch periods. When African-American workers pointed out the need for safety precautions, the foreman would say, "Scared or something?"

20.    The Latino workers have also had portions of their wages withheld or taken from them. On some occasions, agents for Defendants have taken paychecks bearing the names of Latino employees on them and cashed them, without first obtaining these employees' signatures or permission, and then have delivered cash payments to the employees less $100 to $400. On other occasions, the Latino employees are allowed to cash their own checks but must provide the deduction the following Monday (paychecks are issued each Friday). The Latino employees have been told that they must submit to these deductions or they will not be allowed to work. They have also been told that they "do not deserve" all of the money they earned, "when have you never earned this type of money in your life." Supervisors, foreman, and other agents of Defendants have shared these unlawful deductions amongst themselves.

21.    The African-American workers who have been hired by Defendants have been repeatedly told that they are too slow, that they are not working fast enough, they are not good enough, and that other members of the Community are not qualified to do the work that is why they are not hired.

22.    During the Summer of 2007, Defendants withheld the checks of many Latino employees and required that they attend a meeting at a warehouse with representatives of IMR and BBS. Present were MOISES AVILA, ERNESTO CUNNINGHAM, JESUS "CHEWY" SANDOVAL and GASPAR, during which MOISES AVILA said that "we are at war" with the African Americans, because "African-Americans don't like Latinos and don't like them working here." AVILA also said

that African-Americans are lazy and too slow, and that "you should tell them to fuck off." ERNESTO CUNNINGHAM agreed with AVILA, and said we are at "war." CUNNINGHAM also said that African-Americans are "too slow" and that he wanted to fire them. Employees that did not attend this meeting, including African-Americans, were informed of it including that the Latinos were told "niggers on the job don't like you guys, we need to stick together."

23.     Many of the employees, both African-American and Latino, complained either directly to Defendants or to the union, about the unlawful deductions. The complaints were oral and by way of written petition. In response, several of the complainants were terminated from their jobs.

## PLAINTIFFS

24.    GREGORY HALL. Plaintiff, GREGORY HALL, is an African-American male with 27 years of experience as a carpenter, and was employed by Defendants IMR and BBS from approximately July through November, 2007. Plaintiff HALL has been subjected to conduct as further described above.

25.    Plaintiff HALL initially applied for a job and was told that they were not "hiring people from the Community" (meaning African-Americans). Plaintiff HALL approached MARSHALL HORNSTEIN and asked why BBS was refusing to hire people from the Community. HORNSTEIN agreed to hire one crew of three African-Americans to "give them a chance" but after obstacles were placed in the Community group's way HALL was written-up several times.

26.    Plaintiff HALL complained to Defendants about the unlawful deductions from the Latino employees' paychecks. Plaintiff HALL passed around a petition for signature to protest the unlawful practice. Subsequently, Plaintiff HALL was told by ERNESTO CUNNINGHAM that HALL had no power or authority to protest how the job site was being run. Still later, during a safety

1  meeting, CUNNINGHAM gave HALL a hard time for talking to another co-worker at which time

2  CUNNINGHAM yelled, "GET THE FUCK OFF MY JOB!" CUNNINGHAM also yelled this a

3  second time. Later, along with everyone else, Plaintiff HALL was laid off in November, 2007, and

4  checked back a week or so later and was told that he was "probably at the bottom of the list" for

5  rehiring, even though the job site did not re-start until a few weeks later.

6  27.    FAUSTO AGUILAR. Plaintiff, FAUSTO AGUILAR, is a Latino male who is a

7  carpenter, and was employed by Defendants BBS and IMR from approximately June through August,

8  2007. Plaintiff AGUILAR has been subjected to conduct as further described above. He has also been

9  deprived of one full day of premium pay for working overtime on a Sunday.

10  28.    Plaintiff AGUILAR attended a meeting at which QALTEMO ARELLANO was asked

11  why only Latino workers are used and not African Americans. ARELLANO responded, "Don't worry

12  about them [African-Americans] we're going to fire them anyway." Plaintiff AGUILAR also noticed

13  that work materials were not made available to the African-Americans. Once, JESUS SANDOVAL

14  instructed Plaintiff to cover up the doorbell wiring at a living unit. When Plaintiff asked why,

15  SANDOVAL replied: "Fucking black people, they don't deserve it."

16  29.    Plaintiff AGUILAR went to the union along with other Latinos to complain about the

17  unlawful wage deductions and the racist comments at the worksite. Thereafter, Plaintiff was laid off

18  while others were allowed to work. ERNESTO CUNNINGHAM went to Plaintiff's house and, in

19  reference to the complaints wherein QALTEMO was named as one of those taking unlawful

20  deductions from the Latino employees, CUNNINGHAM told Plaintiff's son, and then Plaintiff

21  himself, that Plaintiff "is not a man."

22  30.    GONZALO AGUILAR. Plaintiff, GONZALO AGUILAR, is a Latino male who is a

carpenter, and was employed by Defendants BBS and IMR from approximately June through August, 2007. Plaintiff AGUILAR has been subjected to conduct as further described above. He has also been deprived of one full day of premium pay for working overtime on a Sunday.

31.    Plaintiff also overheard GASPAR, JESUS SANDOVAL and QALTEMO ARELLANO talking about how MOISES AVILA was correct in what he said at the warehouse meeting. That is, that African-Americans are "stupid" and that they would be fired. Plaintiff AGUILAR felt the tension between the African-Americans and Latinos, and that the foremen mistreated the African-Americans. Plaintiff also felt that Latinos were encouraged to be hostile towards the African-Americans. The African-American employees were not invited to the warehouse parties put on for the Latino employees. When work was slow the African-Americans were the first let go, although they were very experienced. Plaintiff asked ERNESTO CUNNINGHAM why they couldn't all work together, to which he said they "can't do it."

32.    Plaintiff AGUILAR went to the union along with other Latinos to complain about the unlawful wage deductions and the racist comments at the worksite. Thereafter, GASPAR said, "Why did you go to the union?" Later, when Plaintiff had a question about something, JESUS SANDOVAL said, "Why don't you go take care of it with the union?" Plaintiff was laid off while others were allowed to work.

33.    CHARLES CHILTON. Plaintiff, CHARLES CHILTON, is an African-American male who is a carpenter for 30 years, and has been employed by Defendants BBS and IMR from approximately June through the present (with layoffs at various times). Plaintiff CHILTON has been subjected to conduct as further described above.

34.    When Plaintiff first arrived he worked for one hour and then was told by MARSHALL

HORNSTEIN and MOISES AVILA that he was not qualified and was terminated. Plaintiff felt he had been set up to fail and that Defendants did not want to hire African-Americans. Plaintiff CHILTON returned to the union hall and was redeployed to the BHPRA jobsite a few days later as part of 15 African-Americans ready to work. Only a few were kept. It was at this point that Plaintiff was hired as part of the "Community" group along with Plaintiffs HALL and GIVENS to compete with the Latino "core" group. These Plaintiffs were constantly told that they were working too slow, not doing a good job and not keeping up with the "core" crew (of Latinos).

35.     There was tension at the worksite and some Latinos demonstrated hostility towards the African-Americans. Plaintiff heard about the warehouse meeting, including that management said the blacks will not be here that long anyways, and understood why. Plaintiff was laid off at least three times while the Latinos kept their jobs and were able to work.

36.     FELIX CORTES. Plaintiff, FELIX CORTES, is a Latino male who is a carpenter for 30 years, and was employed by Defendants IMR and BBS for approximately one month from June through July 13, 2007. He was only paid $15 per hour, instead of the prevailing rate of $33.25. Plaintiff CORTES has been subjected to conduct as further described above.

37.     A person named DAGOBERTO LIBORI, a team leader, was taking Plaintiff's paychecks and cashing them. If Plaintiff made $800, LIBORI would keep $400. LIBORI did this with the knowledge and approval of Defendants, in that on information and belief he shared the proceeds with ERNESTO CUNNINGHAM, JESUS SANDOVAL, QALTEMO ARELLANO and MARSHALL HORNSTEIN.

38.     Plaintiff complained about the conduct by way of the union. He also complained to LIBORI, who said if you don't like it you can leave. Plaintiff told the foreman on Friday, July 13,

2007, that he would not come to work any more. On Tuesday, July17, Plaintiff went to the union again and then back to work Wednesday, July 18. The foreman GASPAR told me I "did wrong" by going to the union and complaining. On August 13, 2007, MOISES AVILA called me and offered a guaranteed job in Oakland for one full year if I would agree to stop complaining to the union. Plaintiff needed the work so he agreed. However, after two weeks on the new job Plaintiff was terminated.

39.   OMAR FRANCO.  Plaintiff, OMAR FRANCO, is a Latino male who is a carpenter for 30 years, and was employed by Defendants IMR and BBS from approximately June through August, 2007. Plaintiff was only paid $24.25 during June and part of July, and then was paid $32.25. At all times Plaintiff was not paid the prevailing wage of $33.25. Plaintiff FRANCO has been subjected to conduct as further described above.

40.   Once Plaintiff was paid $32.25, $100 was taken from his paycheck weekly. If he worked on a Saturday, $200 was taken.

41.   Plaintiff always felt that the Latinos were pressured constantly to work faster and harder. The foremen would scream at the workers if they rested, and yell stuff like "move your fucken ass."

42.   DOUGLAS GIVENS.  Plaintiff, DOUGLAS GIVENS, is an African-American male who is a carpenter, and was employed by Defendants BBS and IMR from approximately July through the present (after layoffs). Plaintiff GIVENS has been subjected to conduct as further described above.

43.   Plaintiff was hired as part of the "Community" group along with Plaintiffs HALL and CHILTON to compete with the Latino "core" group. These Plaintiffs were constantly told that they were working too slow, not doing a good job and not keeping up with the "core" crew (of Latinos). The Community group, including Plaintiff, was watched more closely and critically than the other

workers. Plaintiff had heard about the warehouse meeting and all of the derogatory comments made about African-Americans including the use of the word "nigger."

44.    Plaintiff also saw GREGORY HALL rejected when he asked to be a foreman. Instead, Defendants hired QALTEMO ARELLANO. When African-Americans tried to get work they were told there was no work, then a few minutes later 10 applications would be handed out to Latino job applicants. Plaintiff said to MARSHALL HORNSTEIN, blacks have worked for you before. HORNSTEIN responded, "Not Black siders."

45.    ROBERT IVY. Plaintiff, ROBERT IVY, is an African-American male who is a carpenter, and was employed by Defendant BACF from approximately May through November, 2007. Plaintiff was injured on the job and is temporarily disabled. Plaintiff IVY has been subjected to conduct as further described above.

46.    The African-Americans are the first to get sent home, sometimes the "core" Latino crew gets "snuck" back onto as jobsite where everyone has been sent home for the day, or the Latinos are sent to another site to work. Negative comments such as that African-Americans are incapable and can't do the work by agents of BACF and F&W have gotten back to Plaintiff.

47.    Plaintiff approached MARSHALL HORNSTEIN about a job in April, but would always say not hiring. Then they'd hire others, Latinos, later. Finally, there was a peaceful demonstration at the Oakdale sight and some Community folks were hired thereafter.

48.    Plaintiff was sent home 10-20 times while the "core" of Latinos kept working.

49.    QUINCY MOUTON. Plaintiff, QUINCY MOUTON, is an African-American male who is a carpenter, and was employed by Defendants BBS and IMR from approximately late June through mid July, 2007. Plaintiff MOUTON has been subjected to conduct as further described above.

50.     Plaintiff kept going back to Defendant BBS asking for work at which time he was told there was no work, we will hire you during phase 3. Yet, Defendant BBS kept hiring new Latino employees. Plaintiff was evicted with his partner and 2-year-old because he had no income.

51.     Plaintiff was regularly nit-picked and told to hurry because he was too slow by MOISES AVILA, who always comes around directing and criticizing.

52.     Plaintiff was finally hired back on October 5, 2007, and works under an African-American foreman. MOISES AVILA and ERNESTO CUNNINGHAM interviewed Plaintiff and asked if he was qualified, did he have 5 years of siding experience (yet some of the Latinos are very young and probably do not have this experience). The group of 10-15 African-Americans, who work with one Latino, are not given enough equipment (two drills and a few cords). The Latinos are given all of the equipment. There is a very obvious segregation of the African-American and Latino workers.

53.     Plaintiff also learned of the warehouse meeting and the awful attempt to pit Latinos and African-Americans against each other.

54.     Plaintiff also signed the petition protesting the unlawful deductions from the Latinos' paychecks.

55.     LUIS OSUNA. Plaintiff, LUIS OSUNA, is a Latino male who is a carpenter, and was employed by Defendants BBS and IMR from approximately late June through August, 2007. Plaintiff OSUNA has been subjected to conduct as further described above.

56.     In addition, Plaintiff had $200 deducted from his paycheck each Monday by QALTEMO ARELLANO. Plaintiff is informed and believes that these proceeds were shared by ARELLANO, JESUS SANDOVAL, MOISES AVILA and ERNESTO CUNNINGHAM.

57.    Plaintiff also learned of the warehouse meeting and the awful attempt to pit Latinos and African-Americans against each other.

58.    <u>RICHARD RANKIN</u>.  Plaintiff, RICHARD RANKIN, is an African-American male who is a carpenter, and was employed by Defendants BBS and IMR from approximately late May 29, 2007 through the present.  Plaintiff RANKIN has been subjected to conduct as further described above.

59.    Since he was first hired, Plaintiff has not worked a full 40 hour week.  Plaintiff noticed however, that Latino and Caucasian employees were able to work 40 hours per week.

60.    MOISES AVILA and ERNESTO CUNNINGHAM told African-American employees that they are not doing a good job.

61.    While Plaintiff worked, CUNNINGHAM bombarded him with questions about his progression and manner of work. He told Plaintiff and other African-American employees that they were too slow, they needed to hurry up, and called them "ladies."

62.    Foremen make it difficult for African-American employees to access materials and tools, fail to provide adequate tools, and are deliberately slow in bringing tools to where African-American employees work.

63.    Plaintiff observed that Latino workers do not take all their breaks. Many seem afraid to take breaks. He has observed Latino employees work through lunch.

64.    African-American employees are the first to get sent home when there is not enough work. On one occasion, CUNNINGHAM told an African-American employee named ROY EDWARDS that he was being sent home because work was slow. When MR. EDWARDS stated that African-Americans were always the first to be sent home, CUNNINGHAM called him a "motherfucker."

65.    AVILA arrived and stated that no one would work and that the whole job at that location would be shut down.  However, Plaintiff saw that Latino employees were sent to another site to work.

66.    Plaintiff has been sent home six to eight times because "work was slow."  However, Latino workers were permitted to continue working.

67.    Plaintiff also learned of the warehouse meeting and the awful attempt to pit Latinos and African-Americans against each other.

68.    HECTOR RODRIGUEZ.  Plaintiff, HECTOR RODRIGUEZ, is a Latino male who is a carpenter, and has been employed by Defendants BBS and IMR since May 2007.  Plaintiff was supposed to earn $33.25 per hour.  However, JESUS SANDOVAL and ERNESTO CUNNINGHAM informed him that he would only $24.25 per hour.  Plaintiff earned $24.25 per hour for approximately 15 days.  In or around June 5, 2007, he began receiving $33.25 per hour.

69.    Plaintiff RODRIGUEZ has been subjected to conduct as further described above.

70.    In addition, Plaintiff had $100 deducted from his paycheck each Monday by QALTEMO ARELLANO.  Plaintiff is informed and believes that these proceeds were shared by ARELLANO and JESUS SANDOVAL.

71.    SANDOVAL told Plaintiff that he and his co-workers did not deserve that much money.

72.    Plaintiff was rushed during lunch breaks and told that he did not need that long to eat.

73.    Plaintiff was not permitted to take his full ten-minute rest breaks.  He would be yelled at for trying to take his full ten-minute breaks.

74.    Plaintiff complained to the Union about the unlawful deductions.

75.    SANDOVAL'S brother, ELIAS SANDOVAL threatened Plaintiff that if Plaintiff kept talking to the union, things "might happen to him outside of work." Plaintiff understood that ELIAS SANDOVAL was threatening his personal safety.

76.    CARLOS DELGADO, the brother-in-law of CUNNINGHAM grabbed Plaintiff by the collar and held him by the neck. DELGADO stated to Plaintiff that what he did (talk to union) was not a thing that a "man" does, only a "fag." He then threatened Plaintiff that if anything happened to CUNNINGHAM, he would beat him up.

77.    MARTIN SANDOVAL. Plaintiff, MARTIN SANDOVAL, is a Latino male who is a carpenter, and has been employed by Defendants BBS and IMR from June through August 2007. For a period of time during his tenure, he was paid approximately $32.00 per hour.

78.    Plaintiff SANDOVAL has been subjected to conduct as further described above. He has also been deprived of one full day of premium pay for working on a Saturday.

79.    JESUS SANDOVAL told Plaintiff not to leave a space for doorbell wiring of a unit. SANDOVAL told Plaintiff to cover it up and not to do a good job because black people were going to live there, not them.

80.    Plaintiff, along with other Latino employees, discussed the problems Latino workers were experiencing, with African-American employees.

81.    Plaintiff went to went to the Union along with other Latino employees to complain about unlawful deductions and racist comments made at the worksite. Plaintiff also signed Greg Hall's petition. Plaintiff was laid off while others were able to work.

82.    HENRY TAYLOR. Plaintiff, HENRY TAYLOR, is an African-American male who is an apprentice carpenter, and was employed by Defendants BBS and IMR from approximately June

through early to mid-November 2007. Plaintiff TAYLOR has been subjected to conduct as further described above.

83.    Plaintiff continually sought work with MARSHALL HORNSTEIN beginning in April 2007, but HORNSTEIN delayed hiring Plaintiff.

84.    Plaintiff heard MOISES AVILA tell an African-American employee to "get the fuck off the job."

85.    Plaintiff learned that Ernesto referred to African-Americans as "niggers."

86.    Plaintiff felt that African-Americans were treated with animosity and that foreman made it more difficult for African-Americans to do their jobs.

87.    Plaintiff signed Greg Hall's petition.

88.    Plaintiff has been laid-off approximately 6 times.

89.    LLOYD THIBEAUX.  Plaintiff LLOYD THIBEAUX is an African-American male who is a carpenter and was employed by Bay Area Construction Framers from May 2007 through the end of October 2007. He worked under the supervision of STEVE SOSA. Plaintiff THIBEAUX has been subjected to conduct as further described above.

90.    During his tenure, Plaintiff was deprived of the opportunity to work 40 hours per week, while Caucasian and Latino workers were permitted to do so. Plaintiff noticed that African-Americans were the first to be sent home when work shut down. Caucasian and Latino were sent to other work sites, but not African-Americans.

91.    Plaintiff learned from a co-worker that SOSA made a hangman's noose.

92.    Plaintiff also learned about the warehouse meeting and the awful attempt to pit African-American workers and Latino workers against each other.

93.    <u>MICHAEL BROWN</u>. Plaintiff MICHAEL BROWN is an African-American male with two years experience as a laborer and three years experience as a roofer. Plaintiff BROWN was qualified to perform the duties of Laborer and Roofer. From July 2007 through September 2007, Plaintiff Brown attempted to obtain employment from Defendants BBS and IMR, both through the City Build Program and by applying directly with Defendants.

94.    Plaintiff BROWN has been subjected to conduct as further described above.

95.    From July 2007 through September 2007, Plaintiff Brown was dispatched five times as a Laborer to begin working at the BHPRP. However, each time he reported to the worksite, he was told that no work was available.

96.    Plaintiff BROWN spoke with RICHARD INGRAM, DON MALOY, and MICHAEL CUNNINGHAM who informed him that he would be hired. But Plaintiff BROWN was not hired. However, Plaintiff BROWN observed that Latino workers were being hired.

97.    <u>ASTRIAN CAEL</u>. Plaintiff ASTRIAN CAEL is an African-American female who was employed as an Apprentice Carpenter by BACF at the BHPRP. Plaintiff CAEL was paid $21.96 per hour, and later was re-rated to $23.56 per hour. She worked from approx June 2007 thru December 21, 2007. Plaintiff CAEL has been subjected to conduct as further described above.

**98.**    Plaintiff CAEL performed interior finish and carpentry. During the first three weeks she worked ten-hour shifts and received two rest periods but not a third. Thereafter, Plaintiff worked eight-hour shifts but only received one ten-minute rest period. Plaintiff complained about not receiving all required rest periods to Supervisor JOHN BENTNER, who replied "You do not get a 2nd break." Plaintiff was prohibited from leaving the jobsite during her rest and meal periods.

99.    During her employment, Plaintiff CAEL was told by another employee that he heard

Supervisor BENTNER say the word "nigger" five or six times at the jobsite. There were also "inside" jokes about African-Americans. African-Americans were segregated as a group from the core workers (Caucasian). The African-American employees were overly scrutinized. Caucasians and a carpenter's apprentice (Filipino) were not treated in this manner.

100.    Plaintiff CAEL was laid off about three or four times, and was told there was no work. However, the Caucasian employees would still be working.

101.    <u>ARNULFO CARRANZA-RIVAS</u>. Plaintiff, ARNULFO CARRANZA-RIVAS, is a Latino male who is a carpenter, and was employed by Defendant IMR for approximately one month during the June/July time period in 2007. Plaintiff was supposed to earn $33.25 per hour. However, DAGOBERTO LIBORI informed him that he would earn $32.00 per hour. Plaintiff was subjected to supervision by GASPAR [LNU]

102.    Plaintiff CARRANZA-RIVAS has been subjected to conduct as further described above.

103.    Plaintiff worked eight hours per day, five days per week, and was paid approximately $300 in cash. The remainder of his pay was retained by DAGOBERTO LIBORI, the team leader. Plaintiff is informed and believes that these proceeds were shared by other supervisors.

104.    Plaintiff was rushed during lunch breaks and told that he did not need that long to eat.

105.    Plaintiff felt threatened. The Latinos were told to hide if union representatives came and to say that they were getting paid by check even though many were not.

106.    The leads and supervisors were always saying negative things about the African Americans when they were not around -- they would say how "lazy," and "slow" "those blacks are." To the rest of us, the Hispanics/Latinos, they would say "hurry up fuckers, move your fucking asses."

107.    Plaintiff complained to the Union in approximately July about the unlawful deductions. Shortly thereafter, Plaintiff was terminated by GASPAR.

108.    <u>APOLINAR CORNEJO</u>. Plaintiff, APOLINAR CORNEJO, a Latino male, is a carpenter who worked on BHPRP for IMR and/or BBS. Plaintiff CORNEJO worked from approximately May 2007 through August 2007. Plaintiff CORNEJO has been subjected to conduct as further described above.

109.    MARCO CORREA is an individual with a connection to BBS supervisor ERNESTO CUNNINGHAM. CORREA solicited Latino workers, including Plaintiff CORNEJO, picked them up and drove them to the jobsite. CORREA said he had a connection to ERNESTO CUNNINGHAM. CORREA said that he would get Plaintiff into a union and get him a union card, but that he would "work" for CORREA and get paid cash.

110.    ERNESTO CUNNINGHAM would hide Plaintiff and other non-union Latinos in a warehouse about five miles away. CUNNINGHAM told workers to hide if the union steward were to show up. Plaintiff CORNEJO was "caught" by the union once and CUNNINGHAM & IMR were fined. CUNNINGHAM was upset and said Plaintiff had to hide when they showed.

111.    During the first three weeks Plaintiff was not paid for all hours worked, he was only paid $80 per day, the remainder was kept by CORREA (who received Plaintiff's check from CUNNINGHAM). CUNNINGHAM and TEMO ARELLANO said they [Mexican laborers] "have never earned this kind of money", and "you are not worth the money."

112.    The first month Plaintiff worked full days but was not allowed any rest periods. No African-Americans worked during the first month on the job. After African-Americans began working they asserted their rights and some workers started receiving rest periods.

113.    Plaintiff was eventually paid by check from BBS.  Although Plaintiff was performing carpenter services his job title was "roofer" and he was paid roofer wages of $16 per hour, well below the $33.25 he should have received for Carpenter work.

114.    Latinos and African-Americans were segregated to work in groups by race.  Plaintiff and others complained to the union about the pay situation and being hid from the union. CUNNINGHAM then refused to "deal" with Plaintiff, who was reassigned from carpenter work to labor work – Plaintiff cleaned up the work area along with an African-American female named Molly. Shortly thereafter Plaintiff and the other "complainers" were terminated.  CORREA commented to make sure everything turns out OK or who knows what will happen to you.

115.    ROY EDWARDS.  Plaintiff, ROY EDWARDS, an African-American male, was employed by Defendants BBS and IMR from approximately May or June 2007 through January 2008. Plaintiff's supervisors were ERNESTO CUNNINGHAM and CHEWY SANDOVAL.  Plaintiff EDWARDS has been subjected to conduct as further described above.

116.    During his tenure, Plaintiff EDWARDS was laid off several times with other African-American workers while Latino employees continued to work.

117.    On one occasion, when CUNNINGHAM told Plaintiff to go home because "work was slow," Plaintiff asked CUNNINGHAM why he was always the first one to get sent home.  In response, CUNNINGHAM called Plaintiff a "motherfucker" and told him to find another job.  Plaintiff did not hear CUNNINGHAM speak to Latino employees in this manner.

118.    CUNNINGHAM and SANDOVAL told Plaintiff and other African-American employees that they were not doing their jobs well, that they were not performing their duties, and that they needed to work "faster."  MARSHALL HORNSTEIN also told Plaintiff EDWARDS and other

African-American employees that they need to work "faster." Plaintiff EDWARDS asked CUNNINGHAM questions in English, but he would respond in Spanish. CUNNINGHAM usually gave instructions to employees in Spanish, but not in English.

119.    Plaintiff EDWARDS was deprived of the opportunity to work a full forty hours per week, but Latino employees were permitted to work their full 40 hours per week. Plaintiff and other African-American employees were made to wait for Latino workers to get their tools before African-Americans were given tools.

120.    MOISES AVILA told Plaintiff EDWARDS that he did not work fast enough and could not keep up with the Latino employees.

121.    VICTOR HAMPTON. Plaintiff, VICTOR HAMPTON, is an African-American male who was employed by BACF as a journeyman carpenter from May through September 2007. During the course of his employment with Defendant BACF Plaintiff worked under the supervision of JOHN BENTNER and STEVE SOSA. Plaintiff HAMPTON has been subjected to conduct as further described above.

122.    During his tenure, Plaintiff HAMPTON was laid off many times along with other African American workers. However, Plaintiff noticed that other non-African American employees, the majority of whom were Caucasian, were permitted to continue working for Defendant BACF.

123.    Supervisors BENTNER and SOSA regularly told African-American employees that their work was not as good as the Caucasian employees. Supervisors BENTNER and SOSA regularly told African-American employees that Caucasian employees could do a better job than African-American workers. Supervisors BENTNER and SOSA also commented that Caucasian apprentice carpenters could do a better job than African-Americas carpenters.

124.    Plaintiff HAMPTON, along with other African-American employees were not provided tools for performing their duties, although Defendant BACF was supposed to provide these tools. Plaintiff complained to the union about this practice at which time BENTNER relented and would give Plaintiff tools.  However, Caucasian employees were always provided tools.

125.    Plaintiff HAMPTON and other African-American employees received less desirable assignments, such as cleaning out cabinets and removing them, while Caucasian employees were assigned more desirable work, such as installing cabinets.

126.    RANDY KEYS.  Plaintiff, RANDY KEYS, an African-American male was employed by Defendants BBS and IMR as a carpenter and foreman from July 2007 to mid-January 2008. Plaintiff KEYS has been subjected to conduct as further described above.

127.    At the time of his hire by Defendant BBS, MARSHALL HORNSTEIN informed Plaintiff KEYS that he would be a foreman.  However, when he commenced his employment, Plaintiff did not perform the duties of foreman, but of carpenter.  Only after Plaintiff complained to his union did HORNSTEIN assign Plaintiff to work as a foreman.  Thereafter, Plaintiff supervised African-American employees at both BBS and IMR.

128.    During his tenure, Plaintiff Keys, laid off no less than four times by Defendant BBS because "work was slow," including January, 2008.  However, Latino employees continued to work at the jobsite each time.

129.    Plaintiff KEYS was deprived of the opportunity to work 40 hour weeks, however, Latino employees did work 40 hour weeks.

130.    ERNESTO CUNNINGHAM and TEMO ARELLANO regularly told African-American workers to "hurry up" and that they were "too slow."  Plaintiff heard ERNESTO CUNNINGHAM tell

an African-American employee to "get off [CUNNINGHAM's] motherfucking job." Plaintiff also regularly heard CUNNINGHAM ask African-American employees what they were doing, why they weren't doing their jobs, that they needed to work faster, that they weren't competing with "his guys" [Latino workers]. CUNNINGHAM stated that African-American workers could not keep up with Latino workers, that Latinos were better siders and that Latinos could work faster. Plaintiff heard CUNNINGHAM tell African-Americans that they were too slow and that they were lazy, and he would stare as they worked. CUNNINGHAM rushed African-American workers off their breaks and told them to speed up.

131.    CUNNINGHAM also asked Plaintiff KEYS and another African-American employee if they knew how to do "plumbing" in a demeaning sexual manner.

132.    Plaintiff KEYS tried to talk to CUNNINGHAM about his treatment of African-American workers, but was ignored. Plaintiff also tried to talk to MOISES AVILA about the mistreatment of African-American workers but Moises simply walked away.

133.    Plaintiff learned that CUNNINGHAM had a barbeque with Latino workers and asked him why African-American employees were not invited. CUNNINGHAM ignored Plaintiff and walked away.

134.    Plaintiff KEYS learned that CUNNINGHAM stated that Latinos were going to get "these black motherfuckers" off this hill, and that he told Latino workers that he did not want them talking to "these black motherfuckers."

135.    <u>ANDRE LARRIMORE</u>. Plaintiff, ANDRE LARRIMORE, is an African-American male with 24 years of experience as a union carpenter who has his own tools and truck. Although Plaintiff applied from November 2007 through January 14, 2008, and would stop by the project daily,

he was never was hired for work at BHPRP. Plaintiff also tried to get work through the union hall.

Plaintiff also personally spoke with RICHARD INGRAM from Defendant AIMCO, who said he should be put on job by Defendant IMR. However, Plaintiff was never hired. Plaintiff LARRIMORE has been subjected to conduct as further described above.

136.    Plaintiff LARRIMORE also spoke with MARSHALL HORNSTEIN, who told Plaintiff "I like you" and that Plaintiff would be hired real soon. Plaintiff spoke with HORNSTEIN about 15 times. Yet, community people were not hired they were always told there was no work.

137.    TERRY MACKEY. Plaintiff, TERRY MACKEY, a male African-American employee, worked for Defendants BBS and IMR from June 2007 through September 2007. During his tenure, Plaintiff Mackey worked under the supervision of MARSHALL HORNSTEIN, ERNESTO CUNNINGHAM, JESUS "CHEWY" SANDOVAL and QALTEMO "TEMO" ARELLANO. Plaintiff MACKEY has been subjected to conduct as further described above.

138.    During his tenure, Plaintiff MACKEY was deprived of the opportunity to work a full forty hours per week. However, Latino employees were permitted to work a full forty hours per week. Defendants BBS and IMR laid-off Plaintiff MACKEY, along with other African-American employees, several times. However, Latino employees were permitted to work.

139.    Plaintiff MACKEY was forced to compete with Latino employees who did siding work. Plaintiff asked CUNNINGHAM and HORNSTEIN to integrate Latino and African-American crews, but was ignored. Plaintiff and other African-American employees had to wait for tools to perform their work, while Latino workers were given tools first. Defendants BBS and IMR hindered African-American workers from getting the materials they needed for their assignments, but Latinos were not. African-Americans retrieved their own materials while materials were delivered to the Latinos.

140.    ERNESTO CUNNINGHAM stated to Plaintiff and other African-American employees that Latino employees could perform their work better. CUNNINGHAM also belittled the quality of the work of African-American employees. CUNNINGHAM and HORNSTEIN stated to Plaintiff and other African-American workers that they were working too slowly. Plaintiff learned that CUNNINGHAM, SANDOVAL and ARELLANO stated that African-Americans were not good workers and that their workers could not compare to Latino employees. Plaintiff also learned about a meeting that CUNNINGHAM and others held with Latino workers where he said African-Americans were at "war" with Latinos, that African-Americans did not like Latinos, that Latinos should not try to get along with African-Americans, and that Latinos should ignore African-Americans.

141.    DOUGLAS TURNER. Plaintiff, DOUGLAS TURNER, an African-American male, was not hired for BHPRP. Plaintiff has 13 years experience with Local 22 as a carpenter. Despite his qualifications Plaintiff TURNER was not hired. Plaintiff TURNER has been subjected to conduct as further described above.

142.    Plaintiff applied for work from 6am – 1pm from August 2007 through January 14, 2008, and went by the jobsite at least 20-30 times. For example, Plaintiff applied with JOHN BENTNER of BACF. Plaintiff was told there was a lack of work, but instead Latinos were hired even though Plaintiff lives two blocks from the worksite.   Plaintiff applied with TEMO ARELLANO of BBS who would also say they did not need workers.

143.    JEFF WEST. Plaintiff, JEFF WEST, an African-American male, initially applied for work with ERNESTO CUNNINGHAM of Defendant BBS. CUNNINGHAM would tell Mr. WEST to show up the next day in his work gear, which Plaintiff would do as told but then was told there was no work for him. This happened five days and Plaintiff was never paid for coming out.

144.    Subsequently, Plaintiff was employed by IMR and BBS from approximately August, 2007, through January 2, 2008.  Plaintiff started work as a Laborer and later became a Carpenter's Apprentice in November, 2007.  Plaintiff WEST has been subjected to conduct as further described above.

145.    Plaintiff learned that MARSHALL HORNSTEIN of BBS listed Mr. WEST as a Carpenter's Apprentice for the entire time period he worked but for the first two months was doing the work, and being paid, as a Laborer.  The prevailing wage for a Laborer was $13/hour; for a Carpenter's Apprentice was $23.00/hour.  This was brought to the attention of JOHN [last name unknown] from AIMCO, an African-American male, who directed MOISES AVILA to treat Plaintiff WEST as a Carpenter's Apprentice consistent with WEST's status in the computer.  Thereafter, Plaintiff was assigned the duties of a Carpenter's Apprentice and was eventually paid at the correct rate.

146.    Supervisors TEMO ARELLANO and MOISES AVILA would give conflicting orders to the workers, including Plaintiff WEST, and this would cause further screaming by one or both supervisors.

147.    Crews were segregated according to race, Latinos v. African-Americans.  The groups were treated differently.  For example, many Latinos did not speak English and would throw debris from roof and call out in Spanish, which became a safety issue Plaintiff complained about to AVILA but the problem persisted.  Another time AVILA put two crews together, one Latino and one African-American, and he called them together and gave directions in Spanish then walked off.  AVILA never came back and gave directions in English.  The African-American crew was just left there without a work assignment.

148.    ROBERT WHITE.  Plaintiff Robert White, an African-American male, was employed

by Defendants BBS and IMR from Summer 2007 through November 2007. Plaintiff was supervised by ERNEST CUNNINGHAM and JESUS SANDOVAL. Plaintiff WHITE has been subjected to conduct as further described above.

149.    During his tenure, Plaintiff WHITE was laid off several times, along with other African-American employees. Plaintiff White was also sent home on many occasions and was deprived of the opportunity to work an eight-hour day. However, during these times when Plaintiff and other African-American employees were not permitted to work, Latino employees remained on the job. Plaintiff and other African-American employees were deprived of the opportunity to work overtime. However, Latino employees were able to work overtime.

150.    Plaintiff WHITE and other African-American employees were segregated by race. Plaintiff and other African-American employees were largely assigned to the window crew and generally were not permitted to do siding. However, Latino workers were permitted to perform window work in addition to siding. When tools were disseminated, Plaintiff White and other African American employees were last to get tools. Plaintiff observed that ERNESTO CUNNINGHAM and JESUS SANDOVAL gave assignments and instructions in Spanish, but not in English.

151.    Plaintiff WHITE heard ERNESTO CUNNINGHAM call an African-American worker a "motherfucker." However, Plaintiff did not hear CUNNINGHAM use this term with Latino employees. Plaintiff learned that CUNNINGHAM called African-American workers "niggers." Plaintiff observed that CUNNINGHAM stared at African-American employees while they worked, then would shake his head and walk away. CUNNINGHAM said Plaintiff and other African-American workers needed to hurry up and that they weren't keeping up with Latino workers. CUNNINGHAM described Latino workers' progress to African-American workers in an attempt to

encourage the groups to compete against each other.  CUNNINGHAM also threatened African-American workers that if they did not work faster, there would be layoffs.  JESUS SANDOVAL similarly rushed the African-American employees when they worked.

## FIRST CAUSE OF ACTION
## FAILURE TO PAY WAGES DUE INCLUDING PUBLIC WORKS PREVAILING WAGE
### (LABOR CODE §§ 204, 1771, 1774)

152.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

153.    Cal. Labor Code § 204 provides that all wages, earned by any person in any employment are due and payable at least twice during each calendar month, on days designated in advance by the employer as the regular paydays.

154.    Cal. Labor Code § 1771 provides that except for public works projects of one thousand dollars ($1,000) or less, not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed, and not less than the general prevailing rate of per diem wages for holiday and overtime work fixed as provided in this chapter, shall be paid to all workers employed on public works.

155.    Cal. Labor Code § 1774 provides that a contractor to whom the contract is awarded, and any subcontractor under him, shall pay not less than the specified prevailing rates of wages to all workmen employed in the execution of the contract.

156.    Plaintiffs were deprived of earned regular and overtime wages as set forth hereinabove.

157.    In depriving Plaintiffs of their earned regular and overtime wages, Defendants failed to pay Plaintiffs all wages due, including the prevailing wage in violation of Labor Code §§ 204, 1771 and 1774.

158.    As a result of Defendants' unlawful acts, Plaintiffs have been deprived of wages in amounts to be determined at trial, and are entitled to recovery of such amounts, plus interest thereon, attorneys' fees, and costs, under Labor Code §§ 218.5 and 1194.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## SECOND CAUSE OF ACTION
## UNLAWFUL DEDUCTIONS
## (LABOR CODE §§ 221 and 223)

159.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

160.    Labor Code § 221 provides: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."

161.    Labor Code § 223 provides: "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract."

162.    These and related statutes, along with California's fundamental public policy protecting wages and wage scales, prohibit employers from subjecting employees to unanticipated or unpredicted reductions in their wages; making employees the insurers of their employer's business losses; otherwise passing the ordinary business losses of the employer onto the employee; taking deductions from wages for business losses unless the employer can establish that the loss was caused by a dishonest or willful act, or gross negligence of the employee; or taking other unpredictable deductions that may impose a special hardship on employees.

163.    Defendants have violated Labor Code §§ 221 and 223 by unlawfully taking deductions from Plaintiffs' compensation as set forth hereinabove.

164.    Because Defendants made unlawful deductions from Plaintiffs' compensation, they are liable to Plaintiffs for compensation that should have been paid but for the unlawful deductions, pursuant to Labor Code §§ 221 and 223.

165.    By unlawfully deducting wages and failing to pay Plaintiffs, Defendants are also liable for reasonable attorneys' fees and costs under Labor Code § 218.5.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### THIRD CAUSE OF ACTION
### FAILURE TO PAY OVERTIME COMPENSATION
### (LABOR CODE §§ 510, and 1194)

166.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

167.    By failing to pay overtime compensation to Plaintiffs as set forth hereinabove, Defendants have violated and continue to violate Labor Code § 510 which requires overtime compensation to non-exempt employees.

168.    As a result of Defendants' unlawful acts, Plaintiffs have been deprived of overtime compensation in an amount to be determined at trial, and are entitled to recovery of such amounts, plus interest thereon.

169.    By violating Labor Code § 510, Defendants are liable for attorneys' fees and costs under Labor Code §1194.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### FOURTH CAUSE OF ACTION
### UNLAWFUL FAILURE TO FURNISH ACCURATE WAGE STATEMENTS
### (LABOR CODE § 226(a) and (e))

170.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

171.    Labor Code § 226(a) requires employers semi-monthly or at the time of each payment of wages to furnish each employee with a statement itemizing, inter alia, the total hours worked by the employee, all deductions, and net wages earned.  Labor Code § 226(e) provides that if an employer knowingly and intentionally fails to provide a statement itemizing, inter alia, the total hours worked by the employee, all deductions, and net wages earned, then the employee is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial violation and one hundred dollars ($100) for each subsequent violation, up to four thousand dollars ($4000).

172.    Defendants knowingly and intentionally failed to furnish Plaintiffs with timely,

itemized statements showing the total hours they worked, all deductions taken, and net wages earned,

as required by Labor Code § 226(a).  As a result, Defendants are liable to Plaintiffs for the amounts

provided by Labor Code § 226(e).

173.    As a result of Defendants' violation of Labor Code section 226(a), Plaintiffs are entitled

to reasonable attorney's fees and costs as provided by Labor Code § 226(e).

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### FIFTH CAUSE OF ACTION
### FAILURE TO PROVIDE ADEQUATE MEAL PERIODS
### (LABOR CODE §§ 226.7, 512)

174.    The allegations of each of the preceding paragraphs are realleged and incorporated

herein by reference.

175.    Plaintiffs regularly worked in excess of five (5) hours a day without being afforded at

least half-hour meal periods in which they were relieved of all duties, as required by Labor Code

§§ 226.7 and 512.

176.    Defendants did not pay Plaintiffs an additional hour of pay for each day Plaintiffs did

not receive an off-duty meal period.

177.    Because Defendants failed to afford proper meal periods, Defendants are liable to

Plaintiffs for one hour of additional pay at the regular rate of compensation for each workday that the

proper meal periods were not provided, pursuant to Labor Code § 226.7(b).

178.    By violating Labor Code §§ 226.7 and 512, Defendants are also liable for attorneys'

fees and costs under Labor Code §§ 218.5.

179.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an

amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### SIXTH CAUSE OF ACTION
### FAILURE TO PROVIDE ADEQUATE REST PERIODS
### (LABOR CODE §§ 226.7, 512)

180.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

181.    Plaintiffs regularly worked in excess of four (4) hours a day without being afforded ten-minute rest breaks in which they were relieved of all duties, as required by Labor Code §§ 226.7 and 512.

182.    Defendants did not pay Plaintiffs an additional hour of pay for each day Plaintiffs did not receive an off-duty rest break.

183.    Because Defendants failed to afford proper rest periods, Defendants are liable to Plaintiffs for one hour of additional pay at the regular rate of compensation for each workday that the proper rest periods were not provided, pursuant to Labor Code § 226.7(b).

184.    By violating Labor Code §§ 226.7 and 512, Defendants are also liable for attorneys' fees and costs under Labor Code §§ 218.5.

185.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### SEVENTH CAUSE OF ACTION
### WAITING TIME PENALTIES
### (LABOR CODE §§ 201 & 203)

186.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by this reference.

187.    Labor Code § 201 requires an employer who discharges an employee to pay all compensation due and owing to that employee immediately upon discharge.

188.    Labor Code § 203 provides that if an employer willfully fails to pay compensation

promptly upon discharge, as required by § 201, then the employer is liable for waiting time penalties in the form of continued compensation of up to 30 work days.

189.    Defendants willfully failed and refused to timely pay compensation and wages, including unpaid meal and rest period compensation, sums wrongfully deducted from compensation, and regular and overtime wages to Plaintiffs whose employment Defendants terminated.

190.    As a result of Defendants' unlawful acts, Plaintiffs have been deprived of wages in amounts to be determined at trial, and are entitled to recovery of such amounts, plus interest thereon, waiting time penalties, and attorneys' fees, and costs, under Labor Code §§ 203, 218.5.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

**EIGHTH CAUSE OF ACTION**
**HARASSMENT IN VIOLATION OF CALIFORNIA PUBLIC POLICY**
**RACE- HOSTILE WORK ENVIRONMENT**
**(CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(j))**

191.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

192.    Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin.

193.    Cal. Govt. Code § 12940(j) provides that it shall be unlawful for an employer to harass an employee. Section 12940(j) further provides that harassment of an employee, by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the harassing acts of nonemployees or persons providing services pursuant to a contract in the workplace, where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

194.    Defendants harassed and discriminated against Plaintiffs on the basis of race in violation of Cal. Const. Art. 1 § 8 and Cal. Govt. code §12940 as set forth hereinabove, including subjecting Plaintiffs to a hostile work environment. The wrongful conduct was offensive and unwelcome. The wrongful conduct was sufficiently severe or pervasive to adversely and materially affect Plaintiffs' ability to perform their job duties. Plaintiffs either experienced the wrongful conduct firsthand or were later informed of it.

195.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

196.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### NINTH CAUSE OF ACTION
### HARASSMENT IN VIOLATION OF CALIFORNIA PUBLIC POLICY
### NATIONAL ORIGIN- HOSTILE WORK ENVIRONMENT
### (CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(j))

197.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

198.    Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color or national or ethnic origin.

199.    Cal. Govt. Code § 12940(j) provides that it shall be unlawful for an employer to harass an employee. Section 12940(j) further provides that harassment of an employee, by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or

should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the harassing acts of nonemployees or persons providing services pursuant to a contract in the workplace, where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

200.    Defendants harassed and discriminated against Plaintiffs on the basis of national origin in violation of Cal. Const. Art. I § 8 and Cal. Govt. code §12940 as set forth hereinabove, including subjecting Plaintiffs to a hostile work environment. The wrongful conduct was offensive and unwelcome. The wrongful conduct was sufficiently severe or pervasive to adversely and materially affect Plaintiffs' ability to perform their job duties. Plaintiffs either experienced the wrongful conduct firsthand or were later informed of it.

201.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

202.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## TENTH CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF CALIFORNIA PUBLIC POLICY
### RACE
### (CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(a))

203.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

204.    Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from

entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin.

205.    Cal. Govt. Code section 12940(a) provides that it is unlawful for any employer to discharge or otherwise discriminate against any person in compensation or terms, conditions, or privileges of employment because of race.

206.    Defendants discriminated against Plaintiffs on the basis of race in violation of Cal. Const. Art. 1 § 8 and Cal. Govt. code §12940 as set forth hereinabove, including, but not limited to forcing Plaintiffs to work harder, work faster, work unsafely, compete with other employees, and failing to hire Plaintiffs . Defendants' conduct impaired Plaintiffs' job performance and prospects for advancement. The wrongful conduct altered the terms, conditions or privileges of Plaintiffs' employment.

207.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

208.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## ELEVENTH CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF CALIFORNIA PUBLIC POLICY
### NATIONAL ORIGIN
### (CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(a))

209.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

210.    Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color or national or ethnic origin.

211.    Cal. Govt. Code section 12940(a) provides that it is unlawful for any employer to discharge or otherwise discriminate against any person in compensation or terms, conditions, or privileges of employment because of national origin.

212.    Defendants discriminated against Plaintiffs on the basis of national origin in violation of Cal. Const. Art. I § 8 and Cal. Govt. code §12940 as set forth hereinabove, including, but not limited to forcing Plaintiffs to work harder, work faster, work unsafely, compete with other employees, and failing to hire. Defendants' conduct impaired Plaintiffs' job performance and prospects for advancement. The wrongful conduct altered the terms, conditions or privileges of Plaintiffs' employment.

213.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

214.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### TWELFTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF CALIFORNIA PUBLIC POLICY
### PROTESTING UNLAWFUL FAILURE TO PAY WAGES AND UNLAWFUL DEDUCTIONS
#### (Labor Code §1102.5(c))

215.    The allegations of each of the preceding paragraphs are realleged and incorporated

herein by reference.

216.    Cal. Labor Code §§ 204, 1771, and 1774 require Defendants to pay their employees all earned wages.

217.    Cal. Labor Code §§ 221 and 223 prohibit Defendants from making unlawful deductions from Plaintiffs' wages.

218.    Cal. Labor Code §1102.5(c) provides that, "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

219.    Defendants retaliated against Plaintiffs for complaining about and refusing to participate in activities that violated state and federal statutes.  In particular, Defendants engaged in conduct that materially affected the terms, conditions and privileges of Plaintiffs' employment, including termination of Plaintiffs for protesting the underpayment of wages and unlawful deduction of wages in violation of state or federal laws.

220.    As a result, Defendants retaliated against Plaintiffs in violation of California public policy.

221.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights.  Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

222.    As result of Defendants' unlawful acts as alleged herein, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### THIRTEENTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF PUBLIC POLICY
### PROTESTING RACE AND NATIONAL ORIGIN DISCRIMINATION
### (CAL. CONST. ART. I § 8; CAL. GOVT. CODE § §12940(a),(j)and(h))

223.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

224.    Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin.

225.    Cal. Govt. Code §12940(a) provides that it is unlawful for any employer to discharge or otherwise discriminate against any person in compensation or terms, conditions, or privileges of employment because of race or national origin.

226.    Cal. Govt. Code §12940 (j) provides that it shall be unlawful for an employer to harass an employee. Section 12940(j) further provides that harassment of an employee, "by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the harassing acts of nonemployees or persons providing services pursuant to a contract in the workplace, where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action."

227.    Cal. Govt. Code §12940 (h) provides that it is unlawful for any employer or person to discriminate against any person because the person has opposed any practices forbidden under the Fair Employment and Housing Act, Government Code section 12940, et seq., or because the person has filed a complaint, testified, or assisted in any proceeding under the Fair Employment and Housing Act.

228.    Defendants retaliated against Plaintiffs for complaining about and refusing to participate in activities that violated state and federal statutes. In particular, Defendants engaged in conduct that materially affected the terms, conditions and privileges of Plaintiffs' employment, including termination of Plaintiffs for protesting Defendants' unlawful discriminatory practices, including a hostile work environment.

229.    As a result, Defendants retaliated against Plaintiffs in violation of California public policy.

230.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

231.    As result of Defendants' unlawful acts as alleged herein, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## FOURTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

232.    The allegations of each of the paragraphs set forth above are realleged and incorporated herein by reference.

233.    Defendants' conduct as set forth hereinabove was so extreme and so outrageous that it exceeded the boundaries of a decent society and lies outside of the compensation bargain. Said conduct was intended to cause severe emotional distress, or was done in conscious disregard of the probability of causing such distress. As a proximate result of Defendants' unlawful acts against Plaintiffs, Plaintiffs have suffered past, present and future losses in income and earnings, medical

costs, incidental expenses, and has suffered and continues to suffer embarrassment, humiliation and mental anguish all to damage in an amount according to proof.

234.    Defendants committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiffs, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiffs' rights.  Plaintiffs are thus entitled to recover punitive damages from Defendants in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### FIFTEENTH CAUSE OF ACTION
#### (Race, Color, National Origin and/or ancestry Discrimination, Cal Gov C §12940)

235.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

236.    Plaintiffs at all times material hereto were employees covered by California Government Code §§ 12940, et seq., prohibiting discrimination in employment on the basis of race, color, national origin and/or ancestry.

237.    Defendants at all times material were employers within the meaning of California Government Code § 12926 and, as such, barred from discriminating in employment on the basis of race, color, national origin and/or ancestry as set forth in California Government Code § 12940.

238.    Defendants discriminated against Plaintiffs on the basis of race, color, national origin and/or ancestry in violation of California Government code §§ 12940, et seq., as set forth above, including but not limited to subjecting Plaintiffs to disparate and adverse treatment.

239.    Plaintiffs filed timely charges of discrimination with the California Department of Fair Employment and Housing ("DFEH") and received notices of the right to sue in a California Superior Court pursuant to California Government Code §12965(b) permitting Plaintiffs to bring this action.

Therefore, Plaintiffs have exhausted all of their administrative remedies.

240.    As a proximate result of Defendants' unlawful acts against Plaintiffs, Plaintiff have suffered past, present and future losses in income and earnings, medical costs, incidental expenses, and have suffered and continue to suffer embarrassment, humiliation and mental anguish all to damage in an amount according to proof.

241.    Defendants committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiffs, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiffs' rights.  Plaintiffs are thus entitled to recover punitive damages in an amount according to proof.

242.    As result of Defendants' unlawful acts as alleged herein, Plaintiffs are entitled to reasonable attorney's fees and costs of said suit as provided by California Government Code §12965(b).

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## SIXTEENTH CAUSE OF ACTION
### (Hostile Work Environment - race, color, national origin and/or ancestry, Cal. Govt. Code §12940)

243.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

244.    Plaintiffs at all times material hereto were employees covered by California Government Code §§ 12940, et seq., prohibiting harassment in employment on the basis of race, color, national origin and/or ancestry.

245.    Defendants at all times material were employers within the meaning of California Government Code § 12926 and, as such, barred from harassment in employment on the basis of race,

color, national origin and/or ancestry as set forth in California Government Code § 12940.

246.    Defendant MANNA harassed and discriminated against Plaintiffs on the basis of race, color, national origin and/or ancestry in violation of California Government code §12940 as set forth above, including subjecting Plaintiffs to a hostile work environment. The wrongful conduct was sufficiently severe or pervasive to adversely and materially affect Plaintiffs' ability to perform their job duties. Plaintiffs either experienced the wrongful conduct firsthand or were later informed of it.

247.    Plaintiffs filed timely charges of discrimination with the California Department of Fair Employment and Housing ("DFEH") and received notices of the right to sue in a California Superior Court pursuant to California Government Code §12965(b) permitting Plaintiffs to bring this action. Therefore, Plaintiffs have exhausted all of their administrative remedies.

248.    As a proximate result of Defendants' unlawful acts against Plaintiffs, Plaintiff have suffered past, present and future losses in income and earnings, medical costs, incidental expenses, and have suffered and continue to suffer embarrassment, humiliation and mental anguish all to damage in an amount according to proof.

249.    Defendants committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiffs, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Plaintiffs are thus entitled to recover punitive damages in an amount according to proof.

250.    As result of Defendants' unlawful acts as alleged herein, Plaintiffs are entitled to reasonable attorney's fees and costs of said suit as provided by California Government Code §12965(b).

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## SEVENTEENTH CAUSE OF ACTION
### (Retaliation, Cal Gov C §12940)

251.   The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

252.   Plaintiffs at all times material hereto were employees covered by California Government Code §§ 12940, et seq., prohibiting retaliation for engaging in protected conduct.

253.   Defendants at all times material were employers within the meaning of California Government Code § 12926 and, as such, barred from retaliation for engaging in protected conduct.

254.   Defendants retaliated against Plaintiffs for engaging in protected conduct as set forth in detail above. After engaging in protected conduct, Plaintiffs were subjected to disparate, adverse treatment including but not limited to termination.

255.   Plaintiffs filed timely charges of discrimination with the California Department of Fair Employment and Housing ("DFEH") and received notices of the right to sue in a California Superior Court pursuant to California Government Code §12965(b) permitting Plaintiffs to bring this action. Therefore, Plaintiffs have exhausted all of their administrative remedies.

256.   As a proximate result of Defendants' unlawful acts against Plaintiffs, Plaintiff have suffered past, present and future losses in income and earnings, medical costs, incidental expenses, and have suffered and continue to suffer embarrassment, humiliation and mental anguish all to damage in an amount according to proof.

257.   Defendants committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiffs, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Plaintiffs are thus entitled to recover punitive damages in an amount according to proof.

258.    As result of Defendants' unlawful acts as alleged herein, Plaintiffs are entitled to reasonable attorney's fees and costs of said suit as provided by California Government Code §12965(b).

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## EIGHTEENTH CAUSE OF ACTION
## RETALIATION
### (Labor Code §§ 1102.5)

259.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

260.    California Labor Code section 1102.5(c) provides that, "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

261.    Defendants retaliated against Plaintiffs for engaging in protected conduct, as set forth more fully above. In taking such actions against Plaintiffs, Defendants violated Labor Code section 1102.5, resulting in damages and injury to Plaintiffs as alleged herein

262.    Defendants committed the acts alleged herein oppressively, maliciously and fraudulently, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

263.    Labor Code §1102.5(f) provides that a corporation or limited liability company that retaliates against an employee in violation of Labor Code §1102.5(c), is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation. By violating Labor Code §1102.5(c), Defendants are liable for civil penalties under Labor Code §1102.5(f). Additionally, as a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## NINETEENTH CAUSE OF ACTION
## RETALIATION
### (Labor Code §§ 98.6)

264.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

265.    California Labor Code section 98.6 provides that employers shall not discriminate against employees or applicants, "…because of the exercise by the employee or applicant for employment on behalf of himself, herself, or others of any rights afforded him or her."

266.    Defendants retaliated against Plaintiffs for engaging in protected conduct, as set forth more fully above.  In taking such actions against Plaintiffs, Defendants violated Labor Code section 98.6.5, resulting in damages and injury to Plaintiffs as alleged herein

267.    In the event of a violation of Labor Code §98.6(b) the employee shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by those acts of the employer.

WHEREFORE, Plaintiffs request relief as hereinafter provided.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request relief from Defendants as follows:

1.    For compensatory damages for lost wages, earnings, and benefits, according to proof;

2.    For general damages for humiliation, mental anguish and emotional distress, according to proof;

3.    For consequential damages, according to proof;

4.    For special damages, according to proof;

5.  For punitive damages, according to proof;

6.  For reasonable attorneys' fees, according to proof;

7.  For reasonable costs, according to proof;

8.  Injunctive relief to address the wrongs alleged herein; and

9.  For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a trial by jury in this matter.

Dated: March 12, 2008

                                        SUNDEEN SALINAS & PYLE

                                        ROBERT SALINAS
                                        Attorney at Law

# EXHIBIT C

AMENDED **SUMMONS**
*(CITACION JUDICIAL)*

SUM-100

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
APARTMENT INVESTMENT AND MANAGEMENT COMPANY,
AIMCO CAPITAL, INC., FORTNEY & WEYGANDT, INC.,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
GREGORY HALL, FAUSTO AGUILAR, GONZALO AGUILAR,
CHARLES CHILTON,

Additional Parties Attachment form is attached.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO<br>400 McAllister Street<br>San Francisco, California, CA 94102 | CASE NUMBER:<br>*(Número del Caso):*   CGC-07-470047 |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Robert A. Salinas (Bar # 184260)
SUNDEEN SALINAS & PYLE                                    Phone No. (510) 663-9240
1330 Broadway, Suite 1830, Oakland, CA 94612              Fax No. (510) 663-9241
DATE:                                                    WESLEY RAMIREZ
*(Fecha)* APR 2 2 2008   GORDON PARK-LI    Clerk, by _____, Deputy
                         *(Secretario)*                      *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

    under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
           ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

[SEAL]

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. January 1, 2004)

AMENDED SUMMONS

Code of Civil Procedure §§ 412.20, 465

**SUM-200(A)**

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| HALL v. AIMCO, INC. | CGC-07-470047 |

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

[X] Plaintiff    [ ] Defendant    [ ] Cross-Complainant    [ ] Cross-Defendant

FELIX CORTES, OMAR FRANCO, DOUGLAS GIVENS, ROBERT IVY, QUINCY MOUTON, LUIS OSUNA, RICHARD RANKIN, HECTOR RODRIGUEZ, MARTIN SANDOVAL, HENRY TAYLOR, LLOYD THIBEAUX, MICHAEL BROWN, ASTRIAN CAEL, ARNULFO CARRANZA-RIVAS, APOLINAR CORNEJO, ROY EDWARDS, VICTOR HAMPTON, RANDY KEYS, ANDRE LARRIMORE, TERRY MACKEY, DOUGLAS TURNER, JEFF WEST, ROBERT WHITE, MARQUEZ BOYD

Page ___|___ of ___|___

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

| SHORT TITLE: | **SUM-200(A)** |
|---|---|
| Hall v. AIMCO, INC. | CASE NUMBER:<br>CGC-07-470047 |

### INSTRUCTIONS FOR USE

➜ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➜ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff    ☒ Defendant    ☐ Cross-Complainant    ☐ Cross-Defendant

IMR CONTRACTOR CORPORATION, BAY BUILDING SERVICES, BAY AREA CONSTRUCTION FRAMERS, INC., and DOES 1-50

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

1   ROBERT SALINAS  SBN 184260
    PAMELA KONG  SBN 220912
    JORGE AGUILAR II  SBN 238111
2   SUNDEEN SALINAS & PYLE
    1330 Broadway, Suite 1830
3   Oakland, CA  94612
    Tel: (510) 663-9240
4   Fax: (510) 663-9241

5   Attorneys for PLAINTIFFS

6

ENDORSED
F I L E D
Superior Court of California
County of San Francisco

APR 22 2008

GORDON PARK-LI, Clerk
BY: _____ WESLEY RAMIREZ
                    Deputy Clerk

7           IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

8               IN AND FOR THE COUNTY OF SAN FRANCISCO

9

10   GREGORY HALL, FAUSTO AGUILAR,      )
     GONZALO AGUILAR, CHARLES           )   No. CGC-07-470047
11   CHILTON, FELIX CORTES,             )
     OMAR FRANCO, DOUGLAS GIVENS,       )
12   ROBERT IVY, QUINCY MOUTON,         )
     LUIS OSUNA, RICHARD RANKIN,        )   SECOND AMENDED COMPLAINT FOR
13   HECTOR RODRIGUEZ,                  )   DAMAGES AND INJUNCTIVE RELIEF
     MARTIN SANDOVAL, HENRY TAYLOR,     )
14   LLOYD THIBEAUX, MICHAEL BROWN,     )
15   ASTRIAN CAEL, ARNULFO CARRANZA-    )   JURY TRIAL DEMANDED
     RIVAS, APOLINAR CORNEJO, ROY       )
16   EDWARDS, VICTOR HAMPTON, RANDY     )
17   KEYS, ANDRE LARRIMORE, TERRY       )
     MACKEY, DOUGLAS TURNER, JEFF       )
18   WEST, ROBERT WHITE, MARQUEZ BOYD)  )
19                                      )
            Plaintiffs,                 )
20                                      )
        vs.                             )
21                                      )
22   APARTMENT INVESTMENT AND           )
     MANAGEMENT COMPANY, AIMCO          )
23   CAPITAL, INC., FORTNEY & WEYGANDT, )
     INC.,  IMR CONTRACTOR             )
24   CORPORATION, BAY BUILDING          )
     SERVICES, BAY AREA CONSTRUCTION    )
25   FRAMERS, INC. and DOES 1-50,       )
26                                      )
            Defendants.                 )
27   _____)

28

Second Amended Complaint for Damages & Injunctive Relief
HALL v. AIMCO INC., No. CGC-07-470047
                                                            Page 1

The purpose of this Second Amended Complaint is to amend the name of AIMCO, INC. to the technically proper name (because AIMCO headquarters rejected service of the 1st Amended Complaint on the grounds it did not know who "AIMCO, INC." was referring to); to add Defendant AIMCO CAPITAL, INC.; to add Plaintiff MARQUEZ BOYD; and to add cause of action numbers 20-21.

COME NOW Plaintiffs, who allege as follows:

## PARTIES

1.     At all times material herein, Plaintiffs were adults and residents of the State of California. Plaintiffs were all previously employed by Defendants, at construction and/or rehabilitation sites in connection with the BAYVIEW HUNTER'S POINT REDEVELOPMENT PLAN (BHPRP). The BHPRP was approved approximately May 23, 2006 and has been funded using California State Bonds. At all relevant times, Plaintiffs worked at sites under the direct or indirect supervision of Defendants.

2.     Plaintiffs are informed and believe and on that basis allege that Defendant APARTMENT INVESTMENT AND MANAGEMENT COMPANY ("AIMCO") is a Colorado corporation registered with the California Secretary of State to do business in California, and is based in Denver, Colorado. Defendant AIMCO is a developer concerning BHPRP.

3.     Plaintiffs are informed and believe and on that basis allege that Defendant AIMCO CAPITAL, INC., is a Colorado corporation registered with the California Secretary of State to do business in California, and is based in Denver, Colorado. Defendant AIMCO CAPITAL, INC., is a developer concerning BHPRP.

4.    Plaintiffs are informed and believe and on that basis allege that Defendant FORTNEY & WEYGANDT, INC., ("F&W") is an Ohio corporation registered with the California Secretary of State to do business in California, and is based in North Olmsted, Ohio.  Defendant F&W is the general contractor concerning BHPRP.

5.    Plaintiffs are informed and believe and on that basis allege that Defendant IMR CONTRACTOR CORPORATION ("IMR") is a California corporation registered with the California Secretary of State to do business in California, and is based in Daly City, California.  Defendant IMR is a contractor concerning BHPRP.

6.    Plaintiffs are informed and believe and on that basis allege that Defendant BAY BUILDING SERVICES, INC. ("BBS"), is a Nevada corporation registered with the California Secretary of State to do business in California, and is based in San Rafael, California.  Defendant BBS is a contractor concerning BHPRP.

7.    Plaintiffs are informed and believe and on that basis allege that Defendant BAY AREA CONSTRUCTION FRAMERS, INC. ("BACF"), is a California corporation registered with the California Secretary of State to do business in California, and is based in Livermore, California. Defendant BACF is a contractor concerning BHPRP.

8.    Plaintiffs are informed and believe and on that basis allege that at all times material RICHARD INGRAM, DON MALOY and JOHN [last name unknown] were employed by AIMCO and/or AIMCO CAPITAL, INC., in a supervisory capacity over Plaintiffs.  INGRAM and MALOY are adult Caucasian males; JOHN [LNU] is an adult African-American male.

9.    Plaintiffs are informed and believe and on that basis allege that at all times material MIKE CUNNINGHAM was employed by F&W in a supervisory capacity over Plaintiffs.

CUNNINGHAM is an adult Caucasian male.

10.    Plaintiffs are informed and believe and on that basis allege that at all times material MOISES AVILA and GASPAR (last name unknown) were employed by IMR in a supervisory capacity over Plaintiffs.  AVILA and GASPAR [LNU] are adult Latino males.

11.    Plaintiffs are informed and believe and on that basis allege that at all times material MARSHALL HORNSTEIN, ERNESTO CUNNINGHAM, JESUS "CHEWY" SANDOVAL and QALTEMO "TEMO" ARELLANO were employed by BBS in a supervisory capacity over Plaintiffs. HORNSTEIN is an adult Caucasian male; CUNNINGHAM, SANDOVAL and ARELLANO are adult Latino males.

12.    Plaintiffs are informed and believe and on that basis allege that at all times material JOHN BENTNER and STEVE SOSA were employed by BACF in a supervisory capacity over Plaintiffs.  BENTNER is an adult Caucasian male; SOSA is an adult Latino male.

13.    The true names and capacities of the Defendants named herein as Does 1 through 50, inclusive, whether individual, corporate, associate or otherwise, are unknown to Plaintiffs who therefore sue such Defendants by fictitious names pursuant to California Code of Civil Procedure §474. Plaintiffs are informed and believe that Doe Defendants are California residents.  Plaintiffs will amend this complaint to show such true names and capacities when they have been determined.

14.    Plaintiffs are informed and believe, and thereby allege that each of the Defendants herein, including the Doe Defendants, was at all times relevant hereto the agent, employee or representative of the remaining Defendants and was acting, at least in part, within the course and scope of such relationship.

## ALLEGATIONS

Plaintiffs are informed and believe, and thereby allege, the following facts:

15.    Bayview Hunter's Point is an area located in San Francisco, California, that is predominantly African-American.  BHPRP was approved, in part, to remove blight from this area, rehabilitate existing affordable residential housing units, and construct new residential housing units.

16.    Defendants have worked in conjunction and according to hierarchy during the operations of the BHPRP.  That is, representatives from AIMCO and/or AIMCO CAPITAL, INC., including but not limited to RICHARD INGRAM and DON MALOY, as well as representatives from F&W, including but not limited to MIKE CUNNINGHAM, have directed the other Defendants regarding hiring, firing, layoff, and other decisions concerning construction workers during the operations of the BHPRP.  Managers and/or supervisors from each Defendant have directed 1) managers and/or supervisors from the other Defendants; and 2) employees from the other Defendants. This has led to the formation of a super-management team controlling the employees named as plaintiffs in this Complaint.

17.    Although BHPRP is performed in an area which is predominantly African-American in population, the individuals hired by Defendants to do construction in connection with the BHPRP have been disproportionately Latino.  At a meeting with representatives from AIMCO, AIMCO CAPITAL, INC., F&W and BBS, these Defendants were informed that members of the "Community," or African-Americans, were not being hired.  These Defendants responded as follows:  We will give our "core group" (all Latino workers) a wall to work on and a "Community" group another wall to work on, and if the Community Group can "keep up" with the Latinos we will hire another Community group. Defendant BBS, through MARSHALL HORNSTEIN, protested that if he had to hire another

1    Community Group he would "lose money." This race/national origin group competition ensued, with

2    the Community Group being placed in a position of disadvantage – that group's wall was not prepared

3    and ready to be worked on. There were also mis-instructions for the job, repairs necessary to complete

4    the job were delayed, and materials were withheld. MOISES AVILA of IMR openly cheered on the

5    Latinos, telling them "Rapido!" Defendant AIMCO was later complained to about the unfairness of

6

7    this situation, including the pitting of groups against each other, but the response was that

8    MARSHALL HORNSTEIN was concerned that he would lose money if he had to hire another

9    Community Group.

10          18.     Throughout the relevant time period, beginning approximately June, 2007, through the

11   present, Defendants have routinely responded to African-American job applicants that there are no

12   jobs available. At the same time, Defendants dispensed job applications to Latinos and hired them

13

14   disproportionately to the Community members.

15          19.     The Latino workers are pushed to work harder, faster and sometimes in unsafe

16   conditions. That is, Defendants press the Latino employees to complete their work as fast as possible,

17

18   even if this means running while carrying equipment or materials, missing rest periods and not being

19   able to complete their lunch periods. When African-American workers pointed out the need for safety

20   precautions, the foreman would say, "Scared or something?"

21          20.     The Latino workers have also had portions of their wages withheld or taken from them.

22

23   On some occasions, agents for Defendants have taken paychecks bearing the names of Latino

24   employees on them and cashed them, without first obtaining these employees' signatures or

25   permission, and then have delivered cash payments to the employees less $100 to $400. On other

26

27   occasions, the Latino employees are allowed to cash their own checks but must provide the deduction

28

1  the following Monday (paychecks are issued each Friday). The Latino employees have been told that

2  they must submit to these deductions or they will not be allowed to work. They have also been told

3  that they "do not deserve" all of the money they earned, "when have you never earned this type of

4  money in your life." Supervisors, foreman, and other agents of Defendants have shared these unlawful

5  deductions amongst themselves.

6

7       21.    The African-American workers who have been hired by Defendants have been

8  repeatedly told that they are too slow, that they are not working fast enough, they are not good enough,

9  and that other members of the Community are not qualified to do the work that is why they are not

10  hired.

11

12       22.    During the Summer of 2007, Defendants withheld the checks of many Latino

13  employees and required that they attend a meeting at a warehouse with representatives of IMR and

14  BBS. Present were MOISES AVILA, ERNESTO CUNNINGHAM, JESUS "CHEWY" SANDOVAL

15  and GASPAR, during which MOISES AVILA said that "we are at war" with the African Americans,

16  because "African-Americans don't like Latinos and don't like them working here." AVILA also said

17  that African-Americans are lazy and too slow, and that "you should tell them to fuck off." ERNESTO

18  

19  CUNNINGHAM agreed with AVILA, and said we are at "war." CUNNINGHAM also said that

20  African-Americans are "too slow" and that he wanted to fire them. Employees that did not attend this

21  meeting, including African-Americans, were informed of it including that the Latinos were told

22  "niggers on the job don't like you guys, we need to stick together."

23  

24       23.    Many of the employees, both African-American and Latino, complained either directly

25  to Defendants or to the union, about the unlawful deductions. The complaints were oral and by way of

26  written petition. In response, several of the complainants were terminated from their jobs.

27

28

## PLAINTIFFS

24.    GREGORY HALL.  Plaintiff, GREGORY HALL, is an African-American male with

27 years of experience as a carpenter, and was employed by Defendants IMR and BBS from

approximately July through November, 2007.  Plaintiff HALL has been subjected to conduct as further

described above.

25.    Plaintiff HALL initially applied for a job and was told that they were not "hiring people

from the Community" (meaning African-Americans).  Plaintiff HALL approached MARSHALL

HORNSTEIN and asked why BBS was refusing to hire people from the Community.  HORNSTEIN

agreed to hire one crew of three African-Americans to "give them a chance" but after obstacles were

placed in the Community group's way HALL was written-up several times.

26.    Plaintiff HALL complained to Defendants about the unlawful deductions from the

Latino employees' paychecks.  Plaintiff HALL passed around a petition for signature to protest the

unlawful practice.  Subsequently, Plaintiff HALL was told by ERNESTO CUNNINGHAM that HALL

had no power or authority to protest how the job site was being run.  Still later, during a safety

meeting, CUNNINGHAM gave HALL a hard time for talking to another co-worker at which time

CUNNINGHAM yelled, "GET THE FUCK OFF MY JOB!"  CUNNINGHAM also yelled this a

second time.  Later, along with everyone else, Plaintiff HALL was laid off in November, 2007, and

checked back a week or so later and was told that he was "probably at the bottom of the list" for

rehiring, even though the job site did not re-start until a few weeks later.

27.    FAUSTO AGUILAR.  Plaintiff, FAUSTO AGUILAR, is a Latino male who is a

carpenter, and was employed by Defendants BBS and IMR from approximately June through August,

2007.  Plaintiff AGUILAR has been subjected to conduct as further described above.  He has also been

1   deprived of one full day of premium pay for working overtime on a Sunday.

2        28.    Plaintiff AGUILAR attended a meeting at which QALTEMO ARELLANO was asked

3   why only Latino workers are used and not African Americans. ARELLANO responded, "Don't worry

4   about them [African-Americans] we're going to fire them anyway." Plaintiff AGUILAR also noticed

5
    that work materials were not made available to the African-Americans. Once, JESUS SANDOVAL
6
7   instructed Plaintiff to cover up the doorbell wiring at a living unit. When Plaintiff asked why,

8   SANDOVAL replied: "Fucking black people, they don't deserve it."

9        29.    Plaintiff AGUILAR went to the union along with other Latinos to complain about the

10
    unlawful wage deductions and the racist comments at the worksite. Thereafter, Plaintiff was laid off
11
12  while others were allowed to work. ERNESTO CUNNINGHAM went to Plaintiff's house and, in

13  reference to the complaints wherein QALTEMO was named as one of those taking unlawful

14  deductions from the Latino employees, CUNNINGHAM told Plaintiff's son, and then Plaintiff

15  himself, that Plaintiff "is not a man."

16
         30.    GONZALO AGUILAR. Plaintiff, GONZALO AGUILAR, is a Latino male who is a
17
18  carpenter, and was employed by Defendants BBS and IMR from approximately June through August,

19  2007. Plaintiff AGUILAR has been subjected to conduct as further described above. He has also been

20  deprived of one full day of premium pay for working overtime on a Sunday.

21
         31.    Plaintiff also overheard GASPAR, JESUS SANDOVAL and QALTEMO ARELLANO
22
23  talking about how MOISES AVILA was correct in what he said at the warehouse meeting. That is,

24  that African-Americans are "stupid" and that they would be fired. Plaintiff AGUILAR felt the tension

25  between the African-Americans and Latinos, and that the foremen mistreated the African-Americans.

26  Plaintiff also felt that Latinos were encouraged to be hostile towards the African-Americans. The

27

28

African-American employees were not invited to the warehouse parties put on for the Latino employees. When work was slow the African-Americans were the first let go, although they were very experienced. Plaintiff asked ERNESTO CUNNINGHAM why they couldn't all work together, to which he said they "can't do it."

32.    Plaintiff AGUILAR went to the union along with other Latinos to complain about the unlawful wage deductions and the racist comments at the worksite. Thereafter, GASPAR said, "Why did you go to the union?" Later, when Plaintiff had a question about something, JESUS SANDOVAL said, "Why don't you go take care of it with the union?" Plaintiff was laid off while others were allowed to work.

33.    <u>CHARLES CHILTON</u>. Plaintiff, CHARLES CHILTON, is an African-American male who is a carpenter for 30 years, and has been employed by Defendants BBS and IMR from approximately June through the present (with layoffs at various times). Plaintiff CHILTON has been subjected to conduct as further described above.

34.    When Plaintiff first arrived he worked for one hour and then was told by MARSHALL HORNSTEIN and MOISES AVILA that he was not qualified and was terminated. Plaintiff felt he had been set up to fail and that Defendants did not want to hire African-Americans. Plaintiff CHILTON returned to the union hall and was redeployed to the BHPRA jobsite a few days later as part of 15 African-Americans ready to work. Only a few were kept. It was at this point that Plaintiff was hired as part of the "Community" group along with Plaintiffs HALL and GIVENS to compete with the Latino "core" group. These Plaintiffs were constantly told that they were working too slow, not doing a good job and not keeping up with the "core" crew (of Latinos).

35.    There was tension at the worksite and some Latinos demonstrated hostility towards the

African-Americans. Plaintiff heard about the warehouse meeting, including that management said the blacks will not be here that long anyways, and understood why. Plaintiff was laid off at least three times while the Latinos kept their jobs and were able to work.

36.    FELIX CORTES. Plaintiff, FELIX CORTES, is a Latino male who is a carpenter for 30 years, and was employed by Defendants IMR and BBS for approximately one month from June through July 13, 2007. He was only paid $15 per hour, instead of the prevailing rate of $33.25. Plaintiff CORTES has been subjected to conduct as further described above.

37.    A person named DAGOBERTO LIBORI, a team leader, was taking Plaintiff's paychecks and cashing them. If Plaintiff made $800, LIBORI would keep $400. LIBORI did this with the knowledge and approval of Defendants, in that on information and belief he shared the proceeds with ERNESTO CUNNINGHAM, JESUS SANDOVAL, QALTEMO ARELLANO and MARSHALL HORNSTEIN.

38.    Plaintiff complained about the conduct by way of the union. He also complained to LIBORI, who said if you don't like it you can leave. Plaintiff told the foreman on Friday, July 13, 2007, that he would not come to work any more. On Tuesday, July 17, Plaintiff went to the union again and then back to work Wednesday, July 18. The foreman GASPAR told me I "did wrong" by going to the union and complaining. On August 13, 2007, MOISES AVILA called me and offered a guaranteed job in Oakland for one full year if I would agree to stop complaining to the union. Plaintiff needed the work so he agreed. However, after two weeks on the new job Plaintiff was terminated.

39.    OMAR FRANCO. Plaintiff, OMAR FRANCO, is a Latino male who is a carpenter for 30 years, and was employed by Defendants IMR and BBS from approximately June through August, 2007. Plaintiff was only paid $24.25 during June and part of July, and then was paid $32.25. At all

times Plaintiff was not paid the prevailing wage of $33.25. Plaintiff FRANCO has been subjected to conduct as further described above.

40.    Once Plaintiff was paid $32.25, $100 was taken from his paycheck weekly. If he worked on a Saturday, $200 was taken.

41.    Plaintiff always felt that the Latinos were pressured constantly to work faster and harder. The foremen would scream at the workers if they rested, and yell stuff like "move your fucken ass."

42.    DOUGLAS GIVENS. Plaintiff, DOUGLAS GIVENS, is an African-American male who is a carpenter, and was employed by Defendants BBS and IMR from approximately July through the present (after layoffs). Plaintiff GIVENS has been subjected to conduct as further described above.

43.    Plaintiff was hired as part of the "Community" group along with Plaintiffs HALL and CHILTON to compete with the Latino "core" group. These Plaintiffs were constantly told that they were working too slow, not doing a good job and not keeping up with the "core" crew (of Latinos). The Community group, including Plaintiff, was watched more closely and critically than the other workers. Plaintiff had heard about the warehouse meeting and all of the derogatory comments made about African-Americans including the use of the word "nigger."

44.    Plaintiff also saw GREGORY HALL rejected when he asked to be a foreman. Instead, Defendants hired QALTEMO ARELLANO. When African-Americans tried to get work they were told there was no work, then a few minutes later 10 applications would be handed out to Latino job applicants. Plaintiff said to MARSHALL HORNSTEIN, blacks have worked for you before. HORNSTEIN responded, "Not Black siders."

45.    ROBERT IVY. Plaintiff, ROBERT IVY, is an African-American male who is a

1  carpenter, and was employed by Defendant BACF from approximately May through November, 2007.

2  Plaintiff was injured on the job and is temporarily disabled. Plaintiff IVY has been subjected to

3  conduct as further described above.

4      46.    The African-Americans are the first to get sent home, sometimes the "core" Latino crew

5
6  gets "snuck" back onto as jobsite where everyone has been sent home for the day, or the Latinos are

7  sent to another site to work. Negative comments such as that African-Americans are incapable and

8  can't do the work by agents of BACF and F&W have gotten back to Plaintiff.

9      47.    Plaintiff approached MARSHALL HORNSTEIN about a job in April, but would

10  always say not hiring. Then they'd hire others, Latinos, later. Finally, there was a peaceful

11  demonstration at the Oakdale sight and some Community folks were hired thereafter.

12

13      48.    Plaintiff was sent home 10-20 times while the "core" of Latinos kept working.

14      49.    QUINCY MOUTON. Plaintiff, QUINCY MOUTON, is an African-American male

15  who is a carpenter, and was employed by Defendants BBS and IMR from approximately late June

16  through mid July, 2007. Plaintiff MOUTON has been subjected to conduct as further described above.

17

18      50.    Plaintiff kept going back to Defendant BBS asking for work at which time he was told

19  there was no work, we will hire you during phase 3. Yet, Defendant BBS kept hiring new Latino

20  employees. Plaintiff was evicted with his partner and 2-year-old because he had no income.

21      51.    Plaintiff was regularly nit-picked and told to hurry because he was too slow by

22
23  MOISES AVILA, who always comes around directing and criticizing.

24      52.    Plaintiff was finally hired back on October 5, 2007, and works under an African-

25  American foreman. MOISES AVILA and ERNESTO CUNNINGHAM interviewed Plaintiff and

26  asked if he was qualified, did he have 5 years of siding experience (yet some of the Latinos are very

27

28

young and probably do not have this experience). The group of 10-15 African-Americans, who work with one Latino, are not given enough equipment (two drills and a few cords). The Latinos are given all of the equipment. There is a very obvious segregation of the African-American and Latino workers.

53.    Plaintiff also learned of the warehouse meeting and the awful attempt to pit Latinos and African-Americans against each other.

54.    Plaintiff also signed the petition protesting the unlawful deductions from the Latinos' paychecks.

55.    <u>LUIS OSUNA</u>. Plaintiff, LUIS OSUNA, is a Latino male who is a carpenter, and was employed by Defendants BBS and IMR from approximately late June through August, 2007. Plaintiff OSUNA has been subjected to conduct as further described above.

56.    In addition, Plaintiff had $200 deducted from his paycheck each Monday by QALTEMO ARELLANO. Plaintiff is informed and believes that these proceeds were shared by ARELLANO, JESUS SANDOVAL, MOISES AVILA and ERNESTO CUNNINGHAM.

57.    Plaintiff also learned of the warehouse meeting and the awful attempt to pit Latinos and African-Americans against each other.

58.    <u>RICHARD RANKIN</u>. Plaintiff, RICHARD RANKIN, is an African-American male who is a carpenter, and was employed by Defendants BBS and IMR from approximately late May 29, 2007 through the present. Plaintiff RANKIN has been subjected to conduct as further described above.

59.    Since he was first hired, Plaintiff has not worked a full 40 hour week. Plaintiff noticed however, that Latino and Caucasian employees were able to work 40 hours per week.

60.    MOISES AVILA and ERNESTO CUNNINGHAM told African-American employees

that they are not doing a good job.

61.    While Plaintiff worked, CUNNINGHAM bombarded him with questions about his progression and manner of work. He told Plaintiff and other African-American employees that they were too slow, they needed to hurry up, and called them "ladies."

62.    Foremen make it difficult for African-American employees to access materials and tools, fail to provide adequate tools, and are deliberately slow in bringing tools to where African-American employees work.

63.    Plaintiff observed that Latino workers do not take all their breaks. Many seem afraid to take breaks. He has observed Latino employees work through lunch.

64.    African-American employees are the first to get sent home when there is not enough work. On one occasion, CUNNINGHAM told an African-American employee named ROY EDWARDS that he was being sent home because work was slow. When MR. EDWARDS stated that African-Americans were always the first to be sent home, CUNNINGHAM called him a "motherfucker."

65.    AVILA arrived and stated that no one would work and that the whole job at that location would be shut down. However, Plaintiff saw that Latino employees were sent to another site to work.

66.    Plaintiff has been sent home six to eight times because "work was slow." However, Latino workers were permitted to continue working.

67.    Plaintiff also learned of the warehouse meeting and the awful attempt to pit Latinos and African-Americans against each other.

68.    HECTOR RODRIGUEZ. Plaintiff, HECTOR RODRIGUEZ, is a Latino male who is a

carpenter, and has been employed by Defendants BBS and IMR since May 2007. Plaintiff was supposed to earn $33.25 per hour. However, JESUS SANDOVAL and ERNESTO CUNNINGHAM informed him that he would only $24.25 per hour. Plaintiff earned $24.25 per hour for approximately 15 days. In or around June 5, 2007, he began receiving $33.25 per hour.

69.    Plaintiff RODRIGUEZ has been subjected to conduct as further described above.

70.    In addition, Plaintiff had $100 deducted from his paycheck each Monday by QALTEMO ARELLANO. Plaintiff is informed and believes that these proceeds were shared by ARELLANO and JESUS SANDOVAL.

71.    SANDOVAL told Plaintiff that he and his co-workers did not deserve that much money.

72.    Plaintiff was rushed during lunch breaks and told that he did not need that long to eat.

73.    Plaintiff was not permitted to take his full ten-minute rest breaks. He would be yelled at for trying to take his full ten-minute breaks.

74.    Plaintiff complained to the Union about the unlawful deductions.

75.    SANDOVAL'S brother, ELIAS SANDOVAL threatened Plaintiff that if Plaintiff kept talking to the union, things "might happen to him outside of work." Plaintiff understood that ELIAS SANDOVAL was threatening his personal safety.

76.    CARLOS DELGADO, the brother-in-law of CUNNINGHAM grabbed Plaintiff by the collar and held him by the neck. DELGADO stated to Plaintiff that what he did (talk to union) was not a thing that a "man" does, only a "fag." He then threatened Plaintiff that if anything happened to CUNNINGHAM, he would beat him up.

77.    MARTIN SANDOVAL. Plaintiff, MARTIN SANDOVAL, is a Latino male who is a

carpenter, and has been employed by Defendants BBS and IMR from June through August 2007. For a period of time during his tenure, he was paid approximately $32.00 per hour.

78.    Plaintiff SANDOVAL has been subjected to conduct as further described above. He has also been deprived of one full day of premium pay for working on a Saturday.

79.    JESUS SANDOVAL told Plaintiff not to leave a space for doorbell wiring of a unit. SANDOVAL told Plaintiff to cover it up and not to do a good job because black people were going to live there, not them.

80.    Plaintiff, along with other Latino employees, discussed the problems Latino workers were experiencing, with African-American employees.

81.    Plaintiff went to went to the Union along with other Latino employees to complain about unlawful deductions and racist comments made at the worksite. Plaintiff also signed Greg Hall's petition. Plaintiff was laid off while others were able to work.

82.    HENRY TAYLOR .  Plaintiff, HENRY TAYLOR, is an African-American male who is an apprentice carpenter, and was employed by Defendants BBS and IMR from approximately June through early to mid-November 2007. Plaintiff TAYLOR has been subjected to conduct as further described above.

83.    Plaintiff continually sought work with MARSHALL HORNSTEIN beginning in April 2007, but HORNSTEIN delayed hiring Plaintiff.

84.    Plaintiff heard MOISES AVILA tell an African-American employee to "get the fuck off the job."

85.    Plaintiff learned that Ernesto referred to African-Americans as "niggers."

86.    Plaintiff felt that African-Americans were treated with animosity and that foreman

made it more difficult for African-Americans to do their jobs.

87.    Plaintiff signed Greg Hall's petition.

88.    Plaintiff has been laid-off approximately 6 times.

89.    <u>LLOYD THIBEAUX.</u>  Plaintiff LLOYD THIBEAUX is an African-American male who is a carpenter and was employed by Bay Area Construction Framers from May 2007 through the end of October 2007.  He worked under the supervision of STEVE SOSA.  Plaintiff THIBEAUX has been subjected to conduct as further described above.

90.    During his tenure, Plaintiff was deprived of the opportunity to work 40 hours per week, while Caucasian and Latino workers were permitted to do so.  Plaintiff noticed that African-Americans were the first to be sent home when work shut down.  Caucasian and Latino were sent to other work sites, but not African-Americans.

91.    Plaintiff learned from a co-worker that SOSA made a hangman's noose.

92.    Plaintiff also learned about the warehouse meeting and the awful attempt to pit African-American workers and Latino workers against each other.

93.    <u>MICHAEL BROWN.</u>  Plaintiff MICHAEL BROWN is an African-American male with two years experience as a laborer and three years experience as a roofer.  Plaintiff BROWN was qualified to perform the duties of Laborer and Roofer.  From July 2007 through September 2007, Plaintiff Brown attempted to obtain employment from Defendants BBS and IMR, both through the City Build Program and by applying directly with Defendants.

94.    Plaintiff BROWN has been subjected to conduct as further described above.

95.    From July 2007 through September 2007, Plaintiff Brown was dispatched five times as a Laborer to begin working at the BHPRP.  However, each time he reported to the worksite, he was

told that no work was available.

96.    Plaintiff BROWN spoke with RICHARD INGRAM, DON MALOY, and MICHAEL CUNNINGHAM who informed him that he would be hired. But Plaintiff BROWN was not hired. However, Plaintiff BROWN observed that Latino workers were being hired.

97.    ASTRIAN CAEL. Plaintiff ASTRIAN CAEL is an African-American female who was employed as an Apprentice Carpenter by BACF at the BHPRP. Plaintiff CAEL was paid $21.96 per hour, and later was re-rated to $23.56 per hour. She worked from approx June 2007 thru December 21, 2007. Plaintiff CAEL has been subjected to conduct as further described above.

98.    Plaintiff CAEL performed interior finish and carpentry. During the first three weeks she worked ten-hour shifts and received two rest periods but not a third. Thereafter, Plaintiff worked eight-hour shifts but only received one ten-minute rest period. Plaintiff complained about not receiving all required rest periods to Supervisor JOHN BENTNER, who replied "You do not get a 2nd break." Plaintiff was prohibited from leaving the jobsite during her rest and meal periods.

99.    During her employment, Plaintiff CAEL was told by another employee that he heard Supervisor BENTNER say the word "nigger" five or six times at the jobsite. There were also "inside" jokes about African-Americans. African-Americans were segregated as a group from the core workers (Caucasian). The African-American employees were overly scrutinized. Caucasians and a carpenter's apprentice (Filipino) were not treated in this manner.

100.    Plaintiff CAEL was laid off about three or four times, and was told there was no work. However, the Caucasian employees would still be working.

101.    ARNULFO CARRANZA-RIVAS. Plaintiff, ARNULFO CARRANZA-RIVAS, is a Latino male who is a carpenter, and was employed by Defendant IMR for approximately one month

during the June/July time period in 2007. Plaintiff was supposed to earn $33.25 per hour. However,

DAGOBERTO LIBORI informed him that he would earn $32.00 per hour. Plaintiff was subjected to

supervision by GASPAR [LNU]

102.    Plaintiff CARRANZA-RIVAS has been subjected to conduct as further described

above.

103.    Plaintiff worked eight hours per day, five days per week, and was paid approximately

$300 in cash. The remainder of his pay was retained by DAGOBERTO LIBORI, the team leader.

Plaintiff is informed and believes that these proceeds were shared by other supervisors.

104.    Plaintiff was rushed during lunch breaks and told that he did not need that long to eat.

105.    Plaintiff felt threatened. The Latinos were told to hide if union representatives came

and to say that they were getting paid by check even though many were not.

106.    The leads and supervisors were always saying negative things about the African

Americans when they were not around -- they would say how "lazy," and "slow" "those blacks are."

To the rest of us, the Hispanics/Latinos, they would say "hurry up fuckers, move your fucking asses."

107.    Plaintiff complained to the Union in approximately July about the unlawful deductions.

Shortly thereafter, Plaintiff was terminated by GASPAR.

108.    APOLINAR CORNEJO. Plaintiff, APOLINAR CORNEJO, a Latino male, is a

carpenter who worked on BHPRP for IMR and/or BBS. Plaintiff CORNEJO worked from

approximately May 2007 through August 2007. Plaintiff CORNEJO has been subjected to conduct as

further described above.

109.    MARCO CORREA is an individual with a connection to BBS supervisor ERNESTO

CUNNINGHAM. CORREA solicited Latino workers, including Plaintiff CORNEJO, picked them up

and drove them to the jobsite. CORREA said he had a connection to ERNESTO CUNNINGHAM.

CORREA said that he would get Plaintiff into a union and get him a union card, but that he would

"work" for CORREA and get paid cash.

110.    ERNESTO CUNNINGHAM would hide Plaintiff and other non-union Latinos in a

warehouse about five miles away. CUNNINGHAM told workers to hide if the union steward were to

show up. Plaintiff CORNEJO was "caught" by the union once and CUNNINGHAM & IMR were

fined. CUNNINGHAM was upset and said Plaintiff had to hide when they showed.

111.    During the first three weeks Plaintiff was not paid for all hours worked, he was only

paid $80 per day, the remainder was kept by CORREA (who received Plaintiff's check from

CUNNINGHAM). CUNNINGHAM and TEMO ARELLANO said they [Mexican laborers] "have

never earned this kind of money", and "you are not worth the money."

112.    The first month Plaintiff worked full days but was not allowed any rest periods. No

African-Americans worked during the first month on the job. After African-Americans began working

they asserted their rights and some workers started receiving rest periods.

113.    Plaintiff was eventually paid by check from BBS. Although Plaintiff was performing

carpenter services his job title was "roofer" and he was paid roofer wages of $16 per hour, well below

the $33.25 he should have received for Carpenter work.

114.    Latinos and African-Americans were segregated to work in groups by race. Plaintiff

and others complained to the union about the pay situation and being hid from the union.

CUNNINGHAM then refused to "deal" with Plaintiff, who was reassigned from carpenter work to

labor work – Plaintiff cleaned up the work area along with an African-American female named Molly.

Shortly thereafter Plaintiff and the other "complainers" were terminated. CORREA commented to

make sure everything turns out OK or who knows what will happen to you.

115.  ROY EDWARDS.  Plaintiff, ROY EDWARDS, an African-American male, was employed by Defendants BBS and IMR from approximately May or June 2007 through January 2008. Plaintiff's supervisors were ERNESTO CUNNINGHAM and CHEWY SANDOVAL.  Plaintiff EDWARDS has been subjected to conduct as further described above.

116.  During his tenure, Plaintiff EDWARDS was laid off several times with other African-American workers while Latino employees continued to work.

117.  On one occasion, when CUNNINGHAM told Plaintiff to go home because "work was slow," Plaintiff asked CUNNINGHAM why he was always the first one to get sent home.  In response, CUNNINGHAM called Plaintiff a "motherfucker" and told him to find another job.  Plaintiff did not hear CUNNINGHAM speak to Latino employees in this manner.

118.  CUNNINGHAM and SANDOVAL told Plaintiff and other African-American employees that they were not doing their jobs well, that they were not performing their duties, and that they needed to work "faster."  MARSHALL HORNSTEIN also told Plaintiff EDWARDS and other African-American employees that they need to work "faster."  Plaintiff EDWARDS asked CUNNINGHAM questions in English, but he would respond in Spanish.  CUNNINGHAM usually gave instructions to employees in Spanish, but not in English.

119.  Plaintiff EDWARDS was deprived of the opportunity to work a full forty hours per week, but Latino employees were permitted to work their full 40 hours per week.  Plaintiff and other African-American employees were made to wait for Latino workers to get their tools before African-Americans were given tools.

120.  MOISES AVILA told Plaintiff EDWARDS that he did not work fast enough and could

1    not keep up with the Latino employees.

2        121.    <u>VICTOR HAMPTON</u>.  Plaintiff, VICTOR HAMPTON, is an African-American male

3    who was employed by BACF as a journeyman carpenter from May through September 2007.  During

4    the course of his employment with Defendant BACF Plaintiff worked under the supervision of JOHN

5    BENTNER and STEVE SOSA.  Plaintiff HAMPTON has been subjected to conduct as further

6    described above.

7        122.    During his tenure, Plaintiff HAMPTON was laid off many times along with other

8    African American workers.  However, Plaintiff noticed that other non-African American employees,

9    the majority of whom were Caucasian, were permitted to continue working for Defendant BACF.

10       123.    Supervisors BENTNER and SOSA regularly told African-American employees that

11   their work was not as good as the Caucasian employees.  Supervisors BENTNER and SOSA regularly

12   told African-American employees that Caucasian employees could do a better job than African-

13   American workers.  Supervisors BENTNER and SOSA also commented that Caucasian apprentice

14   carpenters could do a better job than African-Americas carpenters.

15       124.    Plaintiff HAMPTON, along with other African-American employees were not provided

16   tools for performing their duties, although Defendant BACF was supposed to provide these tools.

17   Plaintiff complained to the union about this practice at which time BENTNER relented and would give

18   Plaintiff tools.  However, Caucasian employees were always provided tools.

19       125.    Plaintiff HAMPTON and other African-American employees received less desirable

20   assignments, such as cleaning out cabinets and removing them, while Caucasian employees were

21   assigned more desirable work, such as installing cabinets.

22       126.    <u>RANDY KEYS</u>.  Plaintiff, RANDY KEYS, an African-American male was employed

by Defendants BBS and IMR as a carpenter and foreman from July 2007 to mid-January 2008.

Plaintiff KEYS has been subjected to conduct as further described above.

127.    At the time of his hire by Defendant BBS, MARSHALL HORNSTEIN informed

Plaintiff KEYS that he would be a foreman.  However, when he commenced his employment, Plaintiff

did not perform the duties of foreman, but of carpenter.  Only after Plaintiff complained to his union

did HORNSTEIN assign Plaintiff to work as a foreman.  Thereafter, Plaintiff supervised African-

American employees at both BBS and IMR.

128.    During his tenure, Plaintiff Keys, laid off no less than four times by Defendant BBS

because "work was slow," including January, 2008.  However, Latino employees continued to work at

the jobsite each time.

129.    Plaintiff KEYS was deprived of the opportunity to work 40 hour weeks, however,

Latino employees did work 40 hour weeks.

130.    ERNESTO CUNNINGHAM and TEMO ARELLANO regularly told African-American

workers to "hurry up" and that they were "too slow."  Plaintiff heard ERNESTO CUNNINGHAM tell

an African-American employee to "get off [CUNNINGHAM's] motherfucking job."  Plaintiff also

regularly heard CUNNINGHAM ask African-American employees what they were doing, why they

weren't doing their jobs, that they needed to work faster, that they weren't competing with "his guys"

[Latino workers].  CUNNINGHAM stated that African-American workers could not keep up with

Latino workers, that Latinos were better siders and that Latinos could work faster.  Plaintiff heard

CUNNINGHAM tell African-Americans that they were too slow and that they were lazy, and he would

stare as they worked.  CUNNINGHAM rushed African-American workers off their breaks and told

them to speed up.

131.   CUNNINGHAM also asked Plaintiff KEYS and another African-American employee if they knew how to do "plumbing" in a demeaning sexual manner.

132.   Plaintiff KEYS tried to talk to CUNNINGHAM about his treatment of African-American workers, but was ignored. Plaintiff also tried to talk to MOISES AVILA about the mistreatment of African-American workers but Moises simply walked away.

133.   Plaintiff learned that CUNNINGHAM had a barbeque with Latino workers and asked him why African-American employees were not invited. CUNNINGHAM ignored Plaintiff and walked away.

134.   Plaintiff KEYS learned that CUNNINGHAM stated that Latinos were going to get "these black motherfuckers" off this hill, and that he told Latino workers that he did not want them talking to "these black motherfuckers."

135.   ANDRE LARRIMORE. Plaintiff, ANDRE LARRIMORE, is an African-American male with 24 years of experience as a union carpenter who has his own tools and truck. Although Plaintiff applied from November 2007 through January 14, 2008, and would stop by the project daily, he was never was hired for work at BHPRP. Plaintiff also tried to get work through the union hall. Plaintiff also personally spoke with RICHARD INGRAM from Defendant AIMCO, who said he should be put on job by Defendant IMR. However, Plaintiff was never hired. Plaintiff LARRIMORE has been subjected to conduct as further described above.

136.   Plaintiff LARRIMORE also spoke with MARSHALL HORNSTEIN, who told Plaintiff "I like you" and that Plaintiff would be hired real soon. Plaintiff spoke with HORNSTEIN about 15 times. Yet, community people were not hired they were always told there was no work.

137.   TERRY MACKEY. Plaintiff, TERRY MACKEY, a male African-American

employee, worked for Defendants BBS and IMR from June 2007 through September 2007. During his tenure, Plaintiff Mackey worked under the supervision of MARSHALL HORNSTEIN, ERNESTO CUNNINGHAM, JESUS "CHEWY" SANDOVAL and QALTEMO "TEMO" ARELLANO. Plaintiff MACKEY has been subjected to conduct as further described above.

138.    During his tenure, Plaintiff MACKEY was deprived of the opportunity to work a full forty hours per week. However, Latino employees were permitted to work a full forty hours per week. Defendants BBS and IMR laid-off Plaintiff MACKEY, along with other African-American employees, several times. However, Latino employees were permitted to work.

139..   Plaintiff MACKEY was forced to compete with Latino employees who did siding work. Plaintiff asked CUNNINGHAM and HORNSTEIN to integrate Latino and African-American crews, but was ignored. Plaintiff and other African-American employees had to wait for tools to perform their work, while Latino workers were given tools first. Defendants BBS and IMR hindered African-American workers from getting the materials they needed for their assignments, but Latinos were not. African-Americans retrieved their own materials while materials were delivered to the Latinos.

140.    ERNESTO CUNNINGHAM stated to Plaintiff and other African-American employees that Latino employees could perform their work better. CUNNINGHAM also belittled the quality of the work of African-American employees. CUNNINGHAM and HORNSTEIN stated to Plaintiff and other African-American workers that they were working too slowly. Plaintiff learned that CUNNINGHAM, SANDOVAL and ARELLANO stated that African-Americans were not good workers and that their workers could not compare to Latino employees. Plaintiff also learned about a meeting that CUNNINGHAM and others held with Latino workers where he said African-Americans were at "war" with Latinos, that African-Americans did not like Latinos, that Latinos should not try to

get along with African-Americans, and that Latinos should ignore African-Americans.

141.    DOUGLAS TURNER.  Plaintiff, DOUGLAS TURNER, an African-American male, was not hired for BHPRP.  Plaintiff has 13 years experience with Local 22 as a carpenter.  Despite his qualifications Plaintiff TURNER was not hired.  Plaintiff TURNER has been subjected to conduct as further described above.

142.    Plaintiff applied for work from 6am – 1pm from August 2007 through January 14, 2008, and went by the jobsite at least 20-30 times.  For example, Plaintiff applied with JOHN BENTNER of BACF.  Plaintiff was told there was a lack of work, but instead Latinos were hired even though Plaintiff lives two blocks from the worksite.   Plaintiff applied with TEMO ARELLANO of BBS who would also say they did not need workers.

143.    JEFF WEST.  Plaintiff, JEFF WEST, an African-American male, initially applied for work with ERNESTO CUNNINGHAM of Defendant BBS.  CUNNINGHAM would tell Mr. WEST to show up the next day in his work gear, which Plaintiff would do as told but then was told there was no work for him.  This happened five days and Plaintiff was never paid for coming out.

144.    Subsequently, Plaintiff was employed by IMR and BBS from approximately August, 2007, through January 2, 2008.  Plaintiff started work as a Laborer and later became a Carpenter's Apprentice in November, 2007.  Plaintiff WEST has been subjected to conduct as further described above.

145.    Plaintiff learned that MARSHALL HORNSTEIN of BBS listed Mr. WEST as a Carpenter's Apprentice for the entire time period he worked but for the first two months was doing the work, and being paid, as a Laborer.  The prevailing wage for a Laborer was $13/hour; for a Carpenter's Apprentice was $23.00/hour.  This was brought to the attention of JOHN [last name unknown] from

AIMCO, an African-American male, who directed MOISES AVILA to treat Plaintiff WEST as a Carpenter's Apprentice consistent with WEST's status in the computer. Thereafter, Plaintiff was assigned the duties of a Carpenter's Apprentice and was eventually paid at the correct rate.

146.    Supervisors TEMO ARELLANO and MOISES AVILA would give conflicting orders to the workers, including Plaintiff WEST, and this would cause further screaming by one or both supervisors.

147.    Crews were segregated according to race, Latinos v. African-Americans. The groups were treated differently. For example, many Latinos did not speak English and would throw debris from roof and call out in Spanish, which became a safety issue Plaintiff complained about to AVILA but the problem persisted. Another time AVILA put two crews together, one Latino and one African-American, and he called them together and gave directions in Spanish then walked off. AVILA never came back and gave directions in English. The African-American crew was just left there without a work assignment.

148.    ROBERT WHITE. Plaintiff Robert White, an African-American male, was employed by Defendants BBS and IMR from Summer 2007 through November 2007. Plaintiff was supervised by ERNESTO CUNNINGHAM and JESUS SANDOVAL. Plaintiff WHITE has been subjected to conduct as further described above.

149.    During his tenure, Plaintiff WHITE was laid off several times, along with other African-American employees. Plaintiff White was also sent home on many occasions and was deprived of the opportunity to work an eight-hour day. However, during these times when Plaintiff and other African-American employees were not permitted to work, Latino employees remained on the job. Plaintiff and other African-American employees were deprived of the opportunity to work

overtime.  However, Latino employees were able to work overtime.

150.   Plaintiff WHITE and other African-American employees were segregated by race. Plaintiff and other African-American employees were largely assigned to the window crew and generally were not permitted to do siding.  However, Latino workers were permitted to perform window work in addition to siding.  When tools were disseminated, Plaintiff White and other African American employees were last to get tools.  Plaintiff observed that ERNESTO CUNNINGHAM and JESUS SANDOVAL gave assignments and instructions in Spanish, but not in English.

151.   Plaintiff WHITE heard ERNESTO CUNNINGHAM call an African-American worker a "motherfucker."  However, Plaintiff did not hear CUNNINGHAM use this term with Latino employees.  Plaintiff learned that CUNNINGHAM called African-American workers "niggers." Plaintiff observed that CUNNINGHAM stared at African-American employees while they worked, then would shake his head and walk away.  CUNNINGHAM said Plaintiff and other African-American workers needed to hurry up and that they weren't keeping up with Latino workers. CUNNINGHAM described Latino workers' progress to African-American workers in an attempt to encourage the groups to compete against each other.  CUNNINGHAM also threatened African-American workers that if they did not work faster, there would be layoffs.  JESUS SANDOVAL similarly rushed the African-American employees when they worked.

152.   MARQUEZ BOYD.  Plaintiff Marquez Boyd, an African-American male, was employed by Defendant BBS from May 2007 through December 2007.  Plaintiff was given the title of "Roofer" yet he did not perform roofing work and performed the work of a laborer, as he has for the last 10 years.  Thus, Plaintiff was underpaid for the work he actually performed.  Plaintiff was supervised by ERNESTO CUNNINGHAM and JESUS SANDOVAL.  Plaintiff BOYD has been

subjected to conduct as further described above.

153.    During his tenure, Plaintiff BOYD was laid off several times, along with other African-American employees. Plaintiff BOYD was also sent home on many occasions and was deprived of the opportunity to work an eight-hour day. However, during these times when Plaintiff and other African-American employees were not permitted to work, Latino employees remained on the job. Plaintiff and other African-American employees were deprived of the opportunity to work overtime. However, Latino employees were able to work overtime.

154.    Plaintiff BOYD and other African-American employees were segregated by race. Plaintiff and other African-American employees were largely assigned to the window crew and generally were not permitted to do siding. However, Latino workers were permitted to perform window work in addition to siding. When tools were disseminated, Plaintiff White and other African American employees were last to get tools. Plaintiff observed that ERNESTO CUNNINGHAM and JESUS SANDOVAL gave assignments and instructions in Spanish, but not in English.

155.    Plaintiff BOYD's co-workers told him on various occasions that management used the term "nigger" in referring to African-Americans. The co-workers also said management characterized African-American workers as "dumb" and "slow." Management also told the Latinos not to work with the African-Americans. The supervisors also told Plaintiff BOYD and his African-American crew that they were too slow and that they were going to get fired. Plaintiff frequently observed supervisors speaking Spanish to co-workers and then they would stare at Plaintiff and laugh. Sometimes Plaintiff made out the words being used, such as "puto" and "maricon."

## FIRST CAUSE OF ACTION
### FAILURE TO PAY WAGES DUE INCLUDING PUBLIC WORKS PREVAILING WAGE
### (LABOR CODE §§ 204, 1771, 1774)

156.    The allegations of each of the preceding paragraphs are realleged and incorporated

herein by reference.

157.    Cal. Labor Code § 204 provides that all wages, earned by any person in any employment are due and payable at least twice during each calendar month, on days designated in advance by the employer as the regular paydays.

158.    Cal. Labor Code § 1771 provides that except for public works projects of one thousand dollars ($1,000) or less, not less than the general prevailing rate of per diem wages for work of a similar character in the locality in which the public work is performed, and not less than the general prevailing rate of per diem wages for holiday and overtime work fixed as provided in this chapter, shall be paid to all workers employed on public works.

159.    Cal. Labor Code § 1774 provides that a contractor to whom the contract is awarded, and any subcontractor under him, shall pay not less than the specified prevailing rates of wages to all workmen employed in the execution of the contract.

160.    Plaintiffs were deprived of earned regular and overtime wages as set forth hereinabove, including payments on their behalf for fringe benefits such as vacation, pension and the like.

161.    In depriving Plaintiffs of their earned regular and overtime wages, Defendants failed to pay Plaintiffs all wages due, including the prevailing wage in violation of Labor Code §§ 204, 1771 and 1774.

162.    As a result of Defendants' unlawful acts, Plaintiffs have been deprived of wages in amounts to be determined at trial, and are entitled to recovery of such amounts, plus interest thereon, attorneys' fees, and costs, under Labor Code §§ 218.5 and 1194.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## SECOND CAUSE OF ACTION
## UNLAWFUL DEDUCTIONS
### (Labor Code §§ 221, 222 and 223)

163.    The allegations of each of the preceding paragraphs are realleged and incorporated

herein by reference.

164.    Labor Code § 221 provides: "It shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee."

165.    Labor Code § 222 provides: "It shall be unlawful, in case of any wage agreement arrived at through collective bargaining, either wilfully or unlawfully or with intent to defraud an employee, a competitor, or any other person, to withhold from said employee any part of the wage agreed upon."

166.    Labor Code § 223 provides: "Where any statute or contract requires an employer to maintain the designated wage scale, it shall be unlawful to secretly pay a lower wage while purporting to pay the wage designated by statute or by contract."

167.    Defendants have violated Labor Code §§ 221, 222 and 223 by unlawfully taking deductions from Plaintiffs' compensation as set forth hereinabove, and including deducting amounts from Plaintiff's earned wages for the purpose of paying vacation and work fees, and also for making an agreement to pay Plaintiffs at a lower hourly rate than prescribed by a union agreement.

168.    Because Defendants made unlawful deductions from Plaintiffs' compensation, they are liable to Plaintiffs for compensation that should have been paid but for the unlawful deductions, pursuant to Labor Code §§ 221 and 223.

169.    Defendants are liable for penalties under Labor Code § 225.5:

(a)    For any initial violation, one hundred dollars ($100) for each failure to pay each employee.

(b)    For each subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for each failure to pay each employee, plus 25 percent of the amount unlawfully

withheld.

170.    By unlawfully deducting wages and failing to pay Plaintiffs, Defendants are also liable for reasonable attorneys' fees and costs under Labor Code § 218.5.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### THIRD CAUSE OF ACTION
### FAILURE TO PAY OVERTIME COMPENSATION
### (LABOR CODE §§ 510 and 1194)

171.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

172.    By failing to pay overtime compensation to Plaintiffs as set forth hereinabove, Defendants have violated and continue to violate Labor Code § 510 which requires overtime compensation to non-exempt employees.

173.    As a result of Defendants' unlawful acts, Plaintiffs have been deprived of overtime compensation in an amount to be determined at trial, and are entitled to recovery of such amounts, plus interest thereon.

174.    By violating Labor Code § 510, Defendants are liable for attorneys' fees and costs under Labor Code §1194.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### FOURTH CAUSE OF ACTION
### UNLAWFUL FAILURE TO FURNISH ACCURATE WAGE STATEMENTS
### (LABOR CODE § 226(a) and (e))

175.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

176.    Labor Code § 226(a) requires employers semi-monthly or at the time of each payment of wages to furnish each employee with a statement itemizing, inter alia, the total hours worked by the employee, all deductions, and net wages earned.  Labor Code § 226(e) provides that if an employer

1  knowingly and intentionally fails to provide a statement itemizing, _inter alia_, the total hours worked by

2  the employee, all deductions, and net wages earned, then the employee is entitled to recover the greater

3  of all actual damages or fifty dollars ($50) for the initial violation and one hundred dollars ($100) for

4  each subsequent violation, up to four thousand dollars ($4000).

5       177.   Defendants knowingly and intentionally failed to furnish Plaintiffs with timely,

6  itemized statements showing the total hours they worked, all deductions taken, and net wages earned,

7  as required by Labor Code § 226(a).  As a result, Defendants are liable to Plaintiffs for the amounts

8  provided by Labor Code § 226(e).

9

10      178.   As a result of Defendants' violation of Labor Code section 226(a), Plaintiffs are entitled

11  to reasonable attorney's fees and costs as provided by Labor Code § 226(e).

12      WHEREFORE, Plaintiffs request relief as hereinafter provided.

13                        **FIFTH CAUSE OF ACTION**
14              **FAILURE TO PROVIDE ADEQUATE MEAL PERIODS**
                        **(LABOR CODE §§ 226.7, 512)**
15
16      179.   The allegations of each of the preceding paragraphs are realleged and incorporated

17  herein by reference.

18      180.   Plaintiffs regularly worked in excess of five (5) hours a day without being afforded at

19  least half-hour meal periods in which they were relieved of all duties, as required by Labor Code

20  §§ 226.7 and 512.

21      181.   Defendants did not pay Plaintiffs an additional hour of pay for each day Plaintiffs did

22  not receive an off-duty meal period.

23      182.   Because Defendants failed to afford proper meal periods, Defendants are liable to

24  Plaintiffs for one hour of additional pay at the regular rate of compensation for each workday that the

25  proper meal periods were not provided, pursuant to Labor Code § 226.7(b).

26      183.   By violating Labor Code §§ 226.7 and 512, Defendants are also liable for attorneys'

27

28

fees and costs under Labor Code §§ 218.5.

184.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### SIXTH CAUSE OF ACTION
### FAILURE TO PROVIDE ADEQUATE REST PERIODS
### (LABOR CODE §§ 226.7, 512)

185.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

186.    Plaintiffs regularly worked in excess of four (4) hours a day without being afforded ten-minute rest breaks in which they were relieved of all duties, as required by Labor Code §§ 226.7 and 512.

187.    Defendants did not pay Plaintiffs an additional hour of pay for each day Plaintiffs did not receive an off-duty rest break.

188.    Because Defendants failed to afford proper rest periods, Defendants are liable to Plaintiffs for one hour of additional pay at the regular rate of compensation for each workday that the proper rest periods were not provided, pursuant to Labor Code § 226.7(b).

189.    By violating Labor Code §§ 226.7 and 512, Defendants are also liable for attorneys' fees and costs under Labor Code §§ 218.5.

190.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### SEVENTH CAUSE OF ACTION
### WAITING TIME PENALTIES
### (LABOR CODE §§ 201 & 203)

191.    The allegations of each of the preceding paragraphs are realleged and incorporated

herein by this reference.

192.    Labor Code § 201 requires an employer who discharges an employee to pay all compensation due and owing to that employee immediately upon discharge.

193.    Labor Code § 203 provides that if an employer willfully fails to pay compensation promptly upon discharge, as required by § 201, then the employer is liable for waiting time penalties in the form of continued compensation of up to 30 work days.

194.    Defendants willfully failed and refused to timely pay compensation and wages, including unpaid meal and rest period compensation, sums wrongfully deducted from compensation, and regular and overtime wages to Plaintiffs whose employment Defendants terminated.

195.    As a result of Defendants' unlawful acts, Plaintiffs have been deprived of wages in amounts to be determined at trial, and are entitled to recovery of such amounts, plus interest thereon, waiting time penalties, and attorneys' fees, and costs, under Labor Code §§ 203, 218.5.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

<div align="center">

### EIGHTH CAUSE OF ACTION
### HARASSMENT IN VIOLATION OF CALIFORNIA PUBLIC POLICY
### RACE- HOSTILE WORK ENVIRONMENT
### (CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(j))

</div>

196.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

197.    Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin.

198.    Cal. Govt. Code § 12940(j) provides that it shall be unlawful for an employer to harass an employee. Section 12940(j) further provides that harassment of an employee, by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An

employer may also be responsible for the harassing acts of nonemployees or persons providing services pursuant to a contract in the workplace, where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

199.    Defendants harassed and discriminated against Plaintiffs on the basis of race in violation of Cal. Const. Art. 1 § 8 and Cal. Govt. code §12940 as set forth hereinabove, including subjecting Plaintiffs to a hostile work environment. The wrongful conduct was offensive and unwelcome. The wrongful conduct was sufficiently severe or pervasive to adversely and materially affect Plaintiffs' ability to perform their job duties. Plaintiffs either experienced the wrongful conduct firsthand or were later informed of it.

200.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

201.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### NINTH CAUSE OF ACTION
### HARASSMENT IN VIOLATION OF CALIFORNIA PUBLIC POLICY
### NATIONAL ORIGIN- HOSTILE WORK ENVIRONMENT
### (CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(j))

202.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

203.    Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color or national or ethnic origin.

204.    Cal. Govt. Code § 12940(j) provides that it shall be unlawful for an employer to harass an employee.  Section 12940(j) further provides that harassment of an employee, by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the harassing acts of nonemployees or persons providing services pursuant to a contract in the workplace, where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

205.    Defendants harassed and discriminated against Plaintiffs on the basis of national origin in violation of Cal. Const. Art. I § 8 and Cal. Govt. code §12940 as set forth hereinabove, including subjecting Plaintiffs to a hostile work environment.  The wrongful conduct was offensive and unwelcome.  The wrongful conduct was sufficiently severe or pervasive to adversely and materially affect Plaintiffs' ability to perform their job duties.  Plaintiffs either experienced the wrongful conduct firsthand or were later informed of it.

206.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights.  Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

207.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### TENTH CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF CALIFORNIA PUBLIC POLICY
### RACE
### (CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(a))

208.    The allegations of each of the preceding paragraphs are realleged and incorporated

herein by reference.

209.    Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color, or national or ethnic origin.

210.    Cal. Govt. Code section 12940(a) provides that it is unlawful for any employer to discharge or otherwise discriminate against any person in compensation or terms, conditions, or privileges of employment because of race.

211.    Defendants discriminated against Plaintiffs on the basis of race in violation of Cal. Const. Art. 1 § 8 and Cal. Govt. code § 12940 as set forth hereinabove, including, but not limited to forcing Plaintiffs to work harder, work faster, work unsafely, compete with other employees, and failing to hire Plaintiffs . Defendants' conduct impaired Plaintiffs' job performance and prospects for advancement. The wrongful conduct altered the terms, conditions or privileges of Plaintiffs' employment.

212.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

213.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

//

//

## ELEVENTH CAUSE OF ACTION
### DISCRIMINATION IN VIOLATION OF CALIFORNIA PUBLIC POLICY
### NATIONAL ORIGIN
### (CAL. CONST. ART. I § 8; CAL. GOVT. CODE §12940(a))

214.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

215.    Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color or national or ethnic origin.

216.    Cal. Govt. Code section 12940(a) provides that it is unlawful for any employer to discharge or otherwise discriminate against any person in compensation or terms, conditions, or privileges of employment because of national origin.

217.    Defendants discriminated against Plaintiffs on the basis of national origin in violation of Cal. Const. Art. I § 8 and Cal. Govt. code §12940 as set forth hereinabove, including, but not limited to forcing Plaintiffs to work harder, work faster, work unsafely, compete with other employees, and failing to hire. Defendants' conduct impaired Plaintiffs' job performance and prospects for advancement. The wrongful conduct altered the terms, conditions or privileges of Plaintiffs' employment.

218.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

219.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## TWELFTH CAUSE OF ACTION
### RETALIATION IN VIOLATION OF CALIFORNIA PUBLIC POLICY
PROTESTING UNLAWFUL FAILURE TO PAY WAGES AND UNLAWFUL DEDUCTIONS
(Labor Code §1102.5(c))

220.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

221.    Cal. Labor Code §§ 204, 1771, and 1774 require Defendants to pay their employees all earned wages.

222.    Cal. Labor Code §§ 221 and 223 prohibit Defendants from making unlawful deductions from Plaintiffs' wages.

223.    Cal. Labor Code §1102.5(c) provides that, "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

224.    Defendants retaliated against Plaintiffs for complaining about and refusing to participate in activities that violated state and federal statutes. In particular, Defendants engaged in conduct that materially affected the terms, conditions and privileges of Plaintiffs' employment, including termination of Plaintiffs for protesting the underpayment of wages and unlawful deduction of wages in violation of state or federal laws.

225.    As a result, Defendants retaliated against Plaintiffs in violation of California public policy.

226.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages

1  from Defendants.

2  227.  As result of Defendants' unlawful acts as alleged herein, Plaintiffs have suffered

3  damages in an amount according to proof.

4  WHEREFORE, Plaintiffs request relief as hereinafter provided.

5  **THIRTEENTH CAUSE OF ACTION**
6  **RETALIATION IN VIOLATION OF PUBLIC POLICY**
   **PROTESTING RACE AND NATIONAL ORIGIN DISCRIMINATION**
7  **(CAL. CONST. ART. I § 8; CAL. GOVT. CODE § §12940(a),(j)and(h))**

8  228.  The allegations of each of the preceding paragraphs are realleged and incorporated

9  herein by reference.

10

11  229.  Cal. Const. Art. I § 8 expressly states that a person may not be disqualified from

12  entering or pursuing a business, profession, vocation, or employment because of sex, race, creed, color

13  or national or ethnic origin.

14  230.  Cal. Govt. Code §12940(a) provides that it is unlawful for any employer to discharge or

15  otherwise discriminate against any person in compensation or terms, conditions, or privileges of

16  employment because of race or national origin.

17

18  231.  Cal. Govt. Code §12940 (j) provides that it shall be unlawful for an employer to harass

19  an employee. Section 12940(j) further provides that harassment of an employee, "by an employee,

20  other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or

21  should have known of this conduct and fails to take immediate and appropriate corrective action. An

22

23  employer may also be responsible for the harassing acts of nonemployees or persons providing

24  services pursuant to a contract in the workplace, where the employer, or its agents or supervisors,

25  knows or should have known of the conduct and fails to take immediate and appropriate corrective

26  action."

27

28

232.    Cal. Govt. Code §12940 (h) provides that it is unlawful for any employer or person to discriminate against any person because the person has opposed any practices forbidden under the Fair Employment and Housing Act, Government Code section 12940, et seq., or because the person has filed a complaint, testified, or assisted in any proceeding under the Fair Employment and Housing Act.

233.    Defendants retaliated against Plaintiffs for complaining about and refusing to participate in activities that violated state and federal statutes. In particular, Defendants engaged in conduct that materially affected the terms, conditions and privileges of Plaintiffs' employment, including termination of Plaintiffs for protesting Defendants' unlawful discriminatory practices, including a hostile work environment.

234.    As a result, Defendants retaliated against Plaintiffs in violation of California public policy.

235.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

236.    As result of Defendants' unlawful acts as alleged herein, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## FOURTEENTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

237.    The allegations of each of the paragraphs set forth above are realleged and incorporated herein by reference.

238.    Defendants' conduct as set forth hereinabove was so extreme and so outrageous that it

exceeded the boundaries of a decent society and lies outside of the compensation bargain. Said

conduct was intended to cause severe emotional distress, or was done in conscious disregard of the

probability of causing such distress. As a proximate result of Defendants' unlawful acts against

Plaintiffs, Plaintiffs have suffered past, present and future losses in income and earnings, medical

costs, incidental expenses, and has suffered and continues to suffer embarrassment, humiliation and

mental anguish all to damage in an amount according to proof.

239.    Defendants committed the acts alleged herein maliciously, fraudulently and

oppressively, with the wrongful intention of injuring Plaintiffs, from an improper and evil motive

amounting to malice, and in conscious disregard of Plaintiffs' rights. Plaintiffs are thus entitled to

recover punitive damages from Defendants in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

### FIFTEENTH CAUSE OF ACTION
**(Race, Color, National Origin and/or ancestry Discrimination, Cal Gov C §12940)**

240.    The allegations of each of the preceding paragraphs are realleged and incorporated

herein by reference.

241.    Plaintiffs at all times material hereto were employees covered by California

Government Code §§ 12940, et seq., prohibiting discrimination in employment on the basis of race,

color, national origin and/or ancestry.

242.    Defendants at all times material were employers within the meaning of California

Government Code § 12926 and, as such, barred from discriminating in employment on the basis of

race, color, national origin and/or ancestry as set forth in California Government Code § 12940.

243.    Defendants discriminated against Plaintiffs on the basis of race, color, national origin

and/or ancestry in violation of California Government code §§ 12940, et seq., as set forth above,

including but not limited to subjecting Plaintiffs to disparate and adverse treatment.

244.    Plaintiffs filed timely charges of discrimination with the California Department of Fair Employment and Housing ("DFEH") and received notices of the right to sue in a California Superior Court pursuant to California Government Code §12965(b) permitting Plaintiffs to bring this action. Therefore, Plaintiffs have exhausted all of their administrative remedies.

245.    As a proximate result of Defendants' unlawful acts against Plaintiffs, Plaintiff have suffered past, present and future losses in income and earnings, medical costs, incidental expenses, and have suffered and continue to suffer embarrassment, humiliation and mental anguish all to damage in an amount according to proof.

246.    Defendants committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiffs, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiffs' rights.  Plaintiffs are thus entitled to recover punitive damages in an amount according to proof.

247.    As result of Defendants' unlawful acts as alleged herein, Plaintiffs are entitled to reasonable attorney's fees and costs of said suit as provided by California Government Code §12965(b).

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## SIXTEENTH CAUSE OF ACTION
### (Hostile Work Environment - race, color, national origin and/or ancestry, Cal. Govt. Code §12940)

248.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

249.    Plaintiffs at all times material hereto were employees covered by California

Government Code §§ 12940, et seq., prohibiting harassment in employment on the basis of race, color, national origin and/or ancestry.

250.    Defendants at all times material were employers within the meaning of California Government Code § 12926 and, as such, barred from harassment in employment on the basis of race, color, national origin and/or ancestry as set forth in California Government Code § 12940.

251.    Defendants harassed and discriminated against Plaintiffs on the basis of race, color, national origin and/or ancestry in violation of California Government code §12940 as set forth above, including subjecting Plaintiffs to a hostile work environment. The wrongful conduct was sufficiently severe or pervasive to adversely and materially affect Plaintiffs' ability to perform their job duties. Plaintiffs either experienced the wrongful conduct firsthand or were later informed of it.

252.    Plaintiffs filed timely charges of discrimination with the California Department of Fair Employment and Housing ("DFEH") and received notices of the right to sue in a California Superior Court pursuant to California Government Code §12965(b) permitting Plaintiffs to bring this action. Therefore, Plaintiffs have exhausted all of their administrative remedies.

253.    As a proximate result of Defendants' unlawful acts against Plaintiffs, Plaintiff have suffered past, present and future losses in income and earnings, medical costs, incidental expenses, and have suffered and continue to suffer embarrassment, humiliation and mental anguish all to damage in an amount according to proof.

254.    Defendants committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiffs, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiffs' rights. Plaintiffs are thus entitled to recover punitive damages in an amount according to proof.

255.    As result of Defendants' unlawful acts as alleged herein, Plaintiffs are entitled to reasonable attorney's fees and costs of said suit as provided by California Government Code §12965(b).

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## SEVENTEENTH CAUSE OF ACTION
### (Retaliation, Cal Gov C §12940)

256.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

257.    Plaintiffs at all times material hereto were employees covered by California Government Code §§ 12940, et seq., prohibiting retaliation for engaging in protected conduct.

258.    Defendants at all times material were employers within the meaning of California Government Code § 12926 and, as such, barred from retaliation for engaging in protected conduct.

259.    Defendants retaliated against Plaintiffs for engaging in protected conduct as set forth in detail above. After engaging in protected conduct, Plaintiffs were subjected to disparate, adverse treatment including but not limited to termination.

260.    Plaintiffs filed timely charges of discrimination with the California Department of Fair Employment and Housing ("DFEH") and received notices of the right to sue in a California Superior Court pursuant to California Government Code §12965(b) permitting Plaintiffs to bring this action. Therefore, Plaintiffs have exhausted all of their administrative remedies.

261.    As a proximate result of Defendants' unlawful acts against Plaintiffs, Plaintiff have suffered past, present and future losses in income and earnings, medical costs, incidental expenses, and have suffered and continue to suffer embarrassment, humiliation and mental anguish all to damage in an amount according to proof.

262.    Defendants committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiffs, from an improper and evil motive amounting to malice, and in conscious disregard of Plaintiffs' rights.  Plaintiffs are thus entitled to recover punitive damages in an amount according to proof.

263.    As result of Defendants' unlawful acts as alleged herein, Plaintiffs are entitled to reasonable attorney's fees and costs of said suit as provided by California Government Code §12965(b).

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## EIGHTEENTH CAUSE OF ACTION
## RETALIATION
### (Labor Code §§ 1102.5)

264.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

265.    California Labor Code section 1102.5(c) provides that, "An employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

266.    Defendants retaliated against Plaintiffs for engaging in protected conduct, as set forth more fully above.  In taking such actions against Plaintiffs, Defendants violated Labor Code section 1102.5, resulting in damages and injury to Plaintiffs as alleged herein

267.    Defendants committed the acts alleged herein oppressively, maliciously and fraudulently, with the wrongful intention of injuring Plaintiffs, from an evil and improper motive amounting to malice, and in conscious disregard of Plaintiffs' rights.  Thus, Plaintiffs are entitled to recover punitive damages from Defendants.

268.    Labor Code §1102.5(f) provides that a corporation or limited liability company that retaliates against an employee in violation of Labor Code §1102.5(c), is liable for a civil penalty not exceeding ten thousand dollars ($10,000) for each violation.  By violating Labor Code §1102.5(c), Defendants are liable for civil penalties under Labor Code §1102.5(f). Additionally, as a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an amount according to proof.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

## NINETEENTH CAUSE OF ACTION
## RETALIATION
### (Labor Code §§ 98.6)

269.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

270.    California Labor Code section 98.6 provides that employers shall not discriminate against employees or applicants, "…because of the exercise by the employee or applicant for employment on behalf of himself, herself, or others of any rights afforded him or her."

271.    Defendants retaliated against Plaintiffs for engaging in protected conduct, as set forth more fully above.  In taking such actions against Plaintiffs, Defendants violated Labor Code section 98.6.5, resulting in damages and injury to Plaintiffs as alleged herein

272.    In the event of a violation of Labor Code §98.6(b) the employee shall be entitled to reinstatement and reimbursement for lost wages and work benefits caused by those acts of the employer.

WHEREFORE, Plaintiffs request relief as hereinafter provided.

//

//

//

## TWENTIETH CAUSE OF ACTION
### FAILURE TO PAY WAGES AND BENEFITS AS SCHEDULED
### (LABOR CODE §§ 204, 210, 227 and 203.1)

273.    The allegations of each of the preceding paragraphs are realleged and incorporated herein by reference.

274.    Labor Code § 204 requires an employer who pays on a weekly basis to pay each employee within seven calendar days of the close of the payroll period. Defendants failed to make benefit and/or wage payments by either failing to present Plaintiffs with any payment at all, providing paychecks unsigned or otherwise defective, or by having insufficient funds to cover the paychecks as written. discharges an employee to pay compensation due and owing to said employee immediately upon discharge.

275.    Defendants violated Labor Code § 204, and under Labor Code § 210 are liable to Plaintiffs for the following penalties:

(a) For any initial violation, one hundred dollars ($100) for each failure to pay each employee.

(b) For each subsequent violation, or any willful or intentional violation, two hundred dollars ($200) for each failure to pay each employee, plus 25 percent of the amount unlawfully withheld.

276.    Defendants also violated Labor Code § 203.1 which provides:

If an employer pays an employee in the regular course of employment or in accordance with Section 201, 201.5, 201.7, or 202 any wages or fringe benefits, or both, by check, draft or voucher, which check, draft or voucher is subsequently refused payment because the employer or maker has no account with the bank, institution, or person on which the instrument is drawn, or has insufficient funds in the account upon which the instrument is drawn at the time of its presentation, so long as the same is presented

within 30 days of receipt by the employee of the check, draft or voucher, those wages or

fringe benefits, or both, shall continue as a penalty from the due date thereof at the same

rate until paid or until an action therefor is commenced.   Defendants are also liable for

attorneys' fees under California Labor Code § 218.5.

277.    Labor Code § 227 requires that whenever an employer has agreed with any employee to

make payments to a health or welfare fund, pension fund or vacation plan, or other such plan for the

benefit of the employees, or a negotiated industrial promotion fund, or has entered into a collective

bargaining agreement providing for such payments, it shall be unlawful for such an employer willfully

or with intent to defraud to fail to make the payments required by the terms of any such agreement.

278.    As a proximate result of the acts of Defendants, Plaintiffs have suffered damages in an

amount according to proof.

279.    WHEREFORE, Plaintiffs pray for judgment against Defendants as set forth below.

### TWENTY-FIRST CAUSE OF ACTION
### FAILURE TO FURNISH SCHEDULED HOURS
### (WAGE ORDER NO. 16-2001)

280.    The allegations of each of the preceding paragraphs are realleged and incorporated

herein by reference.

281.    Wage Order No. 16-2001 § 5(B) requires an employer who furnishes less than half an

employees usual scheduled work hours to pay such employee no less than two hours and up to four

hours at the employee's usual rate of pay.

282.    On or about May 15, 2007, Plaintiffs Richard Rankins, Quincy Mouton, and Randy

Keys reported to work as required and were furnished with less than half of their usual hours.

283.    On or about July 24, 2007, Plaintiffs Randy Keys and Henry Taylor reported to work as required and were furnished with less than half of their usual hours.

284.    On or about July 12, 2007, Plaintiffs Charles Chilton, Gregory Hall, Terry Mackey, Quincy Mouton, Fausto Aguilar, Gonzalo Aguilar, Douglas Givens, Robert White and Roy Edwards reported to work as required and were furnished with less than half of their usual hours.

285.    In failing to furnish Plaintiffs with at least half their scheduled hours, Defendants violated § 5(B) of the Wage Order and are liable to Plaintiffs for all relief, provided pursuant to the Wage Order and Labor Code section 203.

286.    As a proximate result of the acts of Defendant, Plaintiff has suffered damages in an amount according to proof.

WHEREFORE, Plaintiff prays for judgment against Defendant as set forth below.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request relief from Defendants as follows:

1.    For compensatory damages for lost wages, earnings, and benefits, according to proof;

2.    For general damages for humiliation, mental anguish and emotional distress, according to proof;

3.    For consequential damages, according to proof;

4.    For special damages, according to proof;

5.    For punitive damages, according to proof;

6.    For reasonable attorneys' fees, according to proof;

7.    For reasonable costs, according to proof;

8.    Injunctive relief to address the wrongs alleged herein; and

9.    For such other and further relief as the Court may deem just and proper.

1

## DEMAND FOR JURY TRIAL

2

Plaintiffs hereby request a trial by jury in this matter.

3

4

Dated: April 17, 2008

SUNDEEN SALINAS & PYLE

5

6

7

8

ROBERT SALINAS
Attorney at Law

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

# SIMPSON, GARRITY & INNES

PROFESSIONAL CORPORATION
ATTORNEYS AT LAW
601 GATEWAY BOULEVARD, SUITE 950
SOUTH SAN FRANCISCO, CALIFORNIA 94080
TELEPHONE (650) 615-4860
FACSIMILE (650) 615-4861
WWW.SGILAW.COM

PAUL V. SIMPSON
PSIMPSON@SGILAW.COM

CONFERENCE FACILITIES
AVAILABLE IN SAN JOSE,
MILL VALLEY & SAN MATEO

May 23, 2008

Robert Salinas, Esq.
Sundeen Salinas & Pyle
1330 Broadway, Suite 1830
Oakland, CA 94612

     Re    *Hall et al. v. Apartment Investment And Management Co. et al.*
         Our File Number: 30625-7

Dear Mr. Salinas:

    We represent IMR Contractor Corporation ("IMR") with respect to the above-referenced lawsuit. The purpose of this letter is to inform you that the recent service of the summons and first amended complaint on IMR was ineffective.

    On May 6, 2008, IMR was served with a copy of the summons and first amended complaint. The summons is dated March 12, 2008 and the first amended complaint indicates it was filed the same day. The first amended complaint served on IMR bears an original "Endorsed Filed" stamp in blue ink.

    We have learned, however, that on April 22, 2008, the Court entered an order ("Order") granting your clients' motion to file a second amended complaint. The Order states "A summons is to issue upon filing and the Second Amended Complaint is to be served on all Defendants." We are informed that the second amended complaint was filed the same day that the Order was entered, April 22, 2008. Further, we understand that the second amended complaint adds two new causes of action and an additional plaintiff to the lawsuit.

    A court does not acquire jurisdiction over a defendant unless the defendant has been properly served with the summons and complaint. *Ruttenberg v. Ruttenberg* (1997) 53 Cal.App.4th 801, 808 (until the statutory requirements for service are satisfied, the court lacks jurisdiction over a defendant). Actual notice of a lawsuit is not a substitute for service of process. *Id.* Further, once an amended complaint is filed, the original complaint drops out of the case and ceases to have any effect as a pleading or as a basis for a judgment. *Hayes v. Risk* (1967) 255 Cal.App.2d 613, 623. An amended complaint must be served on all parties to the action. Cal. Civ. Proc. Code § 471.5(a). The time to respond to an amended complaint begins to run from "service" of the amended complaint. *Id.* Where a defendant has not appeared in the

Robert Salinas, Esq
May 23, 2008
Page 2

action, the amended complaint must be served in the manner provided for the service of a summons. *Engebretson & Co. Inc v. Harrison* (1981) 125 Cal.App.3d 436, 443

Here, an amended summons was issued and the second amended complaint was filed prior to the service on IMR of the first amended complaint. IMR has not been served with the amended summons or the second amended complaint as required by the Order. When the second amended complaint was filed, it superseded the first amended complaint, and the first amended complaint ceased to have any effect in the case. Thus, IMR was served with both a summons and complaint that had been superseded and without effect. As a result, the service on IMR of the March 12, 2008 summons and the first amended complaint was defective and ineffective.

As a gesture of good faith and professional courtesy and to save the Plaintiffs the cost to personally and properly serve IMR, we have been authorized to accept service of the amended summons and the second amended complaint on behalf of IMR. Therefore, we request that you mail to us a copy of the amended summons, the second amended complaint, and a Notice of Acknowledgment of Receipt.

Finally, I would like to meet with you informally and in person to discuss this case and the possibility of an early resolution. Please let me know if you are willing to participate in such a meeting.

Sincerely,

Paul V. Simpson

PVS/tod

cc:    Isamel Avila

# EXHIBIT E

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Robert Salinas (Bar # 184260), Pamela Kong (Bar # 220912), Jorge Aguilar (Bar # 238111) | |

SUNDEEN SALINAS & PYLE
1330 Broadway, Suite 1830
Oakland, CA 94612

TELEPHONE NO (510) 663-9240    FAX NO *(Optional)* (510) 663-9241
E MAIL ADDRESS *(Optional)*
ATTORNEY FOR *(Name)* Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO
STREET ADDRESS 400 McAllister
MAILING ADDRESS
CITY AND ZIP CODE San Francisco 94102
BRANCH NAME

PLAINTIFF/PETITIONER Gregory Hall, et al.

DEFENDANT/RESPONDENT Apartment Investment and Management Company, et al.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER |
|---|---|
| | CGC07470047 |

TO *(insert name of party being served)* IMR Contractor Corporation

### NOTICE

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: May 27, 2008

Pamela Kong
(TYPE OR PRINT NAME)

(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

### ACKNOWLEDGMENT OF RECEIPT

This acknowledges receipt of *(to be completed by sender before mailing)*:
1. ☐ A copy of the summons and of the complaint.
2. ☒ Other *(specify)*:
   Amended Summons; Second Amended Complaint; Order Continuing Case Management Conference; DFEH Charge for Marquez Boyd; Right to Sue Notice for Marquez Boyd

*(To be completed by recipient)*:

Date this form is signed: 6/20/09

PAUL V. SIMPSON on behalf of
IMR Contractor Corporation
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

Paul V. Simpson, Attorney
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 (Rev. January 1, 2005)

NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

*LexisNexis® Automated California Judicial Council Forms*

# EXHIBIT F

1

2

3

4

5

6

7

SUPERIOR COURT OF THE STATE OF CALIFORNIA

8

COUNTY OF SAN FRANCISCO

9

10 | GREGORY HALL, FAUSTO AGUILAR, GONZALO AGUILAR, CHARLES CHILTON, | ) Case No. CGC-07-470047
11 | FELIX CORTES, OMAR FRANCO, DOUGLAS GIVENS, ROBERT IVY, QUINCY MOUTON, | ) **CONSENT BY DEFENDANT BAY**
12 | LUIS OSUNA, RICHARD RANKIN, HECTOR RODRIGUEZ, MARTIN SANDOVAL, HENRY | ) **AREA CONSTRUCTION FRAMERS, INC. TO REMOVE CASE TO**
13 | TAYLOR, LLOYD THIBEAUX, MICHAEL BROWN, ASTRIAN CAEL, ARNULFO | ) **FEDERAL COURT**
14 | CARRANZA-RIVAS, APOLINAR CORNEJO, ROY EDWARDS, VICTOR HAMPTON, RANDY | )
15 | KEYS, ANDRE LARRIMORE, TERRY MACKEY, DOUGLAS TURNER, JEFF WEST, | )
16 | ROBERT WHITE, MARQUEZ BOYD, | )

17 | Plaintiffs, | )

18 | v | )

19 | APARTMENT INVESTMENT AND MANAGEMENT COMPANY, AIMCO CAPITAL, | )
20 | INC., FORTNEY & WEYGANDT, INC., IMR CONTRACTOR CORPORATION, BAY | )
21 | BUILDING SERVICES, BAY AREA CONSTRUCTION FRAMERS, INC. and DOES 1- | )
22 | 50, | )

23 | Defendants | )

24

25

26

27

28

Bay Area Construction Framers, Inc. has been named as a defendant in the case captioned *Hall et al. v. Apartment Investment and Management Company et al.* filed in San Francisco County Superior Court and denominated by case number CGC-07-470047.

Bay Area Construction Framers, Inc. consents to the removal of this case from the San Francisco County Superior Court to the appropriate federal district court. The undersigned, as the attorney for Bay Area Construction Framers, Inc., has the authority to consent to the removal of the case on its behalf.

By consenting to the removal of this case to federal court, Bay Area Construction Framers, Inc. does not waive any defenses it may have to the allegations in the complaint, including but not limited to defenses related to jurisdiction and venue, and reserve the right to submit such defenses against Plaintiffs' claims.

Date: July 16, 2008

Respectfully submitted,

By _____
JOSEPH E. POWELL
Attorney for Defendant
BAY AREA CONSTRUCTION FRAMERS, INC.

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| GREGORY HALL, FAUSTO AGUILAR, GONZALO AGUILAR, CHARLES CHILTON, FELIX CORTES, OMAR FRANCO, DOUGLAS GIVENS, ROBERT IVY, QUINCY MOUTON, LUIS OSUNA, RICHARD RANKIN, HECTOR RODRIGUEZ, MARTIN SANDOVAL, HENRY TAYLOR, LLOYD THIBEAUX, MICHAEL BROWN, ASTRIAN CAEL, ARNULFO CARRANZA-RIVAS, APOLINAR CORNEJO, ROY EDWARDS, VICTOR HAMPTON, RANDY KEYS, ANDRE LARRIMORE, TERRY MACKEY, DOUGLAS TURNER, JEFF WEST, ROBERT WHITE, MARQUEZ BOYD, | ) Case No. CGC-07-470047 ) ) **CONSENT BY DEFENDANT BAY** ) **BUILDING SERVICES, INC. TO** ) **REMOVE CASE TO FEDERAL** ) **COURT** ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| APARTMENT INVESTMENT AND MANAGEMENT COMPANY, AIMCO CAPITAL, INCL, FORTNEY & WEYGANDT, INCL, IMR CONTRACTOR CORPORATION, BAY BUILDING SERVICES, BAY AREA CONSTRUCTION FRAMERS, INC. and DOES 1-50, , | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) ) |

CONSENT TO REMOVE CASE TO FEDERAL COURT

1    Bay Building Services, Inc. has been named as a defendant in the case captioned *Hall et al.*

2  *v. Apartment Investment and Management Company et al.*, filed in San Francisco County Superior

3  Court and denominated by case number CGC-07-470047.

4    Bay Building Services, Inc. consents to the removal of this case from the San Francisco

5  County Superior Court to the appropriate federal district court. The undersigned, as the President

6  of Bay Building Services, Inc., has the authority to consent to the removal of the case on its

7  behalf.

8    By consenting to the removal of this case to federal court, Bay Building Services, Inc. does

9  not waive any defenses it may have to the allegations in the complaint, including but not limited to

10  defenses related to jurisdiction and venue, and reserve the right to submit such defenses against

11  Plaintiffs' claims.

12

13  Date: July 2, 2008                    Respectfully submitted,

14

15  By: _____
      Marshall Hornstein

16  President, Bay Building Services, Inc.

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

10  GREGORY HALL, FAUSTO AGUILAR,      ) Case No. CGC-07-470047
    GONZALO AGUILAR, CHARLES CHILTON,  )
11  FELIX CORTES, OMAR FRANCO, DOUGLAS ) **CONSENT BY DEFENDANTS**
    GIVENS, ROBERT IVY, QUINCY MOUTON, ) **APARTMENT INVESTMENT AND**
12  LUIS OSUNA, RICHARD RANKIN, HECTOR ) **MANAGEMENT COMPANY, AIMCO**
    RODRIGUEZ, MARTIN SANDOVAL, HENRY  ) **CAPITAL, INC., AND FORTNEY &**
13  TAYLOR, LLOYD THIBEAUX, MICHAEL    ) **WEYGANDT, INC. TO REMOVE**
    BROWN, ASTRIAN CAEL, ARNULFO       ) **CASE TO FEDERAL COURT**
14  CARRANZA-RIVAS, APOLINAR CORNEJO,  )
    ROY EDWARDS, VICTOR HAMPTON, RANDY )
15  KEYS, ANDRE LARRIMORE, TERRY       )
    MACKEY, DOUGLAS TURNER, JEFF WEST, )
16  ROBERT WHITE, MARQUEZ BOYD,        )
                                       )
17                  Plaintiffs,        )
                                       )
18          v.                         )
                                       )
19  APARTMENT INVESTMENT AND           )
    MANAGEMENT COMPANY, AIMCO CAPITAL, )
20  INCL, FORTNEY & WEYGANDT, INCL, IMR)
    CONTRACTOR CORPORATION, BAY        )
21  BUILDING SERVICES, BAY AREA        )
    CONSTRUCTION FRAMERS, INC. and DOES 1- )
22  50, ,                              )
                                       )
23                  Defendants.        )
                                       )
24  _____  )

25

26

27

28

1    Apartment Investment and Management Company, AIMCO Capital, Inc., and Fortney &

2    Weygandt, Inc. have been named as defendants in the case captioned *Hall et al. v. Apartment*

3    *Investment and Management Company et al.*, filed in San Francisco County Superior Court and

4    denominated by case number CGC-07-470047.

5    Apartment Investment and Management Company, AIMCO Capital, Inc., and Fortney &

6    Weygandt, Inc. each consents to the removal of this case from the San Francisco County Superior

7    Court to the appropriate federal district court. The undersigned, as the attorney for Apartment

8    Investment and Management Company, AIMCO Capital, Inc., and Fortney & Weygandt, Inc., has

9    the authority to consent to the removal of the case on their behalf.

10    By consenting to the removal of this case to federal court, Apartment Investment and

11    Management Company, AIMCO Capital, Inc., and Fortney & Weygandt, Inc. do not waive any

12    defenses they may have to the allegations in the complaint, including but not limited to defenses

13    related to jurisdiction and venue, and reserve the right to submit such defenses against Plaintiffs'

14    claims.

15    Date:  July 2, 2008                    Respectfully submitted,

16

17    

18    By: _____
        STEPHEN T. DAVENPORT, JR.
19      Attorney for Defendants
        APARTMENT INVESTMENT AND
20      MANAGEMENT COMPANY, AIMCO CAPITAL,
        INC., AND FORTNEY & WEYGANDT, INC.

21

22

23

24

25

26

27

28

# EXHIBIT G

US 1654

# CARPENTERS 46 NORTHERN CALIFORNIA COUNTIES
## MEMORANDUM AGREEMENT

It is hereby mutually understood and agreed by and between the undersigned individual employer or association and the Carpenters 46 Northern California Counties Conference Board, for and on behalf of the Regional Council (NCCRC) and all of its affiliated Local Unions in the 46 Northern California Counties, hereinafter referred to as "Union," that for and in consideration of services performed and to be performed by carpenters for the individual employer, the individual employer or association agrees to comply with all wages, hours, and working conditions set forth in the Carpenters Master Agreement for Northern California effective July 1, 2003 through June 30, 2008 (which Agreement is incorporated herein by reference and a copy of which has been delivered to me and receipt of which is hereby expressly acknowledged), which amends, modifies, supplements and renews each and every, all and singular, previous Carpenters Master Agreements or individual employer Memorandum Agreements in the construction industry in the 46 Northern California Counties, and any future modifications, changes, amendments, supplements, extensions or renewals of or to said Master Agreement which may be negotiated between the parties thereto for the term thereof. The Union has requested recognition as the Section 9(a) representative of the employees covered by this agreement and has demonstrated or offered to demonstrate through authorization cards that it has the support of the majority of the employees. The Employer has satisfied itself that the Union does in fact represent a majority of its employees and hereby recognizes the Union as the Section 9(a) representative of the employees.

The term "Master Agreement" referred to in this Memorandum Agreement shall be the Master Agreement referred to above or any other agreement designated in writing by the Union as the "Master Agreement" for a term of period subsequent to May 1, 1986 or any subsequent modifications, changes, amendments, supplements, extensions or renewals of or to said designated Master Agreement.

The individual employer by executing this Memorandum Agreement continues to be bound by each and every of the Memorandum Agreements previously signed by said individual employer, if any, for all work performed by said individual employer as described in said Master Agreement and as covered by said Master Agreement regardless of the name or style of doing business or method of organization of any individual employer entity including but not necessarily limited to any activity as a contractor, subcontractor, owner, developer or construction manager and specifically applies to any company, firm or corporation in the construction industry with which or to which the undersigned has any connection of any nature or kind whatsoever.

The individual employer agrees to pay all sums of money for each hour paid for or worked by employees performing work covered by said Master Agreement to each and every, all and singular, of the Trust Funds specified in said Master Agreement and to accept, assume, and be bound by, all of the obligations of any Trust Agreement, Plan or Rules, or any amendments, modifications or changes thereof made by the parties thereto, as are now or may hereafter be, imposed upon any individual employer by or pursuant to any such Trust, Trust Fund or Plan as set forth in the Master Agreement or any applicable Trust Agreement.

The individual employer further agrees that he or it does irrevocably designate and appoint the employer members of said Trust Funds and Plans mentioned in the Master Agreement as his or its attorneys in fact for the selection, removal and substitution of Trustees or Board members as provided in the Trust Agreements or Plans as may be hereinafter provided by or pursuant to said Trust Agreements or Plans.

Notwithstanding any provision of the Master Agreement or this agreement, it is understood that the individual employer is required to give written notice to the Union at 265 Hegenberger Road, Suite 220, Oakland, California 94621-1480 of the name or names of any entity, person, firm or corporation engaged in the construction industry with which the undersigned becomes or is now connected and any change of name or style under which the undersigned will be or is engaged in the construction industry in the territory covered by said Master Agreement. Such written notice must be given no less than ten (10) days prior to the date of any such change of name, new corporation, change of corporate status, creation or formation of any entity, etc.

The Union agrees to perform all of the provisions of the agreement hereinabove referred to.

This agreement shall be binding upon the heirs, executors, administrators, successors, purchasers and assigns of the individual employer, including any name or style under which business is conducted with respect to work covered by this Agreement.

Notwithstanding any provision of the Master Agreement or this Agreement, the individual employer agrees that upon a showing by the Union or, on any of its affiliates that a majority of the Individual employer's shop employees, if any, have designated the Union or any of its affiliates as their representative for collective bargaining purposes, the individual employer shall recognize the Union and/or its affiliates as the collective bargaining representative of its shop employees and shall forthwith comply with all wages, hours, terms and conditions of the then applicable Millmen's Master Agreement for the term thereof. Proof of such majority representation shall be established by the submission of authorization cards to a neutral third person who shall compare the signatures with appropriate employee records. The individual employer shall fully cooperate in such review upon demand by the Union or any of its affiliates. Except as set forth below the individual employer waives any right that he or it may have to terminate, abrogate, repudiate or cancel this Agreement during its term, or during the term of any future modifications, changes, amendments, supplements, extensions, or renewals of or to said Master Agreement; or to file or process any petition before the National Labor Relations Board seeking such termination, abrogation, repudiation or cancellation.

This Agreement shall remain in full force and effect until June 30th, 2008, and shall continue thereafter for the term of any future modifications, changes, amendments, supplements, extensions or renewals of or to said Master Agreement which may be negotiated between the parties thereto unless either party to this Memorandum Agreement gives written notice to the other of the desire to change or cancel it by certified mail not less than sixty (60) days prior to June 30, 2008, or June 30th of any year in which the Master Agreement may terminate. This Agreement nor the Carpenters Master Agreement for Northern California, which is incorporated herein, may be changed or modified, in any way, without the written approval by the Chairman or Executive Director of the Union.

UNION:  Carpenters 46 Northern California Counties Conference Board for and on behalf of the Regional Council and all of its affiliated Local Unions in the 46 Northern California Counties.

JUN 13 2005

_(signature)_                                                    San Francisco

Robert Alvarado, Chairman                                        Carpenter Union Local 22
                                                                 Local Union or Regional Council

_(signature)_                                                    _(signature)_  Kenneth Ho

Bill Feyling, Executive Director                                 By Union Representative   BUSINESS TH.

**EMPLOYER:**

IHR Roofing Corp.                                               797787
PRINT: – Name of Individual Employer or Association             Contractor's License Number(s)

_(signature)_ Moises A.                                         Moises Avila
Signature of Individual Employer or Authorized Representative   Title (RME, RMO, Partner, Owner, etc.)

48 Chester Ave                                                  6-10-05          6-10-05
Address                                                         Date Signed      Effective Date

Daly City   Ca   94014                                         650-758-2297     650-758-2299
City and State (Include Zip Code)                              Telephone Number  Fax Number

WHITE = Fund Copy,  CANARY = 46 Counties Conference Board Copy,  PINK = Union Copy,  GOLDENROD = Employer's Copy    (104)

# CARPENTERS

46 Northern California Counties Conference Board

**BILL FEYLING**
Executive Director

57654

I M R ROOFING CORP
48 CHESTER STREET
DALY CITY        CA 94014



RECEIVED
JUN 1 9 2007

CARPENTERS 46 NORTHERN
CALIFORNIA COUNTIES
CONFERENCE BOARD

**TO SIGNATORY MEMORANDUM EMPLOYERS:**                    June 6, 2007

We are pleased to advise you that the Carpenters Master Agreement has been modified, amended, renewed and extended through June 30, 2012. This Master Agreement offers terms and conditions more favorable for the individual employer, and further offers a period of wage stability and labor peace.

The full text of the modifications, which reflect the more favorable terms and conditions, is set forth in the enclosed document. However, the following is a synopsis of some of these changes:

1. Waive fifty cents ($.50) per hour for a twelve month period (July 1, 2007 through June 30, 2008).

2. Makes available a 6:00 a.m. start to the work day and a 4 X 10 work week.

3. Works to improve the quality of the labor pool by establishing a Labor–Management committee to provide a journeyman certification process for the following skills: welding, concrete, scaffolding, lifts, doors and hardware, bridge building and metal framing.

4. Provides the employer the opportunity to refer persons utilizing the hiring hall for evaluation and retraining based on lack of skills, qualifications or work ethic.

   Waives compliance with local government mandated sick leave policies, including the recently enacted San Francisco Sick Leave Ordinance

If you desire to exercise your option and take advantage of the more favorable terms and conditions, you must execute and <u>return to this office the signed original of this letter immediately</u>, since the first changes will become effective July 1, 2007.

If you choose not to execute this Extension Agreement, you will be required to comply with the higher fringe benefit contribution rates and less favorable conditions as set forth in the 2003-2008 Master Agreement.

By executing and <u>returning to this office the signed original of this letter</u>, you may take advantage of these more favorable terms and conditions, and such extension constitutes an extension of your Collective Bargaining Agreement until June 30, 2012, and leaves all other terms and conditions of your current Agreement intact unless modified by this letter and its enclosure.

This offer to extend the Agreement will end at midnight on June 30, 2007, and you will not be permitted to have the benefit of these modifications thereafter.

Please sign and return <u>the original</u> of this letter to this office and retain a copy for your files.

Sincerely,

William Feyling
Executive Director

Receipt of the above-referenced modifications and extensions is acknowledged and are hereby accepted, including all the conditions set forth in this letter.

SIGNATURE: _MC____A_____        DATE: 6/18/07

_Mrses Avila, President____                    783387

Pl__ type or Print Name of Signer & Position with Company        Contractor's License Number    (107)

265 Hegenberger Road • Suite 220 • Oakland, California 94621-1480 • Tel (510) 430-9706 • Fax (510) 430-8431

22

## 46 NORTHERN CALIFORNIA COUNTIES

# CARPENTERS

# MASTER AGREEMENT

# FOR NORTHERN

# CALIFORNIA

Between the

**Construction Employers Association
of California (CEA)**

**Millwright Employers
Association (MEA)**

**Home Builders Association
of Northern California (HBA)**

**Concrete Contractors Association (CCA)**

**NC Contractors Association (NCCA)**

**Associated Cabinet
Manufacturers (ACM)**
and

**Carpenters 46 Northern California
Counties Conference Board**
of the
**United Brotherhood of Carpenters
and Joiners of America (AFL-CIO)**

Effective Date June 3, 2003

## TABLE OF CONTENTS

| | SECTION NO. | PAGE |
|---|---|---|
| Annuity Plan | 42 | 26 |
| Appendices | 38 | 17 |
| Apprentices | 39 | 23 |
| Apprentice Wage Rates | 39F | 23 |
| Area Covered | 3 | 2 |
| Audit | 21 | 9-10 |
| Basis for Contributions | 47 | 32-33 |
| Bonding | 37 | 17 |
| Bridge Structure and Highway Related Addendum. . . .Appendix G | | 86-88 |
| Builders Industry Promotion Trust | 45 | 29-30 |
| Building Industry Trust | 45 | 30 |
| Cabinet Manufacturers Agreement. . .Appendix E | | 63-83 |
| California Builders Advancement Program | 45 | 29 |
| California Construction Advancement Program | 45 | 29 |
| Carpenters Work Preservation Committee | 2-A | 2 |
| Carpenters Work Preservation Committee Trust | 45-A | 31 |
| Construction Industry Advancement Fund | 45 | 30 |
| Contract Administration | 45 | 30-31 |
| Contracting | 50 | 36-38 |
| Contributions for Superintendents | 46 | 32 |
| Discharge | 30 | 14-15 |
| Document Signing | 35 | 16 |
| Efficiency | 18 | 8 |
| Employer Membership | 6 | 4 |
| Foreman and General Foreman | 39 | 25 |
| Fringe Benefit Rates | 39 | 21-23 |
| General Saving Clause | 10 | 5 |
| Grievance Procedure | 51 | 38-40 |
| Health and Welfare | 40 | 25 |
| Hiring | 49 | 33-36 |
| Holidays | 25 | 12-13 |
| Independent Agreement | 8 | 4-5 |
| Injury | 34 | 16 |
| Insulators Addendum | Appendix D | 61-62 |
| Jurisdictional Disputes | 16 | 8 |
| Liability of Parties | 9 | 5 |
| Millwrights Agreement | Appendix B | 44-56 |
| No Discrimination | 11 | 5-6 |
| No Strike | 15 | 7-8 |
| Non-Union Fabricated Materials | 33 | 16 |
| Overtime | 26 | 13 |
| Owners Working | 12 (3) | 6-7 |
| Parking | 27 | 13-14 |
| Payment of Wages | 31 | 15 |
| Pension Plan | 41 | 25-26 |
| Picket Lines | 17 | 8 |
| Pickup Time | 29 | 14 |
| Preamble | | 1 |
| Pre-Job Conferences | 20 | 9 |
| Prohibition of Piece Work | 32 | 16 |
| Recognition of Employer | 5 | 4 |
| Recognition of Union | 7 | 4 |
| Residential Addendum | Appendix C | 57-60 |
| Safety | 19 | 9 |
| Scaffold Erection Addendum | Appendix F | 84-85 |
| Shift Work | 23 | 11-12 |
| Show Up Time | 30 | 14-15 |
| Stewards | 14 | 7 |
| Subcontracting | 50 | 36-38 |
| Subcontractor Records | 36 | 16 |
| Subsistence | Appendix A | 42-43 |
| Term of Agreement | 2 | 1-2 |
| Termination Pay | 30 | 14-15 |
| Tools | 28 | 14 |
| Training Trust Fund | 44 | 28-29 |
| UBC Health & Safety Fund | 45-B | 31-32 |
| Union Representative | 13 | 7 |
| Union Security | 12 | 6-7 |
| Vacation and Holiday Plan | 43 | 26-27 |
| Wage and Fringe Benefit Increases | 39 | 21-23 |
| Wage Rates | 39 | 17-25 |
| Work Covered | 4 | 2-3 |
| Work Day | 22 | 10-11 |
| Work Fee | 43-A | 27-28 |
| Work Week | 24 | 12 |



## PREAMBLE

This Agreement represents a new beginning of cooperation between signatory employers and the Union in a mutual effort to retain and regain the major portions of the work within the geographic area for unionized construction. The successes of the Agreement will be judged on the ability of the signatory contractors to be successful in obtaining contracts where union employees will be employed.

# CARPENTERS MASTER AGREEMENT

## 46 Northern California Counties

## 2003-2008

### Section 1

THIS MASTER AGREEMENT, made and entered into this 3rd day of June, 2003, by and between the CONSTRUCTION EMPLOYERS' ASSOCIATION OF CALIFORNIA (CEAC), MILLWRIGHT EMPLOYERS ASSOCIATION (MEA) CONCRETE CONTRACTORS ASSOCIATION (CCA), NC CONTRACTORS ASSOCIATION (NCCA) and The Home Builders Association of Northern California (HBA) and their respective members, herein referred to collectively as the Employer, and the CARPENTERS 46 NORTHERN CALIFORNIA COUNTIES CONFERENCE BOARD, on behalf of the Northern California Carpenters Regional Council (NCCRC) and affiliated Local Unions having jurisdiction in the 46 Northern California Counties, hereinafter referred to as the Union. This Agreement amends, modifies, supplements, changes, extends and renews the Agreements dated June 16, 1971, July 18, 1974, June 16, 1977, June 16, 1980, September 1, 1982, January 1, 1986, April 1, 1988, June 16, 1992, June 16, 1996, May 25, 1999 , and is effective July 1, 2003.

### Section 2
### Term of Agreement

This Agreement shall remain in full force and effect from the 1st day of July, 2003 through the 30th day of June, 2008, and shall continue thereafter unless either party, not more than ninety (90) days nor less than sixty (60) days prior to the 30th day of June, 2008, or not more than ninety (90) days nor less than sixty (60) days prior to the 30th day of June of any subsequent year in which the Master Agreement may terminate, serves written notice on the other of its desire to change, modify, amend, supplement, renew, extend or terminate this Agreement.

All notices required to be given to the Union shall be addressed to it at 265 Hegenberger Road, Suite 220 Oakland, California 94621.

While this Agreement continues in effect, neither party will make demands upon the other party for any changes in conditions or benefits or for any new or additional conditions or benefits except at the time and in the manner provided above. Notice to the Employer shall be deemed notice to all individual employers.

1

The parties to this Agreement recognize the necessity of assuring the competitive position of the parties within the industry during the term of this Agreement. Consistent with that recognition, the parties will continually monitor the effectiveness of this Agreement relative to specific geographic or market areas and will endeavor, by mutual agreement, to initiate such modifications to the Agreement during its term as may be necessary to assure the work opportunities of the employees and the competitive position of the individual employers.

## Section 2-A
## Carpenters Work Preservation Committee

Notwithstanding the provisions of Section 2, the parties to the Agreement hereby establish a Committee composed of three (3) representatives appointed by the Carpenters 46 Northern California Counties Conference Board and three (3) representatives appointed by the Construction Employers' Association of California, Inc. This Committee will review requests for changes in the terms and conditions of the Labor Agreement that may be necessary to preserve work opportunities for employees and individual employers covered by the Agreement. The Committee is authorized to approve such changes as it deems to be in the best interest of the parties to the Agreement.

This Committee shall be empowered to develop rules and procedures, subject to the approval of the bargaining parties, to carry out the intent of the bargaining parties.

## Section 3
## Area Covered

The area covered by this Agreement shall be Northern California, consisting of the forty-six (46) counties located above the northerly boundary of San Luis Obispo County, the northerly boundary of Kern County, and the westerly boundaries of Inyo and Mono Counties, to wit: Alameda, Alpine, Amador, Butte, Calaveras, Colusa, Contra Costa, Del Norte, El Dorado, Fresno, Glenn, Humboldt, Kings, Lake, Lassen, Madera, Marin, Mariposa, Mendocino, Merced, Modoc, Monterey, Napa, Nevada, Placer, Plumas, Sacramento, San Benito, San Francisco, San Joaquin, San Mateo, Santa Clara, Santa Cruz, Shasta, Sierra, Siskiyou, Sonoma, Solano, Stanislaus, Sutter, Tehama, Trinity, Tulare, Tuolumne, Yolo and Yuba.

## Section 4
## Work Covered

All carpentry work on all construction, including, but not limited to, construction, erection, alteration, repair, modification, demolition, addition or improvement of or to a building or any other structure or construction.

All carpentry work on heavy, highway and engineering construction, including, but not limited to, the construction, improvement, modification and demolition of all or any part of streets, highways, bridges, viaducts, railroads, storage elevators, tunnels, airports, water supply, irrigation, flood control and drainage systems, sewers and sanitation projects, dams, power houses, refineries, aqueducts, canals, river and harbor projects, wharves, docks, breakwaters, jetties, quarrying of breakwater or riprap stone, pipelines, offshore construction, or operations incidental to such heavy construction work.

Work in connection with new methods of construction or use of materials established or developed during the term of this Agreement, and the use and application of tools, devices, metal or plastic studs or any substitute thereof, metal or plastic forms or slip form procedures, mechanical power driven or otherwise, customarily and regularly used by carpenters, any mechanical or technological substitutes thereof, whether continuously or intermittently and which are regarded tools of the carpentry trade. This shall include though not be limited to the use and operation of forklifts, platform lifts and operation of concrete chutes.

All carpentry work in connection with plywood decking, beam sides and beam soffits and all concrete form work.

All carpentry work in connection with tilt-up construction including, but not limited to, benchmarks, layout, setting of all forms, blockouts, metal door and window jambs, templates for bolts, lift points, knee braces, stripping of forms, rigging, setting, plumbing and aligning, welding, drilling, cleaning, ledger bolts, setting ledgers, setting of expansion joints, and caulking. Also to include forms for stairs and loading docks (setting and stripping), installation of all doors, installation of laminated beams or precast structures, and operation of the forklift in reference to all of the above work.

All carpentry work in connection with displays, conventions, tradeshows and exhibitions.

All work in connection with self supporting scaffolds over fourteen feet (14') in height whether patent or otherwise constructed.

The work covered by this Agreement shall include all types of wood flooring of any size, shape or pattern, in all its branches and phases including pre-finished wood and hardwood products, such as nailing, filling, laying, stripping, tongue and groove, underlayment, blocks-mastic work, sanding, edging, staining, finishing, basing, application of shellac, varnishes, sealers, waxing and related work.

Should an individual employer party to this Agreement perform work as a drywall contractor or drywall subcontractor, he shall do so under the terms and conditions of the current Drywall/Lathing Master Agreement between the Carpenters 46 Northern California Counties Conference Board and/or the NCCRC and the appropriate Drywall Contractors Association for the 46 Northern California Counties. However, drywall work which is incidental to the work of the individual employer may be performed under the terms and conditions of this Agreement.

Should an individual employer party to this Agreement perform work or subcontract work covered by the Pile Drivers, Divers, Carpenters, Bridge, Wharf and Dock Builders Agreement, the individual employer shall observe the terms and conditions of said Agreement.

Should an individual employer party to this Agreement perform work or subcontract work covered by the Bridge Structure and Highway Related Addendum, the individual employer shall observe the terms and conditions of said Addendum.

Should an individual employer party to this Agreement perform work or subcontract work covered by the Office Modular Systems Addendum, the individual employer shall observe the terms and conditions of the Office Modular Systems Addendum.

2

3

## Section 5
## Recognition Of Employer

The Union hereby recognizes the Employer as the sole and exclusive bargaining representative for their respective members, present and future, who are or hereafter become members.

## Section 6
## Employer Membership

This Agreement is made for and on behalf of and shall be binding upon all persons, firms or corporations under any name or style of doing business in the construction industry that, at the time of the execution of this Agreement are, or during the term hereof become, members of the Employer, in the area covered by this Agreement. A list of such individual employer members shall be furnished to the Union upon the execution of this Agreement, and thereafter shall be furnished to the Union not less often than once a month.

All individual employers shall be and remain liable under this Agreement for and during the term thereof, irrespective of whether such individual employers shall resign from membership in the Employer or withdraw from the Carpenter Multiemployer Bargaining Section prior to the expiration date of this Agreement, and such liability shall be deemed to have survived the termination of said membership or withdrawal and remain in force for and during the term of this Agreement. Such individual employers shall be bound by any amendments, modifications, supplements, changes, extensions or renewals of or to this Agreement unless such individual employer gives written notice to the Union not more than ninety (90) days nor less than sixty (60) days prior to July 1, 2008 or July 1 of any year in which this Agreement may terminate.

## Section 7
## Recognition of Union

The Union has requested recognition as the Section 9 (a) representative of the employees covered by this Agreement and has demonstrated or offered to demonstrate through authorization cards that it has the support of the majority of the employees. The Employer and each individual employer expressly acknowledge that they and each of them have satisfied themselves that the Union and/or each of its constituent bodies represents a majority of employees employed to perform bargaining unit work and agrees that the Union and or each of its constituents is the collective bargaining representative of such employees. The Employer on behalf of itself and each of its members and each individual employer specifically agrees that it and they are establishing or have established a collective bargaining relationship by this Agreement within the meaning of Section 9 (a) of the National Labor Relations Act of 1947, as amended. The Union is recognized as the sole and exclusive bargaining agent for itself, the NCCRC and all of its affiliated Local Unions.

## Section 8
## Independent Agreement

In the event the Union establishes special conditions for work covered by the Agreement, those special conditions shall be made available to the Employer or individual employers who wish to perform the designated work in the same locality as provided for in that immediate Area Agreement.

The Union will promptly notify the Employer in writing of any amendment, modification, exception or addendum to this Agreement which might be negotiated in any area covered by this Agreement between the Union, any individual employer or group of individual employers.

## Section 9
## Liability of the Parties

This Agreement is made for and on behalf of, and shall be binding upon all persons, firms and corporations, who at the time of execution of this Agreement are members of Employer, or subsequently become members of Employer as defined in Section 6. This Agreement is binding upon each individual employer regardless of whether or not the individual employer changes the name or style or address of the business. Each individual employer, corporate or other legal entity, or its successor as per Section 6, shall be liable, subject to, and bound by this Agreement. It is agreed that the wages, hours, and working conditions of this Agreement are the wages, hours, and working conditions in the area covered by this Agreement.

Except as may be provided in Section 2 of this Agreement, each employer individually signatory hereto waives any right that he or it may have to terminate, abrogate, repudiate, or cancel this Agreement during its term, during the term of any future modifications, changes, amendments, supplements, extensions, or renewals of or to said Master Agreement, or to file any Petition before the National Labor Relations Board seeking to accomplish such termination, abrogation, cancellation or repudiation.

## Section 10
## General Saving Clause

It is not the intent of either party hereto to violate any laws, rulings, or regulations of any governmental authority or agency having jurisdiction of the subject matter or of this Agreement, and the parties hereto agree that in the event any provision of this Agreement is finally held or determined to be illegal or void as being in contravention of any such laws, rulings or regulations, nevertheless, the remainder of this Agreement shall remain in full force and effect unless the parts so found to be void are wholly inseparable from the remaining portion of this Agreement. The parties agree that if and when any provisions of this Agreement are held or determined to be illegal or void they will then promptly enter into lawful negotiations concerning the substance thereof.

It is the intent of the parties to this Agreement that each and every, all and singular, of the provisions of this Agreement be fully in accordance with Federal and State Law. Its interpretation and the interpretation of each of the provisions of this Agreement are therefore intended to apply no broader than that permitted by law.

## Section 11
## No Discrimination

It is mutually agreed that the individual employer and the Union shall fully comply with all federal and state laws, including but not

4

5

limited to all of the provisions of Title 7 of the Civil Rights Act of 1964, as amended; the California Fair Employment and Housing Act, as amended; and the Americans with Disabilities Act of 1991, as amended to the end that no person shall, on the grounds of age, sex, race, color, national origin, sexual orientation, gender, ancestry, disability as defined by the Americans with Disabilities Act of 1991 and the California Fair Employment and Housing Act, or Vietnam Veteran status, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination by not having full access to the contents of this Agreement.

It is further agreed that no person or applicant for employment shall be discriminated against or shall have his/her employment relationship affected by reason of his/her age except as provided in the Trust Agreement, rules and regulations, and statements of procedure governing the Carpenters Training Committee for Northern California.

Nothing in this section and no grievance filed pursuant to this section shall be deemed a waiver of any individual worker's statutory rights provided by federal and/or state laws.

Throughout this Agreement, wherever the masculine gender appears, the feminine form applies equally and may be substituted therefore.

## Section 12
## Union Security

(1) Every person performing work covered by this Agreement who is a member of the Union and in the employment of an individual employer on work covered by this Agreement on the effective date of this Section 12 shall, as a condition of employment or continued employment, remain a member in good standing of the Union or the appropriate Local Union of the Union. Every other person covered by this Agreement and employed to perform work covered by this Agreement shall be required, as a condition of employment, to apply for and become a member of and to maintain membership in good standing in the Union or the appropriate Local Union of the Union which has territorial jurisdiction of the area in which such person is performing work on the expiration of eight (8) days of employment, continuous or cumulative, on such work following the beginning of such employment or the effective date of this Section 12, whichever is later. Membership in any Local Union shall be available to any such person on the same terms and conditions generally applicable to other members. If Federal Law is hereafter amended to permit a lesser requirement for union membership or union membership as a condition of employment than provided in this Section 12, the Employer and the Union will promptly enter into negotiations with regard to such subject.

(2) The individual employer shall not be required to discharge any employee pursuant to this Section 12 until a written notice from the appropriate Local Union of the Union of such employee's non-compliance with this Section 12, stating all pertinent facts showing such non-compliance, shall have been served upon such individual employer and two (2) working days shall have been allowed for compliance therewith.

(3) No person (owner, partner, or officer of any individual employer) shall be permitted to perform work covered by this Agreement unless such person is covered by all the provisions of this Agreement including the payment of all Trust Fund contributions; pro-

vided, however, that not more than one (1) owner may be permitted to work with the tools under the same conditions with the exception of Section 12 (1). This section shall not be interpreted so as to diminish work opportunity for employees covered by this Agreement.

Membership in good standing shall be defined as the tendering of uniform initiation fees and dues, including work fee.

## Section 13
## Union Representative

Union representatives shall be permitted at all times upon any place or location where any work covered by this Agreement is being, has been or will be performed.

Where there are visitation restrictions imposed at the jobsite by entities other than the individual employer, the individual employer will use his best efforts to provide access to the site by the union representative.

## Section 14
## Stewards

(1) A steward shall be a working journeyman employee, appointed by the Local Union or the NCCRC of the Union, who shall, in addition to his/her work as a journeyman be permitted to perform, during working hours, such of his/her Union duties as cannot be performed at other times. The Union agrees that such duties shall be performed as expeditiously as possible and the Employer agrees that stewards shall be allowed a reasonable amount of time for the performance of such duties. The Field Representative shall notify immediately the individual employer of the appointment of each steward to be confirmed by letter.

(2) No steward shall be laid off or terminated without concurrence of the appropriate Field Representative except for:

1. Proven dishonesty.

2. Excessive drinking.

3. Chronic failure to report for work.

4. Completion of the carpentry work on the job.

If a steward is discharged as permitted herein, written notice shall be given to the appropriate Local Union or the NCCRC defining the reasons for discharge.

(3) Application or violation of this Section shall be subject to Section 51 "Grievance Procedure."

## Section 15
## No Strike

Except as provided in this Section, there shall be no strike, lockout or work stoppage by any party hereto or any individual employer. The Union may withhold workers or picket the job of any individual employer who fails to pay wages or is in violation of the Piece Rate Prohibition or Trust Fund Contribution provisions of this Agreement. The Union may withhold workers of any subcontractor who fails to pay wages or is in violation of the Piece Rate Prohibition or Trust Fund Contribution provisions of this Agreement. The Union, with five (5) days written notice to the individual employer may withhold workers or picket the job of any individual employ-

er for violation of the Hiring Hall, Union Security or Subsistence provisions of this Agreement only if no dispute exists between the Employer and the Union concerning such alleged violation.

## Section 16
## Jurisdictional Disputes

There shall be no cessation or interference in any way with any work of the Employer or any individual employer by reason of Jurisdictional Disputes between the Union and any other union affiliated with the AFL-CIO or the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America with respect to jurisdiction over any of the work covered by this Agreement. Such disputes will be settled by the Unions themselves, or submitted to the International Presidents of the Unions involved in the dispute, for determination. Until such determination is made and confirmed by the disputing Unions, the work shall proceed as originally assigned by the individual employer. Craft jurisdiction is neither determined nor awarded by classifications or coverage descriptions appearing in this Agreement. The individual employer shall be bound by an agreement between the General Presidents.

## Section 17
## Picket Lines

The parties to this Agreement recognize that it is vital to the Unionized segment of the Construction Industry that the work opportunities of the employee and the individual employer signatory to this Agreement proceed without interruption because of disputes involving employers and/or unions not signatory to this Agreement.

The Union will not discipline, the individual employer will not permanently replace and the parties both agree not to threaten nor cause to be denied the rights of individual workers to respect primary picket lines established at or on the jobsites of the individual employer.

## Section 18
## Efficiency

It is agreed that the carpenters, through their field representatives, use their efforts to encourage greater efficiency on the job and that they refrain from the solicitation of premium payments for employees represented by the Union. The employees and the Union shall use their efforts to encourage greater efficiency compatible with sound construction practices on the job and shall refrain from the solicitation of premium payments for employees.

Except as provided in Section 50 (Work Preservation, Contracting and Subcontracting) hereof, neither party to this Agreement shall by working rules or any other means or device, impose or direct any work limitations affecting quantity restrictions, quotas or units of production, either maximum or minimum, relating to work covered by this Agreement.

No rules, customs or practices shall be permitted that limit production or increase the time required to do any work. There shall be no limitation or restriction of the use of machinery, tools or other labor-saving devices supplied by the individual employer.

## Section 19
## Safety

The Union shall cooperate (1) with the individual employer and with each other in carrying out all of the individual employer's safety measures and practices for accident prevention and (2) employees shall perform their duties in each operation in such a manner as to promote efficient operation of each particular duty and of any job as a whole. The Union and the Employer recognize that drug and alcohol abuse creates an unsafe and inefficient work place. The individual employer must post the name and address of their doctor and the compensation insurance carrier on the jobsite.

All Federal and State safety rules, regulations, orders and decisions shall be binding upon the individual employers and their employees and shall be applied to all work covered by this Agreement. No worker shall be required to work under unsafe conditions.

The individual employer shall be solely responsible for implementation and maintenance of such safety laws, rules, regulations, standards, orders and decisions. Neither the Union nor any Local Union or the NCCRC is responsible for such implementation or maintenance.

All safety equipment required by State or Federal regulations, including hard hats, shall be provided and maintained by the individual employer without cost to his employees. Upon termination the employee shall return such equipment to the individual employer.

## Section 20
## Pre-Job Conferences

(1) The individual employer shall at his option or at the option of the Union or the NCCRC call for a pre-job conference. If the Union or the NCCRC desires, it shall be entitled to a pre-job conference solely with the individual employer. The individual employer may include his subcontractors at such conference.

(2) The individual employer shall advise the Union or the NCCRC in writing, at all times of the names (including trade names and names of individual proprietors or partners who signed the subcontract) and addresses of all subcontractors or his subcontractors employed or to be employed or contracted with for services to be performed under this Agreement. Such written notice shall be made at the pre-job conference or ten (10) days prior to the commencement of work by any such subcontractor.

(3) The individual employer shall, upon request of the Union or the NCCRC, submit letters of past or present work assignment for purposes of clarifying questions of Union jurisdiction.

## Section 21
## Audit

Each individual employer upon request of the Union, the Employer, or any Trust Fund specified in this Agreement, shall permit the Trust Fund Auditors to review any and all records relevant to the enforcement of the provisions of this Agreement and to enter upon the premises of such individual employer during business hours at reasonable time or times to examine and copy such books, records, papers or reports of such individual employer as may be necessary to determine whether or not the individual employer is making full payment of all sums required by this Agreement. The

8

9

decision as to the relevancy of records shall be made by the Joint Delinquency Subcommittee and their decision shall be binding on all parties. Such review shall be permitted not less than ten (10) working days after demand. If the individual employer cancels an audit appointment without appropriate two (2) hours' notice to the auditor, the cost of such lost time by the auditor shall be borne by the individual employer.

The cost of audit shall be borne by the individual employer if a shortage disclosed by the audit exceeds $4,500.00 and is not the result of clerical error.

Trustees of the Trust Funds specified in this Agreement are authorized to determine the appropriate formula to be applied to compute appropriate Trust Fund contributions. The individual employer shall be required to comply with such Trust Fund formula and make payments to the Trust Funds immediately upon being advised of the amount due.

Any legal action to compel audit entry shall be filed in the Superior Court of the City and County of San Francisco, State of California, or the United States District Court for the Northern District of California.

Any individual employer who refuses audit entry shall pay all the legal fees and costs necessary for compliance of audit entry.

The Union has the right to withhold workers from any individual employer who refuses to make available relevant records necessary for the completion of the audit.

Information derived from the audit shall be confidential and used solely for the enforcement of this Agreement.

## Section 22
## Work Day

The work day shall be eight (8) hours worked between the hours of 8:00 A.M. and 4:30 P.M.

Upon submission of prior written notice by the individual employer to the appropriate District office of the NCCRC, the regular work day may be changed to eight (8) consecutive hours (exclusive of the lunch period) between 7:00 A.M. and 5:00 P.M. The regular work day may be changed to eight (8) consecutive hours (exclusive of the lunch period) between the hours of 6:00 A.M. and 3:00 P.M. by written approval of the appropriate District office of the NCCRC. Once the regular work day is changed, it shall be for no less than five (5) consecutive regular work days and may be changed only by written notification from the individual employer to the appropriate District office of the NCCRC.

The rate of pay for all hours worked other than the regular established work day shall be governed by Section 26, "Overtime."

Any employee who works more than five (5) hours without a meal period shall be paid for all work in excess of five (5) hour period at the applicable overtime rate until a meal period is provided. (Such pay shall be reckoned by the hour and half-hour.)

Effective January 1, 2001, every individual employer shall authorize and permit all employees to take rest periods, which insofar as practicable, shall be in the middle of each work period. Nothing in this provision shall prevent an individual employer from staggering rest periods to avoid interruption in the flow of work and to maintain continuous operations, or from scheduling rest periods

to coincide with breaks in the flow of work that occur in the course of the work day. The authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time for every four (4) hours worked, or major fraction thereof. Rest periods shall take place at individual employer designated areas, which may include or be limited to the employee's immediate work area.

Rest periods need not be authorized in limited circumstances when the disruption of continuous operations would jeopardize the product or process of the work. However, the individual employer shall make-up the missed rest period within the same work day or compensate the employee for the missed ten (10) minutes of rest time at his or her regular rate of pay within the same pay period.

A rest period need not be authorized for employees whose total daily work time is less than three and one-half (3 1/2) hours. Authorized rest period time shall be counted as hours worked for which there shall be no deduction from wages.

If an individual employer fails to provide an employee a rest period in accordance with the applicable provisions of this Section, the individual employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each work day that the rest period was not provided.

All pay shall be reckoned by the day and half-day as follows: Employees who start work at the regular work day or shift shall receive four (4) hours pay or pay for actual hours worked, whichever is greater, regardless of the reason for the inability to complete the regular work day or shift. If the employee voluntarily quits, the employee shall receive pay only for actual hours worked.

Any dispute regarding the provisions of this Section shall be subject to Section 51 (Grievance Procedure) of this Agreement.

## Section 23
## Shift Work

Shift work can only be established upon prior notice from the individual employer to the Union and shall be performed as follows:

Except as provided below, where multiple shifts are worked, if the individual employer elects to work the day shift between the hours of 6:00 A.M. and 5:30 P.M., that shift shall work eight (8) hours and for such work they shall be paid the regular straight time rate for eight (8) hours; the second shift shall work seven and one-half (7-1/2) hours, and for such work they shall be paid the regular straight time rate for eight (8) hours; if a third shift is worked, they shall work seven (7) hours and for such work they shall be paid eight (8) hours regular straight time pay. No multiple shift shall be established or started for less than three (3) consecutive work days.

On tenant improvement or renovation projects in occupied buildings with a total contract value of five (5) million dollars or less, the individual employer may perform multiple shift operations on the basis of eight (8) hours pay for eight (8) hours work on all shifts at the regular straight-time rate.

Overtime rates shall be paid for all hours worked on the second or third shift if less than three (3) consecutive days are worked. The provisions of this Section 23 with regard to rates of pay for shift work shall apply solely to the portion of the job which requires shift operations.

When it is a condition of securing the work, a special single shift may be established that will be for no less than three (3) consecutive days, for off hours between Monday and Friday, and will allow for eight (8) hours pay for eight (8) hours work. Work in excess of eight (8) hours per day shall be subject to the overtime provisions of this Agreement.

All work in excess of eight (8) hours on Saturday and all work on Sundays and holidays shall be double time.

Payments or contributions to each of the Trust Funds provided for in this Agreement shall be based on hours worked or paid for, which include contributions for eight (8) hours per shift. No payment or contribution shall be computed at the rate of time and one-half or double the required rate of payments or contributions per hour, nor shall any such payments or contributions be considered part of the hourly wage rate for the purpose of computing overtime, either under this Agreement, the Fair Labor Standards Act, the Walsh-Healey Act or any other law.

On shift work (a) workers working a shift who come off work on Saturday morning at 8:00 A.M., are to be considered working Friday; (b) workers working a shift who come off work on Sunday morning at 8:00 A.M., are to be considered working Saturday; and (c) workers working a shift who come off work on Monday morning at 8:00 A.M., are to be considered working Sunday.

All regularly scheduled shift work performed on Saturday, Sunday and holidays, shall be in accordance with the overtime rates herein specified. All such work shall be performed under terms and conditions of this Section 23 as to hours worked and rate of pay.

## Section 24
## Work Week

The regular work week shall consist of forty (40) hours of work Monday through Friday. In the event that work cannot be performed Monday through Friday because of inclement weather or major mechanical breakdown, employees may voluntarily make up such day on Saturday and shall be paid at the applicable straight time rates. As a courtesy, the individual employer shall advise the appropriate District office of the NCCRC whenever it intends to implement the Saturday make-up day. (The NCCRC district office phone numbers are as follows: Northern (916) 498-1002, Southern (408) 445-3000, and Central (510) 568-4788.)

On Residential projects as described in Appendix C, "Residential Addendum" the work week shall remain as contained therein.

## Section 25
## Holidays

The following are nationally recognized holidays covered by this Agreement: New Year's Day, Martin Luther King Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas Day. If any of the above holidays fall on Sunday, the Monday following shall be observed as the holiday.

The parties have agreed that the following four (4) days of each year will be selected by the Union as designated off/holidays:

2003: Friday, February 14th; Friday, May 23rd; Friday, August 29th; Friday, December 26th.

2004: Friday, January 2nd; Friday, May 28th; Friday, September 3rd; Friday, December 24th.

2005: Friday, February 18th; Friday May 27th; Friday July 1st; Friday, September 2nd.

2006: Friday, February 17th; Friday May 26th; Monday, July 3rd; Friday, September 1st.

2007: Friday, May 25th; Friday, August, 31st; Monday, December 24th; Monday, December 31st.

2008: Friday, February 15th; Friday, May 23rd; Friday, August 29th; Friday, December 26th.

The four designated off holidays shall be governed by Section 26 (Overtime).

## Section 26
## Overtime

A. On all building construction, the first two (2) hours prior to the start of the regular or approved day or the first four (4) hours after the end of the approved or regular work day, not to exceed a total of four (4) hours in any one (1) work day shall be paid at time and one-half.

Time and one-half shall be paid for the first eight (8) hours worked on Saturdays.

Time and one-half shall be paid for the first eight (8) hours worked on the four designated off/collectively bargained holidays.

Double time shall be paid on all other holidays referenced in Section 25 (Holidays).

All other time shall be paid at double the straight-time rate.

B. On all heavy, highway and engineering construction, including but not limited to the construction, improvement, modification, and demolition of all or any part of streets, highways, bridges, viaducts, railroads, tunnels, airports, water supply, irrigation, flood control and drainage systems, sewers and sanitation projects, dams, power houses, refineries, aqueducts, canals, river and harbor projects, wharves, docks, breakwaters, jetties, quarrying of breakwater or riprap stone, or operations incidental to such heavy construction work; all overtime worked, other than on Sundays and nationally recognized holidays covered by this Agreement shall be at time and one-half the regular straight time rate. All overtime worked on Sundays and nationally recognized holidays covered by this Agreement shall be at double the regular straight time rate. The first eight (8) hours worked on the four (4) designated off/collectively bargained holidays shall be at time and one-half the regular straight time rate.

## Section 27
## Parking

In the event free parking facilities are not available within 1320 feet (measured by the most direct route on a dedicated vehicular public thoroughfare) of a jobsite, the individual employer will provide such facilities and the individual employer shall have the right to designate parking areas to be used. Where, because of congested parking conditions, it is necessary to use public facilities, the individual employer shall reimburse the employee for the cost of such parking upon being presented with a receipt or voucher certi-

fying to the cost thereof, such reimbursement to be made on a weekly basis or at the conclusion of the project, whichever occurs earlier. Designated parking area shall be drained and hard surface.

## Section 28
## Tools

Carpenters and apprentices shall furnish their own tools, but shall not furnish, rent or lease horses, ladders, mitre boxes, electric drills, automotive equipment to be used for the purpose of hauling or delivering individual employer's materials or equipment, or any kind of power operated machines or saws. Each employee shall arrive on the job with tools in proper condition. To implement this section, the individual carpenter shall provide a toolbox with a lock. If necessary the employee shall be allowed a reasonable amount of time during the work week to sharpen tools on the individual employer's time.

The individual employer shall provide a reasonably secure place where his employees may keep their tools. Where ten (10) or more carpenters are employed on any one (1) job or project the individual employer shall provide a separate tool house, or a separate compartment of a tool house under lock and key, for the exclusive use of carpenters. Failure on the part of the individual employer to comply with the provisions hereof shall be referred to the Joint Adjustment Board. If any individual employee's full kit of working tools is lost by reason of fire or theft while in the individual employer's care, the individual employer shall reimburse the employee for such loss up to a maximum of $500.00. Within two (2) working days from the date of claim for loss of tools as provided herein, the individual employer shall acknowledge liability therefore or reject the claim.

## Section 29
## Pickup Time

A carpenter shall be entitled to pickup time, which shall not be less than five (5) or more than fifteen (15) minutes at the end of each work day, the particular amount of such pickup time depending upon accessibility to the area to which the employee is assigned. The amount of pickup time shall be determined by mutual agreement at a jobsite conference between representatives of the individual employer and the Union.

## Section 30
## Show Up Time, Termination Pay and Discharge

Other than on the first (1st) day of dispatch, in which case two (2) hours shall apply, workers who report for work, for whom no employment is provided, shall be entitled to four (4) hours' pay, except where bad weather conditions beyond the control of the individual employer prevents employment.

Payments of contributions to each of the Trust Funds provided for in this Agreement shall be made with respect to payments required by this Section 30.

Except as hereinafter provided, carpenters who start work, but are discharged between the hours of 8:00 A.M. and 12:00 noon, shall receive four (4) hours' pay; carpenters starting work at 8:00 A.M. who are discharged between the hours of 12:00 noon and 4:30 P.M. shall receive pay only for hours worked.

Carpenters discharged on the first (1st) day of employment for inefficiency, insubordination or intoxication, shall receive pay only for hours worked. Carpenters who voluntarily quit shall receive pay only for hours worked.

DISCHARGED EMPLOYEE. Employees receiving notice of termination for any reason shall be allowed a reasonable time (not less than fifteen (15) minutes) before the end of the regular work day to assemble their tools in addition to the normal pickup time prevailing on the job.

After forty (40) hours of employment, the individual employer may discharge any employee for just cause only. Just cause is subject to Section 51, the grievance and arbitration provision of this Agreement. The individual employer during the first forty (40) hours of employment may reject or discharge any employee for any reason.

Discharge for cause shall be in writing to the employee.

## Section 31
## Payment of Wages

An employee who works the full designated work week shall receive on the last day of that work week pay for not less than the number of hours worked on the Monday of that same work week.

Each individual employer shall provide with each payroll check an itemized check stub showing separately the date of issuance, each contribution and deduction made from the payroll period covered by the check or a separate statement showing the name of the employee, the name and the individual employer's contractor's license number and/or address and the employee's social security number. There shall be no cash payment of any nature or kind whatsoever. Payment by cash or second or multiple checks or combination thereof and the payment of excessive premium rates, excessive travel time or bonuses shall be prima facie evidence of an attempt to violate the provisions of this Section 31.

Should an individual employer compensate an employee with a check for which payment is refused by the individual employer's bank because of insufficient funds, or should an individual employer fail to pay his employees on the regular, established pay day for his job, the obligation of the individual employer to the individual employee shall continue at the employee's regular straight time rate for a period not to exceed forty (40) hours, notwithstanding the above, unless the refusal of payment by the bank is due to the bank's error or omission or to circumstances which are beyond the control of the individual employer. Any question concerning responsibility of the individual employer on whether the omission is beyond his control shall be subject to the grievance procedure of this Agreement. Nothing herein shall, however, prevent the individual employer from changing his payroll date upon five (5) days' notice to the appropriate Local Union of the Union that the employee's pay date is being changed.

If terminated by the individual employer for any reason the employee shall be paid immediately in full. His pay status shall continue for each calendar day until pay is received; provided, however, that not more than eight (8) hours pay shall be charged for any calendar day with a maximum of five (5) days.

## Section 32
## Prohibition of Piece Work

No person shall be employed in work covered by this Agreement at piece rates or under any system of bonus pay. Payments by cash or second or multiple checks or combination thereof and/or the payment of excessive travel time, bonuses or other payments as "Travel Pay" or "Subsistence," where not required or permitted by this Agreement, shall be prima facie evidence of a violation of this Agreement.

If at the time of an audit, piece work or bonus payments are discovered, those amounts will be subject to the conversion formula as set forth in Section 21 (Audit). The foregoing shall not apply to an annual bonus paid to supervisors.

## Section 33
## Nonunion Fabricated Materials

To the extent permitted by law, the individual employer will not require Carpenters to handle nonunion fabricated materials.

## Section 34
## Injury

Employees who are, as a result of industrial injury, unable to complete a full day's work, shall nevertheless be paid for the full day on which such injury occurred; provided the attending physician has certified to the employee's inability to complete his/her regular assigned work on that day of such injury.

An industrial injury shall not be cause for discharge and an applicant for employment shall not be rejected because of prior industrial injury, provided that any such prior industrial injury has not caused the applicant to be incapable of satisfactorily performing the duties and functions required by the job to which he/she is assigned or would be assigned.

## Section 35
## Document Signing

No employee or applicant for employment will be required as a condition of employment or continued employment to sign any document not required by law.

## Section 36
## Subcontractor Records

On residential construction, excluding alteration and repair, the individual employer shall keep a record of all hours worked by persons performing work covered by this Agreement for each subcontractor on each separate job or project.

It is recognized and acknowledged that with respect to certain subcontracted functions such as installation of stairways, formica tops, and marlite, it would be difficult and impractical to record the precise hours worked at such function. On such work the individual employer shall make an estimate of the hours worked by the installing subcontractor. These records shall be submitted monthly to the Trust Funds specified in this Agreement.

16

## Section 37
## Bonding

The Union may require of any individual employer who is delinquent in Trust Fund contributions and/or whose payroll checks have been returned for insufficient funds ("bounced"), that such individual employer be required to provide a bond not less than $5,000.00 or more than $75,000.00 at the option of the Union or Trust Fund to insure payment of his payroll and/or Trust Fund contributions. An acceptable letter from responsible party or joint checks may be substituted for bond requirement. It shall not be a violation of this Agreement for the Union to withdraw carpenters from the job(s) of such individual employer who may upon demand and notice, fail or refuse to present such bond to the Carpenter Funds Administrative Office, 265 Hegenberger Road, Suite 100, Oakland, California 94621-1480. In the event the defaulting individual employer is a subcontractor of a prime contractor signatory hereto, the latter will be notified and given opportunity to post bond as herein provided prior to the withdrawal of carpenters from the job(s); provided, however, the bonding company is approved by the Carpenter Funds Administrative Office for Northern California, Inc.

## Section 38
## Appendices

The following appendices attached to this Carpenters Master Agreement are incorporated herein and shall be part of this Agreement as though fully set forth herein: Subsistence (Appendix A), Millwrights (Appendix B), Residential (Appendix C), Insulators (Appendix D), Millmen (Appendix E), Scaffold Erection (Appendix F) and Bridge Structure and Highway Related (Appendix G).

## Section 39
## Wage Rates

The following shall be the classifications and minimum hourly rates during the term of this Agreement for the effective dates noted and in the areas listed.

A. Nine (9) Counties Area consisting of the following counties:

Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, Santa Clara, Solano and Sonoma:

| | |
|---|---|
| Journeyman wage rates effective | 7-01-03 |
| Carpenters | 30.75 |
| Bridge Builders | 30.75 |
| Hardwood Floorlayers | 30.90 |
| Shinglers | 30.90 |
| Power Saw Operators | 30.90 |
| Steel Scaffold & Steel Shoring Erectors | 30.90 |
| Saw Filers | 30.90 |
| Millwrights | See Appendix B |

B. Thirty-Four (34) Counties Area consisting of the following counties:

Alpine, Amador, Butte, Calaveras, Colusa, Del Norte, El Dorado, Fresno, Glenn, Humboldt, Kings, Lake, Lassen, Madera, Mariposa, Mendocino, Merced, Modoc, Nevada, Placer, Plumas, Sacramento, San Joaquin, Shasta, Sierra, Siskiyou, Stanislaus, Sutter, Tehama, Trinity, Tulare, Tuolumne, Yolo and Yuba:

17

1. Effective July 1, 2003, the following journeyman wage rates shall apply to projects with a total project value of less than twenty-five million dollars ($25,000,000) and to projects which are not covered under the provisions of Section 39 B(2) or B(3) below:

| Journeyman wage rates effective | 7-01-03 |
|---|---|
| Carpenters | 23.52 |
| Bridge Builders | 29.59 |
| Hardwood Floorlayers | 23.67 |
| Shinglers | 23.67 |
| Power Saw Operators | 23.67 |
| Steel Scaffold & Steel Shoring Erectors | 23.67 |
| Saw Filers | 23.67 |
| Millwrights | See Appendix B |

2. Effective July 1, 2003, the following journeyman wage rates shall apply on new public and private projects with a total base bid project value of twenty-five million dollars ($25,000,000) or more that are bid or negotiated after the effective date of this Agreement and prior to July 1, 2004, with the exception of wood frame residential construction of three (3) stories or less. These rates shall not apply to public works projects until such time as these rates have been incorporated in the applicable prevailing wage determinations. Where there is a published or advertised estimate of the construction costs for a project, such estimate shall determine "the total base bid project value," for purposes of the twenty-five million dollar ($25,000,000) threshold. In addition, the provisions of Section 39 B(4) shall apply in determining "the total base bid project value."

| Journeyman wage rates effective | 7-01-03 |
|---|---|
| Carpenters | 27.02 |
| Bridge Builders | 30.75 |
| Hardwood Floorlayers | 27.17 |
| Shinglers | 27.17 |
| Power Saw Operators | 27.17 |
| Steel Scaffold & Steel Shoring Erectors | 27.17 |
| Saw Filers | 27.17 |
| Millwrights | See Appendix B |

3. Effective July 1, 2003, the following journeyman wage rates shall apply for the duration of the project to projects with a total base bid project value of twenty-five million dollars ($25,000,000) or more that are bid or negotiated after August 1, 1999 and prior to the effective date of this Agreement or, for public works projects, as required by the applicable prevailing wage determination. These rates shall not apply to wood frame residential construction of three (3) stories or less. Where there is a published or advertised estimate of the construction costs for a project, such estimate shall determine "the total base bid project value," for purposes of the twenty-five million dollar ($25,000,000) threshold. In addition, the provisions of Section 39 B(4) shall apply in determining "the total base bid project value."

| Journeyman wage rates effective | 7-01-03 |
|---|---|
| Carpenters | 30.75 |
| Bridge Builders | 30.75 |
| Hardwood Floorlayers | 30.90 |
| Shinglers | 30.90 |
| Power Saw Operators | 30.90 |
| Steel Scaffold & Steel Shoring Erectors | 30.90 |
| Saw Filers | 30.90 |
| Millwrights | See Appendix B |

4. 25/50 Million Dollars Defined:

The Employer shall meet and confer with the Union prior to the bid and/or execution of negotiated contract to jointly determine the appropriate rate. Employers failing to participate in this process shall incur monetary liability should it later be determined that the $25/50 million dollar threshold was surpassed.

**Private Bid and Negotiated Work:** In all scenarios, the following Divisions shall be considered "traditionally included work". Customarily included items, supplied by the owner shall be included when defining the applicability of the $25/50 million dollar threshold.

Division 1 - General Requirements
Division 2 - Site Work & Demolition
Division 3 - Concrete
Division 4 - Masonry
Division 5 - Metals
Division 6 - Wood & Plastics
Division 7 - Thermal & Moisture Protection
Division 8 - Doors & Windows
Division 9 - Finishes
Division 10 - Specialties
Division 11 - Equipment
Division 12 - Furnishings
Division 13 - Special Construction
Division 14 - Conveying Systems
Division 15 - Mechanical
Division 16 - Electrical

**Equipment:** Equipment, which is integral to the function of the building, customarily furnished and/or installed by the contractor shall be included in the determination of the total base bid value.

**Phased Projects:** Where the work is phased under a single contract, the cumulative total of the contract shall determine the total base value.

**Public Work:** The parties to the agreement shall meet and confer and failing to reach an agreement shall request the awarding body, its designee and/or the Department of Industrial Relations to issue a determination of the project value. If the awarding body fails to issue a determination, the total base bid (excluding alternates) shall govern.

C. Three (3) Counties Area consisting of the following counties:

Monterey, San Benito and Santa Cruz:

1. Effective July 1, 2003, the following journeyman wage rates shall apply to projects with a total project value of less than twenty-five million dollars ($25,000,000) and to projects which are not covered under the provisions of Section 39 C(2) or C(3) below:

| Journeyman wage rates effective | 7-01-03 |
|---|---|
| Carpenters | 24.87 |
| Bridge Builders | 29.87 |
| Hardwood Floorlayers | 25.02 |
| Shinglers | 25.02 |
| Power Saw Operators | 25.02 |
| Steel Scaffold & Steel Shoring Erectors | 25.02 |
| Saw Filers | 25.02 |
| Millwrights | See Appendix B |

2. Effective July 1, 2003, the following journeyman wage rates shall apply on new public and private projects with a total base bid

18

19

project value of twenty-five million dollars ($25,000,000) or more that are bid or negotiated after the effective date of this Agreement and prior to July 1, 2004, with the exception of wood frame residential construction of three (3) stories or less. These rates shall not apply to public works projects until such time as these rates have been incorporated in the applicable prevailing wage determinations. Where there is a published or advertised estimate of the construction costs for a project, such estimate shall determine "the total base bid project value," for purposes of the twenty-five million dollar ($25,000,000) threshold. In addition, the provisions of Section 39 C(4) shall apply in determining "the total base bid project value."

| Journeyman wage rates effective | 7-01-03 |
|---|---|
| Carpenters | 28.37 |
| Bridge Builders | 30.75 |
| Hardwood Floorlayers | 28.52 |
| Shinglers | 28.52 |
| Power Saw Operators | 28.52 |
| Steel Scaffold & Steel Shoring Erectors | 28.52 |
| Saw Filers | 28.52 |
| Millwrights | See Appendix B |

3.   Effective July 1, 2003, the following journeyman wage rates shall apply for the duration of the project to projects with a total base bid project value of twenty-five million dollars ($25,000,000) or more that are bid or negotiated after August 1, 1999 and prior to the effective date of this Agreement or, for public works projects, as required by the applicable prevailing wage determination. These rates shall not apply to wood frame residential construction of three (3) stories or less. Where there is a published or advertised estimate of the construction costs for a project, such estimate shall determine "the total base bid project value," for purposes of the twenty-five million dollar ($25,000,000) threshold. In addition, the provisions of Section 39 C(4) shall apply in determining "the total base bid project value."

| Journeyman wage rates effective | 7-01-03 |
|---|---|
| Carpenters | 30.75 |
| Bridge Builders | 30.75 |
| Hardwood Floorlayers | 30.90 |
| Shinglers | 30.90 |
| Power Saw Operators | 30.90 |
| Steel Scaffold & Steel Shoring Erectors | 30.90 |
| Saw Filers | 30.90 |
| Millwrights | See Appendix B |

4.   25/50 Million Dollars Defined:

The Employer shall meet and confer with the Union prior to the bid and/or execution of negotiated contract to jointly determine the appropriate rate. Employers failing to participate in this process shall incur monetary liability should it later be determined that the $25/50 million dollar threshold was surpassed.

**Private Bid and Negotiated Work:** In all scenarios, the following Divisions shall be considered "traditionally included work". Customarily included items, supplied by the owner shall be included when defining the applicability of the $25/50 million dollar threshold.

Division 1 - General Requirements
Division 2 - Site Work & Demolition
Division 3 - Concrete
Division 4 - Masonry
Division 5 - Metals

Division 6 - Wood & Plastics
Division 7 - Thermal & Moisture Protection
Division 8 - Doors & Windows
Division 9 - Finishes
Division 10 - Specialties
Division 11 - Equipment
Division 12 - Furnishings
Division 13 - Special Construction
Division 14 - Conveying Systems
Division 15 - Mechanical
Division 16 - Electrical

**Equipment:** Equipment, which is integral to the function of the building, customarily furnished and/or installed by the contractor shall be included in the determination of the total base bid value.

**Phased Projects:** Where the work is phased under a single contract, the cumulative total of the contract shall determine the total base value.

**Public Work:** The parties to the agreement shall meet and confer and failing to reach an agreement shall request the awarding body, its designee and/or the Department of Industrial Relations to issue a determination of the project value. If the awarding body fails to issue a determination, the total base bid (excluding alternates) shall govern.

D.   Fringe Benefit Hourly Rates - Entire 46 Counties Area

(July 1, 2003 through June 30, 2004)

| Effective dates: | 7-01-03 | 8-01-03 | 3-01-04 |
|---|---|---|---|
| Health & Welfare | 4.305 | 4.305 | 4.305 |
| Pension | 2.85 | 2.85 | 2.85 |
| Carpenters Annuity | 2.00 | 2.00 | 2.00 |
| Vacation (Carpenters) | 1.80 | 1.80 | 1.80 |
| Work Fee | .97 | .48 | .97 |
| Training | .33 | .33 | .33 |
| Industry Promotion (CEA members only) | .05 | .00 | .05 |
| Industry Promotion (Memorandum Employers only) | .09 | .00 | .09 |
| UBC Health & Safety Fund | .04 | .00 | .04 |
| Carpenters Work Preservation | .06 | .00 | .06 |
| Carpenter Employers Contract Administration | .07 | .00 | .07 |

See Appendix B for Millwright fringe benefit rates.

E.   Future Wage and/or Fringe Benefit Considerations: (2004-2008)

July 1, 2004

In the Forty-six (46) Counties Area, One dollar and Seventy-five cents ($1.75) per hour increase to be allocated as follows: Fifty cents ($.50) to be allocated to Wages; One dollar and fifty cents ($1.50) to be allocated to Health & Welfare; Fifteen cents ($.15) to be allocated to Pension; Five cents ($.05) to be allocated to Training; Vacation shall be decreased by Twenty cents ($.20) and Annuity shall be decreased by Twenty-five cents ($.25).

The Union reserves the right to reallocate wage and fringe benefit amounts, excluding pre-allocated Health & Welfare amounts.

In the Thirty-four (34) Counties and Three (3) Counties

Areas for projects with a total base bid project value of fifty million dollars ($50,000,000) or more that are bid or negotiated on or after July 1, 2004 and prior to July 1, 2007 or, for public works projects, as required by the applicable prevailing wage determination, wage rates for the duration of the project shall be three dollars and fifty cents ($3.50) per hour above the applicable Thirty-four (34) Counties or Three (3) Counties wage rates as set forth in Section 39 B (1) and C (1), except for the Bridge Builder classification. In addition, the scheduled increases set forth in this Section E shall apply to such projects. These rates shall not apply to wood frame residential construction of three (3) stories or less. Where there is a published or advertised estimate of the construction costs for a project, such estimate shall determine "the total base bid project value," for purposes of the fifty million dollar ($50,000,000) threshold. In addition, the provisions of Section 39 B(4) and C(4) shall apply in determining "the total base bid project value."

July 1, 2005

In the Forty-Six (46) Counties Area, Two dollars ($2.00) per hour increase to be allocated as follows: One dollar ($1.00) to be allocated to Wages; Twenty-five cents ($.25) to be allocated to Health & Welfare and up to an additional twenty-five cents ($.25) shall be allocated to Health & Welfare from the total two dollars ($2.00) per hour increase, if needed to maintain existing benefits, provided an additional matching amount of up to twenty-five cents ($.25) shall be contributed to the Health & Welfare Trust Fund by Individual Employers*; Twenty cents ($.20) to be allocated to Pension; Five cents ($.05) to be allocated to Vacation; and Twenty-five cents ($.25) to be allocated to Annuity and/or Health & Welfare.

*The bargaining parties shall rely upon the recommendation of the Health & Welfare Board of Trustees as to the amount of increase needed, and enact same. The maximum total increase, effective July 1, 2005 shall be Two dollars and Twenty-five cents ($2.25) per hour, excluding any increases to Work Fee pursuant to Section 43-A of this Agreement.

The Union reserves the right to reallocate wage and fringe benefit amounts, excluding pre-allocated Health & Welfare amounts.

July 1, 2006

In the Forty-Six (46) Counties Area, Two dollars ($2.00) per hour increase to be allocated as follows: One dollar ($1.00) to be allocated to Wages; Fifty cents ($.50) to be allocated to Health & Welfare; Fifteen cents ($.15) to be allocated to Pension; Five cents ($.05) to be allocated to Vacation; Five cents ($.05) to be allocated to Training; and Twenty-five cents ($.25) to be allocated to Annuity and/or Health & Welfare.

The Union reserves the right to reallocate wage and fringe benefit amounts, excluding pre-allocated Health & Welfare amounts.

July 1, 2007

In the Forty-Six (46) Counties Area, Two dollars and Fifty

22

cents ($2.50) per hour increase to be allocated as follows: One dollar ($1.00) to be allocated to Wages; Twenty-five cents ($.25) to be allocated to Health & Welfare and up to an additional twenty-five cents ($.25) shall be allocated to Health & Welfare from the total two dollars and fifty cents ($2.50) per hour increase, if needed to maintain existing benefits, provided an additional matching amount of up to twenty-five cents ($.25) shall be contributed to the Health & Welfare Trust Fund by Individual Employers*; Twenty cents ($.20) to be allocated to Pension; Five cents ($.05) to be allocated to Vacation; Twenty-five cents ($.25) to be allocated to Annuity and/or Health & Welfare; and Fifty cents ($.50) to be allocated to the Building Industry Trust.

*The bargaining parties shall rely upon the recommendation of the Health & Welfare Board of Trustees as to the amount of increase needed, and enact same. The maximum total increase effective July 1, 2007 shall be Two dollars and Seventy-five cents ($2.75) per hour, excluding any increases to Work Fee pursuant to Section 43-A of this Agreement.

The Union reserves the right to reallocate wage and fringe benefit amounts, excluding pre-allocated Health & Welfare amounts.

When an individual project encompasses two (2) geographic wage areas, the higher of the two (2) wage rates shall apply to the entire project.

F.    Apprentice Wage Percentage Schedule:

The wage rates for apprentices shall be the following percentages of the applicable journeyman classification in the appropriate geographical area. Effective July 1, 2003, fringe benefit increases will no longer be automatic, based on calendar months from an apprentice's indenture or re-indenture date. Wage and fringe benefit increases for all apprentices shall be governed by the individual Joint Apprentice Training Committees (based on calendar months, work hours and completion of mandatory training classes), provided no apprentice shall suffer a reduction in fringe benefits, effective July 1, 2003.

First Period: 0 to 6 months . . . . . . . . . . . . . . . . . . . . . . . . 60%
     Health & Welfare, Work Fee, Industry Promotion, UBC
     Health & Safety, Work Preservation, Training,
     Carpenter Employers Contract Administration
Second Period: 7 to 12 months . . . . . . . . . . . . . . . . . . . . . 65%
     Health & Welfare, Work Fee, Industry Promotion, UBC
     Health & Safety, Work Preservation, Training,
     Carpenter Employers Contract Administration
Third Period: 13 to 18 months . . . . . . . . . . . . . . . . . . . . . 70%
     Health & Welfare, Work Fee, Industry Promotion, UBC
     Health & Safety, Work Preservation, Vacation,
     Annuity, Carpenter Employers Contract Administration
Fourth Period: 19 to 24 months . . . . . . . . . . . . . . . . . . . . . 75%
     Health & Welfare, Work Fee, Industry Promotion, UBC
     Health & Safety, Work Preservation, Training, Vacation,
     Annuity, Carpenter Employers Contract Administration
Fifth Period: 25 to 30 months . . . . . . . . . . . . . . 80% Full Fringes

Sixth Period: 31 to 36 months . . . . . . . . . . . . 85% Full Fringes

Seventh Period: 37 to 42 months . . . . . . . . . . 90% Full Fringes

Eighth Period: 43 to 48 months . . . . . . . . . . . 95% Full Fringes

23

The following conditions shall be applicable to the classification "Power Saw Operators" and "Steel Scaffold Erectors and/or Steel Shoring Erectors":

(1)  If an employee is hired initially as a Power Saw Operator or as a Steel Scaffold Erector and/or Steel Shoring Erector, he shall receive the rate for such classification until he is assigned to work in another classification.

(2)  If an employee already employed on a job is assigned to perform Power Saw Operating duties or Steel Scaffold and/or Steel Shoring Erecting duties, he shall receive the rate of the Power Saw Operator classification or the Steel Scaffold Erector and/or Steel Shoring Erector's classification, as the case may be, for the actual hours worked in such classifications.

(3)  The operation of a hand-operated skill saw shall not be considered as the performance of Power Saw Operating duties and shall not carry the rate for the Power Saw Operator classification.

(4)  Men working from Bos'n chairs, swinging scaffolds, or suspended from a rope, cable, or from a safety belt or any device used as a substitute for in lieu thereof shall receive fifty cents ($.50) per hour above the applicable journeyman or apprentice rate.

The premium specified in this section shall be reckoned by the hour.

When an employee uses survey instruments he shall receive not less than the rate of pay for his regular classification.

Provisions concerning special conditions for Millwrights are set forth in Appendix B of this Agreement and are a part thereof.

The term "Journeyman Carpenter" as used herein means an employee who is qualified by experience and ability to perform work with carpenters' tools, carpenters' level and other such tools or survey instruments as are normally used by carpenters in the performance of carpenters' work.

The foregoing shall be applicable to all work in connection with the building and erection of timber trusses. The framing, assembling and building of the trusses, the raising and putting them in place and the rigging and signaling when power equipment is used are all under the jurisdiction of the United Brotherhood of Carpenters.

The term "Apprentice Carpenter" as used herein means an employee as defined from time to time as an apprentice in the Apprenticeship Standards for the Carpentry Trade in the 46 Counties, who shall be permitted to perform any work done by a journeyman carpenter. The term of apprenticeship shall not exceed a period of four (4) years. It shall be a contractual obligation of contractors party to this Agreement, to re-employ apprentices laid off due to lack of work before employing new apprentices.

An individual employer shall employ apprentices only in accordance with the provisions of this Agreement and the applicable rules and regulations of the Carpenters Training Committee and the Apprenticeship Standards.

An individual employer who is entitled to employ apprentices may employ not more than one (1) apprentice for the first two (2) journeymen regularly employed by him and not more than one (1) additional apprentice for each three (3) additional journeymen employed by him. The first apprentice may not be employed until at least two (2) journeymen are regularly employed by the individual employer. Any individual employer employing five (5) journeymen shall, while employing five (5) journeymen, also employ at least one

(1) apprentice. For each additional five (5) journeymen then in his employ, he shall employ at least one (1) additional apprentice.

FOREMAN: If the individual employer determines to use any foremen, they shall be paid one dollar and fifty cents ($1.50) an hour above the current journeyman's wage rate. Effective July 1, 2000, if the individual employer determines to use any foremen, they shall be paid ten percent (10%) above the appropriate journeyman's wage rate. The individual employer shall have the right to determine, in his sole and unlimited discretion, the need for any number of foremen. There shall be a minimum of one (1) foreman for each permanent shop maintained by specialty contractors and/or prime contractors hiring more than three (3) journeymen carpenters.

GENERAL FOREMAN: The rate for general foremen shall be twenty percent (20%) above the straight time rate for foremen. Whether an employee shall be designated general foreman, the person who shall be so designated and the specific assignment for such person shall be within the sole and exclusive judgment of the individual employer and such determination to appoint a general foreman, or not to do so, shall not be subject to the Grievance Procedure (Section 51) of this Agreement.

No person shall be employed in work covered by this Agreement at piece rates or under any system of bonus pay. Excessive amounts paid as hourly wages or under the guise of "travel pay" or "subsistence," where not required or permitted by this Agreement, shall be prima facie evidence of a violation of this Agreement. The foregoing shall not apply to an annual bonus paid to Supervisors.

## Section 40
## Health and Welfare

Each individual employer covered by this Agreement shall contribute to the Carpenters Health and Welfare Trust Fund for California, the amount listed in Section 39 (Wage Rates) for each hour paid for or worked, whichever is greater, by each employee covered by this Agreement for the purpose of providing Health and Welfare benefits for such employees.

Such contributing individual employer agrees to be bound by that certain Trust Agreement establishing the Fund dated March 4, 1953, as such has been or may from time to time be amended or supplemented.

There shall be no duplicating contribution with respect to any employee or the work of any employee.

Individual employer contributions for a foreman and general foreman covered by this Agreement shall be based upon the hourly contribution rate in effect for journeymen in the particular jurisdiction where they are employed. For purposes of interpreting and applying this section, such Trust Fund contributions shall not be considered as compensation.

The total number of hours worked by each employee in each month, for which contributions are made to this Trust Fund, shall be reported by the individual employer to this Trust Fund.

## Section 41
## Pension Plan

Each individual employer covered by this Agreement shall contribute to the Carpenters Pension Trust Fund for Northern California

the amount listed in Section 39 (Wage Rates) for each hour paid for or worked, whichever is greater, by each employee covered by this Agreement, for the purpose of providing Pension benefits for such employees. Such contributing individual employer agrees to be bound by that certain Trust Agreement establishing the Fund dated August 19, 1958, as such has been or may from time to time be amended or supplemented. The Union and the Employer agree that this plan is a Defined Benefit Plan.

There shall be no duplicating contribution with respect to any employee or the work of any employee.

Individual employer contributions for a foreman and general foreman covered by this Agreement shall be based upon the hourly-contribution rate in effect for journeymen in the particular jurisdiction where they are employed. For purposes of interpreting and applying this section, such Trust Fund contributions shall not be considered as compensation.

The total number of hours worked by each employee in each work month, for which contributions are made to this Trust Fund, shall be reported by the individual employer to this Trust Fund.

## Section 42
## Annuity Plan

Each individual employer covered by this Agreement shall contribute to the Carpenters Annuity Trust Fund for Northern California the amount listed in Section 39 (Wage Rates) for each hour paid for or worked, whichever is greater, by each employee covered by this Agreement, for the purpose of providing Annuity benefits for such employees. Such contributing individual employer agrees to be bound by that certain Trust Agreement establishing the Fund dated August 1, 1981, as such has been or may from time to time be amended or supplemented. The Union and the Employer agree that this Plan is and has been a Defined Contribution Plan.

There shall be no duplicating contribution with respect to any employee or the work of any employee.

Individual employer contributions for a foreman and general foreman covered by this Agreement shall be based upon the hourly contribution rate in effect for journeymen in the particular jurisdiction where they are employed. For purposes of interpreting and applying this section, such Trust Fund contributions shall not be considered as compensation.

The total number of hours worked by each employee in each work month, for which contributions are made to this Trust Fund, shall be reported by the individual employer to this Trust Fund.

## Section 43
## Vacation and Holiday Plan

Each individual employer covered by this Agreement shall contribute to the Carpenters Vacation and Holiday Trust Fund for Northern California the amount listed in Section 39 (Wage Rates) for each hour paid for or worked, whichever is greater, by each employee covered by this Agreement, for the purpose of providing Vacation and Holiday benefits for such employees. Such contributing individual employer agrees to be bound by that certain Trust Agreement establishing the Fund dated May 1, 1972, as such has been or may from time to time be amended or supplemented.

26

There shall be no duplicating contribution with respect to any employee or the work of any employee.

Individual employer contributions for a foreman and general foreman covered by this Agreement shall be based upon the hourly contribution rate in effect for journeymen in the particular jurisdiction where they are employed. For purposes of interpreting and applying this section, such Trust Fund contribution shall be considered as compensation.

The total number of hours worked by each employee in each work month, for which contributions are made to this Trust Fund, shall be reported by the individual employer to this Trust Fund.

The parties agree that up to a maximum of $100,000 in any one calendar year shall be provided to insure employer contributions to the Vacation and Holiday Fund, which after all practical legal and administrative means of collection available to the Fund and the Union have been exhausted, have been declared uncollectible by the Joint Delinquency Committee of the Northern California Carpenter Trust Funds. Of this amount, up to $50,000 shall be provided by the Union; and up to $50,000 shall be provided by the Construction Industry Advancement Fund and the California Construction Advancement Program, in proportion to the amount of contributions received in the calendar year by such Fund and Program, respectively.

## Section 43-A
## Work Fee

Effective for all work performed on and after July 1, 1998, it is agreed that upon written authorization, provided by the Union, as required by law, the amount designated below shall be deducted from the Vacation and Holiday benefit of each worker and remitted directly to the Union, or the appropriate Local Union or the NCCRC of the Union, as the Union may from time to time direct. The amount of the deduction shall be specified on a statement transmitted to the worker. Such remittance shall be made to the Union not less than twelve (12) times per year.

Effective July 1, 1998, the amount to be paid by the 46 Counties Supplemental Dues option, in connection with the Vacation and Holiday contribution shall be an amount equal to two and one-fourth percent (2 1/4%) of the total hourly wage-fringe benefit package of the highest carpenter journeyman classification as defined in the Nine (9) Counties Area in this Agreement (excluding Industry Promotion, Contract Administration, and Construction Industry Advancement Fund contributions) in effect on July 1, 1998 or to be in effect July 1, of each succeeding year, to be effective July 1, of such succeeding year.

Effective July 1, 2003, the term "Supplemental Dues" shall be changed to "Work Fee."

Effective July 1, 2004, the amount to be paid by the 46 Counties Work Fee option, in connection with the Vacation and Holiday contribution shall be an amount equal to two and three eighths percent (2.375%) of the total hourly wage-fringe benefit package of the highest carpenter journeyman classification as defined in the Nine (9) Counties Area in this Agreement (excluding Industry Promotion, Contract Administration, and Construction Industry Advancement Fund contributions) in effect on July 1, 2004 or to be in effect July 1, of each succeeding year, to be effective July 1, of such succeeding year.

27

Effective July 1, 2006, the amount to be paid by the 46 Counties Work Fee option, in connection with the Vacation and Holiday contribution shall be an amount equal to two and one-half percent (2.5%) of the total hourly wage-fringe benefit package of the highest carpenter journeyman classification as defined in the Nine (9) Counties Area in this Agreement (excluding Industry Promotion, Contract Administration, and Construction Industry Advancement Fund contributions) in effect on July 1, 2006 or to be in effect July 1, of each succeeding year, to be effective July 1, of such succeeding year.

The amounts referred to herein shall be remitted by the individual employer as follows:

1. The individual employer shall include such amount in the single check mailed with his/her combined employer report of contributions to the Depository Bank for the Northern California Carpenters Trust Funds.

2. In such report the individual employer shall designate the Depository Bank as his/her or its agent to receive written dues authorizations from employees covered by this Agreement pursuant to Section 302 (c) (4) of the Labor-Management Relations Act, as amended, and any revocation of such authorizations, and shall direct the Bank (a) to deposit the monies reported under the column headed Work Fee (Column B) in a special account, (b) to transfer monthly from such account the monies paid with respect to the work of each employee who has on file with the Bank an unrevoked dues authorization in a form complying with law to the account of the Union as Work Fee and (c) to transfer the remaining monies in said account to the Carpenters Vacation and Holiday Trust Fund for Northern California for credit to the Vacation and Holiday accounts of the other employees. Any delinquency in the payment of such amount shall be subject to the same liquidated damage, interest and other delinquency provisions applicable to contributions to the Northern California Carpenter Trust Funds.

It is the intent and purpose of the parties to comply fully with all laws, rules and regulations applicable to the dues check-off provided by this Section. If any provision of this Section, or any procedure in the implementation or administration of this Section, is determined to violate any such law, rule or regulation, the parties will promptly enter into lawful negotiations to correct such violation.

The Union shall exonerate, reimburse and save harmless the Employer, each individual employer, the Bank or other depository designated pursuant to this Section, and the Carpenter Funds Administrative Office of Northern California, Inc., and their respective officers, directors, agents, and employees, individually and collectively, against any and all liabilities and reasonable expenses arising out of the payment, receipt or a distribution of the amounts listed in Section 39 (Wage Rates) for Work Fee.

## Section 44
## Carpenters Training Trust for Northern California

Each individual employer covered by this Agreement shall contribute to the Carpenters Training Trust for Northern California the amount listed in Section 39 (Wage Rates) for each hour worked by each employee covered by this Agreement for the purpose of providing training and education benefits for such employees.

Such contributing individual employer agrees to be bound by that certain Trust Agreement establishing the Fund dated March 4, 1963, as such has been or may from time to time be amended or supplemented.

There shall be no duplicating contributions with respect to any employee or the work of any employee.

## Section 45
## Contract Administration, California Builders Advancement Program, California Construction Advancement Program, Builders Industry Promotion Trust, Construction Industry Advancement Fund and The Building Industry Trust

Effective July 1, 2003, a total contribution of sixteen cents ($.16) per hour for each hour worked or paid for shall be paid to the California Builders Advancement Program, the California Construction Advancement Program, the Builders Industry Promotion Trust Fund, the Carpenter Employers Contract Administration Trust Fund, and the Building Industry Trust as follows:

**California Construction Advancement Program** — Effective July 1, 2003, each signatory individual memorandum employer shall contribute the sum of one cent ( $.01) per hour worked or paid for to the California Construction Advancement Program which is established for the purpose of protecting, improving and advancing the interests and welfare of the construction industry and its individual employers and employees. The individual employer hereby adopts and agrees to be bound by the terms of the certain Trust Agreement creating the California Construction Advancement Program dated September 12, 1974, as such might be amended from time to time pursuant to the terms thereof, and further agrees to observe and be bound by the actions and determinations of the Trustees of said Trust.

**California Builders Advancement Program** — Effective July 1, 2003, each signatory employer shall contribute the sum of one cent ($.01) per hour worked or paid for to the California Builders Advancement Program which shall be established for the purpose of protecting, improving and advancing the interests and welfare of the unionized building construction industry and its individual employers and employees. The individual employer hereby adopts and agrees to be bound by the terms of the certain Trust Agreement creating the California Builders Advancement Program, as such might be amended from time to time pursuant to the terms thereof, and further agrees to observe and be bound by the actions and determinations of the Trustees of said Trust.

**Builders Industry Promotion Trust Fund** — Effective July 1, 2003, each signatory employer shall contribute the sum of three cents ($.03) per hour worked or paid for to the Builders Industry Promotion Trust Fund which is established for the purpose of protecting, improving and advancing the interests and welfare of the building construction industry and its individual employers and employees. The individual employer hereby adopts and agrees to be bound by the terms of the certain Trust Agreement creating the Builders Industry Promotion Trust Fund dated January 1, 1992, as

28

29

such might be amended from time to time pursuant to the terms thereof, and further agrees to observe and be bound by the actions and determinations of the Trustees of said Trust.

**Construction Industry Advancement Fund** — Effective July 1, 2003, each signatory employer who is a member of the Home Builders Association (HBA) shall contribute the sum of three cents ($.03) per hour worked or paid for to the Construction Industry Advancement Fund Program which is established for the purpose of protecting, improving and advancing the interests and welfare of the construction industry and its individual employers and employees. The individual employer hereby adopts and agrees to be bound by the terms of the certain Trust Agreement creating the Construction Industry Advancement Fund Administrative Agreement dated March 5, 1979, as such might be amended from time to time pursuant to the terms thereof, and further agrees to observe and be bound by the actions and determinations of the Trustees of said Trust.

**Building Industry Trust** — Effective July 1, 2003, each signatory individual memorandum employer shall contribute the sum of four cents ($.04) per hour worked or paid for to the Building Industry Trust which shall be established for the purpose of protecting, improving and advancing the interests and welfare of the unionized building construction industry and its individual employers and employees as provided for in the Labor Management Cooperation Act of 1978 (29 U.S.C. 175 et seq.) and Section 302 (c) (9) of the Labor Management Relations Act, as amended (29 U.S.C. 186 (c) (9)). Effective July 1, 2003, each signatory employer who is a member of the Construction Employers' Association (CEA) or any other association which may so designate, shall contribute the sum of one cent ($.01) per hour worked or paid for to the Building Industry Trust. The individual employer hereby adopts and agrees to be bound by the terms of the Trust Agreement creating the Building Industry Trust, as such might be amended from time to time pursuant to the terms thereof, and further agrees to observe and be bound by the actions and determinations of the Trustees of said Trust.

**Carpenter Employers Contract Administration Trust Fund** — Effective July 1, 2003, each signatory employer shall contribute the sum of seven cents ($.07) per hour worked or paid for to the Carpenter Employers Contract Administration Trust Fund which is established for the purpose of administering the collective bargaining agreement through the grievance procedure or otherwise on behalf of all individual employers signatory to this Agreement. At the discretion of the Trustees of said Trust, contributions to the Carpenter Employers Contract Administration Trust Fund may be increased up to an additional two cents ($.02) per hour during the term of this Agreement. Such increase or increases are to be effective on such dates as determined by the Trustees. The individual employer hereby adopts and agrees to be bound by the terms of the certain Trust Agreement creating the Carpenter Employers Contract Administration Trust Fund dated January 1, 1986, as such might be amended from time to time pursuant to the terms thereof, and further agrees to observe and be bound by the actions and determinations of the Trustees of said Trust.

All contributions and payments required pursuant to this Section or pursuant to the Trusts created hereunder shall not be deemed wages due to the employees with respect to whose work such contributions and payments are made.

Notwithstanding the provisions of this Section, there shall be no

contributions or payments required pursuant to this Section for the period of August 1, 2003 through February 29, 2004.

NOTE: The amount of contributions is subject to further negotiation between the parties provided, however, that the total amount referred to in this section will not be increased but may be subject to redistribution by agreement of the parties.

### Section 45-A
## Carpenters Work Preservation Committee Trust

Effective July 1, 2003, each signatory employer shall contribute the sum of six cents ($.06) per hour for each hour worked or paid for to the Carpenters Work Preservation Committee Trust Fund. Each individual employer hereby adopts and agrees to be bound by the terms of the certain Trust Agreement creating the Carpenters Work Preservation Committee dated January 1, 1986, as such might be amended from time to time pursuant to the terms thereof, and further agrees to observe and be bound by the actions and determination of the trustees of said Trust. At the discretion of the trustees of said Trust, contributions for the Carpenters Work Preservation Committee Trust Fund may be increased up to an additional three cents ($.03) per hour during the term of this Agreement. Such increase or increases are to be effective on such dates as determined by the Trustees.

The Carpenters Work Preservation Committee Trust is established for the purpose of administering the Carpenters Work Preservation Committee as referred to in Section 2-A of this Agreement.

The Carpenters Work Preservation Committee Trust has been created as a tax qualified jointly trusteed trust fund, the purposes of which are to perform the work preservation functions and those functions permitted pursuant to the Labor Management Cooperation Act of 1978 (29 U.S.C. 175 et seq.) and Section 302 (c) (9) of the Labor Management Relations Act, as amended (29 U.S.C. 186 (c) (9)).

It is further agreed that any funds contributed to such fund or funds created for the purposes set forth herein shall not be used for any membership solicitation by any contributor or participant to the Trust Agreement or Trust Agreements or Corporate Articles and By-Laws formed shall be accessible to any signatory employer or employers without regard to membership or non-membership in any employer association which may be signatory to an agreement requiring contributions to the fund or funds created pursuant to this Agreement.

All contributions and payments required pursuant to this Section or pursuant to the Trusts created hereunder shall not be deemed wages due to the employees with respect to whose work such contributions and payments are made.

### Section 45-B
## UBC Health & Safety Fund

Each signatory employer shall contribute to the United Brotherhood of Carpenters and Joiners of America Health & Safety Fund ("Health Fund") the amount listed in Section 39 (Wage Rates) for each hour worked by each employee covered by this Agreement. Each individual employer agrees to be bound by the Agreement and Declaration of Trust for the Health and Safety Fund dated April 2, 1990, as it exists and as it may be amended or

restated and to such rules, regulations and other governing documents adopted pursuant to such Trust.

## Section 46
## Contributions for Superintendents

A.   The Union and the Employer agree that when employees are working in a supervisory position above the rank of foreman or general foreman (where it appears in this Agreement), the individual employer may make payments with respect to his/her work into the Carpenters Health and Welfare Trust Fund for California and Carpenters Pension Trust Fund for Northern California on the basis of 145 hours per month in accordance with the schedules set forth in the Master Agreement, regardless of hours worked by any such employee in a month; provided, however, the individual employer having made one (1) payment on an employee shall continue to make such payments so long as the employee is in his employ.

B.   The Union and the Employer agree that when an employee is working in a supervisory position above the rank of foreman, the individual employer may make payments with respect to his/her work into the Annuity Plans established by this Agreement on the basis of a minimum of 145 hours, or on the basis of a greater number of hours but not less than 145 hours per month, in accordance with the schedules set forth in the Agreement, regardless of hours worked by any such employee in the month; provided, however, the individual employer having made one (1) payment on any employee shall continue to make such payments so long as the employee is in his employ.

C.   The Union and the Employer agree that the individual employers covered by this Master Agreement may cover owners or partners in the Carpenters Trust Funds (as in Section 46 A. & B.) by paying contributions with respect to the work of such an individual into these funds monthly on the basis of 145 hours per month, in accordance with the hourly contribution rates set forth in this Master Agreement, regardless of the number of hours worked by any such individual in a month, provided that such individual is performing work within the 46 Northern California Counties area and that, if not an owner or partner would be working as a journeyman carpenter under the terms of this Master Agreement and provided further that the individual employer, having made one (1) payment with respect to the work of such an individual, shall continue to make such payments monthly so long as the individual continues to perform work for the individual employer within the 46 Northern California Counties area in the capacity of an owner or partner. Such individual shall be deemed an employee covered by this Agreement solely for the purpose of participating in said Trust Funds and shall have no other rights or privileges under this Agreement as an employee.

## Section 47
## Basis for Contributions

Payment of contributions for benefits as provided in Sections 40, 41, 42, 43, 43-A, 44, 45, 45-A and 45-B shall be based upon all hours for which an employee has received payment; provided, however, that contributions shall not become compounded by overtime and all overtime hours for purposes of fringe benefit contributions shall be considered straight time hours.

In order to provide for benefits to employees without disruption

during periods of contract negotiations and to assure an orderly means of collecting Trust Fund contributions during such periods, each signatory employer agrees that he or it shall be obligated to contribute to each and every Trust Fund referred to in this Agreement for any period following their termination date of this Agreement unless and until a lawful impasse occurs or until a successor Agreement is negotiated. Each signatory employer further agrees that any or all said Trust Funds may enforce this obligation by action to collect such delinquent contributions filed in any court of competent jurisdiction.

## Section 48
## Subsistence

All subsistence shall be governed by the provisions of Appendix A of this Agreement.

## Section 49
## Hiring

1.   The NCCRC shall establish and maintain open and nondiscriminatory employment lists for the use of workers desiring employment on work covered by this Agreement and such workers shall be entitled to use such lists.

2.   The individual employer shall first call upon the appropriate Local Union of the NCCRC having work and area jurisdiction for such workers as he or it may from time to time need, and such Local Union shall furnish the individual employer the required number of qualified and competent workers and skilled mechanics of the classifications needed by the individual employer in accordance with the provisions of this Section 49.

3.   It shall be the responsibility of the individual employer when ordering workers, to give the appropriate Local Union all pertinent information regarding the workers' employment.

4.   The Local Union will furnish in accordance with the request of the individual employer such workers of the classifications needed from among those entered on said lists to the individual employer by use of written referral in the following order of preference and the selection of workers for referral to jobs shall be on a nondiscriminatory basis:

(a)   Workers specifically requested by name who have been laid off or terminated as journeymen carpenters in the geographic area of the Local Union or the NCCRC, as the case may be, within three (3) years before such request by a requesting individual employer or a joint venture of which one or more members is a former employer now desiring to re-employ the same workers, provided they are available for employment. This provision shall also apply to individual employers wishing to rehire employees of a joint venture of which the individual employer was a member.

There shall be no restriction on the mobility of workers employed by individual employers in the 46 Northern California Counties.

(b)   Workers who within the five (5) years immediately preceding the individual employer's order for workers, have performed work of the type covered by this Agreement within the geographic area of the Agreement, provided such workers are available for employment.

(c)   Workers whose names are entered on said lists and who are available for employment.

5.   When ordering workers of the skills required, the individual employer will give notice to the appropriate Local Union if possible not later than 2:30 P.M. of the day prior (Monday through Friday) or, in any event, not less than seventeen (17) hours, if possible, before the required reporting time and in the event that forty-eight (48) hours after such notice (Saturdays, Sundays and recognized holidays excluded), the Local Union shall not furnish such workers, the individual employer may procure workers from any source or sources. If workers are so employed, the individual employer shall promptly report to the appropriate Local Union having work and area jurisdiction, each such worker by name. In emergency cases workers may be dispatched other than at such dispatching times.

6.   Subject to the foregoing, the individual employer shall have complete freedom of selectivity in hiring and the individual employer retains the right to reject any job applicant referred by the Union for any reason. The individual employer may discharge any employee for just cause as defined in Section 30 (Show Up Time, Termination Pay and Discharge); provided, there shall be no discrimination on the part of the individual employer against any employee for activities on behalf of or representation of the Union not interfering with the proper performance of his duties.

7.   It is agreed that, notwithstanding the provisions of this section, the first Foreman and up to twenty-five percent (25%) of the employees employed to perform work covered by this Agreement on any project may be employees designated by the individual employer.

Further, an additional twenty-five percent (25%) of the employees employed to perform work covered by this Agreement on any project may be selected by the individual employer from workers who are registered on the out-of-work list and who are members of the Local Union having jurisdiction over the job or project at any location in the 46 Northern California Counties.

It is further agreed that, notwithstanding the provisions of this subsection, up to fifty percent (50%) of the employees employed to perform work covered by this Agreement on any residential project may be employees designated by the individual employer.

In all cases such employees shall be subject to the provisions of Section 12 (Union Security), and must be properly registered on the appropriate Local Union work list before dispatched.

The ratio of twenty-five percent (25%) and fifty percent (50%) to other employees shall not be increased during any time with respect to the job. Whenever employees are laid off, the ratio cannot be increased.

8.   Available for employment shall mean:

(a)   All individuals seeking employment under Subsection One (1) of this section above shall comply with NCCRC policy regarding regularly established roll call time.

(b)   All individuals eligible for referral shall be present at the Local Union during dispatching hours; provided they may be present at a location where they can be reached by telephone if they live in a remote area. This may be waived if, due to extenuating circumstances they cannot be personally present.

9.   Dispatching hours shall be as determined by the NCCRC Hiring Hall Policy.

34

10.   Each individual, upon being referred, shall receive a referral slip to be transmitted to the individual employer representative at the jobsite, indicating his or her name, address, social security number, type of job, date of proposed employment and date of referral.

11.   To ensure the maintenance of a current registration list, all individuals who do not re-register within two (2) weeks of their previous registration shall be removed from the registration list. If such individuals re-register pursuant to the provisions of this section they shall maintain their previous position on such list.

12.   Individuals shall be eliminated from the registration list for the following reasons:

(a)   Dispatched to the job—except that any individual who is rejected by the individual employer or who fails to receive the equivalent of forty (40) hours straight time pay shall retain his or her position on said list.

(b)   Failing to accept suitable employment two (2) times during the current week at the time of dispatch. Employment which cannot be reached by an individual because of lack of transportation shall not be deemed suitable as to such individual.

(c)   Unavailable for employment during the current week.

(d)   Any individual dispatched to a job who fails to report for work or voluntarily terminated prior to receiving the equivalent of forty (40) hours pay shall be placed at the bottom of the list, provided he or she re-registers.

13.   No individual who is rejected by the individual employer shall be referred to such individual employer with respect to the same request pursuant to which he was initially referred.

14.   The Local Unions shall post in places where notices to applicants for employment with the individual employer are customarily posted, all provisions relating to the functions of the hiring arrangements, including the provisions set forth in this section, and each individual employer shall similarly post in places where notices to employees and applicants for employment are customarily posted, a notice of the hiring arrangements, including the provisions set forth in this section.

15.   Selection of applicants for referral to jobs pursuant to this Agreement shall be on a nondiscriminatory basis and shall not be based on, or in any way affected by, union membership, bylaws, rules, regulations, constitutional provisions or any other aspect or obligation of Union membership, policies or requirements, provided that the provisions hereof shall not modify or qualify the requirements of Section 12 (Union Security) of this Agreement.

Any person, including an individual employer aggrieved by the operation of the hiring hall provisions of this section, has the right to submit his grievance to permanent hiring hall neutral arbitrator who shall be Gerald R. McKay, or his successor, provided such submission is made in writing, stating the reasons for the grievance, within ten (10) work days after occurrence of the grievance. The neutral hiring hall arbitrator shall have full power to adjust the grievance and his decision thereon shall be final and binding upon the person submitting the grievance and all parties hereto. Forms for the submission of any such grievance shall be available at all times in the office of each Local Union or the NCCRC. Notices required by this section shall be mailed or delivered to Gerald R. McKay, P.O. Box 406, Burlingame, CA 94011-0406. The date of the postmark or the date of delivery of the grievance, whichever is later, shall

35

stop the running of the ten (10) day period. The costs of the arbitration should be borne equally by the Employer and the Union regardless of which Local Union, NCCRC or individual employer is involved.

16. Any person dispatched in accordance with this Section by accepting such dispatch shall be deemed to have assigned to the Union his/her rights to collect unpaid wages or Trust Fund contributions.

17. The procedural rules for the operation of the NCCRC Hiring Hall shall be those Uniform Hiring Hall rules as established, amended or modified from time to time by the NCCRC pursuant to its Bylaws.

## Section 50
## Work Preservation, Contracting and Subcontracting

1. The purpose of this Section 50 is to preserve and protect the work opportunities that will be available to employees covered by this Agreement at the jobsite or job yard.

2. The terms and conditions of this Agreement, insofar as it affects the Employer and the individual employer, shall apply equally to any subcontractor of any tier under the control of, or working under oral or written contract with such individual employer on any work covered by this Agreement to be performed at the jobsite or job yard, and said subcontractor with respect to such work shall be considered as an individual employer covered by this Agreement.

3. If an individual employer shall subcontract work herein defined, the work will be subcontracted to a subcontractor signatory to the appropriate Agreement with the Union. Such subcontract shall state that such subcontractor is or agrees to become signatory to an appropriate Agreement with the Union and will comply with all the terms and provisions of said Agreement including the payments of wages, Trust Fund contributions and fringe benefit payments. A copy of the subcontract and signature shall be furnished to the Union upon request.

4. The term "subcontractor" means any person, corporation or other entity, other than an employee covered by this Agreement, who agrees, orally or in writing, to perform for, or on behalf of the individual employer, any part or portion of the work covered by this Agreement. The subcontractor shall be properly licensed as required by the California State Contractors License Law.

5. The individual employer will give written notice to the NCCRC and/or Millwrights Local 102, (see Appendix B, Section 15) as the case may be, of any subcontract involving the performance of work covered by this Agreement within five (5) days of entering such subcontract and/or prior to commencement of work by the subcontractor, unless such notice is prevented by emergency conditions, and shall specify the name and address of the subcontractor.

5a. If thereafter the subcontractor becomes delinquent in the payment of any wages, Trust Fund contributions, or fringe benefit payments, then the NCCRC, Local Union or the Trust Fund office shall give prompt notice of the delinquency, confirmed in writing, to the individual employer and to the subcontractor. The notice shall specify the name and amounts, if known, of the delinquency.

5b. Said notification by the NCCRC, Local Union or the Trust Fund office shall be provided within twenty (20) days of publication of the Delinquency list provided by the Trust Funds or if in the case of failure to pay wages five (5) days from the applicable pay day. If such notice is given, the individual employer shall pay and satisfy only the amount of any such delinquency by such subcontractor occurring within ninety (90) days prior to the receipt of said notice from the Union, and said individual employer may withhold the amount claimed to be delinquent out of the sums due and owing by the individual employer to such subcontractor.

5c. Notwithstanding the provision set forth above, if the subcontractor is found in violation of the hiring provisions of this Agreement, pursuant to the provision of Section 51 (Grievance Procedure), and the Union is unable to collect from the subcontractor the damages determined to be owing for such violation, the individual employer shall then be liable for the payment of such damages. The total of this liability, as it would apply to the individual employer, shall be no more than five (5) days' violation or the total of the subcontractor's retention being held by the individual employer, whichever amount is greater.

6. If the individual employer fails to give written notice as required in this Section 50, he shall, until notice is received, assume liability for any violation of the terms and conditions of this Agreement at that particular jobsite or job yard, as may be determined by Section 51 (Grievance Procedure). If the subcontractor is signatory or otherwise bound to an Agreement with the Union, the individual employer shall be liable only for delinquencies as set forth in subsection 5a of this Section 50 for work on that jobsite or job yard. If the subcontractor is not in compliance with this Agreement then the individual employer shall be liable for any violation of this Agreement on that jobsite or job yard.

7. If the Union or the NCCRC should make demand in writing for exercise of this Section, the individual employer will require that any subcontractor of the individual employer specified in the demand will, if he has not already done so, post a surety bond in an amount not to exceed $75,000.00 to cover payments of wages, Trust Fund contributions and fringe benefit payments specified in this Agreement. Failure of the individual employer to comply with this Section within two (2) days of demand will make the individual employer liable for the delinquencies of the subcontractor occurring on the individual employer's specific job. (The amount of the bonds specified in this subsection in no way affects the amounts specified for bonding purposes elsewhere in this Agreement.)

8. Notwithstanding any other provision of this Agreement or this Section 50, on any residential construction, all work covered by this Agreement shall be performed by the individual employer or prime carpentry contractor, and no such work shall be subcontracted to any other contractor except the installation of foundations, overhead garage doors, plastic sink tops, hardwood floors, roof and exterior wall shingles, traditional normal drywall, patio glass sliding doors, stairs, underlayment, base, acoustical ceilings, steel scaffolding, lathing and insulation. The individual employer or prime carpentry contractor shall provide all materials and the individual employer or prime carpentry contractor shall employ all employees covered by this Agreement who shall be shown on its payroll records except as provided herein. The remedies for default provided in this Section 50 shall apply directly to the individual employer or prime carpentry contractor. The individual employer or prime carpentry contractor shall be responsible for and shall direct-

ly employ employees covered by this Agreement to perform all work in connection with the construction of all walls and roof framing, installation of all sub-flooring, all exterior sheathing, installation of all metal or wood sash, doors, installation of all trim, installation of all types of cabinets, wardrobes and sliding doors.

9. The individual employer has the primary obligation for performance of all conditions of this Agreement. This obligation cannot be relieved, evaded or diminished by subcontracting. Should the individual employer elect to subcontract, the individual employer shall continue to have such primary obligation. Said primary obligation shall be deemed conclusive evidence of the Union's majority status for the purpose of establishing the obligation of the individual employer to bargain collectively pursuant to Section 8(A) (5) of the National Labor Relations Act as amended with the Union upon expiration of this Agreement but for no other statute, rule, regulations or law.

10. The provisions of this Section may be enforced only through the grievance and arbitration provisions of this Agreement.

11. It is the intent of the parties to enforce the provisions of this Section only to the extent permitted by law.

12. Notwithstanding any provisions of this Agreement or any Memorandum Agreement to the contrary, the provisions of this Section shall not be enforced by strike action or any other form of job shutdown or work interference; provided, however, that the rights provided in Section 51 (Grievance Procedure) of this Agreement are retained to enforce primary obligations of any individual employer.

13. Payment by cash or second or multiple checks or combination thereof and the payment of excessive premium rates, excessive travel time, or bonuses shall be prima facie evidence of an attempt to violate the provisions of this Section. The foregoing shall not apply to an annual bonus paid to supervisors.

14. No subcontract shall be in compliance with this Section if the effect of such subcontract is to diminish, eliminate or circumvent the payment of wages and fringe benefits to employees covered by this Agreement.

## Section 51
## Grievance Procedure

Any dispute concerning any application or interpretations of this Agreement shall be subject to the following procedure:

1. In the event that a dispute arises on a job, it shall be first reported to the individual employer and/or the Field Representative of the appropriate Local Union or the NCCRC who shall then attempt to adjust said grievance or dispute at the jobsite level.

2. The grieving parties shall specify the date(s) of the alleged violation(s) and the provision(s) of the Agreement applicable to the dispute.

3. If said grievance or dispute is not satisfactorily adjusted by the appropriate Local Union or the NCCRC or otherwise authorized Union Representative and the individual employer or his representative within three (3) days after submission to the individual employer, the matter shall be submitted by either party to a permanent Board of Adjustment created for the settlement of such disputes.

4. The Board of Adjustment shall be composed of one (1) mem-

ber named by the Union, one (1) member named by the Association and an Impartial Arbitrator. The parties shall select an alternate to the permanent neutral Arbitrator who shall serve only in the event the permanent neutral Arbitrator is unable to serve. At any point in the proceedings should the panel be unable to reach a majority vote the Arbitrator shall participate and his decision shall be final and binding.

5. In addition to any rule or procedure which the panel may adopt, the Board of Adjustment shall be governed by the following provisions:

(a) No briefs shall be submitted nor a transcript made of the hearing except by mutual agreement of the parties or by direction of the Arbitrator. Any transcript ordered by any party shall be at the expense of the party ordering the transcript.

(b) In the case of deadlock, the Arbitrator shall render his decision upon the conclusion of the case at the Board of Adjustment hearing, unless the time is extended by mutual agreement of the parties or at the request of the Arbitrator. The Arbitrator shall not render an expanded opinion in any case unless requested by the parties.

(c) The parties shall select and utilize a permanent Impartial Arbitrator who is willing to abide by the procedures set forth herein. By agreement of both parties, the Impartial Arbitrator may be changed or replaced.

(d) The Board of Adjustment or the Arbitrator may fashion an appropriate remedy to resolve the issue including, but not limited to, back pay, money damages, injunctive relief, audit, payment of wages and fringe benefits to persons damaged by the contract violations, interest or attorneys' fees.

(e) Any grievance involving an individual employer not a member of any of the signatory associations shall be submitted directly to the Arbitrator unless the individual employer agrees to submit the matter to the Board of Adjustment.

6. Disputes arising out of work assignment, which are governed by Section 16 (Jurisdictional Disputes), will not be heard at these panels.

7. The Board of Adjustment shall meet within forty-five (45) days on any item properly before the Board. Failure of either party to meet or to participate shall cause the Board or Arbitrator to hear and decide the matter on a default basis.

8. Decisions of the Board of Adjustment or an Impartial Arbitrator shall be within the scope and terms of this Agreement and shall be final and binding upon all parties hereto.

9. In the event an individual employer fails to comply with any such decisions, the Union may withdraw employees or strike the individual employer, and such action shall not be a violation of this Agreement so long as such noncompliance continues, provided, however, that the Union may not enforce the provisions of Section 50 (Subcontracting) by economic action or picketing.

10. The expenses of the Joint Adjustment Board and the Impartial Arbitrator, including the cost of a court reporter, shall be borne equally by the parties hereto.

11. No proceeding hereunder based on any dispute, complaint or grievance herein provided for, shall be recognized unless the grievance procedure steps outlined above have been followed. The Arbitrator or Board may for good cause, accept a late submission,

which shall then be decided by the Board of Adjustment.

12. The Board of Adjustment shall establish regular meeting dates and administer grievances filed in conjunction with this section as set forth in the rules and procedures, which may be amended from time to time by the parties.

13. A decision of the Board of Adjustment by majority vote, or the decision of a permanent Arbitrator shall be enforceable by a petition to confirm an arbitration award filed in the Superior Court of the City and County of San Francisco, State of California, or the United States District Court for the Northern District of California. Any party who fails or refuses to comply with a decision of a Board of Adjustment or an award of the Arbitrator, as the case may be, shall be responsible for reasonable attorneys' fees for the filing and trial of any petition to confirm and enforce said decision or award in addition to all other remedies available through law, unless the petition is denied.

14. All hearings of the Board of Adjustment shall be in the City and County of San Francisco, and/or County of Alameda, unless mutually agreed to move to another location.

15. Other than matters concerning discharge, no proceedings mentioned hereinabove on any dispute, complaint or grievance shall be recognized unless called to the attention of the Employer and the Union within thirty (30) days after the last date the alleged violation was committed.

16. On all cases relating to discharge or discipline, employees must file their grievances with the Local Union or the NCCRC within three (3) working days after the imposition of the discharge or discipline. Thereafter, the Local Union or the NCCRC must file its grievance with the Board of Adjustment within four (4) working days after the employee files his grievance. The Board shall meet within seven (7) working days following submission of the grievance. The Board of Adjustment or Arbitrator shall be free to sustain the discharge or to find discipline other than discharge to be appropriate and may order reinstatement with full or partial back pay as he or it deems appropriate provided there shall be no discrimination on the part of the individual employer against any employee for activities in behalf of or representation of the Union not interfering with the proper performance of his duties.

17. If failure of a Board of Adjustment to meet within one week (7 working days) is due to the unavailability of the Union, the wage payment and Trust Fund contribution liability shall be limited to the above seven (7) working days. If the Employer or individual employer, or Arbitrator is unavailable to meet, the wage payment and Trust Fund contribution liability shall be continuing.

IN WITNESS WHEREOF, the parties hereto have executed this document this 3rd day of June, 2003, in Oakland, California.

THE CARPENTERS 46 NORTHERN CALIFORNIA COUNTIES CONFERENCE BOARD, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, AFL-CIO

On behalf of:

NORTHERN CALIFORNIA CARPENTERS REGIONAL COUNCIL

for Local Unions No.: 22, 25, 34, 35, 46, 102, 152, 180, 217, 262, 405, 505, 605, 701, 713, 751, 1109, 1240, 1496, 1599, 1618, 1789, 1861, 2035, 2236, 9068, 9083, 9109 and 9144.

By _____     By _____
Robert Alvarado, Chairman          William Feyling, Executive Director

CONSTRUCTION EMPLOYERS' ASSOCIATION OF CALIFORNIA

By _____     By _____
John Stripe, President              Larry Nibbi, Chairman
                                    Carpenters Craft Committee

By _____
Michael Walton, Secretary

MILLWRIGHT EMPLOYERS ASSOCIATION

By _____
Michael Vlaming, Executive Manager

## Appendix A
## Subsistence

1. On all work covered by this Agreement, as described in this Appendix A, the following shall apply effective July 1, 2000. All jobs bid or awarded, or under construction prior to July 1, 2000, shall be completed under Subsistence requirements in effect prior to July 1, 2000.

   (a) No subsistence shall be paid on any job or project located less than fifty (50) road miles from any city hall or post office in the following cities:

   Eureka
   Santa Rosa
   Monterey
   Visalia
   Fresno
   Redding
   Kings Beach
   South Lake Tahoe
   Auburn
   Chico
   Cloverdale
   Woodland
   Oakland
   Jackson
   Manteca
   San Jose
   Merced
   Willits

   (b) On any job or project located fifty (50) or more road miles from a city hall or post office located in a city listed in paragraph 1(a), subsistence shall be paid at the rate of twenty-five dollars ($25.00) per day. The individual employer shall pay to each employee covered by this Agreement the amount shown above for each day's work in addition to their regular and overtime wages as subsistence.

   (c) The area known as Geysers is a ten dollar ($10.00) subsistence zone.

   (d) Work performed at the Mt. Hamilton Observatory or facilities adjacent thereto shall be a subsistence zone.

2. Exemption to the requirement for payment of subsistence:

   The individual employer shall not be required to pay subsistence to employees covered by this Agreement where employees are employed to work:

   (a) At the individual employer's permanent yard;

   (b) At the individual employer's permanent shop;

   (c) On buildings of three (3) stories or less which are a part of a residential construction project located within the subsistence area;

   (d) On streets, roadways and utilities, which are a part of a residential construction project of buildings of three (3) stories or less, located within the subsistence area.

   This exemption does not apply to camps, highways, dams, tunnels or similar heavy engineering projects.

3. On all other work located within the subsistence area when any employee works two (2) or more hours in any one (1) day, he/she shall be paid the subsistence allowance for that day. Such pay shall be paid to employees by separate check.

4. The individual employer's daily charge for board and lodging on jobs where subsistence is paid shall not exceed the daily subsistence allowance paid the employee.

5. Such payments for subsistence shall be excluded from the wages of the employee for the purpose of the Fair Labor Standards Act and shall be paid to such employee by check weekly and identified separately therein. Subsistence is defined as reimbursement for food, lodging and living expenses out of town and is not a wage or reimbursement for time spent going to or from the jobsite.

6. If an employee is transported by the individual employer from a permanent yard or shop located in a free zone to work in a subsistence zone and transported back to the same permanent yard or shop in a free zone, all on the same day, on the individual employer's time, he shall not receive subsistence.

7. Both parties agree to meet and confer relative to subsistence where extremely adverse conditions exist with respect to jobsite access.

## APPENDIX B
## 46 Counties of Northern California
## MILLWRIGHTS AGREEMENT

### TABLE OF CONTENTS

|  | SECTION NO. | PAGE |
|---|---|---|
| Foreman | 3 | 47 |
| Millwright Annuity Plan | 5 | 51 |
| Millwright Employers Construction Advancement Program | 7 | 51-52 |
| Outside Contracting | 16 | 56 |
| Overtime | 11 | 53 |
| Pickup Time | 9 | 53 |
| Pre-Job Conference | 13 | 55 |
| Safety | 14 | 55-56 |
| Show-Up Time | 2 | 46-47 |
| Subcontracting | 15 | 56 |
| Tools | 8 | 52 |
| Travel and Subsistence | 1 | 44-46 |
| Wage Rates | 4 | 47-51 |
| Welders | 10 | 53 |
| Work Covered | 12 | 53-55 |
| Work Fees | 6 | 51 |

### In Addition to the
### 46 Counties Carpenters Master Agreement

In addition to the working rules and conditions of the 46 Counties Carpenters Master Agreement, the following working rules and wage rates shall apply to Millwrights.

Effective December 1, 2003, these conditions, rules and wage rates shall cover the Millwright Local Union within the 46 Counties.

### Section 1
### Travel and Subsistence

No Millwright shall use his vehicle for other than personal travel to and from the job.

1.  If transportation is not furnished by the employer, Millwrights shall receive travel and/or subsistence expense as follows:

a.  For the counties of Alameda, Contra Costa, Marin, San Francisco, and San Mateo, travel shall be established from the center of the Oakland Bay Bridge 0.2 miles west of the westerly end of the Yerba Buena Tunnel. In the remaining counties covered by this Agreement, from the City Halls of Chico, Eureka, Fresno, Modesto, Monterey, Redding, Sacramento, San Jose, Santa Rosa, Stockton, Vallejo, and Visalia. Travel from the above-defined points shall be as follows:

b.  Over fifty (50) miles in free zone. $15.00 per day worked.

c.  Millwrights employed in the subsistence area set forth in the subsistence map in the 1968-71 Carpenters Agreement shall receive beginning January 1, 1986 - $32.50 per day worked.

d.  Special condition for Humboldt County and Ft. Bragg proper is subsistence for non-residents only. *Travel shall apply for residents as set forth in I.a. above.

*Residents of Ft. Bragg proper shall be defined as living with-

in twenty (20) road miles of Ft. Bragg city hall.

e.  Map Description - Area No. 1 Free Zone

Commencing with the mouth of the Carmel River in Monterey County, thence easterly along the north bank of Carmel River to Tularcitos Junction, thence southeasterly along Tularcitos Road to Arroyo Seco Road, thence along south fork of Arroyo Seco Road to Greenfield and Highway 101, thence southerly along center line of Highway 101 to San Lucas, thence easterly along center line of Highway 198 to Coalinga, thence southerly along center line of Highway 33 to Kern County line, thence easterly along north boundary line of Kern County of intersection of said county line and Highway 65, thence northerly along center line Highway 65 through Porterville, Exeter, Badger to intersection of Highway 65 and Highway 180, thence on a straight line in a northwesterly direction to Pine Ridge, thence along center line of county road to Auberry, thence northerly along center line of county road to North Fork, Lakeview, to intersection of said county road and Highway 41, thence northerly along center line of Highway 41 to intersection of Highway 41 and Highway 49, thence northerly along center line of Highway 49 through Mariposa, Coulterville, Chinese Camp, Sonora, Jackson, Placerville, Auburn, Grass Valley to San Juan, thence on a northerly line to Challenge, thence along center line of county road through Woodleaf to Strawberry Valley, thence northerly along west boundary of Plumas County to intersection of Highway 36, thence northwesterly along center line of Highway 36 to intersection of Highway 36 and Highway 89, thence northerly along Highway 89 to intersection of Highway 89 and west boundary to Section 22, Township 30 north, Range 4 east of Mount Diablo Base and Meridian, thence northerly to northwest corner of Section 3, Township 30 north, Range 4 east, thence westerly along Township 30 north, to the intersection of Mount Diablo Meridian, thence northerly to the northeast corner of Township 34 north, Range 1 west, thence westerly along Township 34 north, to eastern boundary of Trinity County, thence southerly to intersection of county road, thence southerly along center line of county road to Tower House, thence westerly along center line of Highway 299 to intersection of eastern boundary of Trinity County, thence southerly along east boundary to Trinity County Line to the intersection of the west boundary of Range 7 west, thence south to southwest corner of Township 30 north, Range 7 west, thence southerly along western boundary of Range 6 west to the intersection of Colusa County line of western boundary to Township 16 north, Range 6 west, thence southerly along east boundary of Lake County to intersection of Highway 20, thence westerly along center line of Highway 20 to intersection of Highway 101, thence southerly along Highway 101 to intersection of county road, thence westerly along center line of county road to Comptche, thence from Comptche south to southwest corner of Township 16 north, Range 15 west, thence easterly to northwest corner of Township 15 north, Range 14 west, thence southerly to southwest corner to Township 14 north, Range 14 west, thence easterly to northwest corner of Township 13 north, Range 13 west, thence southerly to southwest corner of Township 13 north, Range 13 west, thence easterly to northeast corner of Township 12 north, Range 12 west, thence southerly to southwest corner of Township 11 north, Range 12 west, thence easterly to northwest corner of Township 10 north, Range 11 west, thence southerly along western boundary of Range 11 west to southwest corner

44

45

of Township 8 north, Range 11 west, thence westerly to south-east corner of Section 33 of Township 8 north, Range 12 west, thence southerly along coastline of California to north bank of Carmel River, the point of beginning.

The following map descriptions shall be called Area 3 and shall be a subsistence zone within Area 1:

Commencing with the southwest corner of Township 7 south, Range 3 east, Mount Diablo Base and Meridian, thence northerly along the easterly line of Range 2 east to the intersection of the northerly boundary of the Santa Clara County line, thence easterly along said county line to the easterly line of Range 4 east, thence southerly along said easterly Range line to the southeasterly corner of Township 7 south, Range 4 east, thence westerly along southerly boundary of said Township 7 south to the point of beginning.

Map Description - Area No. 2 Subsistence Zone

From the Pacific Ocean at the southwest corner of Township 2 north, Range 3 west, Humboldt Base and Meridian, thence easterly to northwest corner of Township 1 north, Range 1 west, thence southerly to southwest corner of Township 1 north, Range 1 west, thence easterly along Humboldt Baseline, to northwest corner of Township 1 south, Range 1 east, thence southerly along Humboldt Meridian to intersection of county road north of Honeydew, thence northeasterly along center line of county road to Dyerville, thence on a straight northeasterly line to Bridgeville, thence northeasterly on Highway 36 to intersection of eastern boundary of Township 1 north, Range 3 east, thence northerly on eastern boundary of Range 3 east, to northwest corner of Township 9 north, Range 4 east, thence westerly along center line of county road through Martin's Ferry to Orick, thence south along coastline to the point of beginning.

F.   Travel expenses in subsistence areas as outlined above will be paid, at the rate of $15.00 at the beginning and at the completion of each job, or termination of the employee, except for jobs performed in one (1) day or less and the employee is paid or furnished transportation.

## Section 2
## Show-Up Time

A.   When workers are ordered and dispatched for work and report for work on the same day, they shall be paid hours worked plus two (2) hours reporting, but not to exceed eight (8) hours on a regular eight (8) hour shift.

B.   Except on the first day of employment when workers report to work and no work is provided, they shall receive four (4) hours pay and travel or subsistence, whichever may apply. If a Millwright employee is required to report to work and no work is provided as a result of inclement weather, the employee shall be paid subsistence or travel for the day as spelled out in Section 1 (Travel and Subsistence), whichever may apply.

C.   The regular lunch period for Millwrights shall start no less than three and one-half (3 1/2) nor more than five (5) hours after the start of any regular shift. Any Millwright who works more than a five (5) hour period without a meal period shall be paid for all work in excess of said five (5) hour period (at the prevailing overtime rate) until a meal is provided (such pay shall be reckoned by

the hour and the half hour). The established lunch period will constitute the reckoning of the day or half day. If the job circumstances require Millwrights to work more than ten (10) hours on a shift, they shall have a second meal period of one-half (1/2) hour and an additional meal period every four (4) hours thereafter. Such meal period shall be paid for at the prevailing overtime rate by the employer.

D.   Notwithstanding the multiple shift three (3) day requirement, a single or multiple approved shift may be established where the premises cannot be vacated in whole or in part until the close of business. Workers then reporting for work shall be paid on the basis of eight (8) hours pay for seven and one-half (7 1/2) hours work. Any work prior to the approved shift and any work after the approved shift period shall be at time and one-half not to exceed four (4) hours. Overtime work in excess of four (4) hours shall be double time.

## Section 3
## Foreman

A.   When two (2) or more Millwrights are employed on a job, one (1) shall be foreman and be paid foreman's pay.

B.   In all 46 Counties a Millwright Foreman may not supervise more than one (1) jobsite. No one (1) Millwright Foreman shall supervise more than ten (10) Millwrights. Foremen shall receive two dollars ($2.00) per hour over Millwright's scale. Either a Millwright Foreman or General Foreman, having supervision over other crafts, shall receive not less than the regular hourly rate of the highest paid classification over which he has supervision, providing that the employee receiving the highest rate of pay (other than a Millwright) shall be on the individual employer's payroll. In the above case the Millwright shall not receive less than the Millwright Foreman or General Foreman's scale.

C.   When there are three (3) or more Millwright Foremen employed by the individual employer on the jobsite, there shall be designated one (1) General Foreman and he shall receive the General Foreman rate, one dollar and fifty cents ($1.50) per hour over Millwright Foreman's scale.

## Section 4
## Wage Rates

The following shall be the classifications and minimum hourly rates during the term of this Agreement for the effective dates noted and in the areas listed.

A.   Nine (9) Counties Area consisting of the following counties:

Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, Santa Clara, Solano and Sonoma:

| | |
|---|---|
| Journeyman wage rates effective | 7-01-03 |
| Millwrights | $30.85 |

B.   Thirty-Four (34) Counties Area consisting of the following counties:

Alpine, Amador, Butte, Calaveras, Colusa, Del Norte, El Dorado, Fresno, Glenn, Humboldt, Kings, Lake, Lassen, Madera, Mariposa, Mendocino, Merced, Modoc, Nevada, Placer, Plumas, Sacramento, San Joaquin, Shasta, Sierra, Siskiyou, Stanislaus, Sutter, Tehama,

Trinity, Tulare, Tuolumne, Yolo and Yuba:

1. Effective July 1, 2003, the following journeyman wage rates shall apply to projects with a total project value of less than twenty-five million dollars ($25,000,000) and to projects which are not covered under the provisions of Section 4 B (2) or B (3) below:

| Journeyman wage rates effective | 7-01-03 |
|---|---|
| Millwrights | 26.02 |

2. Effective July 1, 2003, the following journeyman wage rates shall apply for the duration of the project to projects with a total base bid project value of twenty-five million dollars ($25,000,000) or more that are bid or negotiated after August 1, 1999 and prior to November 1, 2003 or, for public works projects, as required by the applicable prevailing wage determination. These rates shall not apply to wood frame residential construction of three (3) stories or less. Where there is a published or advertised estimate of the construction costs for a project, such estimate shall determine "the total base bid project value," for purposes of the twenty-five million dollar ($25,000,000) threshold. In addition, the provisions of Section 39 B(4) of the Carpenters Master Agreement shall apply in determining "the total base bid project value."

| Journeyman wage rates effective | 7-01-03 |
|---|---|
| Millwrights | 30.85 |

3. Effective December 1, 2003, the following journeyman wage rates shall apply on new public and private projects with a total base bid project value of twenty-five million dollars ($25,000,000) or more that are bid or negotiated after December 1, 2003 and prior to July 1, 2004, with the exception of wood frame residential construction of three (3) stories or less. These rates shall not apply to public works projects until such time as these rates have been incorporated in the applicable prevailing wage determinations. Where there is a published or advertised estimate of the construction costs for a project, such estimate shall determine "the total base bid project value," for purposes of the twenty-five million dollar ($25,000,000) threshold. In addition, the provisions of Section 39 B(4) of the Carpenters Master Agreement shall apply in determining "the total base bid project value."

| Journeyman wage rates effective | 12-01-03 |
|---|---|
| Millwrights | 29.52 |

C. Three (3) Counties Area consisting of the following counties:

Monterey, San Benito and Santa Cruz:

1. Effective July 1, 2003, the following journeyman wage rates shall apply to projects with a total project value of less than twenty-five million dollars ($25,000,000) and to projects which are not covered under the provisions of Section 39 C(2):

| Journeyman wage rates effective | 7-01-03 |
|---|---|
| Millwrights | 27.37 |

2. Effective July 1, 2003, the following journeyman wage rates shall apply for the duration of the project to projects with a total base bid project value of twenty-five million dollars ($25,000,000) or more that are bid or negotiated after August 1, 1999 and prior to July 1, 2004 or, for public works projects, as required by the applicable prevailing wage determination. These rates shall not apply to wood frame residential construction of three (3) stories or less. Where there is a published or advertised estimate of the construction costs for a project, such estimate shall determine "the total base bid project value," for purposes of the twenty-five million dol-

48

lar ($25,000,000) threshold. In addition, the provisions of Section 39 C (4) of the Carpenters Master Agreement shall apply in determining "the total base bid project value."

| Journeyman wage rates effective | 7-01-03 |
|---|---|
| Millwrights | 30.85 |

D. Millwrights Fringe Benefits Hourly Rates (Entire 46 Counties Area ):

| Effective dates: | 7-01-03 | 12-01-03 |
|---|---|---|
| Health & Welfare | 4.305 | 4.305 |
| Pension | 2.85 | 2.85 |
| Appr. Training | .33 | .33 |
| Millwrights Vacation | 1.70 | 1.70 |
| Work Fee | 1.16 | .62 |
| Industry Promotion | .15 | .15 |
| Work Preservation | .05 | .00 |
| UBC Health & Safety | .04 | .00 |
| Millwrights Annuity Fund | 3.25 | 3.25 |

E. Future Wage and/or Fringe Benefit Considerations:

December 1, 2003:

In the Forty-six (46) Counties Area, Sixty-three cents ($.63) per hour of fringe benefits will be waived through June 30, 2004, as follows: Fifty cents ($.50) per hour from Work Fee (Section 43A); Four cents ($.04) per hour from UBC Health & Safety and Apprenticeship; Five cents ($.05) per hour from Work Preservation; Four cents ($.04) per hour from Section 6 (Millwright Vacation and Work Fee).

July 1, 2004:

In the Forty-six (46) Counties Area, reinstatement of the sixty-three cents ($.63) per hour of fringe benefits that were waived for the period of December 1, 2003 through June 30, 2004 as follows: Fifty cents ($.50) per hour to Work Fee (Section 43A); Four cents ($.04) per hour to UBC Health & Safety and Apprenticeship; Five cents ($.05) per hour to Work Preservation; Four cents ($.04) per hour to Section 6 (Millwright Vacation and Work Fee).

In the Forty-six (46) Counties Area, One dollar and Seventy-five cents ($1.75) per hour increase to be allocated as follows: Fifty cents ($.50) to be allocated to Wages; One dollar and fifty cents ($1.50) to be allocated to Health & Welfare; Fifteen cents ($.15) to be allocated to Pension; Five cents ($.05) to be allocated to Training; Vacation shall be decreased by Twenty cents ($.20) and Annuity shall be decreased by Twenty-five cents ($.25).

The Union reserves the right to reallocate wage and fringe benefit amounts, excluding pre-allocated Health & Welfare amounts.

In the Thirty-four (34) Counties and Three (3) Counties Areas for projects with a total base bid project value of fifty million dollars ($50,000,000) or more that are bid or negotiated on or after July 1, 2004 and prior to July 1, 2007 or, for public works projects, as required by the applicable prevailing wage determination, the millwright wage rate for the duration of the project shall be three dollars and fifty cents ($3.50) per hour above the applicable Thirty-four (34) Counties or Three (3) Counties wage rate as set forth in Section 4 B (1) and C (1), provided said rate

49

shall not exceed the 9 Counties wage rate. In addition, the scheduled increases set forth in this Section D shall apply to such projects. These rates shall not apply to wood frame residential construction of three (3) stories or less. Where there is a published or advertised estimate of the construction costs for a project, such estimate shall determine "the total base bid project value," for purposes of the fifty million dollar ($50,000,000) threshold. In addition, the provisions of Section 39 (Wage Rates) B (4) and C (4) of the Carpenters Master Agreement shall apply in determining "the total base bid project value."

July 1, 2005:

In the Forty-Six (46) Counties Area, Two dollars and Fifty cents ($2.50) per hour increase to be allocated as follows: One dollar ($1.00) to be allocated to Wages; Seventy-five cents ($.75) per hour to be allocated to Health & Welfare; Twenty cents ($.20) per hour to be allocated to Pension; Five cents ($.05) per hour to be allocated to Vacation; Twenty-five cents ($.25) per hour to be allocated to Annuity and/or Health & Welfare; Twenty-five cents ($.25) per hour to be allocated to Annuity; Five cents ($.05) per hour to be waived from Section 6, Work Fee, until July 1, 2006.

The Union reserves the right to reallocate wage and fringe benefit amounts during the term of the agreement, excluding the minimum pre-allocated Health & Welfare amount.

July 1, 2006:

In the Forty-Six (46) Counties Area, Two dollars ($2.00) per hour increase to be allocated as follows: One dollar ($1.00) per hour to be allocated to Wages; Fifty cents ($.50) per hour to be allocated to Health & Welfare; Fifteen cents ($.15) per hour to be allocated to Pension; Five cents ($.05) to be allocated to Vacation; Five cents ($.05) per hour to be allocated to Training; and Twenty-five cents ($.25) per hour to be allocated to Annuity and/or Health and Welfare; Five cents ($.05) per hour reinstated to Section 6 Work Fee.

The Union reserves the right to reallocate wage and fringe benefit amounts during the term of the agreement, excluding the minimum pre-allocated Health & Welfare amount.

July 1, 2007:

In the Forty-Six (46) Counties Area, Two dollars and Twenty-five cents ($2.25) per hour increase to be allocated as follows: One dollar ($1.00) per hour to be allocated to Wages; Seventy-five cents ($.75) per hour to be allocated to Health & Welfare; Twenty cents ($.20) per hour to be allocated to Pension; Five cents ($.05) per hour to be allocated to Vacation; Twenty-five cents ($.25) per hour to be allocated to Annuity and/or Health & Welfare.

The Union reserves the right to reallocate wage and fringe benefit amounts during the term of the agreement, excluding the minimum pre-allocated Health & Welfare amount.

In the Thirty-four (34) Counties and Three (3) Counties Areas for projects with a total base bid project value of fifty million dollars ($50,000,000) or more that are bid or negotiated on or after July 1, 2007, or, for public works projects, as required by the applicable prevailing wage

determination, wage rates for the duration of the project shall be the applicable Thirty-Four (34) or Three (3) Counties wage rates.

## Section 5
## Millwright Annuity Plan

A.   Effective July 1, 2000, each individual employer covered by this Agreement will contribute the sum of three dollars and twenty-five cents ($3.25) per hour for each hour paid for or worked by Millwrights employed by such individual employer under this Agreement to the Annuity Plan as established pursuant to this Agreement.

B.   Such contributing individual employer agrees to be bound by that certain Trust Agreement establishing the Fund dated July 1, 1980, as such has been or may from time to time be amended or supplemented. The Union and the Employer agree that this plan is and has been a Defined Contribution Plan.

C.   The individual employer further agrees that he or it does irrevocably designate and appoint the employer members of said Trust Fund as his or its attorneys in fact for the selection, removal and substitution of the Trustees or Board members as provided in said Trust Agreement as may be provided by or pursuant to said Trust Agreement or Annuity Plan.

D.   There shall be no duplicating contribution with respect to any employee or the work of any employee.

## Section 6
## Millwright Vacation and Work Fee

Effective July 1, 2003, each individual employer covered by this Agreement will contribute the sum of one dollar and seventy cents ($1.70) per hour for each hour paid for or worked by Millwrights employed by such individual employer under this Agreement to the Millwrights Vacation Plan as established pursuant to this Agreement.

Effective for all work performed on or after August 1, 1983, there shall be a nineteen cents ($.19) Work Fee established for each hour worked or paid for under Appendix B of this Agreement to be paid to Millwrights Local Union #102. This Work Fee shall be established on the same basis and shall be paid in addition to that currently being paid under Section 43-A (Work Fee) of this Agreement. Effective July 1, 2005 through June 30, 2006, five cents ($.05) of the Work Fee shall be waived until July 1, 2006, at which time the five cents ($.05) per hour worked or paid shall be reinstated to the Work Fee for a total of nineteen cents ($.19).

## Section 7
## Millwright Employers Construction Advancement Program

The Millwright Employers Association, being a party to the collective bargaining agreement with the Carpenters 46 Northern California Counties Conference Board, United Brotherhood of Carpenters and Joiners of America, AFL-CIO, and a signatory Association devoted exclusively to contractors who employ large numbers of Millwrights, will participate in the Construction Industry Advancement Program as contained in the Carpenters Agreement,

Carpenters 46 Northern California Counties Conference Board. Accordingly, the Carpenter Trust Fund office will be advised to assign a Trust Fund Association code number to the Millwright Employers Association and a fifteen cent ($.15) per hour contribution for each hour worked or paid for will be credited to the Millwright Employers Association for all of their members performing work under the collective bargaining agreement as well as all independent, unassigned and/or National Millwright contractor hours.

Effective July 1, 1996, Employers working under this Appendix shall contribute the sum of five cents ($.05) per hour for each hour worked or paid for to the Carpenters Work Preservation Committee Trust.

## Section 8
## Tools

A.   The individual employer shall provide on each jobsite a reasonably secure place where Millwrights may keep their tools and special protective clothing. Where five (5) or more Millwrights are employed on a single job or project, the individual employer shall provide a separate and secure place, under lock and key, for the exclusive use of the Millwrights. The individual employer shall also provide seven hundred and fifty dollars ($750.00) indemnification to protect Millwrights against loss or damage to entire kit of tools or special protective clothing while in the individual employer's care, resulting from loss or damage due to a fire or theft.

B.   In the event a Millwright has more than one kit or tools on the job, indemnification shall be the replacement value of this inventory, but in no event to exceed one thousand-five hundred dollars ($1,500.00). Millwrights shall not furnish the following tools: Open or box end wrenches or sockets over one and one-fourth inch (1 1/4"), master levels, drill bits, taps and reamers, micrometers over one inch (1"), or no more than two (2) dial indicators.

C.   A cap of ten (10) working days will be placed on the time the employer has to reimburse the employee for loss of tools. The employee is required to provide the employer with an inventory of all of his tools used on the job at the start of the job.

D.   On all jobsites where inclement weather, heat, dust, cold or other adverse conditions prevail, and/or another craft has a change area, a safe and secure change area shall be provided for the sole use of the Millwrights on the jobsite or job yard.

E.   Welding hoods, gloves and sleeves shall be considered tools and, therefore, shall be replaced, in kind, if damaged or stolen on the jobsite.

F.   The individual employer, at his own option, may also replace individual tools lost or damaged on the jobsite. The individual employer shall replace any tool owned by an employee modified at the individual employer's request, but such modified tools shall then become the property of the employer.

G.   The individual employer shall furnish all necessary safety protection equipment. When normal protective equipment cannot be used, there shall be a meeting of the union and the individual employer to work out a mutually agreeable safety practice.

H.   The individual employer shall furnish waterless hand cleaner and rags for personal cleanup.

52

## Section 9
## Pickup Time

A.   Each Millwright shall be entitled to pickup time for personal tools at the end of each day, which shall not be less than five (5) or more than fifteen (15) minutes, exact time to depend on accessibility to actual place of work, and to be established by mutual agreement at a jobsite conference between a representative of the individual employer and a representative of the Union.

B.   Millwrights receiving notice of discharge or layoff shall be allowed a reasonable time not less than thirty (30) minutes before the end of the shift in addition to pickup time prevailing on the job to assemble their tools.

## Section 10
## Welders

A.   A qualified Millwright welder is one who has passed a qualification test (such as ASME test, or one equivalent thereto) given by a recognized testing laboratory within the prior twenty-four (24) months. When a Millwright welder, certified within the past twenty-four (24) months by a recognized testing laboratory, is required to pass another test, the individual employer shall pay for time required for such test and testing lab fee.

B.   When as a condition of employment, an employer requires a certified welder to re-certify at the jobsite, the employer shall provide the employee with a copy of his certification papers upon layoff or completion of job. It is understood this section shall not apply to employees who quit or are discharged for cause.

## Section 11
## Overtime

A.   On all construction, the first two (2) hours prior to the start of the regular or approved day or the first four (4) hours after the end of the approved or regular work day, not to exceed a total of four (4) hours in any one (1) day shall be paid at time and one-half.

Time and one-half shall be paid for the first eight (8) hours worked on designated off days and/or Saturdays.

All other time shall be paid at double the straight-time rate.

If work is to be performed on a specific construction jobsite on Saturday, Sunday, designated off days or holidays, Millwrights employed the preceding five (5) regular work days shall be given the opportunity to work such overtime.

B.   **Special Single Shift:**  A single approved shift may be established where the premises cannot be vacated in whole or in part until the close of business. Workers then reporting for work shall be paid on the basis of eight (8) hours pay for seven and one-half (7 1/2) hours work. Any work prior to the approved shift and any work after the approved shift period shall be at time and one-half, not to exceed four (4) hours. Overtime work in excess of four (4) hours shall be double time.

## Section 12
## Work Covered

A.   This Agreement shall cover and apply to all work of the indi-

53

vidual employer falling within the recognized jurisdiction of the Millwright Union as spelled out in the UBC Jurisdictional Claims Handbook approved by the General Executive Board of the United Brotherhood of Carpenters and Joiners of America dated January 1, 1961, including, but not limited to all recognized tools and equipment of the trade on new construction, repair, modifications, or maintenance work, including, but not limited to, all moving of machinery and/or equipment installed by Millwrights, making of skids and crates, skidding and unskidding, crating and uncrating: and installation of lubrication and/or Hydraulic lines or piping (on machines set by Millwrights) that come to the jobsite prefabricated, and computer floors.

B.   The work of the Millwright as spelled out in the Jurisdictional Claims Handbook referred to in Section A, above, is as follows:

The term "MILLWRIGHT AND MACHINE ERECTORS" shall mean the unloading, hoisting, rigging, skidding, moving, dismantling, aligning, erecting, assembling, repairing, maintenance, and adjusting of all machinery and equipment installed either in buildings, factories, structures, processing areas either under cover, underground or elsewhere, required to process material, handle, manufacture or servicing, be it powered or receiving power manually by steam, gas, electric, gasoline, diesel, nuclear, solar, water, air, or chemically, and in industries such as and including (identified for the purpose of description but not limited to) the following: woodworking plants, canning industries, steel, coffee roasting plants, paper and pulp, cellophane, stone crushing, gravel and sand washing and handling, refineries, grain storage and handling, asphalt plants, sewage disposal, water plants, laundry, bakery, mixing plant, can, bottle and bag packing plant, textile mills, paint mills, breweries, milk processing plants, power plants, aluminum processing or manufacturing plants, amusement and entertainment field. Installation of mechanical equipment in atomic energy plants; installation of reactors in power plants, installation of control rods and equipment in reactors, installation of mechanical equipment in rocket missile bases, launchers, launching gantry, floating bases, hydraulic escape doors and any and all component parts thereto, either assembled, semi-assembled or disassembled.

The installation of, but not limited to, the following: setting of all engines, motors, generators, air compressors, fans, pumps, scales, hoppers, conveyors of all types, sizes and their supports, escalators, man lifts, moving sidewalks, hoists, dumbwaiters, all types of feeding machinery, amusement devices, mechanical pin setters and spotters in bowling alleys, refrigeration equipment and installation of all types of equipment necessary and required to process material either in the manufacturing or servicing, the handling and installation of pulleys, gears, sheaves, fly wheels, air and vacuum drives, worm drives and gear drives, directly or indirectly coupled to motors, belts, chains, screws, legs, guards, boots, boot tanks, all bin valves, turn heads and indicators, shafting, bearing, cable sprockets, cutting all key seats in new and old work, troughs, chippers, filters, calendars, rolls, winders, rewinders, slitters, cutters, wrapping machines, blowers, forging machines, rams, hydraulic or otherwise, planing, extruder, ball, dust collectors, equipment in meat packing plants, splicing of ropes, cables.

The laying out, fabrication and installation of protection equipment including machinery guards, making and settling of templates for machinery, fabrication of bolts, nuts, pans, drilling of holes for any equipment which the Millwrights install regardless of materials;

all welding and burning regardless of types, fabrication of all lines, hoses or tubing used in lubricating machinery, installed by Millwrights, grinding, cleaning, servicing and machine work necessary for any part of any equipment installed by Millwrights, and the breaking in and trial run of any equipment or machinery installed by the Millwrights. Dock levelers, dock bumpers, manual or power actuated roll up doors, security doors, door seals, and airport x-ray and bomb detection equipment. Air inlet filter houses, air inlet filters, air inlet ducts and power actuated dampers, flex line, fuel piping and flex connections, all power generation power island equipment, including, but not limited to, turbines, generators, gear reducers, diffusers and expansion joints. Thermal blankets and gear boxes. All water treatment/sewage treatment plant equipment, including, but not limited to, all types of pumps, compressors, chain of flygt conveyance systems, aeration basin equipment, primary/secondary clarifier mechanisms, sludge thickeners, mechanical/stationary bar screens and trash racks, and stop logs.

C.   It is understood that no dispute, complaint or grievance shall be filed under Section 51 (Grievance Procedure) of the Master Labor Agreement alleging violation of this Section 12, as a result of assignment of work as set forth in this section to other crafts working under collective bargaining agreements; but rather such dispute, complaint, or grievance shall be handled under Section 16 (Jurisdictional Disputes) of the Master Labor Agreement.

D.   The individual employer and the Local Union will cooperate promptly in attempting to resolve jurisdictional disputes that may arise on any job or project.

E.   When requested in writing by the Millwright Union, individual employers who are parties to this Agreement shall furnish signed letters promptly on a date mutually agreed upon by both parties, but in no case more than thirty (30) days, on the letterhead of the individual employer, stating he is employing or had employed Millwrights on a specific type of work and specific job and paid the negotiated scale of wages and fringe benefits for such work.

## Section 13
## Pre-Job Conference

A.   Whenever an individual employer or his representative holds a pre-job conference pursuant to Section 20 of the Master Labor Agreement, separate individual notice shall be given to the Millwright Local having jurisdiction over the project in the same format used to notify the other crafts attending.

B.   A markup meeting for the purpose of discussing jurisdiction shall be mandatory upon written request of the Local Union on all jobs whose total cost is one million dollars ($1,000,000.00) or more. Markup meetings on jobs of less than one million dollars ($1,000,000.00) shall be optional upon mutual consent of the individual employer and the unions involved. This is not necessarily an exclusive Millwright Markup. At a Markup meeting where plans or mock-ups are to be used, the Union will be given reasonable time to review such plans or mock-ups prior to the start of the meeting.

## Section 14
## Safety

A.   As a safety factor, no Millwright shall be required to work alone while making repairs or adjustments on machinery and/or

54

55

equipment that is in operation or capable of being operated. Since this is a safety factor, the second individual is not necessarily a Millwright, but must be a responsible individual capable of starting, stopping and operating said machinery. If the second individual is not a Millwright, he shall not be allowed to perform Millwright tasks. No Millwright employee shall be discharged for refusing to work under unsafe conditions.

## Section 15
## Subcontracting

A. The individual employer shall not subcontract Millwright work as set forth in Section 12, to any subcontractor without notifying the union, in writing, of the subcontractor's name, address, phone number and license number within five (5) days after selecting the subcontractor or five (5) days before starting the job, whichever is longer, except in emergencies. Such subcontracting shall be done in accordance with Section 50 (Work Preservation, Contracting and Subcontracting) of the Master Agreement.

## Section 16
## Outside Contracting

Any outside firm undertaking any Millwright work within the territory where this Agreement applies shall be allowed to bring in one (1) non-resident Foreman or General Foreman, subject to the Hiring Provisions of Section 49 (Hiring) of the Master Labor Agreement. Such non-resident shall register for Health and Welfare, Vacation Plan, Annuity, and Retirement Plan at the office of the Local Union, and shall be furnished a copy of the current Agreement for his future guidance prior to starting any job. The Local Union office shall inform such workers of the proper compensation due him/her under this Agreement and may later require specific proof of conformance. The second Foreman shall be a local Millwright. All Foremen or General Foremen shall receive the wages and conditions of this Agreement.

MILLWRIGHT EMPLOYERS ASSOCIATION

_____     _____
Michael Vlaming                     Date

MILLWRIGHTS LOCAL UNION #102

_____     _____
Bill Napier, Business Manager       Date

CARPENTERS 46 NORTHERN CALIFORNIA
COUNTIES CONFERENCE BOARD

_____     _____
Robert Alvarado, Chairman           Date

_____     _____
William Feyling, Executive Director  Date

56

## Appendix C
## Residential Addendum

The terms and conditions of this Addendum shall apply on the work description contained herein, provided the job(s) are registered as per Section C-5 of this Addendum and all the terms and conditions of the Carpenters Master Agreement shall remain in full force and effect unless specifically amended by this Addendum.

C-1.Residential Wood Frame Structures are defined as single family residences, condominiums, town houses, cluster homes and multiple unit, multi-story wood frame residential structures as permitted by the applicable building code.

Due to the constantly changing aspects of the residential construction industry, the parties to this addendum reaffirm the conditions of Section 2 (Term of Agreement), paragraph 4, and Section 2-A (Carpenters Work Preservation Committee) of the Master Agreement shall particularly apply to all phases of this Residential Addendum.

C-2.Work Description:

Residential work processes include, but are not limited to, fabrication and installation of concrete forms and foundations; floor framing members; subfloors; wall, ceiling and roof framing; exterior siding, roof and exterior wall shingles, shakes or asphalt shingles; lathing; normal and traditional drywall; steel scaffolding; windows and sliding glass patio doors; stairs; underlayment and base; installation and finishing of hardwood floors including pre-finished hardwood floors regardless of the method of installation; acoustical ceiling; installation of all interior trim including cabinets, counter tops, pre-finished marble counter tops and vanities; customer service or warranty work; and other work incidental to the performance of the work covered and work performed by using the tools recognized as and regarded as tools of the trade.

C-3.The terms and conditions of Section 39 (Wage Rates) of the Master Agreement are amended as follows:

Seven (7) Counties Area consisting of the following counties: Alameda, Contra Costa, Marin, San Francisco, San Mateo, Santa Clara, and Solano.

| | |
|---|---|
| Journeyman wage rates effective | 7/1/03 |
| Carpenters | $30.15 |
| Hardwood Floorlayers | $30.30 |
| Shinglers | $30.30 |
| Power Saw Operators | $30.30 |
| Steel Scaffold & Steel Shoring Erectors | $30.30 |
| Saw Filers | $30.30 |

Three (3) Counties Area consisting of the following counties: Napa, San Benito and Sonoma.

| | |
|---|---|
| Journeyman wage rates effective | 7/1/03 |
| Carpenters | $24.87 |
| Hardwood Floorlayers | $25.02 |
| Shinglers | $25.02 |
| Power Saw Operators | $25.02 |
| Steel Scaffold & Steel Shoring Erectors | $25.02 |
| Saw Filers | $25.02 |

Apprentice Wage Percentage Schedule: The wage rates for apprentices shall be the following percentages of the applicable Journeyman classification in the appropriate geographical area.

First Period:    0 to 6 months . . . . . . . . . . . . . . . . . . . . . 60%

57

Health & Welfare, Work Fee, Industry Promotion,
UBC Health & Safety, Work Preservation,
Training, Carpenter Employers Contract
Administration

Second Period:  7 to 12 months . . . . . . . . . . . . . . . . . . . 65%
Health & Welfare, Work Fee, Industry Promotion,
UBC Health & Safety, Work Preservation,
Training, Vacation, Carpenter Employers Contract
Administration

Third Period:   13 to 18 months . . . . . . . . . . . . . . . . . . 70%
Health & Welfare, Work Fee, Industry Promotion,
UBC Health & Safety, Work Preservation,
Training, Vacation, Annuity, Carpenter Employers
Contract Administration

Fourth Period:  19 to 24 months . . . . . . . . . . . . . . . . . . 75%
Health & Welfare, Work Fee, Industry Promotion,
UBC Health & Safety, Work Preservation, Training,
Vacation, Annuity, Carpenter Employers Contract
Administration

Fifth Period:    25 to 30 months . . . . . . . . . . 80% Full Fringes

Sixth Period:    31 to 36 months . . . . . . . . . . 85% Full Fringes

Seventh Period:  37 to 42 months . . . . . . . . . . 90% Full Fringes

Eighth Period:   43 to 48 months . . . . . . . . . . 95% Full Fringes

Pre-Apprentices

In order to encourage persons who have not traditionally entered the carpentry trade to enter and complete the necessary apprenticeship program and to increase the potential for successful completion of all those who become indentured apprentices, the parties hereto agree to create a pre-apprenticeship program, the purpose of which will be to introduce the Trade to such persons.

Such pre-apprenticeship program may be utilized by Employers under the following conditions:

On private residential projects covered and registered as per Appendix C, a pre-apprentice period is established as follows:

Period of time 180 calendar days. Wage rates 35% of the applicable journeyman rate plus fringe benefit contributions as follows: Training, Work Fee, Industry Promotion, UBC Health & Safety, Work Preservation and Carpenter Employers Contract Administration.

An individual employer may employ one (1) pre-apprentice for each apprentice in his employ that has entered the third or higher period of apprenticeship. Pre-apprentices shall not be considered in computing the journeyman-apprentice ratio.

The use of pre-apprentices is to be considered a privilege by an individual employer and violation of the pre-apprentice ratio shall cause the privilege to be denied, subject to Section 51 (Grievance Procedure).

The Employer and the Union shall establish rules governing the use of and criteria for advancement of pre-apprentices into the Apprenticeship program.

Except as specifically amended in this Section C-3 of this addendum, the terms and conditions of Section 39 (Wage Rates) of the Master Agreement remain unchanged.

C-4. The work week will be governed by the terms of Section 24 (Work Week) of the Agreement.

58

C-5. Job Registration

A.   Individual Employers shall register all jobs to be performed under the terms and conditions of this Addendum. An individual employer who opts to subcontract covered work shall register any such subcontractor. An individual employer acting as a subcontractor shall register all jobs to be performed under the terms of this Addendum.

B.   Each individual employer shall notify the Union in writing, on a Job Registration Form to be provided by the Union of the location of each job on which he or it will be performing work covered by the Agreement. Such notice shall be given prior to the commencement of work and shall contain all the information required by the Union. On jobs where the time factor does not permit all registration of jobs prior to their commencement, the contractor shall notify the appropriate Local Union or the NCCRC office by telephone, giving all pertinent information regarding the specific job. Such notification must be confirmed in writing on the regular Job Registration Form provided by the Union within forty-eight (48) hours thereafter.

C.   In the event a contractor takes over the performance of a contract covered by the terms of this Agreement for another contractor, the successor contractor shall notify the Union by certified mail of its intent to undertake performance of the contract. Such notice shall be given prior to commencing work. Failure to give such notice shall subject the successor contractor to any liability for any delinquent fringe benefits of the predecessor contractor through Section 51 (Grievance Procedure) in addition to any other claims which may arise because of such failure.

D.   The information to be contained on the registration form shall include, but not be limited to, the following:

1.   Individual employer's name, address, telephone number, Contractor's License number, Carpenters Trust Fund account number, and Workers Compensation carrier and policy number.

2.   Name and address of project; jobsite phone (if any); name of contractor's job supervisor; proper term for Federal, HUD, or State project I.D. number; estimated starting and completion dates.

3.   Job description, i.e., single family tract, remodel, apartment, etc., number of units, square footage, estimated number of hours of covered work to be performed.

4.   Name and account number of payroll bank account.

5.   List of all subcontractors performing work covered by this Addendum of the Agreement, including address, Carpenter Trust Fund account number, if known, estimated hours, if available, and description of work to be performed.

E.   Nothing in this Addendum shall in any way abridge, amend or detract from Section 50 of the Master Agreement, entitled "Work Preservation, Contracting and Subcontracting," provided, however, compliance with the registration of subcontractors as required herein shall satisfy the written notice requirement of Section 50 paragraph 5.

C-6. In the event that the Union negotiates more favorable terms and conditions for work covered by this Addendum in the Ten County Area, such more favorable terms and conditions shall be available to any employer signatory to this Addendum provided, however, any signatory desiring to take advantage of the different terms and conditions must adopt all the terms and conditions applicable to such other agreement. This provision shall not apply to any

59

project agreements negotiated by the Union. The terms of Section 2-A (Carpenters Work Preservation Committee) of the Agreement shall also apply to this Addendum.

## Appendix D
## Insulators Addendum

The following special conditions shall apply between the CARPENTERS 46 NORTHERN CALIFORNIA COUNTIES CONFERENCE BOARD and the individually signatory INSULATION CONTRACTORS and are in addition to and shall prevail over conflicting provisions of the foregoing Master Agreement.

1.  For work on occupied residences only, no overtime will be required for work on Saturdays, except to the extent an employee works in excess of forty (40) hours in a week and provided the Union is notified in advance of this change in the work week.

2.  The Union will recommend to the involved Local Unions and the NCCRC that no "foreign dues" will be charged to workers who work within different union jurisdictions, provided the individual employee obtains a dispatch by telephone before going to the job.

3.  On blower crews only, to accommodate the weather conditions, and subject to advance notice to the Union, an individual employer may commence the work day as early as 6:00 A.M.

4.  Travel pay from the individual employer's warehouse or shop to the furthermost jobsite and return to the employer's headquarters shall be paid one way only, at the employee's regular hourly rate, provided that if a company vehicle breaks down on the return trip to the shop after completing a job, time and one-half shall be paid for all time in excess of thirty (30) minutes caused by the breakdown, and provided further that overtime will be paid only in excess of eight (8) straight time hours worked in any one (1) day.

5.  The job classification, "Hopper or Blower Operator" is established at a wage rate of 50% of applicable Journeyman rate and all fringe benefit contributions. Pre-Apprentices and Apprentices may be assigned to the Hopper-Blower operation as a part of their training for a period not to exceed sixty (60) calendar days. An Apprentice or Pre-Apprentice so assigned shall receive their normal wage rate and fringe benefits for the sixty (60) calendar day period and shall receive no less than the Hopper Blower Operator wage and fringe benefit rates after the expiration of the sixty (60) day period.

6.  When a Local Union is not able to supply a sufficient number of Journeymen, the ratio of Apprentices to Journeymen may be increased but not to exceed one (1) Apprentice to each Journeyman.

7.  To facilitate overtime work permits, the individual employer may make arrangements by telephone rather than by personal visits.

8.  An Insulator Apprentice Program will be established to provide competent Journeymen. The period of apprenticeship shall be thirty-six (36) months. The periods, wage percentage of Journeyman rate, fringe benefit contributions shall be as follows:

Wage Percentage/Fringes

First Period    0 to 6 months . . . . . . . . . . . . . . . . . . . . . 60%

Health & Welfare, Work Fee, Industry Promotion, UBC Health & Safety, Work Preservation, Training, Carpenter Employers Contract Administration

Second Period   7 to 12 months . . . . . . . . . . . . . . . . . .65%

Health & Welfare, Work Fee, Industry
Promotion, UBC Health & Safety, Work
Preservation, Training, Vacation, Carpenter
Employers Contract  Administration

Third Period     13 to 18 months . . . . . . . . . . . . . . . . . 70%
Health & Welfare, Work Fee, Industry
Promotion, UBC Health & Safety, Work
Preservation, Training, Vacation, Annuity,
Carpenter Employers Contract Administration

Fourth Period     19 to 24 months . . . . . . . . . . . . . . . . . 75%
Health & Welfare, Work Fee, Industry
Promotion, UBC Health & Safety, Work
Preservation, Training, Vacation , Annuity ,
Carpenter Employers Contract Administration

Fifth Period     25 to 30 months . . . . . . . . . . 80% Full Fringes

Sixth Period     31 to 36 months . . . . . . . . . . 85% Full Fringes

Pre-Apprentices shall be covered by the terms set forth in
Appendix C of the Master Agreement but shall not be limited to res-
idential projects only. The individual employers shall be entitled to
one (1) pre-apprentice and not be in violation of the pre-apprentice:
apprentice ratio set forth in Appendix C.

9.   When the Adjustment Board Arbitration Panel is scheduled to
hear a grievance involving an insulation contractor who is party to
this Agreement, the employer panel members will be represented by
the individually signatory members.

---

**Appendix E**
# Associated Cabinet Manufacturers
### and
## Carpenters 46 Northern California Counties
## Conference Board on behalf of its
## affiliated Local Unions
## Master Agreement
## July 1, 2004 through June 30, 2008

### TABLE OF CONTENTS

| | SECTION NO. | PAGE |
|---|---|---|
| Apprenticeship . . . . . . . . . . . . . . . . . . . . . . | 6 | 67-68 |
| Apprentice Wage Rates and Schedule of Benefits . . . . . . . . . . . . . . . . . . . . . . . . . | | 79 |
| Associate Cabinet Manufacturers Addendum "A" . . . . . . . . . . . . . . . . . . . | | 80 |
| Foreman and Layout Man . . . . . . . . . . . . . . | 17 | 72 |
| General Provisions . . . . . . . . . . . . . . . . . . | 7 | 68-69 |
| Grievance Procedure, Discharge and Retirement . . . . . . . . . . . . . . . . . . . . | 15 | 71-72 |
| Handicapped Workers . . . . . . . . . . . . . . . . | 8 | 69 |
| Holidays . . . . . . . . . . . . . . . . . . . . . . . . . . | 4 | 66 |
| Leave of Absence . . . . . . . . . . . . . . . . . . . . | 14 | 71 |
| Maintenance . . . . . . . . . . . . . . . . . . . . . . . | 9 | 69 |
| Mill-Cabinet Industry Apprenticeship & Training/Employee Benefit Fund . . . . . . . . . . | 20 | 74-75 |
| Notice to Union Confirming Order For Referral of Personnel . . . . . . . . | | 82 |
| Notice to Local Union of Employee Hire . . . . . . | | 83 |
| Overtime . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 65-66 |
| Rights of Union Representatives . . . . . . . . . . . . | 11 | 69 |
| Seniority . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 | 70-71 |
| Shop Steward . . . . . . . . . . . . . . . . . . . . . . . | 10 | 69 |
| Show-Up Time . . . . . . . . . . . . . . . . . . . . . . | 18 | 72 |
| Union Label . . . . . . . . . . . . . . . . . . . . . . . | 12 | 69-70 |
| Union Security . . . . . . . . . . . . . . . . . . . . . . | 1 | 64-65 |
| Vacation . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 66-67 |
| Wage Schedule "A" . . . . . . . . . . . . . . . . . . | | 76-79 |
| Work Day/Work Week . . . . . . . . . . . . . . . . . | 2 | 65 |
| Work Performed Away From Plant . . . . . . . . . . | 19 | 73-74 |
| Work Preservation Committee . . . . . . . . . . . . . | 16 | 72 |

### Preamble

In addition to the working rules and conditions of the 46 Counties
Carpenters Master Agreement, the following special working rules
and wages shall apply to Mill-Cabinet and related work:

THIS AGREEMENT is made and entered into this 1st day of July,
2004, by and between the ASSOCIATED CABINET MANUFACTUR-
ERS (ACM), representing and on behalf of those member firms in
the counties of Alameda, Contra Costa, Marin, San Benito, Santa
Clara, San Francisco, and San Mateo whose employees are legal-
ly represented by one of the signatory Unions, (firms bound by the
Agreement at the date of the signing are listed on the applicable
addendum, and firms subsequently joining the Association whose
employees are legally represented by the Union shall come under
this Agreement upon notice to the Carpenters 46 Northern
California Counties Conference Board from the Association that
such firm has become a party to this Agreement), each of said firms
being hereinafter referred to as the Employer and Locals 262 and

2236, affiliated with the Carpenters 46 Northern California Counties Conference Board, for and on behalf of the Northern California Carpenters Regional Council and their affiliated Local Unions being hereinafter referred to as the Union. The geographical application of this Agreement shall be extended to other counties in Northern California in accordance with the provisions of Section 3 hereof or otherwise by agreement of the parties hereto.

This Mill-Cabinet Agreement amends, modifies, supplements, changes, extends and renews the Agreement dated May 1, 1987, June 15, 1990, August 1, 1992, June 16, 1996, May 25, 1999, and is effective July 1, 2004. The terms and conditions of this Agreement shall apply to all individual employers signatory to the Millmen's Seven Bay Area Northern California Counties Memorandum Agreement.

## Section 1
## Union Security

(a)  Every employee covered by this Agreement who is a member of the Union and in the employ of the Employer shall, as a condition of employment or continued employment, remain a member in good standing of the appropriate Local Union. Every other employee covered by this Agreement shall be required, as a condition of employment or continued employment, to apply for and become a member of, and to maintain membership in good standing in the appropriate Local Union on or after the expiration of thirty-one (31) continuous or cumulative days of employment. In the event that Federal Law setting forth the time limitations for requiring membership are changed so as to allow a shorter limitation for requiring membership or changed so as to allow a shorter period before membership must be obtained, the parties hereto agree that shorter periods as may be allowed, by law, shall be applicable hereto.

For purposes of this Section "good standing" shall be defined to mean employees who tender the periodic dues, initiation and reinstatement fees uniformly required as a condition of acquiring or retaining membership. The Union agrees to accept Non-member employees into membership on the same terms and conditions generally applicable to other member employees.

Upon written notice from the Union or failure on the part of any individual to complete membership in the Union or to maintain membership in the Union as required by this Section, the Employer shall immediately discharge said employee.

(b)  The Employer shall notify the appropriate Local Union of job vacancies before hiring new, additional or replacement employees before the vacancy is filled.

If the notice is other than in writing, the Employer shall confirm such notice that same date using form OFE-1 (Order for Employees) set out as Exhibit "2" attached to and made part of this Agreement.

The Local Union shall be permitted an opportunity to refer applicants to fill such vacancies within forty-eight (48) hours of such notice, excluding Saturdays, Sundays, and holidays. The Employer may fill a vacancy from any source if the Local Union is not able to supply qualified applicants for employment within such period. The Employer may temporarily fill the vacancy from any source. Where the Employer hires an employee covered by this Agreement from any source, he shall immediately report the name, address, classification, rate of pay, Social Security number and date of hire in writing to the appropriate Local Union using Form NOH-1 (Notice of

Hire) set out as Exhibit "3" attached to and made part of this Agreement with a copy to the Shop Steward, if any.

(c)  The Employer, party to this Agreement, agrees that no more than one (1) member of the firm shall work with the tools of the trade unless he is a union member. "Member of the firm" shall mean one (1) owner or a corporate manager with full authority to act on behalf of the firm, who have been designated by prior notice to the Union.

## Section 2
## Work  Day/Work Week

(a)  The Union agrees that signatory employers may utilize a 4 X 10 workweek if a majority of the affected employees are in favor. The Union and the ACM will meet promptly to finalize the procedures to be used in implementing a 4 X 10 work schedule. No 4 X 10 workweek will be implemented unless and until said procedures are finalized.

(b)  Eight (8) hours shall constitute a regular work day. The regular work day shall be between 8:00 a.m. and 5:00 p.m. Five (5) days shall constitute a regular work week from Monday through Friday, inclusive. The starting time of the regular work day may be changed by written agreement between the Employer and the Union.

(c)  A pay period shall be any seven (7) consecutive days. Employees shall be paid on a regularly designated payday each week for all work performed during the previous pay period. Checks shall be distributed before the regular quitting time on the regular payday.

(d) Should an Employer compensate an employee with a check for which payment is refused by the Employer's bank because of insufficient funds or should an Employer fail to pay his employees on the regular established payday for work performed, the Employer shall be obligated to pay a penalty equal to eight (8) hours straight-time pay for each work day thereafter up to a total of forty (40) hours penalty pay in addition to the Employer's obligation to pay for hours worked.

Such penalty shall not apply when there is a bank error or omission or when the failure to make timely payment is totally beyond the control of the Employer. The penalty payments shall commence on the first work day following notice to the employer of the bank's refusal to honor the check.

## Section 3
## Overtime

(a)  The first two (2) hours prior to the start of the regular work day or the first four (4) hours after the end of the regular work day, not to exceed a total of four (4) hours in any one (1) work day shall be paid at time and one-half.

1. Time and one-half shall be paid for the first eight (8) hours worked on Saturdays.

2. All work in excess of eight (8) hours on Saturdays and all work on Sundays and holidays shall be double time.

(b) All travel time shall be paid in accordance with Section 19 (d) & (e).

(c) Overtime shall be first offered to the employee whose job is

64

65

working. If he is unable to work, it shall then be offered to qualified employees in the seniority pool.

## Section 4
## Holidays

The following are nationally recognized holidays covered by this Agreement:

2004: Monday, July 5th (Fourth of July); Monday, September 6th (Labor Day); Thursday, November 25th (Thanksgiving Day); Friday, November 26th (Day after Thanksgiving); Friday, December 24th (Christmas Eve); Friday, December 31st (New Year's Eve).

2005: Monday, January 17th (Martin Luther King's Birthday); Monday, February 21st (President's Day); Monday, May 30th (Memorial Day); Monday, July 4th (Fourth of July); Monday, September 5th (Labor Day); Thursday, November 24th (Thanksgiving Day); Friday, November 25th (Day after Thanksgiving); Monday, December 26th (Christmas Day).

2006: Monday, January 2nd (New Year's Day); Monday, January 16th (Martin Luther King's Birthday); Monday, February 20th (President's Day); Monday, May 29th (Memorial Day); Tuesday, July 4th (Fourth of July); Monday, September 4th (Labor Day); Thursday, November 23rd (Thanksgiving Day); Friday, November 24th (Day after Thanksgiving); Monday, December 25th (Christmas Eve); Tuesday, December 26th (Christmas Day); Monday, January 1st (New Years Eve).

2007: Tuesday, January 2nd (New Year's Day); Monday, January 15th (Martin Luther King's Birthday); Monday, February 19th (President's Day); Monday, May 28th (Memorial Day); Wednesday, July 4th (Fourth of July); Monday, September 3rd (Labor Day); Thursday, November 22nd (Thanksgiving Day); Friday, November 23rd (Day after Thanksgiving); Monday, December 24th (Christmas Eve); Tuesday, December 25th (Christmas Day); Monday, December 31st (New Year's Eve).

2008: Tuesday, January 1st (New Year's Day); Monday, January 21st (Martin Luther King's Birthday); Monday, February 18th (President's Day); Monday, May 26th (Memorial Day).

Should a holiday provided for in this Section fall on Sunday, the day observed by the State or Nation shall be considered the holiday.

Employees who are required to work on any of the above holidays shall be paid double time rate.

## Section 5
## Vacation

Each individual employer covered by this Agreement shall contribute to the Carpenters Vacation and Holiday Trust Fund for Northern California the amount listed in Wage Schedule "A" for each hour paid for or worked, whichever is greater, by each employee covered by this Agreement, for the purposes of providing Vacation and Holiday benefits for such employees. Such contributing individual employer agrees to be bound by that certain Trust Agreement establishing the Fund dated May 1, 1972, as such has been or may from time to time be amended or supplemented. The Union and the Employer agree that this plan is and has been a Defined Contribution Plan.

There shall be no duplicating contribution with respect to any employee or the work of any employee.

For purposes of interpreting and applying this section, such Trust Fund Contribution shall be considered as compensation.

The total number of hours worked by each employee in each work month, for which contributions are made to this Trust Fund, shall be reported by the individual employer to this Trust Fund.

1. To be eligible for the following vacation time off the job, an employee must have twelve (12) successive months of continuous employment as defined in Section 13 of this Agreement following an anniversary date of the employee's date of hire.

FIRST YEAR through FOURTH YEAR—10 days vacation

*FIFTH YEAR or MORE—15 days vacation

* The Employer may require one (1) week of any three (3) weeks vacation to be taken at any time between October 1 and April 1 and separate from the other two (2) weeks.

2. All vacation pay shall be allocable to the period worked and not to the period when paid.

3. If a holiday occurs during that calendar week in which the vacations are taken by any of the employees, one additional vacation day may be taken because of such holiday.

4. Vacations shall be taken at a time mutually agreeable to the Employer and the employee. Promptly after January 1 of each year, each employee who has reason to believe that he will be entitled to a vacation, shall notify the Employer in writing, specifying the vacation time he desires prior to April 1 the Employer shall post a vacation schedule on the bulletin board. As possible, vacations shall be granted at the time specified by the employee. In cases of conflict, employees shall be given preference of choice according to seniority.

## Section 6
## Apprenticeship

(a) An apprentice shall not be less than seventeen (17) years of age when starting his apprenticeship. An apprentice shall undergo a course of training under the direction of the Local Joint Apprenticeship Committee. The period of shop training shall be four (4) years unless the apprentice is given credit for previous work experience by the Committee.

(b) The employment of apprentices shall not exceed one (1) apprentice to every two (2) journeymen except where only one (1) journeyman is employed one (1) apprentice may also be employed. Handicapped workers, Truck Drivers and production workers, regardless of wage scale, shall not be included in this computation.

(c) It shall be a contractual obligation to employ apprentices who might have been laid off due to lack of work before employing new apprentices.

(d) It is agreed between the parties hereto that apprenticeship training shall conform to the Apprenticeship Standards prepared by the Local Joint Apprenticeship Committee and approved by the Administrator of Apprenticeship. Apprentices shall be indentured in accordance with the Shelley-Maloney Act. The apprentice rates provided for in the wage schedule shall apply only to Indentured apprentices. (Note: See Section 20 (Mill-Cabinet Industry

Apprenticeship & Training/Employee Benefit Fund) for apprentice training contributions.)

## Section 7
## General Provisions

(a)  No employee will be required to pass through a picket line sanctioned by the appropriate Local Central Labor Council and/or the appropriate Local Building Trades Council, and/or the United Brotherhood of Carpenters and Joiners of America, and/or the appropriate Local Joint Council of Teamsters.

(b)  The Employer shall maintain a bulletin board in a prominent and easily accessible location in the plant upon which board the Union shall have the privilege of posting necessary notices pertinent to the conduct of Union business.

(c)  There shall be a ten (10) minute break with pay once in the first part of any shift and a ten (10) minute break with pay in the second part of any shift. Where an Employer is signatory to another agreement that provides for a longer break period to other employees such longer break period shall apply to all persons covered by this Agreement who work on the premises.

(d)  In the event of a death in the immediate family (father, father-in-law, mother, mother-in-law, legal guardian or former legal guardian, wife, husband, brother, sister, son, daughter or grandparents), the employee shall be entitled to a maximum of three (3) days off with pay to attend the funeral or memorial service. The compensable day or days must fall within the employee's regular scheduled work week, excluding weekends and holidays. Payment of compensation shall be made in accordance with Section 7, (f) below.

(e)  When an employee, covered by this Agreement, is called for jury duty in any municipal, county, state or federal court, he shall advise the Employer upon receipt of such call, and if absent from his work for such service, shall be reimbursed as provided herein for any loss of wages while actually performing such services, provided he exhibits to the employer his properly endorsed check or voucher he received for such service and permits the employer to copy same. The amount the employee shall be reimbursed shall be determined by subtracting the amount he received as a per diem for such service from the amount he would have earned at his regular straight-time hourly rate during the regular working hours he missed while performing such service, it being understood that such reimbursement is limited to a maximum of twenty (20) days annually.

(f)  Payment for funeral leave, memorial services leave, and/or jury duty shall be made by the employer to the employee after the submission of the claim and after the employer has been paid by the Jointly Administered Benefit Fund, provided such employer has been a contributor to the Fund and is not delinquent in contributions to any of the Trusts at the time the claim is made and at the time the claim was incurred. Payment under this paragraph shall be limited to the amount of the gross wages of the employee involved. Gross wages shall mean vacation/holiday pay, supplemental dues, annuity and the hourly wage rate.

(g)  Production workers shall perform work covered by wage Schedule "A".

(h)  The provisions of Section 8 shall not apply to newly organized operations for the first twelve (12) months from the effective date of such Employer becomes signatory. The Union will notify Employer (ACM) in writing of any amendment to this Agreement given to a newly signatory Employer.

## Section 8
## Handicapped Workers

An employee who is incapacitated by age, physical or mental handicaps or other infirmities, or who is temporarily disabled may be employed at an hourly rate of wage below the minimum established by this Agreement provided he shall first have obtained a written dispensation from his Local Union.

## Section 9
## Maintenance

Maintenance of machinery or equipment or the resetting or replacement of machinery or equipment already installed may be done at the convenience of the Employer. The rate of wage for such work shall be the regular rate of wage of journeymen millmen, except that the rate of wage for overtime shall be time and one-half regardless of the day or hour. This Section is not applicable to grinding, changing knives, saw filing or setting up of machines for production. Maintenance work on Saturdays and Sundays shall be at time and one-half. Maintenance employees referred to in this Section are intended to include employees of the Employer engaged in the ordinary upkeep and repair of the Employer's machinery and equipment.

## Section 10
## Shop Steward

The Shop Steward shall make himself known to the Employer. There shall be no discrimination against the shop steward because of Union activities, provided that same are performed without undue loss of time or inconvenience to the Employer.

## Section 11
## Rights of Union Representatives

Business Agents of the Local Union shall have access to the Plant during working hours at their own risk.

## Section 12
## Union Label

It is hereby understood and agreed by the Employer and the Union that an application shall be made for the Union Label to the First General Vice President of the United Brotherhood of Carpenters and Joiners of America. If the application is approved, and the Union Label is issued by the United Brotherhood of Carpenters and Joiners of America to be placed upon the Employer's products, it is understood and agreed that the Label shall remain the property of the United Brotherhood of Carpenters and Joiners of America, and shall be at all times in the possession of a member of the United Brotherhood of Carpenters and Joiners of America; and that said Union Label shall at no time be used in any manner that will be detrimental to the interest and welfare of the members of the United Brotherhood. Use of said Label may be

withdrawn from the mill, shop, factory, or manufacturing establishment of the Employer at any time at the discretion of the "International Union."

## Section 13
## Seniority

(a)  Seniority shall apply to any employee who is in the continuous employ of the Employer for ninety (90) calendar days or more and, thereafter, for the period he remains in continuous employ. For purposes of this Agreement continuous employ is defined as employment uninterrupted by absence due to either:

1.  Discharge for just cause or quit unless rehired within thirty (30) days or reinstated as a result of a decision of the grievance committee or arbitrator, or

2.  Accident, sickness or layoff for lack of work for a continuous period of more than nine (9) months, unless such period is extended by mutual agreement.

The employee may be required to present satisfactory proof that his absence was due to accident or illness.

Time lost as a result of an Industrial injury or Industrial accident recognized by Worker's Compensation, suffered during the course of employment, shall be counted as part of continuous employment. However, acceptance of employment elsewhere during such period shall interrupt continuous employ unless the employee has requested less strenuous work which the Employer is unable to provide.

(b)  The parties agree and understand that for the store fixture, commercial cabinetry and architectural millwork, seniority shall apply only as follows:

1.  The Employer may layoff and recall employees from the seniority pool based on the Employers need.

2.  No new employee will be hired while any member of the seniority pool remains on layoff, except that new production workers may be hired when all such laid-off members of the seniority pool have been first offered the work in the production worker classification.

3.  Recall rights extend for nine (9) months from the date of layoff.

4.  No employee enters the seniority pool until sixty (60) continuous days from the date of hire.

Apprentices shall not attain seniority until they have been an apprentice for twelve (12) months of employment and meet the above requirements.

The seniority provision of the agreement, pertaining to lay-off and rehire, shall not apply during this twelve (12) month period.

5.  Production workers shall not attain seniority.

Apprentices in the continuous employ of the employer shall attain seniority after their twelfth (12th) month of employment.

(c)  Employees laid-off shall keep the Employer advised of their current telephone number and mail or telegraph address. Notice to report shall be given by mailing same to such address or by telegram to the employees outside the contract area and shall be deemed delivered on the day following sending same. All employees covered by this Agreement shall be subject to call and shall for-

feit seniority and/or recall rights if they fail to inform the employer, within two (2) working days after being notified to return, as to whether they will return to work or if thereafter they fail to return to work without good cause within five (5) days after being called or notified by the Employer; provided, that if any employee is away from town when called for work, the time reasonably required by such employee to return to work shall be added to the said five (5) day period. The Employer may hire temporary employees until recalled employees return to work.

(d)  Whenever a vacancy occurs in a skilled job and there are at the time employees who have sufficient aptitude and experience to fill the job, such employees shall be entitled to fair trial to qualify for said job. In the event that such employee shall, in the opinion of the Employer, fail to qualify, he shall revert to his former job without prejudice.

(e)  During a leave of absence granted under Section 14, seniority shall accrue for the first ninety (90) days in the same manner as though the employee was working. Where a leave of absence is more than ninety (90) days, seniority shall be frozen as of the ninetieth (90th) day unless otherwise extended by mutual agreement between the Local Union and the Employer.

## Section 14
## Leave of Absence

(a)  The Employer may, upon written request, grant a leave of absence. Such written leave of absence shall not be considered a break in "continuous employ." A copy of such leave of absence shall be furnished to the Local Union.

(b)  A leave of absence without pay for pregnant employees shall be in accordance with applicable Federal and State Laws.

## Section 15
## Grievance Procedure,
## Discharge and Retirement

(a)  Effective July 1, 2004, the parties agree to utilize the grievance procedure contained in Section 51 (Grievance Procedure) of the Carpenters Master Agreement. A representative selected by the ACM will serve as the Employer panel member for grievances arising under Appendix E. Written notification of the designated panel member will be sent to the Union. This grievance procedure shall apply prospectively. As such, it shall apply only to matters or grievances which arise on or after July 1, 2004.

(b)  The Employer shall not discriminate against any employee because of activities in, or on behalf of, any Local Union. Such Union activities shall not interfere with production.

(c)  An Employee may be discharged or suspended for just cause, such as failure or refusal to perform work as directed; intoxication which shall be defined as any impairment of an employee's ability to properly perform his job resulting from consumption of alcohol or drugs, or any such consumption during working hours, dishonesty, or chronic absenteeism. Absenteeism shall not include employee time off for sickness. Grievances in connection with discharges or suspension shall be subject to the provisions of Section 51 of the Carpenters Master Agreement and employees may be reinstated with or without full or partial back pay if the Grievance

Committee or Arbitrator decides that grounds for discharge or suspension were not established. The Employer shall give written notice of suspension or discharge to the employee in person, or if absent, by mail and a copy of same shall be sent to the Union on the date the notice is served on the employee. The written notice shall state all the reasons for the discharge or suspension.

(d)  The normal retirement age shall be in accordance with applicable Federal and State Laws.

## Section 16
## Work Preservation Committee

The parties to the Agreement hereby establish a Committee composed of three (3) representatives appointed by the 7 Bay Counties Millmen Conference Board and three (3) representatives appointed by the Associated Cabinet Manufacturers.

Each party may select two (2) alternates who will serve on the Committee and vote in the absence of one (1) of the regularly appointed members. Each of the parties shall be entitled to one (1) vote. The Committee shall have a chairman, selected by labor, and a secretary selected by management.

This Committee will review requests for short term modifications of the terms and conditions of this Agreement that may be necessary to preserve work opportunities for employees and individual employers covered by this Agreement. The Committee is authorized to approve such changes as it deems to be in the best interest of the parties to this Agreement.

This Committee shall be empowered to develop rules and procedures, subject to the approval of the bargaining parties, to carry out the intent of the bargaining parties.

## Section 17
## Foreman and Layout Man

(a)  If an employee is voluntarily selected by the Employer as a foreman, he shall be paid a minimum of fifty cents ($.50) per hour above the current journeyman's minimum wage rate when acting as such.

(b)  If an employee is voluntarily selected by the Employer to work primarily as a layout man, he shall be paid a minimum of twenty-five cents ($.25) per hour above the current journeyman's wage rate when acting as such.

## Section 18
## Show-Up Time

Unless notice is given to the employee, prior to 6:00 p.m. on the preceding day, not to report for work, an employee who reports for work at the start of his regular work day shall be paid for two (2) hours at straight time if no work is provided, and a minimum of four (4) hours at straight-time if any work is performed, unless failure to provide work is caused by fire, rain, flood or other causes beyond the control of the Employer.

## Section 19
## Work Performed Away from Plant

The following conditions shall apply for all work performed at the construction jobsite:

(a)  The Employer may install their products which are manufactured under the terms of this Agreement at 85% of the Carpenters nine (9) Counties Commercial or Residential rate whichever is applicable. This rate applies only to his Millmen employees and shall not apply to Construction Carpenters who are hired from Construction Locals and shall not apply to any work that may be subcontracted out.

(b)  Any and all items not manufactured by the Employer shall be installed under the terms and conditions of the applicable Carpenters Master Agreement.

Regular employees of the Employer may perform work on the jobsite that is permissible under the terms of the Carpenters Master Agreement. Such regular employees who are assigned to such work shall apply for dispatch slips at the appropriate office of the appropriate Regional Council or Local Union and such dispatch slips shall be issued for such employees for jobsite work for the duration of their employment with such Employer. Such regular employees shall be subject to the hours in accordance with the terms and conditions of the Carpenters Master Agreement except for travel time, mileage and subsistence and other matters specifically provided for herein. The Employer shall hire temporary additional employees for work at the construction site as needed directly from the Union or the appropriate Regional Council in accordance with the terms and conditions of the Carpenters Master Agreement applicable to the geographical area of the assignment.

(c)  If an employee leaves from the plant to go to the jobsite during his regular work hours and returns to the plant within the same regular work day he shall be paid for all travel time at the regular inside Millmen's rate and in addition, all mileage as required. If an employee leaves from his home to go to the jobsite or if any employee returns to his home from the jobsite, car mileage, when required and travel time, shall be paid between the jobsite and his home or between the jobsite and the plant site, whichever is the shorter distance, provided, however, that payment for car mileage or travel time shall not be required to or from the jobsite located less than twenty-five (25) miles distance from either his home or the plant (payment commences with the 26th mile for mileage and travel time.)

(d)  Travel time outside the regular work day as defined in Sections 2 and 3 of this Agreement or the regular work week as defined in the Carpenters Master Agreement will be paid at the rate of time and one-half of the regular inside Millmen's rate and in addition all mileage as required. Travel time from job to job during the regular work day, as defined in Section 2 of this Agreement, will be paid at the appropriate straight-time rate as provided in paragraph A of this section.

(e)  Car mileage shall be paid at the rate of twenty-nine cents ($.29) per mile for the use of an employee's car when transportation is not furnished by the Employer.

(f)  Jobsite work outside of Alameda, Contra Costa, Marin, San Francisco, San Mateo and Santa Clara Counties or jobsite work requiring overnight stay within said counties, shall be known as "out of town work" for employees working under the terms and conditions of this Agreement.

When "out of town work" is required, transportation shall be provided or the transportation costs shall be borne by the Employer. Adequate room and board must be provided for the individual employee or a minimum overnight subsistence of thirty dollars ($30.00) per night shall be paid, whichever is greater.

(g)  Special arrangements shall be made between the Employer and the employee prior to doing work on any jobsite work presenting unusual circumstances not adequately covered by this Agreement.

(h)  Nothing herein shall be construed to require the terms of this Agreement to be applicable to construction carpenters employed by the Employer.

## Section 20
## Mill-Cabinet Industry Appreticeship & Training/Employee Benefit Fund

(a)  Each Employer signatory hereto shall contribute the amount of ten cents ($.10) per hour for each hour worked by each employee in each calendar month to the Mill-Cabinet Industry Apprenticeship and Training/Employee Benefit Trust Fund.

It is agreed that nine cents ($.09) from the above amount will be contributed to the Mill-Cabinet Apprenticeship and Training/Employee Benefit Trust Fund for:

1.  journeymen, apprenticeship and other training programs,

and

2.  as a fringe reserve for the purpose of reimbursing employees for bereavement leave or jury duty pursuant to Section 7 (General Provisions) (E) and (F), Appendix E of the Carpenters Master Agreement for Northern California, provided such Employer has been a contributor to the Mill-Cabinet Industry Apprenticeship and Training/Employee Benefit Trust Fund.

These monies shall be allocated jointly by the Trustees and representatives of the local unions. The bargaining parties acknowledge that the Trustees of the Mill-Cabinet Apprenticeship and Training/Employee Benefit Trust Fund are responsible for the allocation of these funds.

(b)  It is further agreed, that the remaining one cent ($.01) per hour from the contribution rate of ten cents ($.10) will be contributed to the National Labor-Management Committee for the Custom Wookworking Industry for all hours worked by employees covered by this agreement. The averaging of all hours worked during the preceding calendar year (January to December) will determine the contribution amount to be made each month from the Apprenticeship Training/Employee Benefit Trust Fund to the National Labor-Management Committee for the Custom Woodworking Industry (NLMCCWI), 101 Constitution Avenue NW, Washington, DC 20001.

By the execution of this Agreement, each individual Employer, the Employer, each individual local union and the Unions hereby agree to accept and be bound by the provisions of the Mill-Cabinet Industry Apprenticeship and Training/Employee Benefit Fund Trust Agreement and the National Labor-Management Committee for the Custom Woodworking Industry Trust Agreement, as each is established and as each may be amended from time to time in accordance with their terms.

Each individual Employer, the Employer, each individual local union and the Unions shall have all rights, privileges and obligations as set forth in each Trust. No amendment to the Trusts may increase the obligation of any Employer to contribute to the Funds. The costs of establishing and maintaining the Funds shall be borne out of contributions to the Funds.

## WAGE SCHEDULE "A"

| JOB CLASSIFICATION | Effective 07/01/04 |
|---|---|
| Journeyman | 23.30 |
| Foreman | 24.30 |
| Layout | 24.05 |
| Maintenance | 23.30 |
| Truck Driver | 22.80 |
| | |
| * Production Worker I | 16.05 |
| ** Production Worker II | 14.05 |

| FRINGE BENEFITS | Effective 07/01/04 |
|---|---|
| Health & Welfare | 5.055 |
| Pension | 3.00 |
| Annuity | 1.00 |
| Vacation/Holiday | 1.85 |
| Work Fee | .87 |
| Apprenticeship/Employee | |
| Benefit Fund | .10 |
| NCMCICAF | .02 |

\* Fringes for Production Worker I: H&W, VAC, WF, ANNUITY
\*\* Fringes for Production Worker II: H&W, VAC, WF

## PRODUCTION WORKER HIRING RATIO:

Each individual employer is entitled to hire one (1) Production Worker. Thereafter the following ratio will prevail: One (1) additional Production Worker for every five (5) employees employed, of which at least one (1) must be an Apprentice.

VACATION AND WORK FEE AMOUNTS ARE ADDED TO THE HOURLY RATE TO ESTABLISH THE GROSS PAY. THE GROSS AMOUNT IS SUBJECT TO NORMAL PAYROLL DEDUCTIONS. AFTER NORMAL DEDUCTIONS, THE FULL VACATION AND WORK FEE CONTRIBUTIONS ARE DEDUCTED, REPORTED AND PAID TO THE APPROPRIATE TRUST FUND.

## FUTURE RATES:

### Effective July 1, 2004

The work fee rate for Employers signatory to Appendix E shall be set at twenty cents ($0.20) lower than the rate established under the Carpenters Master Agreement. This lower work fee shall be paid by all signatory employers (ACM members and Independents). Eighty-five cents ($0.85) shall be paid as part of the taxable wage paid to employees and shall be contributed to the Vacation B Account on behalf of each individual employee.

Two cents ($0.02) on all hours worked or paid for, from the twenty cent ($0.20) reduction in the work fee shall be contributed by all Employers signatory to Appendix E into a newly established "Northern California Mill Cabinet Industry Contract Administration Fund" (NCMCICAF). The contributions shall be collected in an escrow account until such time as this non-profit organization is formed. The Union will provide legal assistance towards the creation of same. The Union will fund the initial cost for filing fees, etc.

The Contract Administration Fund contributions will be collected by the Carpenters Funds Administration Office and forwarded to the NCMCICAF with a service fee to be established by the Trust consistent with the service fees charged to similar contract administration and industry promotion funds.

### Effective July 1, 2005

Increase wages by twenty-five cents ($0.25) per hour. The increase shall be applied to all classifications as listed in Schedule "A". The Apprentice rate percentages shall remain unchanged and shall be recalculated based on the new journeyman rate.

The Plan B Health and Welfare contribution rate shall be increased by eighty-five cents ($0.85) to five dollars and ninety and one-half cents ($5.905) per hour.

The Pension contribution rate shall be increased by twenty cents ($0.20) to three dollars and twenty cents ($3.20) per hour.

The Vacation and Holiday contribution rate shall be increased by five cents ($0.05) to one dollar and ninety cents ($1.90) per hour.

The work fee rate for Employers signatory to Appendix E shall be set at twenty cents ($0.20) lower than the rate established under the Carpenters Master Agreement. This lower work fee shall be paid by all signatory employers (ACM members and Independents). Ninety cents ($0.90) shall be paid as part of the taxable wage paid to employees and shall be contributed to the Vacation B Account on behalf of each individual employee.

Two cents ($0.02) on all hours worked or paid, from the twenty cent ($0.20) reduction in the work fee shall be contributed by all Employers signatory to Appendix E into a newly established "Northern California Mill Cabinet Industry Contract Administration Fund" (NCMCICAF). The contributions will be collected in an escrow account until such time as this non-profit organization is formed.

The Contract Administration Fund contributions will be collected by the Carpenters Funds Administration Office and forwarded to the NCMCICAF with a service fee to be established by the Trust consistent with the service fees charged to similar contract administration and industry promotion funds.

The Union reserves the right to reallocate the wage and fringe benefit amounts during the term of the Agreement, excluding the agreed upon health and welfare contributions.

### Effective July 1, 2006

Increase wages by twenty-five cents ($0.25) per hour. The increase shall be applied to all classifications as listed in Schedule "A". The Apprentice rate percentages shall remain unchanged and shall be recalculated based on the new journeyman rate.

The Plan B Health and Welfare contribution rate shall be increased by eighty-five cents ($0.85) to six dollars and seventy-five and one-half cents ($6.755) per hour.

The Pension contribution rate shall be increased by fifteen cents ($0.15) to three dollars and thirty-five cents ($3.35) per hour.

The Vacation and Holiday contribution rate shall be increased by five cents ($0.05) to one dollar and ninety-five cents ($1.95) per hour.

The work fee rate for Employers signatory to Appendix E shall be set at twenty cents ($0.20) lower than the rate established under the Carpenters Master Agreement. This lower work fee shall be paid by all signatory employers (ACM members and Independents). One dollar and one cent ($1.01) shall be paid as part of the taxable wage paid to employees and shall be contributed to the Vacation B Account on behalf of each individual employee.

Two cents ($0.02) on all hours worked or paid, from the twenty cent ($0.20) reduction in the work fee shall be contributed by all Employers signatory to Appendix E into a newly established "Northern California Mill Cabinet Industry Contract Administration Fund". The contributions will be collected in an escrow account until such time as this non-profit organization is formed.

The Contract Administration Fund contributions will be collected by the Carpenters Funds Administration Office and forwarded to the NCMCICAF with a service fee to be established by the Trust consistent with the service fees charged to similar contract administration and industry promotion funds.

The Union reserves the right to reallocate the wage and fringe benefit amounts during the term of the Agreement, excluding the agreed upon health and welfare contributions.

**Effective July 1, 2007**

Increase wages by twenty-five cents ($0.25) per hour. The increase shall be applied to all classifications as listed in Schedule "A". The Apprentice rate percentages shall remain unchanged and shall be recalculated based on the new journeyman rate.

The Plan B Health and Welfare contribution rate shall be increased by eighty-five cents ($0.85) to seven dollars and sixty and one-half cents ($7.605) per hour.

The Pension contribution rate shall be increased by twenty cents ($0.20) to three dollars and fifty-five cents ($3.55) per hour.

The Vacation and Holiday contribution rate shall be increased by five cents ($0.05) to two dollars ($2.00) per hour.

The work fee rate for Employers signatory to Appendix E shall be set at twenty cents ($0.20) lower than the rate established under the Carpenters Master Agreement. This lower work fee shall be paid by all signatory employers (ACM members and Independents). One dollar and seven cents ($1.07) shall be paid as part of the taxable wage paid to employees and shall be contributed to the Vacation B Account on behalf of each individual employee.

Two cents ($0.02) on all hours worked or paid, from the twenty cent ($0.20) reduction in the work fee shall be contributed by all Employers signatory to Appendix E into a newly established "Northern California Mill Cabinet Industry Contract Administration Fund" (NCMCICAF). The contributions will be collected in an escrow account until such time as this non-profit organization is formed.

The Contract Administration Fund contributions will be collected by the Carpenters Funds Administration Office and forwarded to the NCMCICAF with a service fee to be established by the Trust consistent with the service fees charged to similar contract administration and industry promotion funds.

The Apprenticeship/Employee Benefit contribution rate shall remain at ten cents ($0.10) per hour for the duration of the Agreement.

The Union and the A.C.M. agree to meet, following the execution of this Extension Agreement, for the purpose of exploring the possibility of establishing an agreement covering production work. This agreement shall be subject to mutual agreement of the parties.

It is agreed that there shall be no cap of hours applied to any wages or benefit contributions required by the Carpenters Master Agreement or this Appendix E.

78

The Union reserves the right to reallocate the wage and fringe benefit amounts during the term of the Agreement, excluding the agreed upon health and welfare contributions.

## APPRENTICE WAGE RATES AND SCHEDULE OF BENEFITS

**Effective July 1, 2004**

Increase wages by twenty-five cents ($0.25) per hour. The increase shall be applied to all classifications as listed in Schedule "A". The Apprentice rate percentages shall remain unchanged and shall be recalculated based on the new journeyman rate.

The Plan B Health and Welfare contribution rate shall be increased by eighty-five cents ($0.85) to five dollars and five and one-half cents ($5.055) per hour.

The Pension contribution rate shall be increased by fifteen cents ($0.15) to three dollars ($3.00) per hour.

The Vacation and Holiday contribution rate shall be increased by five cents ($0.05) to one dollar and eighty-five cents ($1.85) per hour.

Effective Date                                    07/01/04

| Apprentice Training Period | Work Hours | School Hours | Shop Rates | Rate of % | Outside Rate |
|---|---|---|---|---|---|
| First Period 0 to 6 months | | | 11.07 | 47.5% | 12.62 |
| Second Period 7 to 12 months | 600 | 72 | 11.07 | 47.5% | 12.62 |
| Third Period 13 to 18 months | 1200 | 144 | 12.82 | 55% | 14.61 |
| Fourth Period 19 to 24 months | 1800 | 216 | 14.56 | 62.5% | 16.60 |
| Fifth Period 25 to 30 months | 2400 | 288 | 16.31 | 70% | 18.59 |
| Sixth Period 31 to 36 months | 3000 | 360 | 18.06 | 77.5% | 20.58 |
| Seventh Period 37 to 42 months | 3600 | 432 | 19.81 | 85% | 22.58 |
| Eighth Period 43 to 48 months | 4200 | 504 | 21.55 | 92.5% | 24.57 |
| Journeyman | 4800 | 576 | 23.30 | 100% | 26.56 |

First six (6) months through fourth six (6) months: H&W, WF, APPR-EBF, VAC

Fifth six (6) months through eighth six (6) months: ALL FRINGES

Effective July 1, 2004 — Fringe Benefit Rate:

| | |
|---|---|
| H & W | 5.055 per hour |
| WORK FEE | 0.85 |
| *APPR/EBF | 0.10 |
| PENSION | 3.00 |
| VACATION | 1.85 |
| ANNUITY | 1.00 |
| NCMCICAF | 0.02 |

79

**UNIFORM SUBSTANCE ABUSE POLICY:**

The Carpenters 46 Northern California Counties Uniform Substance Abuse Policy is available to all employers signatory to Appendix E.

## ASSOCIATED CABINET MANUFACTURERS

### ADDENDUM "A"

MEMBER FIRMS OF ASSOCIATED CABINET MANUFACTURERS:

Commercial Casework, Inc.
41780 Christy Street
Fremont, CA 94538

Design Workshop
486 Lesser Street
Oakland, CA 94601

East Bay Fixture Company
941 Aileen Street
Oakland, CA 94608

Lloyd Gordon Mfg. Company
5225 Central Avenue
Richmond, CA 94804

Mission Bell Manufacturing
15749 Concord Circle
Morgan Hill, CA 95037

Plant Architectural Woodworking
300 Newhall Street
San Francisco, CA 94124

Tamalpais Commercial Cabinetry
200 Ninth Street
Richmond, CA 94802

The following Sections of the Carpenters Master Agreement for Northern California shall not apply to the Millmen's Agreement:

Sections:

| Section | |
|---|---|
| Section 2-A | CONTRACT WORK PRESERVATION COMMITTEE |
| Section 12 | UNION SECURITY |
| Section 13 | UNION REPRESENTATIVE |
| Section 14 | STEWARDS |
| Section 17 | PICKET LINES |
| Section 22 | WORK DAY |
| Section 24 | (DESIGNATED OFF DAYS) WORK WEEK |
| Section 25 | HOLIDAYS |
| Section 26 | OVERTIME |
| Section 27 | PARKING |
| Section 29 | PICKUP TIME |
| Section 30 | SHOW UP TIME, TERMINATION PAY & DISCHARGE |
| Section 31 | PAYMENT OF WAGES |
| Section 32 | PROHIBITION OF PIECE WORK |
| Section 36 | SUBCONTRACTOR RECORDS |
| Section 37 | BONDING |
| Section 39 | WAGE RATES |
| Section 44 | APPRENTICESHIP |
| Section 45 | CONTRACT ADMINISTRATION, WORK PRESERVATION, CALIFORNIA CONSTRUCTION ADVANCEMENT PROGRAM, AND CONSTRUCTION INDUSTRY ADVANCEMENT FUND |
| Section 48 | SUBSISTENCE |
| Section 49 | HIRING |
| APPENDIX A-B-C-D | |

NOTICE OF HIRE

## NOTICE TO UNION
## CONFIRMING ORDER
## FOR REFERRAL OF PERSONNEL

TO:  Local Union No._____  Date:_____

This will confirm our order for qualified personnel, described below:

Date of order_____. May be telephone___. Other___.

| Number | Job Title or Description |
|--------|-------------------------|
| 1. ____ | _____ |
| 2. ____ | _____ |
| 3. ____ | _____ |

Special requirements:_____

_____

_____

Signed by:_____
                    Name and Title

Signed by:_____
                    Company and Address

_____

a) Union has 48 hours, excluding Saturdays, Sundays and Holidays to fill this order. Time being as of time of original order.

b) This form is to be mailed the same day if order for personnel is placed by telephone or given personally to a union representative.

82

---

NOTICE OF HIRE

## EXHIBIT 2
## NOTICE TO LOCAL UNION
## OF EMPLOYEE HIRE

TO:  Local Union No._____  Date:_____

This constitutes the required notice of our having hired the following employee:

Name _____

Address _____

Social Security # _____ Telephone # _____

Date Hired _____ Date began work: _____

Job Hired for _____

Rate of Pay _____

Signed by:_____
                    Name and Title

Form to be completed and mailed within one (1) day of employee's beginning work.

Signed by:_____
                    Company and Address

_____

83

**Appendix F**
## Carpenters Master Agreement
## Scaffold Erection Addendum

The terms and conditions of this work addendum shall apply to Scaffold/Shoring erection and dismantling work only and all terms and conditions of the Carpenters Master Agreement shall remain in full force and effect unless specifically amended by this Addendum.

1.  The work day shall be eight (8) consecutive hours worked.

2.  Travel pay from the employer's warehouse or shop in a company vehicle to the furthermost jobsite shall be paid one way only at the regular scaffold wage rate. Fringe benefits are not to be included for travel pay.

3.  There shall be no restrictions on the mobility of regular workers of the individual employers in the 46 Northern California Counties.

4.  After the fifth (5th) working day of employment, the individual employer may discharge any employee for just cause only. Just cause is subject to Section 51, the grievance and arbitration provision of the Carpenters Master Agreement. The individual employer during the first five (5) working days of employment may reject or discharge any employee for any reason.

5.  The training of scaffold/shoring erectors will be accomplished by establishing a four (4) year apprenticeship program. This program will be complimented with on-the-job training by the individual employer.

The wage rates for apprentices shall be the following percentages of the applicable journeyman classification in the appropriate geographical area:

| First Period | 0 to 6 months . . . . . . . . . . . . . . . . . . . . 60% |
|---|---|
| | Health & Welfare, Work Fee, Industry Promotion , UBC Health & Safety, Work Preservation, Training, Carpenter Employers Contract Administration |
| Second Period | 7 to 12 months . . . . . . . . . . . . . . . . . 65% |
| | Health & Welfare, Work Fee, Industry Promotion, UBC Health & Safety, Work Preservation, Training, Vacation, Carpenter Employers Contract Administration |
| Third Period | 13 to 18 months . . . . . . . . . . . . . . . . . . . 70% |
| | Health & Welfare, Work Fee, Industry Promotion, UBC Health & Safety, Work Preservation, Training, Vacation, Annuity, Carpenter Employers Contract Administration |
| Fourth Period | 19 to 24 months . . . . . . . . . . . . . . . . . . 75% |
| | Health & Welfare, Work Fee, Industry Promotion, UBC Health & Safety, Work Preservation, Training, Vacation, Annuity, Carpenter Employers Contract Administration |
| Fifth Period | 25 to 30 months . . . . . . . . . . 80% Full Fringes |
| Sixth Period | 31 to 36 months . . . . . . . . . . 85% Full Fringes |
| Seventh Period | 37 to 42 months . . . . . . . . . 90% Full Fringes |
| Eighth Period | 43 to 48 months . . . . . . . . . 95% Full Fringes |

6.  Scaffold erectors may be allowed to drive company equipment and materials to all job sites.

7.  The Union and the individual employer will cooperate to ensure that all signatory Scaffold/Shoring contractors are in compliance with the terms and conditions of the Carpenters Master Agreement.

CARPENTERS 46 NORTHERN CALIFORNIA COUNTIES CONFERENCE BOARD

By _____    By _____
    Robert Alvarado, Chairman        William Feyling, Executive Director

CONSTRUCTION EMPLOYERS' ASSOCIATION OF CALIFORNIA

By _____
    Michael Walton, Secretary

## Appendix G

# Carpenters 46 Northern California Counties Bridge Structure and Highway Related Addendum to the 2003-2008 Carpenters Master Agreement

Notwithstanding the working rules and conditions of the 46 Counties Carpenters Master Agreement, the following special terms and conditions shall apply to Highway work as described herein.

The Carpenters 46 Northern California Counties Conference Board, for and on behalf of its affiliates, agrees to the following Addendum to the above Agreement:

### Section 1—Coverage

All work performed by Bridge Builder Carpenters on highway construction including the construction, improvement, modification and demolition of all or any part of streets, highway and bridges.

### Section 2—Mobility and Hiring

There will be no restrictions on the free movement of workers employed by a signatory employer from one job to another anywhere within the 46 Northern California Counties. Should an employer require additional workers (new hires) on any given job that has commenced, such workers shall be hired from the hiring hall having primary geographical jurisdiction over the work site.

### Section 3—Work Registration

The Union will provide a separate format for work registration as a Bridge Builder Carpenter in their hiring hall procedures. When the Individual Employer requests a Bridge Builder Carpenter, the Union will only dispatch those members who have indicated Bridge Builder work experience. The dispatch of apprentices shall not be subject to this provision.

The parties agree that to adequately respond to the needs of the bridge building industry, the Union has agreed to establish a one-stop hiring procedure. The Union has agreed to establish a 1-800 number for Bridge Builder dispatch requests.

### Section 4—Wages & Fringe Benefits

(a)  Wage and fringe benefit rates for Bridge Builder Carpenters shall be as provided in Section 39 A, B, C and D of the 2003-2008 Carpenters Master Agreement, effective July 1, 2003.

(b)  Future wage and/or fringe benefit considerations.

Wage and Fringe benefit increases will be uniform throughout the entire 46 Northern California Counties pursuant to Section 39 (E) of the 2003-2008 Carpenters Master Agreement.

In addition, the following wage only increase shall apply to projects with a total project value of less than twenty-five million dollars ($25,000,000) and to projects which are not covered under the provisions of Section 39 B(2), B(3), C(2) or C(3) of the Carpenters Master Agreement to equalize Bridge Builder wages throughout the 46 Northern California Counties.

Three (3) Counties Area

January 1, 2004    $0.88

Thirty-Four (34) Counties Area

January 1, 2004    $1.16

86

### Section 5—Holiday/Designated Off Days

(a)  Thirty-Four (34) Counties and Three (3) Counties Area:

Section 25 (Holidays) of the Master Agreement shall be modified as follows:

The following are recognized holidays: New Year's Day, Martin Luther King Jr. Day, Presidents' Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the Friday following Thanksgiving Day, and Christmas Day. If any of the above holidays fall on Sunday, the Monday following shall be observed as the holiday.

(b) Nine (9) Counties Area:

The nationally recognized holidays and designated off days shall be in accordance with the provisions of Section 25 (Holidays) of the Carpenters Master Labor Agreement.

### Section 6—Four by Ten (4 x 10) Workweek

An individual Employer may establish a workweek for four (4) consecutive days of ten (10) consecutive hours. The applicable overtime rate shall be paid for all work before a shift begins, after ten (10) hours, and on Fridays, Saturdays, Sundays, and holidays. In the event two (2) shifts are employed, the first shift shall work (exclusive of meal period) ten (10) consecutive hours for which ten (10) hours shall be paid; the second shift shall be ten (10) consecutive hours of work, exclusive of meal period, and shall constitute a shift's work for which ten (10) hours shall be paid. Provided, further, all shifts are worked the same four (4) consecutive days during a 4 x 10 workweek, except as may be changed by mutual agreement.

In the event that work cannot be performed Monday through Thursday, (4 x 10 hour workweek) because of inclement weather or major mechanical breakdown beyond the control of the Employer, employees (at their option) may make-up such lost work day(s) on Friday and shall be paid at the applicable straight time rate.

The Union and the Employer will commit to proposing and supporting legislation to change existing law to allow for a 4 x 10 workweek on all Bridge Structure and Highway Related work.

### Section 7—Make Up Day

In the event that work cannot be performed Monday through Friday because of inclement weather or major mechanical breakdown, Bridge Builder Carpenters (at their option) may make up such day on Saturday and shall be paid at the applicable straight time rate.

### Section 8—Substance Abuse Testing

The Carpenters 46 Counties Conference Board will actively participate in the negotiation of a Basic Trades Uniform Substance Abuse Policy with the Cement Masons, Laborers, Operating Engineers, Pile Drivers and Teamsters during the life of this Agreement.

An Individual Employer may initiate unannounced lottery testing; a selection process where all company employees are selected for testing and each company employee has an equal chance of being selected for testing. If an Individual Employer initiates such lottery testing, all company employees shall be subjected to such testing. An Individual Employer who initiates lottery testing shall specifically state in its notice to the Union and its notice to employees that employees will be subject to lottery testing. The Individual Employer shall give thirty (30) days notice to the Union and employees prior

87

to implementing a lottery drug testing program. Any such lottery testing shall be administered by an independent third party.

### Section 9—Shift Work

When a job site access has been limited by the construction user, a special shift may be established during off hours, Monday through Friday, when required as a condition of securing the work. The employer may pay eight (8) hours pay for eight (8) hours work on such shift. Work in excess of eight (8) hours shall be subject to the overtime provisions of the Agreement.

No special shift shall be established or started for less than three (3) days duration unless the contracting authority specifies work tasks of only one (1) or two (2) days duration. Work performed during special shifts of less than three (3) days duration shall be paid at the wage rate of 12.5% premium pay for a minimum of eight (8) hours. If as a result of working such special shift(s) a Bridge Builder loses the opportunity to work his/her regular workweek, then all work performed on such special shift(s) shall be paid at the normal overtime rate.

### Section 10—Maximum Utilization

An employer may maximize the utilization of all its United Brotherhood of Carpenters members by working them under the terms and conditions of the Bridge Structure and Highway Related Addendum.

### Section 11

In all other respects, the terms and conditions of the 2003-2008 Carpenters Master Agreement, or any other Master Agreement to which a bridge building employer may be bound, shall continue in full force and effect for the remainder of said term.

Construction Employers' Association

By: _____
    Michael Walton, Secretary


Carpenters 46 Northern California Counties Conference Board

By: _____
    Robert Alvarado, Chairman

By: _____
    William Feyling, Executive Director

# EXHIBIT H

# WORKING AGREEMENT

### BETWEEN

## LOCAL NO. 40

### OF THE

## UNITED UNION OF ROOFERS, WATERPROOFERS AND ALLIED WORKERS, AFL-CIO

### AND

## ASSOCIATED ROOFING CONTRACTORS OF THE BAY AREA COUNTIES, INC.

### AUGUST 1, 2006 – JULY 31, 2009

# I N D E X

| Topic | Article | Section | Sub-Section | Page |
|-------|---------|---------|-------------|------|
| **Adverse Weather Conditions** | | | | |
| Make-Up | XI | 3 | | 11 |
| Alternative Dispute Resolution | VII | 5 | | 10 |
| Apprenticeship Ratio | XXI | 4 | | 20 |
| | XXI | 6 | (b) | 21 |
| Apprenticeship Training | XXI | | | 19 |
| Assignment of Work | II | | | 4 |
| Authorized Union Representative | XXV | | | 22 |
| Auto and Parking Expenses | XII | 6 | | 14 |
| Bonding | XXIV | | | 22 |
| Changing Starting Time | XI | 4 | | 11 |
| Check Stubs or Separate Vouchers | XV | | | 14 |
| Check-Off | XIX | 4 | | 19 |
| | Addendum One | | | 31 |
| **Check-Off Authorization and** | | | | |
| Designation of Beneficiary | Exhibit A | | | 32 |
| Classifications of Employees | V | 3 | (a) | 5 |
| Classifying Employees | VI | 2 | | 8 |
| | Addendum One | | | 30 |
| Compliance with Specifications | XVII | 13 | | 17 |
| Continuing Education | XVII | 19 | | 17 |
| Contracting Opportunities | XVII | 10 | | 16 |
| Coverage of Employees | II | | | 4 |
| **Definitions:** | | | | |
| Apprentice | IV | 2 | | 5 |
| Association | | | | 1 |
| Employees | IV | | | 5 |
| Employer | | | | 1 |
| Foreman | IV | 4 | | 5 |
| | XVII | 7 | | 16 |
| Individual Employers | | | | 1 |
| International Union | | | | 1 |
| Journeyman Roofer | IV | 1 | | 5 |
| Local Union | | | | 1 |
| Permanent Employee | V | 3 | (b) | 6 |
| Roof Removal Employee | IV | 3 | | 5 |
| Shop | XII | 4 | | 13 |
| Temporary Employee | V | 3 | (b) | 6 |
| Union | | | | 1 |
| **Designation of Beneficiary and** | | | | |
| Check-Off Designation | Exhibit A | | | 32 |
| Discharge | V | 2 | | 5 |
| | V | 4 | | 8 |
| | V | 5 | | 8 |
| | XVII | 10 | | 16 |

i

I N D E X

| Topic | Article | Section | Sub-Section | Page |
|-------|---------|---------|-------------|------|
| Dispatching | V | 3 | (j) (1) | 7 |
| | V | 3 | (j) (2) | 7 |
| | V | 3 | (j) (3) | 7 |
| | V | 3 | (j) (4) | 7 |
| | VII | 1 | | 9 |
| | XXIV | 3 | | 22 |
| | XXVII | | | 23 |
| Drinking Water Containers and Utensils | VII | 4 | | 10 |
| Duration of Agreement | XXXI | | | 27 |
| Emergency Work | VIII | 2 | | 10 |
| Employee or Employer Grievances Re-Hiring | V | 7 | | 8 |
| Employer Judge of Employee Qualifications | V | 5 | | 8 |
| 50% Rule | V | 3 | (g) | 6 |
| First Aid Cards | XVII | 18 | | 17 |
| Foremen | IV | 4 | | 5 |
| | XVII | 7 | | 16 |
| Free Zone | XII | 3 | (a) | 12 |
| General Rules | XVII | | | 15 |
| Global Positioning (GPS) Devices | XVII | 16 | | 17 |
| Health and Welfare | XVIII | | | 18 |
| Hiring | V | 3 | (j) | 7 |
| Hiring by Name | V | 3 | (j) (2) | 7 |
| Hiring Hall | V | 3 | (j) (1) | 7 |
| Holidays | VIII | 1 | | 10 |
| Hours of Work | XI | 1 | | 11 |
| | XI | 4 | | 11 |
| Immigration & Naturalization Service Documents | V | 3 | (j) (5) | 7 |
| | XVII | 5 | | 16 |
| Individual Employer Agreement | | | | 39 |
| Joint Area Conference Board | XXVIII | | | 24 |
| Joint Examination Board | VI | | | 8 |
| Joint Examination Board Grievances | VI | 9 | | 9 |
| Jurisdictional Disputes | XXIX | | | 26 |
| Kettle and Tanker Operation | XVII | 3 | | 15 |
| Key Employees | V | 3 | (h) | 6 |
| Labor-Management Trust | XXIII | | | 21 |
| Labor Saving Devices and Methods | XVII | 12 | | 16 |
| Laying Off and Re-Hiring of Employees | V | 3 | (e) | 6 |
| Licensing | VII | 1 | | 9 |
| | XVII | 22 | | 18 |
| Limited Liability | IX | 1 | | 10 |

# I N D E X

| Topic | Article | Section | Sub-Section | Page |
|---|---|---|---|---|
| Local Area Adjustment Board ................... XXVIII | | | | 21 |
| Local Union Recognition and Territory ........................... III | | | | 4 |
| Loss of Fringe Benefits ............................... XVII | 11 | | | 16 |
| ................................................. XVIII | | | | 18 |
| ................................................. XX | | | | 19 |
| Moonlighting Prohibited ............................ XVII | 10 | | | 16 |
| National Roofing Industry Pension Fund.. Addendum Three | | | | 34 |
| ................................................. XX | | | | 19 |
| New Operating Rules.................................. X | | | | 11 |
| No Discrimination....................................... V | 3 | (j) (6) | | 7 |
| ................................................. V | 4 | | | 8 |
| ................................................. VI | 6 | | | 9 |
| No Strikes and Lockouts............................ XXVII | | | | 23 |
| Notification to Employee if No Work......... XVII | 5 | | | 16 |
| Notification to Employer if Unable to Work ................................ XVII | 5 | | | 16 |
| Other Signatory Employers ...................... XXX | | | | 26 |
| Out-of-Town Expenses ............................... XII | 5 | | | 13 |
| Overtime on Sundays and Other Holidays ..................................... VIII | 2 | | | 10 |
| ................................................. XI | 2 | | | 11 |
| Overtime Rates ....................................... XI | 2 | | | 11 |
| ................................................. XI | 5 | | | 11 |
| ................................................. XI | 6 | | | 11 |
| ................................................. XII | 2 | | | 12 |
| ................................................. XII | 3 | | | 12 |
| Pay Check Stubs or Separate Vouchers..... XV | | | | 14 |
| Payment of Wages ...................................... XI | 5 | | | 11 |
| ................................................. XV | | | | 14 |
| Payroll Records Inspection........................ XVII | 6 | | | 16 |
| Pension Plan.............................................. XX | | | | 19 |
| Permanent or Temporary Employees – Seniority ........................... V | 3 | (b) | | 6 |
| Picket Duty.............................................. XVII | 24 | | | 18 |
| Piece Work Prohibited ............................. XVII | 9 | | | 16 |
| Posting of Hiring Provisions ...................... V | 6 | | | 8 |
| Preamble.................................................... | | | | 1 |
| Pre-Job Conference ..................................... V | 3 | (h) | | 6 |
| Promotion Fund......................................... XXII | | | | 21 |
| Public Works Projects ............................. XIII | | | | 14 |
| Qualifications for Union Membership ....... V | 5 | | | 8 |
| ................................................. XVII | 22 | | | 18 |
| Qualifications of Employees ...................... V | 5 | | | 8 |
| Referral Slips ............................................. V | 3 | (j) (4) | | 7 |

# INDEX

| Topic | Article | Section | Sub-Section | Page |
|-------|---------|---------|-------------|------|
| Registration for Employment | V | 3 | (j) (3) | 7 |
| Rejection of Applicant | V | 3 | (j) (5) | 7 |
| | V | 5 | | 8 |
| Reporting for Work and Show-Up Time | V | 3 | (j) (5) | 7 |
| | XVII | 5 | | 16 |
| Restriction on New Operating Rules | X | | | 11 |
| Retirement Fund | XX | | | 19 |
| Roof Removal Employees | IV | 3 | | 5 |
| | XVII | 7 | | 16 |
| | XXI | 6 | | 20 |
| Safety | VII | 3 | | 9 |
| | VII | 6 | | 10 |
| | XVII | 12 | | 16 |
| | XVII | 17 | | 17 |
| | XVII | 20 | | 18 |
| Saturday Make-Up | XI | 3 | | 11 |
| Scope of Work | I | | | 1 |
| Seniority of Union Officers | V | 3 | (f) | 6 |
| Seniority – Permanent or Temporary Employees | V | 3 | (b) | 6 |
| Separability | IX | 2 | | 10 |
| Show-Up Time | V | 3 | (j) (5) | 7 |
| | XVII | 5 | | 16 |
| Signatory Employers | XXX | | | 26 |
| Social Security Numbers | XVII | 14 | | 17 |
| Specifications, Compliance With | XVII | 13 | | 17 |
| Strikes and Lockouts | XXVII | | | 23 |
| Subcontracting | XXVI | | | 23 |
| | XXVIII | 7 | (a) | 25 |
| Subsistence | XII | 5 | | 13 |
| Substance Abuse | XIV | | | 14 |
| | Addendum Two | | | 33 |
| Tanker and Kettle Operation | XVII | 3 | | 15 |
| Targeted Jobs | XXVI | 2 | | 23 |
| Targeted Job Form | Addendum Four | | | 38 |
| Tools and Equipment | XVII | 17 | | 17 |
| Transportation | XII | 1 | | 12 |
| | XII | 6 | | 14 |
| | XVII | 15 | | 17 |
| | XVII | 16 | | 17 |
| Travel | XII | | | 12 |
| Truck Driving | XII | 2 | | 12 |
| Truck Identification | XVII | 21 | | 18 |
| Truck Loading | XI | 6 | | 11 |
| Union Activity | V | 4 | | 8 |

# I N D E X

| Topic | Article | Section | Sub-Section | Page |
|-------|---------|---------|-------------|------|
| Union Security and Employment | V | | | 5 |
| | XVII | 10 | | 16 |
| | XVII | 22 | | 18 |
| Union Security and Employment Grievances | V | 7 | | 8 |
| Use of Employee's Car | XII | 6 | | 14 |
| | XVII | 15 | | 17 |
| Use of Labor Saving Devices and Methods | XVII | 12 | | 16 |
| Vacation | XIX | | | 18 |
| Violations by Employees | XXVIII | 7 | (b) | 26 |
| Violations by Employers | XXVIII | 7 | (a) | 25 |
| Wage and Fringe Distribution and Hour Premiums | Addendum One | | | 28 |
| Waiting Time | XV | | | 14 |
| Weight Limitations | XVII | 4 | | 15 |
| Work Performed in Another Jurisdiction | XVI | | | 15 |
| Work Prospects | XVII | 10 | | 16 |
| Working Employer | XVII | 8 | | 16 |
| Workmen's Compensation Insurance | VII | 1 | | 9 |
| | VII | 2 | | 9 |

# AGREEMENT

This AGREEMENT is entered into effective August 1, 2006, by and between the ASSOCIATED ROOFING CONTRACTORS OF THE BAY AREA COUNTIES, INC. (for and on behalf of its members who have authorized it or who subsequently authorize it to represent them in labor relations and those other firms who have executed authorizations or who subsequently execute authorizations for the Association to represent them in labor relations) and such other persons, firms or corporations as may become parties to this Agreement, and Local No. 40 of the United Union of Roofers, Waterproofers and Allied Workers, AFL-CIO.

If any Employer who has executed this Agreement is not a member of the Association or has not executed an Authorization for labor negotiations, then such Employer agrees that the Association shall act for and on behalf of such Employer in the appointment and/or election of Employer representatives to the Joint Area Conference Board, the Local Area Adjustment Board, and the Joint Examination Board and, with respect to any Trust Funds to which such Employer is required to contribute by this Agreement, for and on behalf of such Employer with respect to the appointment and/or election of Employer Trustees to the respective Boards of Trustees and with respect to amendments and changes to the Agreements and Declarations of Trust.

The term "Association" as used in this Agreement refers to Associated Roofing Contractors of the Bay Area Counties, Inc.

The term "Employer" or "Individual Employers" as used in this Agreement refers to (1) the members of the Association authorizing the Association to represent them in labor relations, (2) the other firms authorizing the Association to represent them in labor relations, and (3) any other person, firm or corporation which may become a party to this Agreement.

The term "Local Union" as used in this Agreement, unless otherwise expressly required by the context, refers to Local No. 40 of the United Union of Roofers, Waterproofers and Allied Workers, AFL-CIO.

The term "Union" or "International Union" as used in this Agreement, unless otherwise expressly required by the context, refers to the United Union of Roofers, Waterproofers and Allied Workers, AFL-CIO.

# ARTICLE I

## *Scope of Work*

1.  The work jurisdiction of this Local Union shall be all roofing and waterproofing systems or products whenever the primary function of such systems or products is to prevent the intrusion or migration of moisture. These systems or products shall include but not be limited to all those outlined in this Article.

2.  Steep roofers shall include in their work jurisdiction the following work processes and types of materials, including and not limited to:

    - All slate where used for roofing or siding of any size, shape or color, including flat or promenade slate, with necessary metal flashing to make watertight.
    - All tile where used for roofing or siding of any size, shape or color, and in any manner laid including flat or promenade tile, with necessary metal flashing to make watertight.
    - All asbestos shingles or asbestos (rigid) or asbestos of any size, shape or color and in any manner laid where used for roofing or siding with necessary metal flashing to make watertight.
    - All cementing in, on, or around the slate or tile roof.
    - All laying of felt, paper, membranes, ice and water shields, vapor barriers or similar underlayments on sloped roof structures.
    - All forms of composite insulations having nailable surfaces (e.g. plywood, pressboard, chipboard, drywall or other laminates) bonded to the insulation whenever such composite insulations are used as an integral thermal insulating component of the roofing system.
    - All dressing, punching and cutting of all roof slate or tile.
    - All operation of slate cutting or punching machinery.
    - All substitute material taking the place of slate or tile, such as asbestos slate or tile, cement or composition or Spanish tile, wood shakes, composition or wood shingles, metal shingles and tile, or other substitute materials used on steep roofs.

1

- All removal of slate or tile roofing as defined above where the same is to be reapplied in their place.
- All solar or photovoltaic cell-type shingles used to transform solar energy to electrical energy.
- All removal of roofing including but not limited to materials defined above when a roof is to be replaced.

3. Composition roofers shall include in their work jurisdiction the following work processes and types of materials including but not limited to:

- All forms of plastic slate, slag, gravel or rock roofing, including all types of aggregate, blocks, bricks, stones or pavers used to ballast or protect built-up roofing systems or protect Inverted Roof Membrane Assembly (IRMA) roofs or roofs of similar construction where the insulation is laid over the membrane.
- All kinds of asphalt and composition roofing and waterproofing.
- All rock asphalt mastic when used for damp and waterproofing.
- All organic or inorganic felts and fabrics that comprise the reinforcing membrane of built-up roofing and waterproofing systems.
- All compressed paper, chemically prepared paper, and burlap when used for roofing or damp and waterproofing purposes, with or without coating.
- All damp resisting preparations when applied with a mop, three-knot brush, roller, swab or spray system in or outside of buildings.
- All components of composition roofing systems used to seal the roof, including but not limited to compression seals, termination bars, lath, roof cement and reinforcements, caulking and sealants.
- All cleaning, preparing, priming and sealing of roof decks and surfaces that receive roofing, dampproofing and/or waterproofing.
- All epoxy materials used for roofing and waterproofing.
- All laying of felt, paper, membrane, ice and water shields, vapor barriers or similar underlayments.
- All mineral surfaced roofing, including 90 lb. and SIS, whether nailed, mopped with bitumen, or applied with mastic or adhesive.
- All substrates used on the roof deck for fireproofing or any materials used as a support or nailing surface for the roofing system over the deck.
- All damp course, sheeting or coating on all foundation work.
- All tarred floors.
- All laying of tile, wood block or brick, when laid in pitch, tar, asphalt, mastic, marmolite, or any form of bituminous products.
- All forms of insulation used as a part of or in connection with roofing, waterproofing or dampproofing, including but not limited to for thermal and/or acoustical purposes.
- All forms of composite insulations having nailable surfaces (e.g. plywood, pressboard, chipboard, drywall or other laminates) bonded to the insulation whenever such composite insulations are used as an integral thermal insulating component of the roofing system.
- All waterproofing of shower pans and/or stalls.
- All forms of protection boards, walkway pads and roof treads used in composition roofing or waterproofing to protect the membrane from damage.
- All components of "living roof" systems including but not limited to membranes, insulation, filters, fleece, vegetation blankets, plantings and soil.
- All solar or photovoltaic cell-type structures that are used as substitutes for ballast or membrane protection.
- All solar or photovoltaic cell-type roof membranes used to transform solar energy to electrical energy.

4. Metal roofers shall include in their work jurisdiction the following work processes and types of materials including but not limited to:

- All forms of metal roofing systems, whether consisting of protected or unprotected metal of any and all types, including but not limited to:

  Galvanized steel
  Aluminized steel
  Galvalume®
  Tin
  Terne metal
  Terne-coated stainless steel
  Stainless steel

Aluminum
Copper
Lead-coated copper
Lead
Zinc

whether prefabricated as sheets or panels (including photovoltaic panels whose primary purpose is roofing, waterproofing or weatherproofing);

whether in the form of prefabricated metal shingles, tiles or similar substitutes for traditional roofing materials; and

whether manufactured on the job-site from sheets, rolls or coils via roll-forming, forming in brake, drawing, stamping, pressing spinning, extruding or otherwise manipulating "raw" materials into finished products, including but not limited to standing seam, batten-seam and flat seam roofing systems;

- All flashings used in connection with metal roofing systems to roof or waterproof intersections of horizontal surfaces.
- All sealing and caulking of seams and joints on these metal roofing systems to ensure water tightness.
- All protective coatings applied to metal roofing systems.
- All insulations applied with metal roofing systems, whether laid dry, mechanically fastened, or attached with adhesives.
- All forms of composite insulations having nailable surfaces (e.g. plywood, pressboard, chipboard, drywall or other laminates) bonded to the insulations wherever such composite insulations are used as an integral thermal insulation component of the roofing system.
- All layng of felt, paper, membranes, ice and water shields, vapor barriers or similar underlayments required with metal roof systems.
- All cleaning, preparing, priming and sealing of surfaces to be roofed.
- All handling of metal roofing materials.
- All hoisting and storing of metal roofing materials.
- All types of coatings, sealants, mastics and toppings when used for roof maintenance and repairs.

5. Composition roofers shall also include in their work jurisdiction the following work processes and types of materials including but not limited to:

- All forms of elastomeric and/or plastic (elastoplastic) roofing systems, both sheet and liquid, whether single-ply or multi-ply. These shall include but not be limited to:

  a) PVC (polyvinyl chloride systems)
  b) Butyl Rubber
  c) EPDM (ethylene propylene diene monomer)
  d) PIB (polyisobutylene)
  e) CPE (chlorosulfonated polyethylene)
  f) CSPE (chlorosulfonated polyethylene)
  g) ECB (ethylene-copolymer-bitumen and anthracite dusts)
  h) Modified bitumens
  i) Neoprene
  j) NBP (Nitrile alloy)
  k) EIP (Ethylene Interpolymers)
  l) TPO (Thermoplastic Polyolefins)

- All base flashings, curb flashings and counter flashings of elastoplastic composition as used to roof or waterproof intersections of horizontal surfaces.
- All components of elastoplastic roofing systems used to seal the roof, including but not limited to, compression seals, termination bars, caulking and sealants.
- All insulation applied with the above systems, whether laid dry, mechanically fastened, or attached with adhesives.
- All types of aggregates, blocks, bricks, stones, pavers or units of photovoltaic construction used to ballast these elastoplastic systems.
- All types of aggregates, blocks, bricks, stones, pavers or units of photovoltaic construction used as a ballast for Inverted Roofing Membrane Assembly (IRMA) roofs, or roofs of similar construction where the insulation is laid over the roofing membrane.
- All sealing and caulking of seams and joints on these elastoplastic systems to ensure water-tightness.

3

- All liquid-type elastoplastic preparations for roofing, damp or waterproofing when applied with a squeegee, trowel roller or spray equipment, whether applied inside or outside of a building.
- All sheet-type elastoplastic systems, whether single or multi-ply, for waterproofing either inside or outside of any structure.
- All priming of surfaces to be roofed, damp or waterproofed, whether done by roller, mop, swab, three-knot brush, or spray systems.
- All cleaning, preparing, priming and sealing of surfaces to be roofed, dampproofed or waterproofed, whether done by roller, mop, swab, three-knot brush, squeegee, spray systems or any other means of application.
- All types of preformed panels used in waterproofing (Volclay, etc.).
- All applications of protection boards to prevent damage to the dampproofing, waterproofing and/or roofing membrane by other crafts or during backfilling operations.
- All handling and installation of roofing, damp and waterproofing materials.
- All hoisting and storing of roofing, damp and waterproofing materials.
- All types of spray-in-place foams such as urethane, polyurethane, or polyisocyanurate, the machinery and equipment used to apply them, and the coatings that are applied over them.
- All types of resaturants, coatings, mastics and toppings when used for roof maintenance and repairs.
- All caulking and waterproofing of any surface to ensure water-tightness.
- All tri-polymers, silicones, urethanes, coatings and any other product used for waterproofing. If the work to be performed is for purposes of preventing water intrusion, it is to be considered the work of a waterproofer.
- All deck coatings and below grade work for the purpose of dampproofing and waterproofing.
- All wrapping and/or coating of underground piping with bitumastic enamel or cold process, polykin tape, tapecoat, or other asphaltic coatings or tapes and the preparation of surface by sand blasting or wire brushing.
- All operation of jeeper or holiday detectors.
- All materials laminated to roofing and/or insulation systems.
- All substrates used on the roof deck for fireproofing or any materials used as a support or nailing surface for the roofing system.
- All removal of asbestos roofing, asbestos flashing and any other asbestos roofing materials.
- All roofing and waterproofing products and materials that are or have been installed by a roofer or waterproofer shall be done by employees covered by this Agreement.

6. All tear-off and/or removal of any type of roofing, all spudding, weeping and/or clean-up of any and all areas of any type where a roof is to be relaid, or any materials and operation of equipment such as kettles, pumps, tankers, or any heating devices that are used on roofing or waterproofing systems coming under the scope of jurisdiction as outlined above is to be applied.

7. All substitutions, improvements, changes, modifications and/or alternatives to the jurisdiction or materials set out in this Article.

8. All other materials, equipment and/or applications necessary or appropriate to complete, perform or apply the processes and/or materials in this Article.

## ARTICLE II

### *Coverage of Employees*

This Agreement shall cover all employees of Employers performing the work set out in ARTICLE I and shall constitute and be the first assignment of such work to employees.

## ARTICLE III

### *Local Union Recognition and Territorial Jurisdiction*

The Association and the Employers recognize the Local Union as the sole and exclusive collective bargaining representative of the employees of the Employers employed within the Local Union's territorial jurisdiction as set forth below under Section 9(a) of the National Labor Relations Act:

4

The territorial jurisdiction of Local No. 40 of the Union is San Francisco and San Mateo Counties, California.

## ARTICLE IV

### *Definitions of Employees*

1.  **Journeyman Roofer:**

    A Journeyman Roofer is an employee who has served at least three and one-half (3 ½) years as an Apprentice and has passed an examination given by the Roofers and Waterproofers Joint Apprenticeship Committee in the area covered by this Agreement, or any other employee who has qualified as a Journeyman under the provisions of ARTICLE VI of this Agreement. Journeymen may be classified as set forth in said ARTICLE VI.

2.  **Apprentice:**

    An Apprentice is an employee working under and subordinate to the Roofers Joint Apprenticeship and Training Committee in the area covered by this Agreement.

3.  **Roof Removal Employee:**

    A Roof Removal Employee is an employee who decides in conjunction with his/her Employer at the time he/she is eligible to move into the fourth Bracket to specialize in the removal of roofs instead of continuing in the Apprenticeship Program.

4.  **Foreman:**

    A Foreman is an employee receiving one of the premium rates provided for in the Wage Schedules set forth in Addendum One to this Agreement.

5.  **Journeymen and Foremen** shall be paid according to the provisions for their respective classifications as set forth in Addendum I to this Agreement, and Apprentices and Roof Removal Employees shall like-wise be appropriately paid according to the schedules and provisions for Apprentices and Roof Removal Employees set forth in Addendum One to this Agreement.

## ARTICLE V

### *Union Security and Employment*

**Section 1.**  All employees shall be required, as a condition of employment, to apply for and become members of, and to maintain membership in the Local Union on or after the eighth day following the commencement of their employment or the date of execution of this Agreement, whichever is the later. When employees of an Employer are brought from outside the territorial jurisdiction set forth herein under the fifty percent (50%) rule as set forth in ARTICLE V, Section 3(g), hereof, membership in the local union of the International Union from whose territorial jurisdiction they have been brought shall satisfy the requirements of this Section. This Section shall be enforced to the full extent permitted by law.

**Section 2.**  Upon written notice from the Local Union that any employee has failed to comply with the requirements of Section 1 of this Article, the Employer shall immediately discharge such employee, unless the Employer has reasonable grounds for believing that membership in the Local Union was not available to such employee on the same terms and conditions generally applicable to other members or that membership was denied to such employee or terminated for reasons other than failure to tender periodic dues or initiation fees uniformly required as a condition of acquiring or retaining membership.

The Local Union shall hold the Employer harmless from liability for any loss or damage suffered by any employee or applicant for employment by reason of the Local Union's own discrimination or its inducement of discrimination.

**Section 3.**

(a)  There are or may be the following classifications of employees:

5

    (1) Journeyman - Roofers, Enamelers, Pipe Wrappers, and Damp and Waterproof Workers
    (2) Apprentices
    (3) Roof Removal Employees

(b)  For the purposes of seniority only there shall be two classes of employees:

    (1) Permanent Employees
    (2) Temporary Employees

    A Permanent Employee is one who has completed three and one-half (3 ½) full years, or over, in the trade in one or more of the classifications listed in Paragraph (a) hereof with Employers now parties to this Agreement, provided, however, that an Apprentice upon becoming a Journeyman shall carry with him not more than three and one-half (3 ½) years seniority.

    A Temporary Employee is any other person who has been employed in the trade in one of the classifications listed in Paragraph (a) hereof by Employers now parties to this Agreement, provided, however, that an employee who is employed in violation of this Section 3 does not acquire the status of a Temporary Employee by such employment.

(c)  A Permanent Employee who is not employed at the trade in the area covered by this Agreement for any consecutive period of two (2) years shall lose his status as a Permanent Employee hereunder, provided, however, that said period of two (2) years will be extended for any period of incapacity or military service. Any such person who desires to return to the trade in the area covered by this Agreement shall do so as a Temporary Employee.

(d)  A Temporary Employee who is not employed at the trade in the area covered by this Agreement for a period of one (1) year shall thereupon lose his status as a Temporary Employee hereunder, provided, however, that period of one (1) year will be extended for any period of incapacity or military service. Employment prior to the loss of status under this Section shall not be counted thereafter in determining the status of a person who re-enters the trade in the area covered by this Agreement.

(e)  In the laying-off and re-hiring of employees, all Permanent Employees shall be treated as having been hired prior to the hiring of any Temporary Employees and all Temporary Employees shall be treated as if hired after all Permanent Employees. All Temporary Employees of an Individual Employer shall be laid off before any Permanent Employee is laid off. No Temporary Employee shall be hired by any Individual Employer until all Permanent Employees who have been laid off by the Individual Employer shall have been re-hired.

(f)  All Local Union officers and employees of the Local Union shall, for the purpose of seniority, be deemed to be employed at the trade, it being the intent of this Section to provide that upon returning to the employment of any Individual Employer such officer or employee does so with the same rights as if he had continually worked for Individual Employers.

(g)  Notwithstanding anything to the contrary in this ARTICLE provided, any Individual Employer coming from an area not covered by this Agreement to perform work in the territorial jurisdiction covered by this Agreement may bring from such area not more than fifty percent (50%) of the employees required to perform such work if applicants for employment are available from the Local Union provided, however, such employees have been originally hired in accordance with the non-discriminatory hiring provisions of the collective bargaining contract of the local union of the United Union of Roofers, Waterproofers and Allied Workers, AFL-CIO, in effect in the area from which the Individual Employer comes.

(h)  When an Individual Employer needs key employees, there shall be a pre-job conference at which the classifications to be filled by such employees, and the number of employees in each classification, and the times of the commencement of their employment, or the operational stage of the job or project at which their employment shall commence shall be determined. Thereafter upon written request of an Individual Employer on a job or project and delivered to the Employment Office servicing such job or project stating that such Individual Employer desires that a named person or persons be dispatched to a classification or classifications agreed to at such pre-job conference, such person or persons shall be dispatched without regard to the provisions of this Section 3, and the Individual Employer shall hire such person or persons dispatched.

(i)  Apprenticeship ratios are set forth in Section 4 of ARTICLE XXI of this Agreement.

(j)  In the Hiring of Employees:

(1)  The Individual Employer shall secure all employees required in the performance of the work covered by this Agreement through the Employment Offices or the Dispatcher of the Local Union. Satisfactory and competent people will be dispatched within forty-eight (48) hours, when available. In the event that satisfactory and competent people are not dispatched within forty-eight (48) hours, the Individual Employer may employ any person but shall within twenty-four (24) hours notify the Local Union of the name, address and social security number of the person so employed.

(2)  In dispatching, the Local Union shall first dispatch Permanent Employees who may be unemployed, then Temporary Employees who may be unemployed and thereafter any applicants for employment. Within each classification, the Local Union shall dispatch employees in the order in which they have registered for work, provided, however, that among new applicants for employment those with the greatest experience in the trade shall be dispatched first and those with the least experience, last. Notwithstanding the foregoing, an Individual Employer may request, in writing or in person, an employee by name, and he/she shall be dispatched unless at such time he/she is working for some other Individual Employer.

(3)  The Local Union will maintain appropriate registration facilities for employees and applicants for employment to make themselves available for work. No employee or applicant for employment will be dispatched who has not registered for work.

(4)  Upon being dispatched, the employee or applicant for employment shall proceed to the shop at once if prior to the start of the regular working day or to the job at once if after the start of the regular working day. Referral slips shall clearly and accurately show the dispatched person's proper classification or if an Apprentice, the correct bracket.

No one, except a member of the United Union of Roofers, Waterproofers and Allied Workers, AFL-CIO, of more than three (3) years' duration who is transferring into the Local Union from another local union of the International Union and who has already been classified as a Journeyman prior to said transfer, shall be dispatched as a Journeyman unless he/she has previously been qualified as such in the area covered by this Agreement prior to August 28, 1968, or unless he/she has, since August 28, 1968, completed and graduated from a Joint Apprenticeship Training program recognized by the parties to this Agreement or has been qualified as a Journeyman by the Joint Examination Board as provided in ARTICLE VI of this Agreement.

(5)  The Individual Employer may reject any employee or applicant for employment dispatched by the Local Union, provided, however, that any such employee or applicant for employment reporting for work and rejected by the Individual Employer shall be entitled to show-up time in the amount specified in Section 5 of ARTICLE XVII of this Agreement, unless such employee or applicant for employment is rejected because he/she reported in a condition unfit for work, or because he/she has been discharged for cause by the Individual Employer within twelve (12) months next preceding the date of such reporting for work, or because he/she is not qualified to perform the type of work specified by the Individual Employer at the time of calling the Employment Office of the Local Union for such employee or applicant for employment, or because he/she does not have in his/her possession the documents specified by the Immigration and Naturalization Service if needed in order for the Employer to legally hire the Individual.

(6)  The Local Union, in carrying out the provisions of this ARTICLE V will not discriminate either in favor of or against such employees or applicants for employment by reason of race, color, religion, sex, national origin or by reason of membership or non-membership in any union, or by reason of activity on behalf of or in opposition to any union, nor shall the carrying out of the provisions of this ARTICLE V be based on, or in any way affected by union membership, bylaws, rules, regulations, constitutional provisions or any other aspect or obligation of union membership, policies or requirements except to the extent that membership in the Union shall be a condition of employment as provided in this ARTICLE V of this Agreement, nor shall the Individual Employer discriminate either in favor of or against employees or applicants for employment or any of them by reason of race, color, religion, sex, national origin or by reason of membership or non-membership in any union, except to the extent that membership in the Local Union shall be a condition of employment as provided in this ARTICLE V of this Agreement.

**Section 4.**    Union Activity. No employee shall be discharged or in any way discriminated against by reason of activity for or against any union, provided, however, that no employee shall be paid by the Individual Employer for time spent on such activities. No employee shall be discharged or in any way disciplined for refusal to pass a lawful primary picket line established by an international union affiliated with the Building & Construction Trades Department, AFL-CIO, or a local union thereof, provided the picket line has been authorized and sanctioned, or otherwise processed and not disapproved by the Local Building & Construction Trades Council or the Central Labor Council having jurisdiction over the area in which the job is located in accordance with their usual procedures.

**Section 5.**    The Individual Employer shall be the sole judge of the qualifications of all his employees and on such grounds may refuse to hire any employee, but may discharge an employee for just cause only. In the event of a dispute, the existence of just cause shall be determined in accordance with the grievance procedure provided in ARTICLE XXVIII hereof. Employees discharged without just cause may be ordered reinstated with payment for time lost.    The Local Union shall be the sole judge of the qualifications for membership therein.

**Section 6.**    The provisions contained in this ARTICLE V are intended to be, and are, the only provisions governing the hiring, dispatching and discharging of employees. The Local Union and Employers shall for the information of employees and applicants for employment at all times keep posted in the places where notices are usually posted a copy of this ARTICLE V.

**Section 7.**    Any employee or Employer claiming to be aggrieved by the application to himself/herself of any of the provisions of this ARTICLE V, whether by the Local Union, the Association, or any Individual Employer, may submit the same to the Local Area Adjustment Board in accordance with the appropriate provisions of this Agreement. All such grievances must be submitted in writing to the Local Area Adjustment Board within five (5) days of the date when such grievance arose. The Local Union and the Association shall at all times keep on hand a sufficient number of forms for the use of employees or Employers in submitting such grievances.

## ARTICLE VI

### *Joint Examination Board*

**Section 1.**    Immediately upon execution hereof, there shall be established a Joint Examination Board to consist of six (6) members, three (3) members, and alternates, to be appointed by the Local Union and three (3) members, and alternates, to be appointed by the Association. The members shall meet forthwith for the purpose of appointing a Chairman and a Secretary and adopting rules of procedure. The Chairman and Secretary shall be appointed from among the members of the Board, provided, however, that when an Employer member is appointed Chairman, a Local Union member shall be appointed Secretary, and vice versa. The Board shall have full power to adopt their own rules of procedure not inconsistent with the provisions of this ARTICLE.

**Section 2.**    It shall be the duty of the Board to examine all persons seeking to qualify as Journeyman Roofers, Enamelers and Pipe Wrappers and Damp and Waterproof Workers upon their qualifications to be employed as such upon the work covered by this Agreement.

To assist in the examination process, the Board shall: develop an inventory of skills and competencies associated with each bracket of apprenticeship, and with Journeyman status; devise physical/hands-on testing protocols for candidates for each bracket of apprenticeship, and for Journeyman status; and introduce these protocols into the evaluation and examination processes as soon as practicable.

Applicants may be qualified by the Joint Examination Board as:

(1) A Journeyman capable of doing all types of work covered by this Agreement; or
(2) A Journeyman Waterproofer. In making its determination as to whether or not to qualify an applicant as a Journeyman, the Joint Examination Board shall seek and consider input and recommendations from any recent employers for whom the applicant may have performed work or from any employer for whom the applicant is currently performing work of the type for which the applicant is seeking to be qualified as a Journeyman.

In those instances that an applicant is qualified as a Journeyman capable of doing only a portion of the work covered by this Agreement, the applicant shall be classified, paid and have fringe contributions made as an Apprentice for all other

8

types of work covered by this Agreement in the Apprentice bracket determined by the Joint Examination Board to be appropriate, and the employee's referral slip shall clearly and accurately show the dispatched employee's proper classification and bracket for the type of work for which he/she is being dispatched.

**Section 3.** All persons seeking to qualify after August 28, 1968, for employment as Journeymen upon work covered by this Agreement, except Apprentices duly qualified under an Apprentice Training Program and except a member of the United Union of Roofers, Waterproofers and Allied Workers, AFL-CIO, of more than three (3) years' duration who is transferring into the Local Union from another local union of the International Union and who has already been classified as a Journeyman prior to said transfer, shall be required to apply for, and submit to, examination by the Board and shall not be so employed unless and until their qualifications as such Journeymen have been duly certified by the Board. Persons already qualified as Journeymen and working in the area covered by this Agreement as of August 28, 1986, shall not be required to take the examination and may continue to be employed as Journeymen in accordance with the terms and conditions of this Agreement.

**Section 4.** No person shall be permitted to take the examination who has not completed three and one-half (3 ½) full years in the trade prior to the filing of his application. Applicants failing the examination shall not be permitted to take the examination again before completing another full year of work in the trade after such failure.

**Section 5.** Applications for qualification as Journeymen shall be made in writing upon written forms to be supplied for that purpose and filed with the Secretary of the Board. It shall be the duty of the Secretary to present all such applications to the Board at its next meeting. All applicants shall be examined within sixty (60) days of the date their applications are filed with the Secretary of the Board and shall be notified in writing within ten (10) days of the date of said examination of the result thereof.

**Section 6.** All examinations shall be conducted fairly and impartially and without regard to the applicant's membership or non-membership in any union, or the applicant's race, color, religion, sex or national origin.

**Section 7.** The Board shall meet at least once every month and more often if the number of applicants for qualification as Journeyman shall so require.

**Section 8.** To constitute a quorum there must be present at each meeting at least two (2) members appointed by the Association and two (2) members appointed by the Local Union. The decisions of the Board shall be by majority vote, with an equal number of Employer members and Local Union members participating.

**Section 9.** Any applicant who is aggrieved by any action of the Board or by its failure to act may appeal to the Local Area Adjustment Board in accordance with ARTICLE XXVIII of this Agreement, but such right of appeal must be exercised within five (5) days of the action of the Joint Examination Board, or in case of its failure to act, within five (5) days of the time within which it is required to act as hereinbefore provided.

# ARTICLE VII

## *Licensing, Workmen's Compensation Insurance and Safety*

**Section 1.** In the event Employers are not properly licensed, or do not operate in accordance with this Agreement, or do not carry adequate Workers' Compensation Insurance, or do not operate in full compliance with the Fair Trade Act and Unfair Practices Act, or do not maintain a recognized place of business, as hereinafter defined, and a telephone, or any or all of them, it shall not be a violation of this Agreement for the Local Union to refuse to dispatch people or for any Individual to refuse to work for such Employers.

**Section 2.** Employees shall not be required to work for Employers unless said Employer's insurance carrier has filed with the Local Union a certificate of Workers' Compensation Insurance. The certificates of compensation insurance may be forwarded through the Association's office and shall be available for inspection by the Local Union.

**Section 3.** No employee shall be required to Work under conditions or to use any material or equipment that is or are unsafe, dangerous or injurious to human life, health or limb. Toward that end, the Individual Employer shall provide employees with required protective clothing and/or safety equipment and devices in accordance with applicable laws and regulations. In the event of a dispute as to the requirements of this Section no employee shall be required to work under

9

protested conditions or with protested material or equipment until the dispute shall have been resolved by an Inspector from the Division of Occupational Safety and Health of the Department of Industrial Relations of the State of California, or corresponding agency of the Federal Government, or through the grievance procedures of this Agreement.

**Section 4.** The Employer is to provide drinking water containers and drinking utensils as required by OSHA.

**Section 5.** Roofing contractors who are signatory to this Agreement may at their discretion participate in an alternative dispute resolution system pursuant to the provisions of California Labor Code Section 3201.5.

**Section 6.** The Employer will provide fall protection as required by the California Construction Industry Safety Orders and where appropriate, instruction in the use of required fall protection.

## ARTICLE VIII

### *Holidays*

**Section 1.** All Sundays shall be recognized Holidays, in addition to the following Legal Holidays recognized and observed within the area covered by this Agreement: New Year's Day, Presidents' Day, Memorial Day, July Fourth, Labor Day, Thanksgiving Day and Christmas Day. Should any of these Legal Holidays fall on a Saturday, the preceding Friday shall be considered a voluntary work day. Should any of these Legal Holidays fall on a Sunday, the following Monday shall be considered a voluntary work day. No employee shall be discharged or otherwise disciplined for refusing to work on these days. Employees who do elect to work on these days shall be compensated at their regular straight-time wage rate.

**Section 2.** No overtime shall be worked on Sunday or on the Holidays, including but not limited to Labor Day, specified in this Agreement except in cases of extreme emergency when, by mutual consent of both parties hereto, such emergency work is permitted, and in all cases where such necessary emergency work is permitted, the applicable over-time rate shall be paid.

**Section 3.** The day after Thanksgiving, the day after Christmas and the day after New Years' Day shall be considered voluntary work days. No employee shall be discharged or otherwise disciplined for refusing to work on these days.

## ARTICLE IX

### *Liability and Separability*

**Section 1.** Neither the Association nor the Employers nor the Local Union shall be liable for damages caused by the acts or conduct of any Individual or any group of Individuals acting in violation of the terms of this Agreement without authority of the Association or the Employers or the Local Union respectively.

**Section 2.** It is not the intent of any party hereto to violate any laws, rulings, or regulations of any Governmental authority or agency having jurisdiction of the subject matter of this Agreement, and the parties hereto agree that in the event that any provisions of this Agreement are finally held or determined to be illegal or void as being in contravention of any such laws, rulings or regulations, nevertheless, the remainder of the Agreement shall remain in full force and effect, unless the parts so found to be void are wholly inseparable from the remaining portion of this Agreement. The parties agree that if and when any provisions of this Agreement are finally held or determined to be illegal or void, they will then promptly enter into lawful negotiations concerning the substance thereof.

# ARTICLE X

## *Operating Rules*

In establishing this Agreement, it is agreed that no operating rules or regulations shall be placed in effect which are in conflict with the terms of this Agreement, without first being presented to, and approved by, the Joint Area Conference Board or the Local Area Adjustment Board.

# ARTICLE XI

## *Hours of Work and Overtime*

**Section 1.**  The regular work week shall consist of forty (40) hours from 8:00 a.m. Monday to 4:30 p.m. Friday, and the regular work day shall consist of eight (8) hours, 8:00 a.m. to 4:30 p.m., Mondays through Fridays, both inclusive, with one-half (1/2) hour for lunch and two 10-minute breaks, one in the morning and one in the afternoon. Employees shall not normally be required to work in excess of five (5) consecutive hours without a meal break. This provision may be temporarily suspended on a case-by-case basis, however, by mutual agreement of the foreman and crew.

**Section 2.**

(a)  All time worked after 10 hours in a day and after 40 hours of work during a week (Monday through Saturday) shall be considered overtime. All overtime worked shall be paid at one and one-half (1 ½) times the applicable wage rate. It is agreed that all straight time work on Saturday will be strictly voluntary and no employee shall be discharged, or otherwise disciplined for refusing such work. There may be no more than two (2) consecutive 10 hour days of work in any one week; this limitation does not apply to truck driving time, time spent traveling beyond the free zone, or to time spent loading and unloading at the Individual Employer's shop.

(b)  All time worked on Sundays or the Legal Holidays named in ARTICLE VIII shall be considered overtime. All overtime worked on Sundays and the Legal Holidays named in ARTICLE VIII shall be paid at one and one-half (1 ½) times the applicable wage rate.

**Section 3.**  In the event that wind, rain, snow or ice, fog, frost, dew, or extreme heat on one (1) or more days during the regular work week prevent employees from working, then upon notification to the Local, work may be performed on Saturday at straight time rates. In the event any competitive condition prevents employees from working on one (1) or more days during the regular work week, then with the approval of the Business Representative, work may be performed on Saturday at straight time rates. Such notification must be given no later than noon Friday preceding the Saturday work. It is specifically agreed that all straight time work on Saturday will be voluntary and that no employee shall be discharged or otherwise disciplined, for refusing such work. Employees who have worked forty (40) hours or more during the regular work week shall not be eligible for straight time work on Saturday.

Work performed on Saturday in violation of this provision shall be subject to the overtime provisions of the Working Agreement, and the parties involved may be cited under the grievance provisions of ARTICLE XXVIII of the Working Agreement. Employees who are currently drawing unemployment benefits will not be offered the opportunity for such work by the Employer.

**Section 4.**  Notwithstanding the provisions of Section 1 of this ARTICLE, the period of the regular 8-hour work day may be changed by mutual agreement between the Individual Employer and his employees.  During the winter months, starting time at 8:30 a.m. is permissible at the option of the Individual Employer, in which case the regular work day will end at 5:00 p.m.

**Section 5.**  Employees are to be paid regular straight time for time worked by the day, three-quarters of a day, or the half-day.  Overtime worked, except as otherwise provided, shall be paid by the hour and half (1/2) hour.

**Section 6.**  Employees shall be compensated for the actual time spent loading and unloading trucks at the Individual Employer's shop at two-thirds (2/3) of the employee's regular wage rate.  When such loading and unloading occurs

11

during an overtime period, there will be a time and one-half (1 ½) premium applicable to their rates of wages applicable to loading and unloading. No fringe fund contributions are required for loading and unloading.

# ARTICLE XII

## *Travel*

**Section 1.**     An Individual Employer may have employees who are not driving the Individual Employer's vehicles report to either the job-site or to the Individual Employer's shop or may give the employee the choice to report to either the job-site or the shop.  Employees who report directly to a job-site within the free zone will receive no travel time or expense reimbursement nor will they receive any mileage allowance if they elect to use their own vehicle.

If an employee elects to report to the employer's shop to receive transportation in a company vehicle to and/or from the job-site within the free zone, the employee will receive no travel time or expense allowance.

When employees are transported in vehicles furnished by the Individual Employer, such transportation shall be safe and lawful. When traveling in an Individual Employer's vehicle, employees are to be protected from wind and rain.

**Section 2.**

(a)  Employees shall be compensated for the actual time spent driving trucks from the Individual Employer's shop to the first job-site, and for the actual time spent driving trucks from the last job site to the shop at the employee's regular wage rate.  When such driving occurs during an overtime period time and one-half (1 ½) the employee's rate of wages shall be paid.

On no occasions are fringe fund contributions required until employees driving trucks reach the first job-site.  At such time, fringe fund contributions which are applicable to the employee's classification or category will commence and will continue for all the time for which the employee is paid wages until the employee leaves his/her last job site, following which no further fringe fund contributions are required for that work day.

(b)  Employees shall be compensated for the actual time spent driving trucks from job-site to job-site at the employee's regular wage rate.  When such driving occurs during and overtime period, time and one-half (1 ½) the employee's rate of wages shall be paid.

For such driving, fringe fund contributions which are applicable to the employee's classification or category shall be paid.

(c)  Journeymen and Foremen will be the sole drivers of trucks, unless the truck is to be used for tear-off or the loading of equipment and/or materials, provided they have valid California driver's licenses and are acceptable to the Employer's insurance company; otherwise any other employees may drive.

(d)  The payment of "wages" for any activity does not make that activity into "work" if it would not otherwise be considered to be work.

**Section 3.**     Employees shall be reimbursed for their costs and expenses of travel as follows:

(a)  There is a free zone of forty-five (45) miles radius from the Individual Employer's shop.

(b)  (i) When working on projects within the free zone, the free zone will apply to travel from the Individual Employer's shop to the first project to which the employees are assigned.  Their work period will start thereafter. At the end of the work day, the free zone will apply to travel from the last project to which the employees are assigned back to the Individual Employer's shop, regardless of whether such travel occurs during or outside of the regular work day.  The normal dispatch of employees to a project is not work and does not start an employee's work for the day, nor is the return from a job to the shop work.

With regard to projects within the free zone, if an employee reports to the shop but does not perform any work before starting to travel to the job-site or if an employee reports to the job-site, the employee will receive no travel

time or expense reimbursement, nor will the employee receive any mileage allowance if the employee elects to use his own vehicle. If an employee elects to report to the Individual Employer's shop to receive transportation in a company vehicle to and/or from the job-site, the employee will receive no travel time or expense allowance.

(ii) If employees travel from job-site to job-site within the free zone during the regular work day, wages at each employee's regular wage rate and full fringe fund contributions which are applicable to each employee's classification or category shall be paid. If such travel occurs during an overtime period time and one-half (1 ½) the employee's rate of wages shall be paid.

(c) For travel expenses beyond the free zone the Individual Employer shall reimburse the employee thirty-six dollars ($36.00) per day.

(d) However, at the Individual Employer's option, instead of reimbursing the employee for travel expense as provided in subparagraph (c) above, the Individual Employer may compensate the employee for time spent in traveling beyond the free zone as follows:

(i) For the actual time of travel during the regular work day from the Individual Employer's free zone radius border to the initial job-site for the day or from the last job-site back to the Employer's free zone radius border, the employee shall be compensated at the employee's applicable straight time rate of wages.

When such traveling beyond the free zone radius occurs during an overtime period, time and one-half (1 ½) the employee's rate of wages shall be paid.

Such travel expense beyond the free zone radius is compensatory up to a maximum of thirty-six dollars ($36.00) per day.

On no occasions are fringe fund contributions required until employees who are traveling reach the first job-site beyond the free zone radius. At such time, fringe fund contributions which are applicable to the employee's classification or category will commence and will continue for all the time for which the employee is paid wages until the employee leaves his/her last job-site, following which no further fringe fund contributions are required for that work day.

(ii) Employees shall be compensated for the actual time spent traveling from job-site to job-site beyond the free zone radius, at their applicable straight time rate of wages.

When such travel beyond the free zone radius occurs during an overtime period, time and one-half (1 ½) the employee's rate of wages shall be paid.

When such travel beyond the free zone radius occurs, fringe fund contributions which are applicable to the employee's classification or category shall be paid.

(e) The payment of "wages" for any activity does not make that activity into "work" if it would not otherwise be considered to be work.

**Section 4.**

(a) For the purpose of clarification, a shop shall be defined as a regular established place of business in which roofing materials are regularly stored and from which workmen and equipment are dispatched. Any Individual Employer establishing an additional shop or shops must have them in actual existence and operating one hundred twenty (120) days before a job-site is started for the purposes of this ARTICLE.

(b) For any Individual Employer with an established shop outside the territorial jurisdiction of Roofers' Local No. 40 and doing work within the territorial jurisdiction of Roofers Local Union No. 40, the office of Local No. 40 shall be classed as his/her shop for the purposes of this ARTICLE.

**Section 5.** When it is necessary for an employee to remain out of town overnight, employer-paid lodging of not less than Motel 6 quality, two persons per room, shall be provided. In addition, each employee shall be provided with a meal stipend of not less than $15 per work day.

13

**Section 6.** Use of Employee's Car.

(a) When transportation is not furnished by the Individual Employer and employees are requested to use their own cars when traveling from shop to job, or job to job, or job to shop, they shall be reimbursed at the Internal Revenue Service rate in effect at the time the mileage expense was incurred, but in no case less than thirty ($0.30) cents per mile.

(b) If the Individual Employer directs the employee to use his or her personal vehicle to report to the job site and free parking is not available, the Individual Employer shall designate one or more approved paid parking locations. If the employee utilizes an approved parking location, the Individual Employer upon the submission of a valid receipt shall reimburse the employee's actual parking expense.

## ARTICLE XIII

### *Public Works*

Applicable prevailing rates of wages and fringe benefits only shall be paid on all publicly funded work. When prevailing rates of wages and/or fringe benefits are lower than are called for under this Working Agreement:

(a) Such work will be voluntary and no employee shall be discharged, or otherwise disciplined, for refusing such work; and

(b) To the extent allowable by applicable law(s), the amounts available for distribution to the existing fringe funds shall be allocated to wages, health and welfare, vacation, pension, apprenticeship training and/or promotion fund according to the wishes of the employees employed on the project.

## ARTICLE XIV

### *Substance Abuse*

Drug and Alcohol Policy adopted 5/12/92, see Addendum Two.

## ARTICLE XV

### *Payment of Wages*

The wages and all travel and out-of-town expenses and transportation allowances, if due, shall be paid in cash or check in the shop, or on the job, at or before quitting time on Friday or on the other regular pay-day set by the Employer, which pay-day cannot be changed without two weeks' notice. No more than two days' pay can be held back. All employees laid off, discharged, or fired shall be so informed by the Employer or Foreman at the termination of the day's work and shall be paid in full.

If employees are caused or forced to wait for wages or other payments due, the Employer shall pay the employee for "waiting time", the regular rate of wages per hour until such time as the employee is paid in full.

Employees shall be furnished with check stub(s) or separate voucher(s) showing straight time worked; truck loading, truck driving and travel time when applicable; and overtime; and the applicable hourly wage rates for each of them; and the amount added for Vacation, and deductions for Vacation, State Disability Insurance, Social Security, Withholding Taxes, and any other deductions. All such check stub(s) or separate voucher(s) shall also include gross wages earned; net wages earned; the employee's name and social security number; the inclusive dates of the pay period; and the name and address of the Employer.

14

# ARTICLE XVI

## *Work Performed in Another Jurisdiction*

When sent by an Individual Employer to supervise or perform work specified in this Agreement outside the geographical jurisdiction of the Local Union, employees shall be paid the total of the wage scale and fringe amounts for his/her Local Union area or the total of the wage scale and fringe amounts of the local union area in which he/she is working, whichever is higher, plus all applicable travel and out-of-town expenses and transportation allowances while employed outside the geographical jurisdiction of the Local Union. In instances where an employee is working outside of his/her Local Union's geographical area, fringe contributions will be made into the funds which cover his/her Local Union's area. In no instance, however, shall an Individual Employer be required to make contributions into two different fringe funds in different areas which have been created for similar or identical purposes or to provide similar or identical benefits.

# ARTICLE XVII

## *General Rules*

**Section 1.** Patch work where hot material is used: two (2) employees or more are to be employed and no hot asphalt or heavy material is to be carried up ladders.

**Section 2.** On all shingle work two (2) stories or over, derrick is to be used for hoisting material where possible. A two-story building is defined as being over twenty (20) feet to the eave. On all shingle work one-quarter (1/4) pitch or over, or two (2) stories or over, two (2) employees must be assigned during loading and if scaffolding is needed, two (2) employees must be assigned at all times.

**Section 3.**

(a)  The following will apply when a kettle is being used:

Kettles will be manned and operated per State Construction Industry Safety Orders and any other applicable safety ordinances. When the burner is lit and material is being drawn off, the kettleman will not be required to go on a roof if the roof is thirty (30) or more feet above the ground (this limitation does not apply to patch work of five (5) squares or less). The ladder should be placed a safe distance from the kettle to provide access to and from the roof in the event of a fire. If job site conditions permit, the recommended distance between the kettle and the ladder is twenty-five (25) feet.

(b)  The following will apply when a tanker or tanker-kettle  (equipment which uses liquid material, whether truck mounted or trailered) is being used:

Tankers and tanker-kettles will be operated per State Construction Industry Safety Orders and any other applicable safety ordinances. Manning of a tanker or tanker-kettle by a kettleman on the ground is not required.

**Section 4.**

(a)  No employee shall be required to hold in suspension, while in the act of applying the same, any roll of roofing material weighing in excess of fifty-five (55) pounds, except thirty (30) pound felt in two (2) square rolls. Fifteen (15) pound felt in four (4) square rolls may not be used on a roof.

(b)  No employee shall be required to handle any roll of roofing material, gravel, rock or granules in bag, package or parcel weighing in excess of eighty (80) pounds, except on a flat roof and then only when a power hoist is used and at least two (2) employees are assigned to the work of loading and unloading such rolls, bags, packages or parcels.

(c)  No employee shall be required to lift material manually by himself/herself to a height over his/her head from the level from which the material is being lifted.

**Section 5.** Reporting for Work. Employees shall not be required to report to work more than thirty (30) minutes before starting time. The Individual Employer agrees that when an employee regularly on the Individual Employer's payroll reports for work on order of the Individual Employer and no work is provided, the employee so reporting shall receive two (2) hours' pay, provided lack of work is not caused by bad weather or other acts of God, or by strikes or other conditions over which the Individual Employer has no control. When an Individual Employer informs an employee by 7:30 a.m. that there is no work for him/her, show-up time shall not be paid.

Employees unable to report when so ordered shall notify the Individual Employer by 7:30 a.m. In proper cases under this Section, employees may be cited to appear before the Local Area Adjustment Board. When an Individual not regularly on the payroll is dispatched by the Local Union upon order by the Individual Employer, he/she shall be given not less than four (4) hours' pay, whether worked or not, provided lack of work is not caused by bad weather or other acts of God, or by strikes or other conditions over which the Individual Employer has no control.

Employees or applicants for employment who appear for work in a physically unfit condition shall not be entitled to pay for reporting. Neither shall employees or applicants for employment be entitled to pay for reporting if he/she has been discharged for cause by the Individual Employer within twelve (12) months next proceeding the date of such reporting for work, or because he/she is not qualified to perform the type of work specified by the Individual Employer at the time of calling the Employment Office of the Local Union for such employee or applicant for employment, or because he/she does not have in his/her possession the documents specified by the Immigration and Naturalization Service if needed in order for the Employer to legally hire the Individual.

**Section 6.** Individual Employers agree to allow the Business Representative to visit all shops and jobs and to examine time books and payroll records during business hours.

**Section 7.** Foremen. When five (5) or more employees covered by this Agreement are employed on a structure, one Foreman shall be employed for the first five (5) such employees and thereafter one (1) Foreman for each additional three (3) such employees, or fraction thereof. All Foremen must be Journeymen, and at least one (1) Journeyman shall receive Foreman's pay on each job. An Individual Employer shall not be classed as a Foreman when working on the job. An employee may be moved from a job to do incidental work during the day without changing his Foreman rate. This Section 7 does not apply to Roof Removal Foremen.

**Section 8.** Working Employer. Only one member of a firm, to be pre-designated as a working owner, shall be permitted to work on any class of work covered by this Agreement provided that at least one employee covered by this Agreement is in his/her employ. Such working owner shall comply with all applicable provisions of this Agreement with respect to hours and working conditions.

**Section 9.** Piece Work. Piece work or contracting by employees will not be permitted.

**Section 10.** Contracting Opportunities. Any employee learning of contracting opportunities in the roofing industry while in the employ of an Individual Employer shall report all such opportunities to the Individual Employer, and no employee shall perform any roofing job as an Individual proprietor, or as a partner or as a corporation, and no employee shall bid or contract for any roofing job himself/herself, either individually or in conjunction with any other party, while employed by any Individual Employer or registered for employment in the Employment Office of the Local Union. No employee or applicant for employment shall accept employment on any roofing job except as provided in ARTICLE V of this Agreement, whether registered or not. Violation of this Section by an employee or applicant for employment shall be conclusively presumed to be just cause for his/her discharge and/or for referral of the employee or applicant for employment to the Local Area Adjustment Board for such action as it may take pursuant to the provisions of ARTICLE XXVIII, Section 7(b). Employees may, however, notwithstanding the provisions of this Section, perform work upon any residence owned by themselves.

**Section 11.** Loss of Fringe Benefits if Work in Noncovered Roofing Service. To the extent allowable by applicable law, certain health and welfare benefits and options may be restricted or lost if an employee works in Noncovered (non-union) Roofing Service. In addition, to the extent allowable by applicable law, certain pension benefits may be lost if an employee works in Noncovered (non-union) Roofing Service.

**Section 12.** Use of Labor Saving Devices and Methods. The Individual Employer and the Local Union recognize the necessity of eliminating restrictions and promoting efficiency. No rules, customs or practices shall be permitted that limit production or increase the time required to do the work, and no limitation shall be placed on the amount of work which

16

an employee shall perform during the working day, nor shall there be any restrictions against the use of any kind of machinery, tools or labor saving devices or methods, provided, however, that no employee shall be required to work under any conditions that are injurious to his/her health or safety.

**Section 13.**  Compliance with Specifications. Both the Individual Employer and employees shall comply with the work specifications in every detail. In case of any violation of any written specifications or false report with respect thereto, such Individual Employer, or employee, as the case may be, shall be cited before the Local Area Adjustment Board which, after investigating the matter, shall make recommendations to the Association, the Employer or the Local Union as it deems proper.

**Section 14.**  Social Security Numbers. The Local Union shall, on request, furnish the Individual Employer with a list of the Social Security numbers of workers when the same is available.

**Section 15.**  Employees shall not be required as a condition of employment to furnish the use of an automobile or other conveyance to transport tools, equipment or materials from shop to job, from job to job, or from job to shop, facilities for such transportation to be provided by the Individual Employer. This provision is not to restrict the use of an automobile or other conveyance to transport its owner and personal tools from home to shop or job at starting time, or from shop or job to home at quitting time. If an Individual Employer directs an employee to transport Company tools, equipment, materials and/or personnel from shop to job, from job to job, and/or from job to shop in the employee's personal vehicle, instead of a mileage allowance the employee shall be compensated at his/her regular wage rate in accordance with the applicable provisions of this Agreement.

**Section 16.**  The transportation equipment furnished by the Individual Employer shall be used for transportation from shop to job, job to job, or job to shop, and shall not be used for personal convenience of the employees without the express consent of the Individual Employer. When there is a GPS tracking device on the Individual Employer's vehicle and either the employee or the Individual Employer disputes the information derived therefrom, the dispute shall be resolved according to the Grievance Procedures set forth in Article XXVIII.

**Section 17.**  Tools and Equipment. Apprentices shall report for work with hammer, hatchet, knife, snips, small ripping bar, cartridge caulking gun and chalk line, and in addition, whenever required shall supply their own long-sleeved shirts and appropriate shoes for "hot" work and hard hats. Journeymen shall report for work with the following additional tools: regular screwdriver, phillips head screwdriver, pliers, adjustable wrench, small handsaw, keyhole saw, socket set, nail bag, tape measure and cat's paw. Employees who fail to report to work with tools appropriate for the task(s) they are expected to perform that day shall be deemed to have reported for work in an unfit condition and may be sent home without compensation or show-up time.

**Section 18.** All employees shall be responsible for maintaining valid First Aid cards. Employers will assist employees to meet this requirement by either:

(a)  providing for First Aid classes to be held at the shop and not charging employees a fee for attending said classes; or

(b)  upon proof of successful completion of a First Aid class sponsored by the Roofing Apprenticeship Program, the Roofing Apprenticeship Program shall directly reimburse the employees' registration fees. The Program will, in turn, bill the employees' employers for reimbursement of said registration fees.

In neither case will employees be compensated for time spent in class. Employees who choose to satisfy the First Aid requirement by any other means than those specified above shall not be reimbursed or otherwise compensated for so doing.

**Section 19.** All Journeymen shall complete a minimum of eight (8) hours of roofing-related continuing education every year. Said continuing education may be undertaken in order to maintain certifications (i.e. First Aid, asbestos), to improve their roofing and/or waterproofing skills and/or to familiarize themselves with new materials or equipment. Journeymen are to satisfy the continuing education requirement on an uncompensated basis. If the Individual Employer directs an employee who would otherwise be engaged in work activity at the job site to attend a particular continuing education class that is offered during the regular work week, the employee shall be compensated at his or her regular wage rate for time actually spent in said class.

**Section 20.** All equipment provided by the Individual Employer shall be such as will give adequate protection of life, limb and property. The Individual Employer will provide such barriers and lights on the job as may be required by applicable laws and/or regulations to give proper warnings of all danger points.

**Section 21.** Truck Identification. Each Individual Employer, within thirty (30) days after becoming a party to this Agreement, shall have all trucks commonly used to haul employees and materials plainly identified as to the Employer's business name with signs, seals, decals or stickers. Such identification shall be visible from either side of the vehicle, and the Individual letters shall be not less than two (2) inches in height.

The parties agree to improve these truck identification requirements, and changes to this Section to accomplish this shall be placed into effect upon the mutual consent of the Local Union and the Association.

**Section 22.** Anyone who is or who becomes an Employer or an independent contractor or who holds or is listed in any proprietary capacity on a currently active California Contractors' License in any license classification which covers work covered by this Agreement shall not hold membership in the Union. Violations of this Section shall be processed in accordance with ARTICLE XXVIII of this Agreement.

**Section 23.** Promoting Union Contracting. We have agreed to explore and work jointly in an effort to develop a plan to acquaint major property owners, property managers and others with the advantages of using union roofing contractors to perform their roofing and re-roofing work and to encourage them to do so.

**Section 24.** Picket Duty. Members of the Local Union shall serve one (1) day per year assisting the Local Union with picket duty, hand billing and organizing activities. Whenever possible, the Local shall provide the Individual Employer with seventy-two (72) hours advance notice of the selection of his or her employee for such duty. The employee shall not be compensated by the Individual Employer for serving such duty.

## ARTICLE XVIII

### *Health and Welfare*

Each Individual Employer covered by this Agreement shall pay into the Bay Area Roofers Health and Welfare Trust Fund contributions as set forth in Addendum One to this Agreement for each hour actually worked by his/her employees who are working within classifications and in types of work covered by this Agreement which require health and welfare contributions.

The payments shall be made at the times and in the manner provided for by the Trust Agreement creating the Bay Area Roofers Health and Welfare Trust Fund, and each Individual Employer is bound by all the terms and conditions of said Trust Agreement and any amendment or amendments thereto.

To the extent allowable by applicable law, certain health and welfare benefits and options may be restricted or lost if an employee works in Noncovered Roofing Service as defined in the eligibility rules of the Bay Area Roofers Health and Welfare Plan.

## ARTICLE XIX

### *Vacation and Check-Off*

**Section 1.** Each Individual Employer covered by this Agreement shall pay into the Roofers Local Union No. 40 Area Vacation Trust Fund contributions as set forth in Addendum One to this Agreement for each hour actually worked by his/her employees who are working within classifications and in types of work covered by this Agreement which require vacation contributions. The payments of the contributions shall be made at the times and in the manner provided for by the Trust Agreement creating the Roofers Local Union No. 40 Area Vacation Trust Fund, and each Individual Employer is bound by all the terms and conditions of said Trust Agreement and any amendment or amendments thereto. All employees' taxes owed by reason of said payments which are required by law, Federal, State or local, shall be deducted from the employee's regular pay check and paid by the Individual Employer to the appropriate agencies. All taxes due

18

from the Individual Employer under the law, Federal, State, or local, by reason of said payments shall be paid by the Individual Employer.

**Section 2.**    Vacation payouts to employees are to be made twice each year with distribution to be the first Friday in December and the first Friday in February of each year.

**Section 3.**    An Association-Local Union Committee shall be established as soon as possible and shall in good faith attempt to develop trust amendments so as to remove vacation pay from Workers' Compensation Insurance liability, provided, however, that such trust amendments shall be legal and feasible within the context of all applicable laws and regulations. Administrative costs, if any, shall be borne by the Employers.

**Section 4.**    Check-Off.

(a)  Payments on account of initiation fees, if any, for each hour actually worked for which vacation contributions are due at the rate of $1.50 per hour for Journeymen and $0.60 per hour for Apprentices, until paid in full, and thereafter payment of working dues at the rate of $0.76 per hour for each hour actually worked for which vacation contributions are due by each employee covered by this Agreement who has executed a lawful authorization in writing therefor in manner and form as set forth in Exhibit "A" annexed hereto shall be checked off and deducted from the employee's vacation funds by the Administrator of the Roofers Local Union No. 40 Area Vacation Trust Fund, as agent for the Individual Employers covered by this Agreement, and transmitted to the Local Union. The executed authorization shall be lodged with the Association, the Administrator of the Roofers Local Union No. 40 Area Vacation Trust Fund, and Local Union No. 40.

(b)  Local Union No. 40 will hold harmless the Association, all Individual Employers, and the Trustees and Administrator of the Roofers Local Union No. 40 Area Vacation Trust Fund against any claim or claims which may be made against them or any one or ones of them by any person by reason of the deduction of working dues and payments on account of initiation fees as herein provided, including the cost of defending against the same, and will absorb any additional costs which may result from the administration of these deductions

## ARTICLE XX

### *Retirement Fund*

Each Individual Employer covered by this Agreement shall pay into the Pacific Coast Roofers Pension Plan and the National Roofing Industry Pension Fund contributions as set forth in Addendum One and Addendum Three to this Agreement for each hour actually worked by his/her employees who are working within classifications and in types of work covered by this Agreement which require pension contributions.

These payments shall be made at the times and in the manner provided for by the "Pacific Coast Roofers Pension Plan Trust Agreement", and each Individual Employer is bound by all the terms and conditions of said Trust Agreement and the National Roofing Industry Pension Fund Agreement and Declaration of Trust and any present or future amendments thereto.

To the extent allowable by applicable law, certain pension benefits may be lost if an employee works in Noncovered Roofing Service as defined in the Pension Plans and in their respective Summary Plan Descriptions.

## ARTICLE XXI

### *Apprenticeship Training*

**Section 1.**    Each Individual Employer covered by this Agreement shall pay into the Bay Area Counties Roofing Industry Apprenticeship Training Fund contributions as set forth in Addendum One to this Agreement for each hour actually worked by his/her employees who are working within classifications and in types of work covered by this Agreement which require apprenticeship fund contributions. The payments shall be made at the times and in the manner provided for by the Trust Agreement creating the Bay Area Counties Roofing Industry Apprenticeship Training Fund,

and each Individual Employer is bound by all the terms and conditions of said Trust Agreement and any amendment or amendments thereto.

**Section 2.**    The Board of Trustees of the Bay Area Counties Roofing Industry Apprenticeship Training Fund will continue to have full control over the Director of Apprentice Training and control of all the finances and pay all expenses from the Apprenticeship Trust Fund.   Certain insurances are to be continued on a joint basis with the Association, which will be reimbursed by the Apprenticeship Fund only for actual costs.

**Section 3.**    The normal length of the regular apprenticeship program will be forty-two (42) months.

**Section 4.**    Ratio. For all work, public and private, the ratio of Apprentices to Journeymen employed by the Employer may not be more than one (1) of every two (2) employees for roofing work, and four (4) of every five (5) employees for roof removal work, except when qualified Journeymen are not available, and except as provided in Section 6 of this ARTICLE.

If the ratios approved by the state for any other roofing industry apprenticeship program operating within the territorial jurisdiction of Local 40 change, the ratios in this Working Agreement will immediately be changed to mirror them. However, in no case shall the ratio of Apprentices to Journeymen applicable under this Working Agreement be less than those which applied under the previous Working Agreement: one (1) of the first three (3) employees and one (1) of every two (2) thereafter.

**Section 5.** Apprentices are not to be changed by the Employer from the Bracket or Class Code to which they have been assigned by the San Francisco and San Mateo Counties Joint Apprenticeship and Training Committee. An Apprentice should not be paid more than the amounts applicable to the Bracket in which the Apprentice has been placed by the San Francisco and San Mateo Counties Joint Apprenticeship and Training Committee.

To be advanced from one Bracket to another, in addition to the amount of time indicated for each Bracket in Addendum One, certain criteria set by the Committee must also be satisfactorily met, including, but not limited to, passing both a written examination and a physical/hands-on demonstration of their skills and competencies upon completion of each unit or module of instruction.  Apprentices seeking credit for past experience shall also be required to provide a physical/hands-on demonstration of the skills and competencies commensurate with the Bracket in which they wish to be placed.

All Apprentices, both existing and new, will not be advanced from the first bracket to the 2nd bracket of apprenticeship until the San Francisco and San Mateo Counties Joint Apprenticeship and Training Committee has determined that the Apprentice has reached the level of expertise to be advanced.   Advancement from the 2nd bracket to the 3rd bracket shall be automatic, provided that the Apprentice has met all applicable requirements and criteria for advancement.

Commencing with the 3rd Bracket, all Apprentices, both existing and new, will not be advanced to the 4th and subsequent Brackets of apprenticeship until it is jointly determined by the Apprentice's Foreman, the owner of the company for which the Apprentice is working and the San Francisco and San Mateo Counties Joint Apprenticeship and Training Committee that the Apprentice has reached the level of expertise to be advanced to the next Bracket. When an evaluation is sent to the Individual Employer recommending advancement of the Apprentice, said evaluation shall be completed as required and returned to the Joint Apprenticeship and Training Committee within twenty (20) working days of receipt of the evaluation by the Individual Employer.  If an evaluation is not returned within the prescribed time frame, the Apprentice will be considered to have been approved for advancement.

Advancement of Apprentices will be triggered by letters of notification from the Apprenticeship Training Office to the apprentice's employer rather than the apprentice being required to show his pay card to his employer.
Existing Apprentices as well as new Apprentices must advance through the Master Apprentice Bracket before reaching Journeyman status.  Master Apprentices will remain in that category after completion of apprentice school until it is determined by the Apprentice's Foreman, the owner of the company for which the Apprentice is working and the San Francisco and San Mateo Counties Joint Apprenticeship and Training Committee that the Apprentice has reached the level of expertise to graduate to the Journeyman level.  The Master Apprentice may petition to be considered for advancement every six (6) months.

**Section 6.**    Roof Removal Employees.

20

(a) Effective August 1, 1986, a Roof Removal Employee classification is established. Employees moving into this classification will be drawn from those in the Apprenticeship Program who does not wish to proceed through the entire regular program to Journeyman status. Before an Apprentice moves from the 3rd Bracket into the 4th Bracket, the Employer and the Apprentice will decide if the Apprentice wants to and should continue in the regular Apprenticeship Program or become a Roof Removal Employee. This review and decision making process may include the Apprentice's Foreman and the San Francisco and San Mateo Counties Joint Apprenticeship and Training Committee.

(b) Ratio. The number of Roof Removal Employees an Employer employs will not serve to reduce the number of regular Apprentices an Employer can have under the ratio in Section 4.

(c) The Journeymen at each particular signatory shop will be given the opportunity to work on tear-off jobs if they are not going to be sent out for other work on a particular day. Journeymen must be given the first priority in the offer of work over Roof Removal Employees.

**Section 7.**    An Apprentice may be assessed monetary fines by the Joint Apprenticeship and Training Committee as one form of disciplinary action for unexcused absences, for failure to appear before the Joint Apprenticeship and Training Committee when notified and directed to do so, for failure to carry out any instructions of the Joint Apprenticeship and Training Committee related to the Apprentice's training or for violations of any of the Rules and Regulations adopted by the Committee applicable to apprenticeship training. The schedule of any such monetary fines is to be established by the San Francisco and San Mateo Counties Joint Apprenticeship Training Committee. Fines are to be paid to the Bay Area Counties Roofing Industry Apprenticeship Training Fund.

**Section 8.**    The Association and the Local Union mutually agree that the Apprenticeship Training Program should be evaluated and may need to be improved. However, this cannot be done hastily and without thorough consideration. Therefore, we agree that the details be worked out and mutually agreed to by a joint committee of the Local Union and the Association as promptly as possible. Both the Local Union and the Association will have to agree to any recommendations developed by the joint committee.

## ARTICLE XXII

### *Promotion Fund*

Each Individual Employer covered by this Agreement shall pay into the Bay Area Counties Roofing Industry Promotion Fund contributions as set forth in Addendum One to this Agreement for each hour actually worked by his/her employees who are working within classifications and in types of work covered by this Agreement which require promotion fund contributions. Such Fund shall be administered by the Association. The payments shall be made at the times and in the manner provided for by the Trust Agreement creating the Bay Area Counties Roofing Industry Promotion Fund, and each Individual Employer is bound by all the terms and conditions of said Trust Agreement and any amendment or amendments thereto.

## ARTICLE XXIII

### *Labor-Management Trust*

Each Individual Employer covered by this Agreement shall pay into the San Francisco Roofers Labor-Management Trust Fund contributions as set forth in Addendum One to this Agreement for each hour actually worked by his/her employees who are working within classifications and in types of work covered by this Agreement which require labor-management trust fund contributions. The payments shall be made at the times and in the manner provided for by the Trust Agreement creating the San Francisco Roofers Labor-Management Trust Fund, and each Individual Employer is bound by all the terms and conditions of said Trust Agreement and any amendment or amendments thereto. The primary purposes of the Trust are to enforce the terms of this Agreement and to preserve and protect work opportunities for signatory roofing contractors and the union craftsmen they employ.

21

During the term of this Agreement, the Labor-Management Trust shall study, in cooperation with counterpart roofing industry Trusts and other interested parties, the merits of the current 4:1 ratio for roof removal work and possible ways and means of altering it on an industry-wide basis, as well as the merits of the 1:1 ratio for roofing/waterproofing work and whether it also should be changed.

## ARTICLE XXIV

### *Bonding*

**Section 1.**    Each Individual Employer covered by this Agreement shall be required to post a bond with the Bay Area Roofers Health and Welfare Trust, or a cash deposit equal to the face amount of the required bond amount in lieu thereof in a Trust account properly earmarked in a bank to be designated by the Bay Area Roofers Health and Welfare Trust, for the purpose of guaranteeing the payment of amounts falling due to the Trust Funds as provided in ARTICLES XVIII, XIX, XX, XXI, XXII and XXIII of this Agreement and Addendum One hereto. The Bay Area Roofers Health and Welfare Trust is empowered to determine the amount(s) of such bonds or cash deposits, to formulate and adopt rules covering such bonds or cash deposits, including rules setting forth the equitable, but effective enforcement of bonding requirements, and from time to time to amend the same as in the judgment of its members may be required.

**Section 2.**    In the event such bond or cash deposit should be insufficient to cover any such payments due from the Individual Employer at one time, the proceeds shall be applied to the obligations of such Individual Employer in the following order:

(1)  Roofers Vacation Trust Fund (s),
(2)  Roofers Health and Welfare Trust Fund (s),
(3)  Pacific Coast Roofers Pension Plan,
(4)  Bay Area Counties Roofing Industry Apprenticeship Training Fund,
(5)  San Francisco Roofers Labor-Management Trust Fund,
(6)  Bay Area Counties Roofing Industry Promotion Fund.

**Section 3.**    The Local Union shall not dispatch employees to, the Local Union shall withdraw employees from, and any employees covered by this Agreement shall not work for any Individual Employer who has failed to post the bond or make the cash deposit required by this ARTICLE or, having done so, has failed to maintain the same in full force and effect throughout the term of this Agreement.

**Section 4.**    The Association and the Local Union mutually agree that the concepts of Employers who have had a history of being delinquent with their contribution payments to the Trust Funds or who have been audited by the Trust Funds and have been found to have flagrantly failed to have made the proper contributions to the Trust Funds posting a cash deposit in an increased amount have merit and should receive due consideration from the Bay Area Roofers Health and Welfare Trust in carrying out its responsibilities under this Article.

## ARTICLE XXV

### *Authorized Union Representatives*

**Section 1.**    Unless otherwise expressly indicated in writing to the Association by the Local Union, the Business Representative shall be the only person authorized to represent the Local Union in its collective relations with the Association and the Individual Employers parties hereto.  The actions, declarations or conduct of any other person or persons shall not be binding upon the Local Union.

**Section 2.**    Should the Local Union exercise its right to designate any person or persons in addition to the Business Representative to act as its representative, the authority of such other person or persons may be revoked at any time by notice in writing to the Association or the Individual Employer.

## ARTICLE XXVI

### *Subcontracting*

Except as provided in Sections 1 and 2, none of the work covered by this Agreement, which is to be performed at the site of construction, alteration, painting, or repair of any building structure or other work, shall be subcontracted by any Individual Employer except to a union contractor. It is understood and agreed that this provision shall be enforced only to the extent necessary to protect the employees and preserve all of the work which has normally and traditionally been performed by them.

**Section 1.** The tear-off of roofs on single-family and duplex (attached, two-family) residences only may be subcontracted to non-union tear-off companies. Upon the request of the Local Union, the Individual Employer will provide a list of jobs that have used or will be using the services of such non-union tear-off companies.

**Section 2.** Targeted Jobs. The Local Union agrees to consider the use by the Individual Employer of any number of modifications to this Agreement so that the Employer can be competitive in bidding for roofing/waterproofing work that is likely to be lost to non-signatory contractors or to signatory contractors from outside the jurisdiction of the Local Union.

The Employer will notify the Local Union by telephone when it is bidding such work. The Employer will identify the project in question and the modifications to this Agreement that are needed in order to be competitive. If the Local Union agrees with the Employer, it will verbally authorize the alterations to this Agreement for that project. The Employer will then complete and sign the Targeted Jobs Form (see Addendum Four) in duplicate and submit both copies to the Local Union, which will confirm its agreement to the modifications by signing the forms, keeping one copy for its records and returning one copy to the Employer.

In establishing this Targeted Jobs Program, the parties agree that participation in the Program is restricted to Individual Employers who are both signatory to this Agreement and have shops located within the jurisdiction of the Local Union; that no modifications to the wage or fringe benefit aspects of this Agreement will be permitted; and that information about modifications requested and/or approved for a given project will not be shared by the Local Union with any other Employer, unless another Employer who is eligible to participate in the Program requests modifications relating to the same project, in which case the same modifications will be made available to both Employers.

## ARTICLE XXVII

### *Strikes and Lockouts*

It is mutually agreed that during the term of this Agreement neither the Association nor any Individual Employer shall authorize or engage in any lockout, and that the Local Union shall not authorize any strikes, slowdowns, or stoppages of work in any dispute, complaint or grievance arising under the provisions of this Agreement, except disputes, complaints or grievances involving ARTICLES V or XV, or the provisions of the Addendum hereto requiring payments to any of the Trust Funds. In the event of any dispute involving ARTICLES V or XV or the provisions of the Addendum requiring payments into any of the Trust Funds, or in any case in which the Association or an Individual Employer or Individual Employers is or are failing to abide by an order of the Joint Area Conference Board or the Local Area Adjustment Board, it shall not be a violation of this Agreement for the Local Union to withdraw the employees of such Individual Employer or Individual Employers and, during the time such dispute, complaint or grievance remains unresolved or the refusal of the Association or the Individual Employer or the Individual Employers to abide by any such order continues, to refuse to dispatch employees to such Individual Employer or Individual Employers. Employees so withdrawn shall not lose their status as employees but shall not be entitled to receive wages or any other compensation for any period during which they have been so withdrawn or have refused to work.

Should the Joint Area Conference Board determine that the failure or refusal of any Individual Employer to abide by its decision on any matter referred to it is of sufficient gravity, it shall so notify the Local Union in writing which shall thereafter withdraw the employees of such Individual Employer and during the time such refusal of the Individual Employer to abide by its decision continues withhold all employees from such Individual Employer. No Individual

Employer shall, however, be relieved of its obligations under ARTICLE V or any other provision hereof by reason of its employees being so withdrawn and withheld during its period of non-compliance.

## ARTICLE XXVIII

### *Joint Area Conference Board and Local Area Adjustment Board*

**Section 1.**  Immediately upon execution of this Agreement, a Local Area Adjustment Board, with jurisdiction coincidental with the area covered by this Agreement, and a Joint Area Conference Board encompassing the area covered by this Agreement and the area covered by the Agreement between the Association and Local No. 81 of the Union shall be established as follows:

(a)  The Joint Area Conference Board shall be constituted of two  (2) Employer members and two (2) alternates appointed by the Association, and two (2) Local Union members and two (2) alternates appointed one each by Local Nos. 40 and 81 of the Union, all of whom shall be active members in good standing of the organization which they represent.

(b)  The Local Area Adjustment Board shall consist of two (2) Local Union appointed members, one of whom shall be the Business Manager of the Local Union, and two (2) Local Union appointed alternates, and two (2) Association appointed Employer members and two  (2) Association appointed Employer alternates all having shops in the area covered by this Agreement.

**Section 2.**   Local Unions Nos. 40 and 81 shall notify the Association, and the Association shall notify Local Unions Nos. 40 and 81, immediately upon execution of this Agreement, of the names of their respective appointees to the Joint Area Conference Board and the Local Union shall notify the Association, and the Association shall notify the Local Union, immediately upon execution of this Agreement, of the names of their respective appointees to the Local Area Adjustment Board.  The members of each Board shall meet at the earliest possible time to select from among their respective members a Chairman and a Secretary. When the Chairman is an Employer member, the Secretary shall be an Employee member, as the case may be, and vice versa.  No member of the Joint Area Conference Board or of the Local Area Adjustment Board shall participate in any decision upon any dispute to which he or his principal is a party. The members of the Joint Area Conference Board and the Local Area Adjustment Board shall also adopt rules of procedure, set the frequency of meetings and shall determine all other details necessary to perform their duties as hereinafter set forth, provided, however, that the Joint Area Conference Board shall meet at least quarterly in the months of March, June, September and December.

**Section 3.**  A full Board shall be required to constitute a quorum for the transaction of the business of the Local Area Adjustment Board and the Joint Area Conference Board. A quorum being present, all matters shall be decided by majority vote of the members present.

**Section 4.** The Joint Area Conference Board and the Local Area Adjustment Board shall be empowered to:

(a)  Establish a general recognition and enforcement of the provisions of this Agreement.

(b)  Hear and determine disputes, complaints or grievances initiated by the Local Union, the Association, or an Individual Employer, involving the interpretation or enforcement of any provision of this Agreement, except disputes, complaints or grievances involving ARTICLES V or XV, or the provisions of the Addendum hereto requiring payments into any of the Trust Funds.

(c)  Hear and determine employee or Employer grievances initiated under Sections 5 and 7 of ARTICLE V hereof and Section 9 of ARTICLE VI hereof.

(d)  Subpoena or otherwise require any party to this Agreement, or their officers, agents, representatives or employees, to testify with regard to any matter before them for decision.

(e)  Make awards of damages, liquidated, general or special, and grant any other relief for any violation of the provisions of this Agreement subject to their jurisdiction which they may deem appropriate thereto, but not to alter or add to any provisions of this Agreement or the Addendum hereto, provided, however, that any awards of damages made by

the Local Area Adjustment Board may be appealed to the Joint Area Conference Board as provided in Section 5 of this ARTICLE and that all awards of damages made by the Local Area Adjustment Board are subject to ratification by the Joint Area Conference Board.

(f)  The Joint Area Conference Board and the Local Area Adjustment Board may hold hearings with respect to disputes involving ARTICLE XV and make recommendations as to whether the same should be laid before the Labor Commissioner of the State of California.

**Section 5.**    Whenever a dispute, complaint or grievance over which the Joint Area Conference Board or the Local Area Adjustment Board has jurisdiction arises, the Local Union and the Association or the Individual Employer, as the case may be, shall make every effort to settle the same. Should they be unable to settle the same within two (2) working days thereafter, exclusive of the day of the occurrence giving rise thereto, the party aggrieved, whether the Local Union, the Association or the Individual Employer, may within the five (5) working days next following submit the same to the Local Area Adjustment Board for decision. Such submission must be in writing and a copy thereof served upon the opposite party. The Local Area Adjustment Board shall endeavor to determine the same at its next meeting.    Upon notification that a grievance has been filed, the scheduling of a date and the holding of a hearing shall be completed within fifteen (15) working days. The Association and the Local Union agree to appoint a sufficient number of alternates to the Local Area Adjustment Board so as to facilitate this purpose.  In the event it is unable to reach a decision, however, or, having reached a decision, either party to the dispute should be dissatisfied therewith, the matter may be appealed to the Joint Area Conference Board within the next ten (10) working days, exclusive of the day of the meeting. Such appeal must also be in writing and a copy thereof served upon the opposite party. Upon such submission to it, the Joint Area Conference Board shall endeavor to decide the same at its next scheduled meeting.

**Section 6.**    Unless appealed from, as provided in Section 5 hereof, the decision of the Local Area Adjustment Board shall become final and binding upon the parties at the end of the period provided for such appeal. Should an appeal be filed, however, the subsequent decision of the Joint Area Conference Board shall likewise be final and binding upon the parties, but should it, in turn, be unable to reach a decision within five (5) working days of deliberation, the matter may be submitted to an impartial arbitrator for decision upon notice by either party delivered to the Joint Area Conference Board within the ten (10) working days next following. Upon receipt of such notice the Joint Area Conference Board shall request the Federal Mediation and Conciliation Service to submit a panel of five (5) names from which the name of the impartial Arbitrator shall be selected by the parties to the dispute, in accordance with the procedures of the Federal Mediation Service in such cases provided. The decision of the Arbitrator so chosen shall be final and binding upon the parties. The expenses of such Arbitrator, except those incurred solely at the instance of one party, shall be borne by the parties equally. With respect to the Employers' share of such expenses, it shall be borne by the Association if the Individual Employer concerned is a member of the Association; otherwise it shall be borne by the Individual Employer.

**Section 7.**  Violations of Agreement

(a)  Violations by Employers. The parties hereto agree that in the event of a violation of any provision of this Agreement by an Individual Employer, the actual amount of damages sustained by the Local Union, employees, Employer, or other Individual Employers by reason of such breach would be extremely difficult to determine, and therefore, an Individual Employer shall pay the sum of fifty ($50.00) dollars per day as liquidated damages for each such violation except in the case of a violation of ARTICLE XXVI of this Agreement. In the case of a single continuous incident, and if a group of employees are involved in a single continuous incident, the violation shall be deemed to apply with respect to the entire group of employees and not to consist of a separate violation with respect to each employee.

The parties hereto agree that in the event of a violation of ARTICLE XXVI of this Agreement by an Individual Employer, the actual amount of damages sustained by the Local Union, employees, Employer, or other Individual Employers by reason of such breach would be extremely difficult to determine, and therefore, an Individual Employer shall pay the sum of one hundred ($100.00) dollars per day as liquidated damages for such violation.  In the case of a single continuous incident, and if a group of employees is involved in a single continuous incident, the violation shall be deemed to apply with respect to the entire group of employees and not to consist of a separate violation with respect to each employee unless the Employer is notified by the Business Representative of the alleged violation and does not cease the practice within twenty-four (24) hours. If the Employer is subsequently found to have been in violation of ARTICLE XXVI, liquidated damages assessed against the Employer for any periods the practice continued following such notification shall be at the rate of one hundred ($100.00) dollars per day per Individual worked in violation.

When the Local Area Adjustment Board or the Joint Area Conference Board finds liquidated damages shall be due under this Section, such liquidated damages shall be paid to the Bay Area Counties Roofing Industry Apprenticeship Training Fund. Liquidated damages found to be due under this Section shall be in addition to any sums of money due any employee or Trust Fund under this collective bargaining Agreement.

(b)  Violations by Employees.  If the Local Area Adjustment Board or the Joint Area Conference Board finds a member of the Local Union in violation of a provision of this Agreement, except in the case of a violation of Section 10 of ARTICLE XVII, it shall refer the matter to the Local Union which shall, if in the judgment of its Executive Board there is substantial evidence to support the finding, bring the member to trial in accordance with the applicable provisions of its Bylaws.  The Local Union shall notify the Local Area Adjustment Board or the Joint Area Conference Board of its findings in writing, not later than five (5) working days after the termination of the hearing.

In the event of a violation of Section 10 of ARTICLE XVII by an employee or applicant for employment, the Local Area Adjustment Board or the Joint Area Conference Board may refer the matter to the Local Union for action as provided in the preceding paragraph or it may assess liquidated damages against the employee.  The parties hereto agree that in the event of a violation of Section 10 of ARTICLE XVII of this Agreement by an employee or applicant for employment, the actual amount of damages sustained by the Local Union, other employees or applicants for employment, or Individual Employers by reason of such breach would be extremely difficult to determine, and therefore, an employee shall pay the sum of one hundred ($100.00) dollars per day as liquidated damages for each such violation.  When the Local Area Adjustment Board or the Joint Conference Board finds liquidated damages shall be due under this Section, such liquidated damages shall be paid to the Bay Area Counties Roofing Industry Apprenticeship Training Fund.

## ARTICLE XXIX

### *Jurisdictional Disputes*

In the event of any dispute as to jurisdiction of the work covered by the terms of this Agreement by reason of any such work being claimed by a union or unions other than those affiliated with the United Union of Roofers, Waterproofers and Allied Workers, AFL-CIO, such dispute shall be referred to and settled in accordance with any procedure or agreement for the settlement of jurisdictional disputes to which the United Union of Roofers, Waterproofers and Allied Workers, AFL-CIO, is a party, or by which it is bound, including without limitation the National Joint Plan for Settlement of Jurisdictional Disputes or any plan successor thereto established by the Building and Construction Trades Department, AFL-CIO.

The decision of the National Joint Board for Settlement of Jurisdictional Disputes, or any other agency agreed to, as the case may be, shall be final and binding on the parties hereto. There shall be no slowdown or stoppage of work as a result of such dispute.

The provisions of this ARTICLE XXIX shall not apply to any such jurisdictional dispute involving an employer (other than an Individual Employer) to whom an Individual Employer has subcontracted work covered by this Agreement in violation of ARTICLE XXVI hereof which shall remain subject to the procedures set forth in ARTICLE XXVIII hereof for the settlement of disputes generally.

## ARTICLE XXX

### *Signatory Employers*

**Section 1.**    After this Agreement takes effect, any employer may become a party hereto if an identical counterpart of this Agreement is executed by him. This Agreement shall take effect as to such new contracting party at such time as said party signs such counterpart.

The Association, on behalf of the Employers it represents, at its option may become a party to any agreement or a counterpart thereof, containing different provisions which the Local Union may enter into during the life of this

26

Agreement with respect to the work covered by this Agreement. In such event, said other agreement shall supersede this Agreement.

**Section 2.**    The employer warrants, asserts, and agrees that this document is executed by him/her with full authority to represent and bind any firm, partnership, corporation or association of which he/she is a partner, officer, representative or member.

**Section 3.**    If this Agreement is signed by a member of a partnership, it shall apply to them and each of them individually. In the event of a dissolution or termination of said partnership or in the event of a merger, consolidation or other legal change whatsoever with respect to employer, any obligations hereunder shall be binding upon any assign, successor, legal representatives or lessee of such employer.

**Section 4.**    This Agreement may be executed in multiple counterparts and when one counterpart is signed by the Association, all such counterparts shall constitute, when taken together, one and the same instrument as if all such signatures were contained in the original.

## ARTICLE XXXI

### *Duration of Agreement*

This Agreement, and the Addendum thereto, shall remain in full force and effect to and including the 31st day of July, 2009 and from year to year thereafter, unless either the Association shall give notice to the Local Union, or the Local Union shall give notice to the Association, in writing, at least ninety (90) days prior to said 31st day of July, 2009 or any anniversary thereof, of intention to modify or terminate the same. Any Employer not represented by the Association desiring to terminate this Agreement and to negotiate a separate agreement thereafter may do so upon like notice provided, however, that such notice shall state the desire of the Employer to negotiate a separate agreement and shall be served upon the Association and the Local Union at least ninety (90) days prior to said 31st day of July, 2009 or any anniversary thereof. Notice served pursuant hereto by the Association or by the Local Union shall terminate this Agreement as to all parties thereto but such notice from any one Employer shall terminate this Agreement only as to such Employer. In the event that notice shall be given terminating this Agreement as to all parties as herein provided, all parties, except those giving notice of desire to negotiate separate agreements, shall during the ninety (90) day period herein specified, or within such additional time as may be agreed, negotiate jointly upon a successor Agreement, but if no such Agreement has been reached at the end of such period of time shall be free thereafter to negotiate and execute separate agreements. For the purpose of this ARTICLE, notice to the Association shall be deemed equivalent to notice to all Employers, whether represented by the Association or not, and all Employers agree to accept such notice as though served upon each of them separately.

**IN WITNESS** and testimony of the provisions and terms mutually agreed upon and specified herein, the duly authorized officers and/or representatives of both parties hereby affix their signatures as of the 25th day of July, 2006.

**ASSOCIATED ROOFING CONTRACTORS OF THE BAY AREA COUNTIES, INC.**

By _William T. Callahan, Jr._
       **Executive Secretary**

**LOCAL UNION NO. 40 of the UNITED UNION OF ROOFERS, WATERPROOFERS AND ALLIED WORKERS, AFL-CIO**

By _Stan Tobin_
      **Business Representative**

## ADDENDUM ONE

### Hourly Wages and Fringes

### JOURNEYMAN (Class Code "J")

| Date | Wage Rate | Vacation | H & W | Pension | Appr. Trng. | Pro. Fund | Labor-Mgt. Trust | Total |
|------|-----------|----------|-------|---------|-------------|-----------|------------------|-------|
| 8/1/2006 | $27.02 | $3.21 | $5.79 | $4.10 | $0.30 | $0.25 | $0.20 | $40.87 |
| 8/1/2007 | | | | | | $0.25 | | $42.47 |
| 8/1/2008 | | | | | | $0.25 | | $44.17 |

Effective August 1, 2007 there will be a Journeyman increase of $1.60 per hour to be allocated between wages and existing fringe funds at the discretion of the Local Union. Effective August 1, 2008 there will be a Journeyman increase of $1.70 per hour to be allocated between wages and existing fringe funds at the discretion of the Local Union.

### APPRENTICE

(a) The normal length of the regular Apprenticeship program will be 42 months.

(b) Effective August 1, 2004 the proportional allocation of annual Journeyman increases to Apprentices will be calculated as follows: the Journeyman wage shall be multiplied by the percentage associated with each bracket of apprenticeship to derive the wage rate for each bracket of apprenticeship. Fringe fund contribution rates for Apprentices shall be as set forth in the schedules below. The Local may at its discretion increase fringe fund contribution rates for Apprentices, but only by deducting such funds from Apprentice wages.

(c) The following Schedule A contains the appropriate wage and fringe amounts for Apprentices indentured, assigned to or advancing between brackets on or after August 1, 2006.

### Schedule A

| Bracket | Code | Wages-Percent of Journeyman Wage | | Vacation | H&W | Pension | Appr. Trng. | Pro. Fund | Labor-Mgt. Trust | Total |
|---------|------|-----------|--------|----------|-----|---------|-------------|-----------|------------------|-------|
| 1st 6 mos. | 1-A | 45% | $11.96 | $1.10 | $1.42 | $0.20 | $0.30 | $0.25 | $0.20 | $15.43 |
| 2nd 6 mos. | 2-A | 46% | $12.23 | $1.10 | $5.79 | $0.20 | $0.30 | $0.25 | $0.20 | $20.07 |
| 3rd 6 mos. | 3-A | 48% | $12.77 | $1.10 | $5.79 | $0.20 | $0.30 | $0.25 | $0.20 | $20.61 |
| 4th 6 mos. | 4-A | 50% | $13.41 | $1.10 | $5.79 | $0.20 | $0.30 | $0.25 | $0.20 | $21.25 |
| 5th 6 mos. | 5-A | 62% | $16.65 | $1.10 | $5.79 | $0.82 | $0.30 | $0.25 | $0.20 | $25.11 |
| 6th 6 mos. | 6-A | 74% | $19.89 | $1.10 | $5.79 | $1.13 | $0.30 | $0.25 | $0.20 | $28.66 |
| Master Appr. | 7-A | 90% | $24.22 | $1.10 | $5.79 | $1.65 | $0.30 | $0.25 | $0.20 | $33.51 |

(d) The following Schedule B will be the basis for determining the wages and fringes for Apprentices indentured, assigned to or advancing between brackets on or after August 1, 2006.

### Schedule B

| Bracket | Code | Wages-Percent of Journeyman Wage | Vacation | H&W | Pension | Appr. Trng. | Pro. Fund | Labor-Mgt. Trust |
|---------|------|-----------|----------|-----|---------|-------------|-----------|------------------|
| 1st 6 mos. | 1-A | 45% | yes | yes* | yes | yes | yes | yes |
| 2nd 6 mos. | 2-A | 46% | yes | yes | yes | yes | yes | yes |
| 3rd 6 mos. | 3-A | 48% | yes | yes | yes | yes | yes | yes |
| 4th 6 mos. | 4-A | 50% | yes | yes | yes | yes | yes | yes |
| 5th 6 mos. | 5-A | 62% | yes | yes | yes | yes | yes | yes |
| 6th 6 mos. | 6-A | 74% | yes | yes | yes | yes | yes | yes |
| Master Appr. | 7-A | 90% | yes | yes | yes | yes | yes | yes |

\* Effective August 1, 2007, the health and welfare contribution for first bracket apprentices will increase to $1.67 per hour. Effective August 1, 2008, the health and welfare contribution for first bracket apprentices will increase to $1.92 per hour.

(e)  Apprentices are not to be changed by the Employer from the Bracket or Class Code to which they have been assigned by the San Francisco and San Mateo Counties Joint Apprenticeship and Training Committee. An Apprentice should not be paid more than the amounts applicable to the Bracket in which the Apprentice has been placed by the San Francisco and San Mateo Counties Joint Apprenticeship and Training Committee.

To be advanced from one Bracket to another, in addition to the amount of time indicated for each Bracket in Addendum One, certain criteria set by the Committee must also be satisfactorily met, including, but not limited to, passing both a written examination and a physical/hands-on demonstration of their skills and competencies upon completion of each unit or module of instruction. Apprentices seeking credit for past experience shall also be required to provide a physical/hands-on demonstration of the skills and competencies commensurate with the Bracket in which they wish to be placed.

All Apprentices, both existing and new, will not be advanced from the first bracket to the 2nd bracket of apprenticeship until the San Francisco and San Mateo Counties Joint Apprenticeship and Training Committee has determined that the Apprentice has reached the level of expertise to be advanced. Advancement from the 2nd bracket to the 3rd bracket shall be automatic, provided that the Apprentice has met all applicable requirements and criteria for advancement.

Commencing with the 3rd Bracket, all Apprentices, both existing and new, will not be advanced to the 4th and subsequent Brackets of apprenticeship until it is jointly determined by the Apprentice's Foreman, the owner of the company for which the Apprentice is working and the San Francisco and San Mateo Counties Joint Apprenticeship and Training Committee that the Apprentice has reached the level of expertise to be advanced to the next Bracket. When an evaluation is sent to the Individual Employer recommending advancement of the Apprentice, said evaluation shall be completed as required and returned to the Joint Apprenticeship and Training Committee within twenty (20) working days of receipt of the evaluation by the Individual Employer. If an evaluation is not returned within the prescribed time frame, the Apprentice will be considered to have been approved for advancement.

Advancement of Apprentices will be triggered by letters of notification from the Apprenticeship Training Office to the apprentice's employer rather than the apprentice being required to show his pay card to his employer.

Existing Apprentices as well as new Apprentices must advance through the Master Apprentice Bracket before reaching Journeyman status. Master Apprentices will remain in that category after completion of apprentice school until it is determined by the Apprentice's Foreman, the owner of the company for which the Apprentice is working and the San Francisco and San Mateo Counties Joint Apprenticeship and Training Committee that the Apprentice has reached the level of expertise to graduate to the Journeyman level. The Master Apprentice may petition to be considered for advancement every six (6) months.

(f)  The following schedule contains the appropriate wage and fringe amounts for Roof Removal Employees and Roof Removal Foremen, effective August 1, 2006:

| Classification | Code | Wages-Percent Of Journeyman Wage | Vacation | H&W | Pens. | Appr. Trng. | Pro. Fund | Labor-Mgt. Trust | Total |
|---|---|---|---|---|---|---|---|---|---|
| Roof Removal Employee | 1-R | 95.25% $25.74 | $3.21 | $5.79 | $3.60 | $0.20 | $0.25 | $0.20 | $38.99 |
| Roof Removal Foreman | 2-R | 98.25% $26.55 | $3.21 | $5.79 | $3.60 | $0.20 | $0.25 | $0.20 | $39.80 |

Individual Employers may use Journeymen, Apprentices, or Roof Removal Employees and Roof Removal Foremen to perform roof removal work, at the Individual Employer's discretion, giving consideration to Journeymen as provided in Section 6 (c) of Article XXI of the Working Agreement.

(g) Effective August 1, 2006, and continuing thereafter, the following will be the basis for determining the wages and fringes for Roof Removal Employees and Roof Removal Foremen:

| Classification | Code | Wages-Percent Of Journeyman Wage | Vacation | H&W | Pens. | Appr. Trng. | Pro. Fund | Labor-Mgt. Trust |
|---|---|---|---|---|---|---|---|---|
| Roof Removal Employee | 1-R | 95.25% | $3.21 | $5.79 | $3.60 | $0.20 | $0.25 | $0.20 |
| Roof Removal Foreman | 2-R | 98.25% | $3.21 | $5.79 | $3.60 | $0.20 | $0.25 | $0.20 |

## CLASSIFYING EMPLOYEES

The Joint Examination Board may classify any person seeking to qualify as a Journeyman in accordance with the provisions of ARTICLE VI of this Agreement.

In those instances that an applicant is qualified as a Journeyman capable of doing only a portion of the work covered by this Agreement, he/she shall be classified, paid and have fringe contributions made as an Apprentice for all other types of work covered by this Agreement in the Apprentice Bracket determined by the Joint Examination Board to be appropriate, and the employee's referral slip shall clearly and accurately show the dispatched employee's proper classification and bracket for the type of work for which he/she is being dispatched.

## HOURLY PREMIUMS

\*     **Bitumastic, Enamelers, Pipe Wrappers and Coal Tar Pitch Built-up**...............**$2.00**

**Mastic Workers**.........................................................................................**$0.25**

**Kettleman (2 Kettles Without Pumps)**...........................................**$0.25**

**Ist Foreman (Crews of 3 or more)**..................................................**$3.00**

**Additional Foremen and Foreman on crews of less than 3 employees**.............**$0.75**

**Roof Removal Crew Foremen**...............................................(see (f) above)

\*     **Any building, new or old, where both Asphalt and Pitch are used in the application of a built-up roof or tear-off, the entire work crew will be paid at the Pitch Rate.**

# CHECK-OFF

(a) Payments on account of initiation fees, if any, for each hour actually worked for which vacation contributions are due at the rate of $1.50 per hour for Journeymen and $0.60 per hour for Apprentices, until paid in full, and thereafter payment of working dues of $0.76 per hour for each hour actually worked for which vacation contributions are due by each employee covered by this Agreement who has executed a lawful authorization in writing therefor in manner and form as set forth in Exhibit "A" annexed hereto shall be checked off and deducted from the employee's vacation funds by the Administrator of the Roofers Local Union No. 40 Area Vacation Trust Fund, as agent for the Individual Employers covered by this Agreement, and transmitted to the Local Union. The executed authorization shall be lodged with the Association, the Administrator of the Roofers Local Union No. 40 Area Vacation Trust Fund, and Local Union No. 40.

(b) Local Union No. 40 will hold harmless the Association, all Individual Employers, and the Trustees and Administrator of the Roofers Local Union No. 40 Area Vacation Trust Fund against any claim or claims which may be made against them or any one or ones of them by any person by reason of the deduction of working dues and payments on account of initiation fees as herein provided, including the cost of defending against the same, and will absorb any additional costs which may result from the administration of these deductions.

**EXHIBIT "A"**
## VACATION TRUST FUND DESIGNATION OF BENEFICIARY
### AND DUES CHECK-OFF AUTHORIZATION
#### Check-Off Authorization

I authorize any of the various Individual Employers who are covered by the current Working Agreement between Roofers' Local Union No. 40 and Associated Roofing Contractors of the Bay Area Counties, Inc., and/or any renewal or extension thereof, and/or any bank designated by the Trustees of the Roofers Local Union No. 40 Area Vacation Trust Fund to receive vacation contributions, and/or the Administrator of the Roofers Local Union No. 40 Area Vacation Trust Fund, to deduct from any vacation payments made by an Individual Employer on my behalf and transmit to Local Union No. 40 the sum of one dollar and fifty cents ($1.50) per hour if I am a Journeyman, and the sum of sixty cents ($0.60) per hour if I am an Apprentice, as payments on account of initiation fees, if any, until my initiation fees are paid in full, and when said initiation fees are paid in full to deduct and transmit to Local Union No. 40 the sum of seventy-six cents ($0.76) per hour as hourly working dues. This Authorization shall also apply to any other sum lawfully established as my payments on account of initiation fees, if any, or as my hourly working dues, for which deduction is permitted by the Working Agreement. Said sums shall be deducted on the basis of each hour worked by me for any Individual Employer covered by the Working Agreement referred to above.

This Authorization is retroactive to August 1, 1989 and shall be irrevocable for the period of one (1) year following the date it was signed or until the current Working Agreement expires, whichever occurs sooner. This Authorization shall be automatically renewed from year to year unless sixty (60) days prior to the termination of the annual renewal date I revoke this Authorization by written notice to Roofers' Local Union No. 40, to the Trustees of the Roofers Local Union No. 40 Area Vacation Trust Fund, to any bank designated to receive vacation contributions by the Trustees of the Roofers Local Union No. 40 Area Vacation Trust Fund and the Administrator of the Roofers Local Union No. 40 Area Vacation Trust Fund. Dues, contributions or gifts to Roofers' Local Union No. 40 are not deductible as charitable contributions for federal income tax purposes. Dues paid to Roofers' Local Union No. 40, however, may qualify as business expenses, and may be deductible in limited circumstances subject to various restrictions imposed by the Internal Revenue Code.

_____ 20 ____              _____
          **Date**                                    **Name (Please Print)**

_____                       _____
        **Address**                                 **Social Security Number**

_____                       _____ _____
          **City**                                     **State**        **Zip**

### Designation of Beneficiary

I hereby designate the named person/persons as my beneficiary for any of the monies due me from the Roofers Local Union No. 40 Area Vacation Trust Fund in the event of my death.

_____                       _____
   **Name of  Beneficary**                     **Relationship**

_____ 20____               _____
         **Date**                                    **Signature of Employee**

## ADDENDUM TWO

### DRUG & ALCOHOL POLICY

### Adopted May 2, 1992

Copies of the (optional) Drug and Alcohol Policy are available upon request from the Local Union or the Association.

## ADDENDUM THREE

## NATIONAL ROOFING INDUSTRY PENSION FUND

Parties:

A.   Associated Roofing Contractors of the Bay Area Counties, Inc. (Association).

B.   Local No. 40 of the United Union of Roofers, Waterproofers and Allied Workers, AFL-CIO (Union).

Collective Bargaining Agreement:

The parties have entered into a Collective Bargaining Agreement with a term from August 1, 2006 to July 31, 2009. This document is an Addendum to that Collective Bargaining Agreement. If the term of the Collective Bargaining Agreement is modified, then the term of this Addendum is modified to be the same.

Effective Date:

The Addendum is effective for work performed on or after August 1, 2006 and shall become a part of the Collective Bargaining Agreement from and after that date.

Pension Contributions:

The Collective Bargaining Agreement provides for pension contributions to the Pacific Coast Roofers Pension Plan. As of the effective date specified above, this Addendum provides that contributions also be made to the National Roofing Industry Pension Fund.

A.   As of the effective date, the contributions to the Pacific Coast Roofers Pension Plan shall be as set forth in Exhibit A to this Addendum. (A minimum Journeyman contribution of $1.00 per hour for each hour worked in covered employment is required).

B.   As of the effective date, the contributions to the National Roofing Industry Pension Fund shall be as set forth in Exhibit B to this Addendum.

C.   The National Roofing Industry Pension Fund ("NRIPF") was created pursuant to the terms of that certain Agreement and Declaration of Trust dated January 1, 1966, as amended from time to time ("Agreement and Declaration of Trust"). The contributions provided for in Exhibit B to this Addendum shall be made to the NRIPF as follows:

   1.   Each Individual Employer shall pay to the administrator of the Pacific Coast Roofers Pension Plan for NRIPF, the amount(s) specified in Exhibit B for each hour worked for which the Employer is obligated to pay contributions to the NRIPF for an employee covered by the Collective Bargaining Agreement. Such hourly contributions shall be payable at the same time and in the same manner provided for payment of contributions to the Pacific Coast Roofers Pension Plan, but in no event later than the last day of the month following the month in which the hours were worked.

   2.   Each Individual Employer agrees to be bound by and party to the aforesaid Agreement and Declaration of Trust, and any amendments thereto, creating the NRIPF, except as herein modified or which is in conflict with this Addendum or the Collective Bargaining Agreement, and ratifies any action taken by the Employers authorized to designate Employer Trustees and any action taken by such Trustees, together with their successor Trustees, except which is in conflict with this Addendum or the Collective Bargaining Agreement.

34

3.  In the event an Individual Employer fails to pay the contributions required of said Employer or otherwise fails to comply with the terms of this Addendum or the rules and regulations adopted by the Trustees of the NRIPF, except as herein modified or which are in conflict with this Addendum or the Collective Bargaining Agreement, the Union, upon notice from said NRIPF, may forthwith withdraw employees from said Individual Employer or utilize other measures available to it until such breach is cured, without first resorting to arbitration.  Such remedy shall be in addition to any other remedies available to the Union or the Trustees of the NRIPF.

4.  The contributions required by this Addendum shall accrue with respect to hours worked by any person doing work within the jurisdiction of the Union for which contributions are required under the Collective Bargaining Agreement and this Addendum to the NRIPF, and said contributions shall accrue with respect to such hours whether performed within or outside the jurisdiction of the Union, except that when work is performed outside the Union's jurisdiction where another fringe benefit fund of a similar kind exists and the Individual Employer makes a contribution to that fund on behalf of an employee covered by the terms of the Collective Bargaining Agreement, the said Individual Employer shall not be required to make a contribution to the NRIPF.

5.  With respect to both the NRIPF and the Pacific Coast Roofers Pension Plan, liquidated damages and interest in the amounts specified in the Pacific Coast Roofers Pension Trust Agreement shall automatically be due and payable on contributions due to either plan paid past the due date.  In addition, the Individual Employer shall be liable for all costs and attorneys' fees incurred by the NRIPF and the Pacific Coast Roofers Pension Plan in collecting delinquent payments.

6.  The Pacific Coast Roofers Pension Plan and NRIPF shall coordinate their audit activities on contributing employers and the sub-administrators to minimize duplicate audits of employers.  However, both the Pacific Coast Roofers Pension Plan and NRIPF retain the right under their respective Trust Agreements to audit employers when they deem it to be necessary and appropriate.

ASSOCIATED ROOFING CONTRACTORS
OF THE BAY AREA COUNTIES, INC.

By: _William T. Callahan, Jr._    Title: _EXECUTIVE SECRETARY_

Date: _July 25, 2006_

LOCAL NO. 40, UNITED UNION OF ROOFERS,
WATERPROOFERS AND ALLIED WORKERS, AFL-CIO.

By: _Steven Tucker_    Title: _Business Representative_

Date: _July 25, 2006_

35

EXHIBIT A TO

COLLECTIVE BARGAINING AGREEMENT
CONTRIBUTIONS TO PACIFIC COAST ROOFERS PENSION PLAN

From the effective date of the Addendum the contributions to the Pacific Coast Roofers Pension Plan shall be as follows:

Journeyman (Class Code 'J')......................................... $3.05

Apprentices indentured, assigned to or advancing between on or after August 1, 2006

Bracket

1-A......................................................................$0.10

2-A......................................................................$0.10

3-A......................................................................$0.10

4-A......................................................................$0.10

5-A......................................................................$0.72

6-A......................................................................$1.03

7-A......................................................................$1.55


Roof Removal Employee, Class Code 1-R....................... $3.50

Roof Removal Foreman, Class Code 2-R........................ $3.50

EXHIBIT B TO
COLLECTIVE BARGAINING AGREEMENT
CONTRIBUTIONS TO NATIONAL ROOFING INDUSTRY PENSION FUND

From the effective date of the Addendum the contributions to the National Roofing Industry Pension Fund shall be as follows:

Journeyman (Class Code 'J')...................................... $1.05

Apprentices indentured, assigned to or advancing between on or after August 1, 2006

Bracket

1-A..................................................................... $0.10

2-A..................................................................... $0.10

3-A..................................................................... $0.10

4-A..................................................................... $0.10

5-A..................................................................... $0.10

6-A..................................................................... $0.10

7-A..................................................................... $0.10

Roof Removal Employee, Class Code 1-R......................... $0.10

Roof Removal Foreman, Class Code 2-R.......................... $0.10

## ADDENDUM FOUR

## TARGETED JOB FORM

Pursuant to Article XXVI, Section 2 of the Working Agreement, Local Union No. 40 of the United Union of Roofers, Waterproofers and Allied Workers (hereinafter "Union") and _____ (hereinafter "Employer" or "Contractor") agree that the following described construction project,

Project Name_____

Address_____

City _____ State _____ Zip _____

shall be classified as a targeted job.  The following provisions of the Working Agreement shall therefore be altered:

FOR THE EMPLOYER                         FOR THE UNION

By:_____              By:_____

Title:_____             Title:_____

Dated:_____              Dated:_____

## INDIVIDUAL EMPLOYER AGREEMENT

The undersigned Individual Employer, not represented by the Associated Roofing Contractors of the Bay Area Counties, Inc., agrees to be bound by and comply with all of the terms and conditions of the Working Agreement between Local No. 40 of the United Union of Roofers, Waterproofers, and Allied Workers, AFL-CIO, and the Associated Roofing Contractors of the Bay Area Counties, Inc., entered into effective the 1st of August, 2006, receipt of a copy of which is hereby acknowledged;

This Individual Employer Agreement is effective _____, 20____;

The term hereof shall be from the effective date through July 31, 2009, and from year to year thereafter, unless timely notice is given as set forth in Article XXX of the Working Agreement.

**FIRM:** _____

**BY:** _____

**TITLE:** _____

**ADDRESS:** _____

**CITY/STATE/ZIP CODE:** _____

**PHONE:**   (_____) _____

**CONTRACTOR'S LICENSE NUMBER:** _____

**WORKERS' COMPENSATION INSURANCE CARRIER:** _____

**POLICY NUMBER:** _____

**DATE:** _____, 20_____

**INSTRUCTIONS:**

Sign all 5 copies: One for Employer; One for the Local Union; One for Association; One for local Fringe Funds' Administrator; One for Pension Fund Administrator.

# EXHIBIT I

1   STEPHEN THOMAS DAVENPORT, JR. #88208
    JEFFREY G. McCLURE #152974
2   DAVENPORT GERSTNER & McCLURE
    1990 N. California Blvd., Suite 650
3   Walnut Creek, California 94596
    Telephone: (925) 279-3430 Fax: (925) 932-1961
4
    Attorneys for Defendant, Fortney & Weygandt, Inc.
5



**F I L E D**
Superior Court of California
County of San Francisco

MAY 2 7 2008

GORDON PARK-LI, Clerk
BY: _Carolyn C Balistreri_
                        Deputy Clerk

6

7

8                  SUPERIOR COURT OF CALIFORNIA
9              CITY AND COUNTY OF SAN FRANCISCO

10

11   GREGORY HALL, FAUSTO AGUILAR,          No. CGC-07-470047
     GONZALO AGUILAR, CHARLES
12   CHILTON, FELIZ CORTES, OMAR
     FRANCO, DOUGLAS GIVENS,               **DEFENDANT FORTNEY &**
13   ROBERT IVY, QUINCY MORTON, LIS        **WEYGANDT, INC.'s ANSWER TO**
     OSUNA, RICHARD RANKIN, HECTOR         **SECOND AMENDED COMPLAINT**
14   RODRIGUEZ, MARTIN SANDOVAL,           **FOR DAMAGES AND INJUNCTIVE**
     HENRY TAYLOR, LLOYD THIBEAUX,         **RELIEF**
15   MICHAEL BROWN, ASTRIAL CAEL,
     ARNULFO CARRANZA-RIVAS,
16   APOLINAR CORNEJO, ROY
     EDWARDS, VICTOR HAMPTON,
17   RANDY KEYS, ANDRE LARRIMOE,
     TERRY MACKEY, DOUGLAS                 **BY FAX**
18   TURNER, JEFF WEST, ROBERT
     WHITE, MARQUEZ BOYD,
19
20          Plaintiffs,
21               vs.
22   APARTMENT INVESTMENT AND
     MANAGEMENT COMPANY, AIMCO
23   CAPITAL, INC., FORTNEY &
     WEYGANDT, INC., IMR
24   CONTRACTOR CORPORATION, BAY
     BUILDING SERVICES, BAY AREA
25   CONSTRUCTION FRAMERS, INC., and
     DOES 1 – 50,
26
            Defendants.
27

28

Davenport
Gerstner & McClure
1990 N. California Blvd
Suite 650

1
**DEFENDANT FORTNEY & WEYGANDT, INC.'s ANSWER TO 2ND AMENDED COMPLAINT**

1        Comes now, Defendant Fortney & Weygandt, Inc., and answers the allegations of the

2   within Second Amended Complaint, as follows:

3        1.    Defendant generally denies the allegations of the Second Amended Complaint.

4        AS A FIRST, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that the

5   Second Amended Complaint fails to state facts sufficient to constitute a cause of action.

6        AS A SECOND, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that

7   the Second Amended Complaint fails to state a cause of action upon which relief can be granted.

8        AS A THIRD, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that this

9   Court lacks jurisdiction of the subject matter of the Second Amended Complaint.

10       AS A FOURTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that it

11  acted in good faith at all times mentioned in the Second Amended Complaint.

12       AS A FIFTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that the

13  Second Amended Complaint is barred for Plaintiff's failure to exhaust administrative remedies

14  prior to filing the within action.

15       AS A SIXTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that the

16  several causes of action of the Second Amended Complaint are barred by applicable periods

17  and/or statutes of limitation, including but not limited to Code of Civil Procedure Section 340 and

18  Government Code Sections 12960 and 12965.

19       AS A SEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that

20  Plaintiffs are barred from recovery due to their failure to mitigate damages.

21       AS AN EIGHTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that

22  the Second Amended Complaint is barred by the doctrine of waiver.

23       AS A NINTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that the

24  Second Amended Complaint is barred by the doctrine of unclean hands.

25       AS A TENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that the

26  Second Amended Complaint is barred by the doctrine of laches.

27

28

Davenport
Gerstner & McClure
1660 N. Calistoga Blvd.
Suite 400

2
DEFENDANT FORTNEY & WEYGANDT, INC.'s ANSWER TO 2ND AMENDED COMPLAINT

1    AS AN ELEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges

2 that the Second Amended Complaint is barred by the doctrine of estoppel.

3    AS A TWELFTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges that

4 Plaintiffs have been paid all wages and/or other amounts that may be due to Plaintiffs as a result of

5 their employment.

6    AS A THIRTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges

7 that the claims alleged in the Second Amended Complaint are moot.

8    AS A FOURTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges

9 that the claims alleged in the Second Amended Complaint are barred by the doctrines of accord

10 and satisfaction, and/or by waiver and release.

11    AS A FIFTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges

12 that any claims for Labor Code Section 203 waiting time penalties are barred because Defendant

13 did not willfully fail to pay any wages due at the time of termination and because a good faith

14 dispute exists as to whether any wages are due.

15    AS A SIXTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges

16 that the Plaintiffs were not employed by Defendant and that Defendant was not the employer of

17 the Plaintiffs.

18    AS A SEVENTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant

19 alleges that the claims alleged in the Second Amended Complaint are preempted by the National

20 Labor Relations Act.

21    AS an EIGHTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendant alleges

22 that it presently has insufficient knowledge or information on which to form a belief as to whether

23 it has or may have additional, as yet unstated defenses available to it, and therefore Defendant

24 reserves the right to assert additional affirmative defenses which may be discovered hereafter.

25    WHEREFORE, Defendant Fortney & Weygandt, Inc. prays as follows:

26    1.    That Plaintiffs take nothing by way of the Second Amended Complaint;

27

28

1    2.    That the Second Amended Complaint be dismissed, in its entirety, and with

2    prejudice;

3    3.    For costs of suit herein incurred;

4    4.    For reasonable attorneys fees; and

5    5.    For such other and further relief as this Court may deem just and proper.

6    Dated: May 23, 2008.    DAVENPORT GERSTNER & McCLURE

7

8    _____

9    STEPHEN THOMAS DAVENPORT, JR.
     Attorneys for Defendant,

10   Fortney & Weygandt, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Davenport
Gerstner & McClure
1940 N. California Blvd.
Suite 650

4

DEFENDANT FORTNEY & WEYGANDT, INC.'s ANSWER TO 2ND AMENDED COMPLAINT

**PROOF OF SERVICE**

STATE OF CALIFORNIA        )
                           ) ss.
COUNTY OF CONTRA COSTA     )

I declare that I am employed in Contra Costa County, California, I am over eighteen years old, and I am not a party to the within action, and that my business address is 1990 N. California Blvd., Suite 650, Walnut Creek, California 94596. On this date, I served the following document(s): DEFENDANT FORTNEY & WEYGANDT, INC.'S ANSWER TO SECOND AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF on the persons shown below by placing true copies thereof in sealed envelopes addressed as shown below, by the following means of service:

[ X ]    <u>By First-Class Mail</u> – I am familiar with the firm's practice for collecting and processing correspondence for mailing. Under that practice, the correspondence is deposited with the United States Postal Service on the same day as collected, with first-class postage thereon fully prepaid, in Walnut Creek, California, for mailing to the office of the addressee following ordinary business practices.

[ ]      <u>By Personal Service</u> – I caused each such envelope to be given to a courier messenger for personal delivery to the addressee.

[ ]      <u>By Overnight Courier</u> – I caused each such envelope to be given to an overnight mail service at Walnut Creek, California, for delivery to the addressee on the next business day.

[ ]      <u>By Fax</u> – I caused each such document to be transmitted by facsimile transmission from fax machine telephone number (925) 932-1961, before 5:00 p.m., to the parties and fax numbers listed below. I declare that the transmitting fax machine reported that the transmission was complete and without error, and properly issued a transmission report, a copy of which is attached to this Proof of Service.

Robert Salinas
Sundeen Salinas & Pyle
1330 Broadway, Suite 1830
Oakland, CA 94612

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Walnut Creek, California.

Dated: May 23, 2008.          /s/ *Alice Garcia*
                              ALICE GARCIA

Davenport
Gentner & McClary
1990 N. California Blvd.
Suite 650
Walnut Creek, CA 94596
(925) 270 5650

# EXHIBIT J

**F I L E D**
Superior Court of California
County of San Francisco

JUN 6 2008

GORDON PARK-LI, Clerk
BY: _Danielle Thompson_
Deputy Clerk

1  STEPHEN THOMAS DAVENPORT, JR. #88208
   JEFFREY G. McCLURE #152974
2  DAVENPORT GERSTNER & McCLURE
   1990 N. California Blvd., Suite 650
3  Walnut Creek, California 94596
   Telephone: (925) 279-3430 Fax: (925) 932-1961
4
   Attorneys for Defendants Fortney & Weygandt, Inc., Apartment Investment And Management
5  Company, and AIMCO Capital, Inc.

6

7

8                    SUPERIOR COURT OF CALIFORNIA
                    CITY AND COUNTY OF SAN FRANCISCO
9

10

11  GREGORY HALL, FAUSTO AGUILAR,          No. CGC-07-470047
    GONZALO AGUILAR, CHARLES
12  CHILTON, FELIZ CORTES, OMAR            ANSWER OF DEFENDANTS
    FRANCO, DOUGLAS GIVENS,                APARTMENT INVESTMENT AND
13  ROBERT IVY, QUINCY MORTON, LIS         MANAGEMENT COMPANY AND
    OSUNA, RICHARD RANKIN, HECTOR          AIMCO CAPITAL, INC. TO SECOND
14  RODRIGUEZ, MARTIN SANDOVAL,            AMENDED COMPLAINT FOR
    HENRY TAYLOR, LLOYD THIBEAUX,          DAMAGES AND INJUNCTIVE
15  MICHAEL BROWN, ASTRIAL CAEL,           RELIEF
    ARNULFO CARRANZA-RIVAS,
16  APOLINAR CORNEJO, ROY
    EDWARDS, VICTOR HAMPTON,
17  RANDY KEYS, ANDRE LARRIMOE,
    TERRY MACKEY, DOUGLAS
18  TURNER, JEFF WEST, ROBERT              **BY FAX**
    WHITE, MARQUEZ BOYD,
19
20          Plaintiffs,

21          vs.

22  APARTMENT INVESTMENT AND
    MANAGEMENT COMPANY, AIMCO
23  CAPITAL, INC., FORTNEY &
    WEYGANDT, INC., IMR
24  CONTRACTOR CORPORATION, BAY
    BUILDING SERVICES, BAY AREA
25  CONSTRUCTION FRAMERS, INC., and
    DOES 1 – 50.
26
            Defendants.
27

28
Davenport
Gerstner & McClure
1990 N. California Blvd
Suite 650
Walnut Creek, CA 94596
(925) 279-3430
Fax (925) 932-1961

ANSWER OF D's APARTMENT INVESTMENT AND MANAGEMENT COMPANY AND AIMCO
CAPITAL, INC. TO 2ND AMENDED COMPLAINT

1    Come now, Defendants Apartment Investment And Management Company and AIMCO

2  Capital, Inc., and answer the allegations of the within Second Amended Complaint, as follows:

3        1.    Defendants generally deny the allegations of the Second Amended Complaint.

4        AS A FIRST, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the

5  Second Amended Complaint fails to state facts sufficient to constitute a cause of action.

6        AS A SECOND, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that

7  the Second Amended Complaint fails to state a cause of action upon which relief can be granted.

8        AS A THIRD, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that this

9  Court lacks jurisdiction of the subject matter of the Second Amended Complaint.

10        AS A FOURTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that

11  they acted in good faith at all times mentioned in the Second Amended Complaint.

12        AS A FIFTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the

13  Second Amended Complaint is barred for Plaintiff's failure to exhaust administrative remedies

14  prior to filing the within action.

15        AS A SIXTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the

16  several causes of action of the Second Amended Complaint are barred by applicable periods

17  and/or statutes of limitation, including but not limited to Code of Civil Procedure Section 340 and

18  Government Code Sections 12960 and 12965.

19        AS A SEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that

20  Plaintiffs are barred from recovery due to their failure to mitigate damages.

21        AS AN EIGHTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that

22  the Second Amended Complaint is barred by the doctrine of waiver.

23        AS A NINTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the

24  Second Amended Complaint is barred by the doctrine of unclean hands.

25        AS A TENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that the

26  Second Amended Complaint is barred by the doctrine of laches.

27

28

Davenport
Gentner & McClure
14432 California Blvd
Suite 650
Walnut Creek, CA 94596
(925) 274-3430
Fax (925) 932-2960

2
ANSWER OF D's APARTMENT INVESTMENT AND MANAGEMENT COMPANY AND AIMCO
CAPITAL, INC. TO 2ND AMENDED COMPLAINT

1  AS AN ELEVENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege

2  that the Second Amended Complaint is barred by the doctrine of estoppel.

3  AS A TWELFTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege that

4  Plaintiffs have been paid all wages and/or other amounts that may be due to Plaintiffs as a result of

5  their employment.

6  AS A THIRTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege

7  that the claims alleged in the Second Amended Complaint are moot.

8  AS A FOURTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege

9  that the claims alleged in the Second Amended Complaint are barred by the doctrines of accord

10  and satisfaction, and/or by waiver and release.

11  AS A FIFTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege

12  that any claims for Labor Code Section 203 waiting time penalties are barred because Defendants

13  did not willfully fail to pay any wages due at the time of termination and because a good faith

14  dispute exists as to whether any wages are due.

15  AS A SIXTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege

16  that the Plaintiffs were not employed by Defendants and that Defendants were not the employers

17  of the Plaintiffs.

18  AS A SEVENTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants

19  allege that the claims alleged in the Second Amended Complaint are preempted by the National

20  Labor Relations Act.

21  AS an EIGHTEENTH, SEPARATE AND AFFIRMATIVE DEFENSE, Defendants allege

22  that they presently have insufficient knowledge or information on which to form a belief as to

23  whether they have or may have additional as yet unstated defenses available to them, and therefore

24  Defendants reserve the right to assert additional affirmative defenses which may be discovered

25  hereafter.

26  ///

27  ///

28

Davenport
Gerstner & McClure
1000 H. California Blvd
Suite 650
Walnut Creek, CA 94596
(925) 274-3430
Fax (925) 932-1961

3
ANSWER OF D's APARTMENT INVESTMENT AND MANAGEMENT COMPANY AND AIMCO
CAPITAL, INC. TO 2ND AMENDED COMPLAINT

1    WHEREFORE, Defendants Apartment Investment And Management Company and

2  AIMCO Capital, Inc., pray as follows:

3        1.    That Plaintiffs take nothing by way of the Second Amended Complaint;

4        2.    That the Second Amended Complaint be dismissed, in its entirety, and with

5  prejudice;

6        3.    For costs of suit herein incurred;

7        4.    For reasonable attorneys fees; and

8        5.    For such other and further relief as this Court may deem just and proper.

9  Dated:  June 6, 2008.        DAVENPORT GERSTNER & McCLURE

10

11                                _____
                                STEPHEN THOMAS DAVENPORT, JR.
12                                Attorneys for Defendants, Apartment Investment And Management
                                Company, and AIMCO Capital, Inc.
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Davenport
Gerstner & McClure
1900 N. California Blvd.
Suite 650
Walnut Creek, CA  94596
(925) 279-3420
Fax (925) 933-1961

                                        4
      ANSWER OF D's APARTMENT INVESTMENT AND MANAGEMENT COMPANY AND AIMCO
                    CAPITAL, INC. TO 2ND AMENDED COMPLAINT

### PROOF OF SERVICE

1

2  STATE OF CALIFORNIA        )
                             ) ss.
3  COUNTY OF CONTRA COSTA    )

4  I declare that I am employed in Contra Costa County, California, I am over eighteen years old, and
   I am not a party to the within action, and that my business address is 1990 N. California Blvd.,
5  Suite 650, Walnut Creek, California 94596. On this date, I served the following document(s):
   ANSWER OF DEFENDANTS APARTMENT INVESTMENT AND MANAGEMENT
6  COMPANY AND AIMCO CAPITAL, INC. TO SECOND AMENDED COMPLAINT FOR
   DAMAGES AND INJUNCTIVE RELIEF on the persons shown below by placing true copies
7  thereof in sealed envelopes addressed as shown below, by the following means of service:

8
   [ X ]      By First-Class Mail – I am familiar with the firm's practice for collecting and
9            processing correspondence for mailing. Under that practice, the correspondence is
             deposited with the United States Postal Service on the same day as collected, with
10           first-class postage thereon fully prepaid, in Walnut Creek, California, for mailing to
             the office of the addressee following ordinary business practices.
11

12 [ ]       By Personal Service – I caused each such envelope to be given to a courier
             messenger for personal delivery to the addressee.
13

14 [ ]       By Overnight Courier – I caused each such envelope to be given to an overnight
             mail service at Walnut Creek, California, for delivery to the addressee on the next
15           business day.

16 [ ]       By Fax – I caused each such document to be transmitted by facsimile transmission
             from fax machine telephone number (925) 932-1961, before 5:00 p.m., to the
17           parties and fax numbers listed below. I declare that the transmitting fax machine
             reported that the transmission was complete and without error, and properly issued
18           a transmission report, a copy of which is attached to this Proof of Service.

19
                    Robert Salinas
20                  Sundeen Salinas & Pyle
                    1330 Broadway, Suite 1830
21                  Oakland, CA 94612

22 I declare under penalty of perjury that the foregoing is true and correct and that this declaration
   was executed in Walnut Creek, California.
23

24

25 Dated: June 6, 2008.                    _____
                                           ALICE GARCIA
26

27

28

Davenport
Gersiner & McClure

# EXHIBIT K

1 | Joseph E. Powell, Esq. - Bar No. 83957
Paul Michael Vuksich, Esq. - Bar. No. 97144
2 | LAW OFFICES OF JOSEPH E. POWELL
582 Market Street, Suite 2001
3 | San Francisco, California 94104
Telephone: (415) 788-4949
4 | Facsimile: (415) 788-9949
Email: jepmain@hotmail.com

5

Attorney for Defendant
6 | Bay Area Construction Framers, Inc.

**F I L E D**
Superior Court of California
County of San Francisco

JUN - 2 2008

GORDON PARK-LI, Clerk
BY:
                                    Deputy Clerk

7

8 |        SUPERIOR COURT OF THE STATE OF CALIFORNIA

9 |                 COUNTY OF SAN FRANCISCO

10

11

12 | GREGORY HALL et al.                    )    Case No. CGC-07-470047
                                          )
13 |              Plaintiffs,              )
                                          )
14 |         v.                            )    **ANSWER TO SECOND AMENDED**
                                          )    **COMPLAINT**
   | APARTMENT INVESTMENT AND)
15 | MANAGEMENT COMPANY et al.             )
   | and DOES 1 - 50,                      )
16 |                                       )
   |              Defendants.              )    Complaint filed    December 14, 2007
17 | _____

18 |                    <u>GENERAL DENIAL</u>

19 |      Defendant Bay Area Construction Framers, Inc. generally denies each and every, all and

20 | singular allegations of the unverified Seconded Amended Complaint (Complaint) of plaintiffs

21 | under the provisions of Sections 430.10 and 431.30 of the Califorina Code of Civil Procedure,

22 | and further denies that plaintiffs have sustained any damage, whether in the amount set forth in

23 | the complaint, or in any sum, or sums, or at all, by reason of any act or omission on the part of

24 | these answering defendants.

25 |                  <u>AFFIRMATIVE DEFENSES</u>

26 |      The following and separately numbered affirmative defenses of defendant Bay Area

27 | Construction Framers, Inc.are alleged to the Complaint, and each cause of action, therein::

28 | _____
                              1

First Affirmative Defense

1. The Complaint, and each cause of action, fails to state a claim upon which relief can be granted.

Second Affirmative Defense

2. The Complaint, and each cause of action therein, are barred by California Civil Code Sections 1473, 1474, 1476, 1477, 1485, 1541 and/or 1624; and/or, California Code of Civil Procedure Sections 337, 337.1, 337.15, 338, 339, 340 and/or 343.

Third Affirmative Defense

3. Plaintiffs by their conduct are estopped from pursuing any claims against this defendant.

Fourth Affirmative Defense

4. Plaintiffs' damages, if any, were caused by an entity other than this defendant, and that entity is wholly or partly responsible for plaintiffs' damages, if any; and in taking the actions causing plaintiffs' damages, if any, that other entity was acting within or under the terms of an agreement and/or agency with plaintiffs, and recovery is therefore barred or proportionately reduced accordingly.

Fifth Affirmative Defense

5. Plaintiff does not state facts sufficient to constitute a cause of action against this defendant.

Sixth Affirmative Defense

6. Plaintiffs have failed or neglected to use reasonable care for protection and to minimize the losses and damages, if any there were, and said failure is the direct and proximate cause of said alleged damages, if any there were, and recovery is therefore barred or proportionately reduced accordingly.

Seventh Affirmative Defense

7. Plaintiffs contributed to any damages that they may have sustained, if any, in that the damages alleged by plaintiffs were the direct and proximate result of the said negligence and wrongdoing of plaintiffs and, if so, plaintiffs' actions either bar or proportionately reduce any

2

1 | potential recovery to plaintiffs.

2 |     <u>Eight Affirmative Defense</u>

3 |     8.  Plaintiffs are barred from asserting any causes of action against this defendant by the

4 | doctrine of waiver.

5 |     <u>Ninth Affirmative Defense</u>

6 |     9.  Plaintiffs are barred from asserting any causes of action against this defendant by

7 | virtue of consent to the acts and/or conditions alleged.

8 | <div align="center">**PRAYER**</div>

9 | WHEREFORE, Defendant prays for relief as follows:

10 |     1.   That plaintiffs take nothing by virtue of their Complaint filed herein;

11 |     2.   That judgement issue in favor of this defendant;

12 |     3.   For costs of suit, attorney's fees and investigative fees as permitted by law; and

13 |     4.   For such other and further relief as the court may deem just and proper.

14 | Dated:     May 27, 2008

15 |

16 |

17 |                 Joseph E. Powell, Esq.
                Attorney for Defendant
                Bay Area Construction Framers, Inc.

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

# PROOF OF SERVICE

I, Joseph E. Powell, certify and declare as follows:

I am over the age of 18 years, and not a party to this action. My business address is Law Offices of Joseph E. Powell, 582 Market Street, Suite 2001, San Francisco, CA 94104, which is located in the county where the mailing described below took place.

On this date, I served a true and correct copy of the following documents:

## ANSWER TO SECOND AMENDED COMPLAINT

on the persons listed below by placing true copies thereof in sealed envelopes addressed as follows:

Robert Salinas
Sundeen, Salinas & Pyle
1330 Broadway, Suite 1830
Oakland, CA 94612
Fax:    (510) 663-9241

[X]   **VIA MAIL:**   I caused each such envelope, with postage thereon fully prepaid, to be placed in the United States post office mailbox at San Francisco, California.

[ ]   **VIA PERSONAL DELIVERY:**   I caused each such envelop to be delivered by hand to the addressees above listed.

[ ]   **VIA OVERNIGHT DELIVERY:** I caused each such document to be delivered by overnight courier to the addressees above listed.

[ ]   **VIA FACSIMILE:**   I caused each such document to be sent by facsimile transmission to the addressee above listed.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May 28, 2008 at San Francisco, California.

_____
Joseph E. Powell

# EXHIBIT L

# FILED
San Francisco County Superior Court    PLD-050

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | TELEPHONE NO. | FOR COURT USE ONLY |
|---|---|---|
| CHRISTOPHER A. BROSE (SBN 60673)<br>4000 GEARY BLVD., SUITE 201<br>SAN FRANCISCO, CA 94118<br>BAY BUILDING SERVICES, INC. | | JUL — 7 2008<br>GORDON PARK-LI, Clerk<br>BY<br>Deputy Clerk |

ATTORNEY FOR *(Name):*

NAME OF COURT: SUPERIOR COURT OF CALIFORNIA
STREET ADDRESS: 400 MCALLISTER STREET
MAILING ADDRESS: SAN FRANCISCO, CA 94102
CITY AND ZIP CODE:
BRANCH NAME: CIVIC CENTER COURTHOUSE

PLAINTIFF: Gregory Hall

DEFENDANT: BAY BUILDING SERVICES, INC.

| GENERAL DENIAL to 2nd amended complaint | CASE NUMBER: CGC-07- 470047 |
|---|---|

---

You MUST use this form for your general denial if the amount asked for in the complaint or the value of the property involved is $1000 or less.

You MAY use this form if:
1. The complaint is not verified, OR
2. The complaint is verified, and the action is subject to the economic litigation procedures of the municipal and justice courts, EXCEPT

You MAY NOT use this form if the complaint is verified and involves a claim for more than $1000 that has been assigned to a third party for collection.

(See Code of Civil Procedure sections 90-100, 431.30, and 431.40).

---

1. DEFENDANT (name): BAY BUILDING SERVICES, INC.
   generally denies each and every allegation of plaintiff's complaint.

2. ☒ DEFENDANT states the following FACTS as separate affirmative defenses to plaintiff's complaint *(attach additional pages if necessary):*

   1. As to this answering defendant, plaintiffs have failed to allege facts sufficient to constitute a cause of action.

   2. Any wrongful conduct alleged to have been committed by employees of Bay Building Services, Inc. (BBS), was neither authorized or ratified by their employer, and is therefore not attributeable to it as a matter of law.

   3. Any wrongful hiring or employment practices alleged as to BBS were subject to a qualified privilege of private economic interests of BBS.

Date: 7/7/08

CHRISTOPHER A. BROSE
(TYPE OR PRINT NAME)

► Christopher G. Brose
(SIGNATURE OF DEFENDANT OR ATTORNEY)

---

If you have a claim for damages or other relief against the plaintiff, the law may require you to state your claim in a special pleading called a cross-complaint or you may lose your claim. (See Code of Civil Procedure sections 426.10–426.40.)

The original of this General Denial must be filed with the clerk of this court with proof that a copy was served on each plaintiff's attorney and on each plaintiff not represented by an attorney. *(See the other side for a proof of service.)*

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
PLD-050 (Rev. January 1, 2007)

**GENERAL DENIAL**

Code Civ. Procedure, §§ 431.30, 431.40
www.courtinfo.ca.gov

PLD-050

| PLAINTIFF (name): HALL et al. | CASE NUMBER |
|---|---|
| DEFENDANT (name): A IMCO, INC. et al | CGC-07-470047 |

## PROOF OF SERVICE
☐ Personal Service    ☒ Mail

A General Denial may be served by anyone at least 18 years of age EXCEPT you or any other party to this legal action. Service is made in one of the following ways:

    (1) Personally delivering a copy to the attorney for the other party or, if no attorney, to the other party.
        **OR**
    (2) Mailing a copy, postage prepaid, to the last known address of the attorney for the other party or, if no attorney, to the other party.

Be sure whoever serves the General Denial fills out and signs a proof of service. File the proof of service with the court as soon as the General Denial is served.

1. At the time of service I was at least 18 years of age and not a party to this legal action.

2. I served a copy of the General Denial as follows *(check either a or b):*

  a. ☐   **Personal service.** I personally delivered the General Denial as follows:
      (1) Name of person served:
      (2) Address where served:

      (3) Date served:
      (4) Time served:

  b. ☒   **Mail.** I deposited the General Denial in the United States mail, in a sealed envelope with postage fully prepaid. The envelope was addressed and mailed as follows:
      (1) Name of person served: Robert Salinos, Esq.
      (2) Address: 1330 Broadway, Suite 1830
      Oakland, CA 94612

      (3) Date of mailing: 7/7/08
      (4) Place of mailing *(city and state):* San Francisco CA
      (5) I am a resident of or employed in the county where the General Denial was mailed.

  c. My residence or business address is *(specify):*
      4000 Geary Boulevard, Suite 201
      San Francisco, CA 94118

  d. My phone number is *(specify):* (415) 750-1500

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 7/7/08

Ryan Leona
_____
(TYPE OR PRINT NAME OF PERSON WHO SERVED THE GENERAL DENIAL)

▶ _____
(SIGNATURE OF PERSON WHO SERVED THE GENERAL DENIAL)

**GENERAL DENIAL**
(Proof of Service)

# EXHIBIT M

1 | PAUL V. SIMPSON. BAR NO. 83878
TIMOTHY P. O'DONNELL. BAR NO. 185492
2 | SIMPSON. GARRITY & INNES
Professional Corporation
3 | 601 Gateway Boulevard. Suite 950
South San Francisco. CA 94080
4 | Telephone: (650) 615-4860
Fax: (650) 615-4861
5 |
Attorneys for Defendant
6 | IMR Contractor Corporation

7 |                 SUPERIOR COURT OF THE STATE OF CALIFORNIA

8 |                         COUNTY OF SAN FRANCISCO

9 |

10 | GREGORY HALL. FAUSTO AGUILAR.        Case No. CGC-07-470047
GONZALO AGUILAR. CHARLES CHILTON.
11 | FELIX CORTES. OMAR FRANCO. DOUGLAS   **NOTICE TO STATE COURT OF
GIVENS. ROBERT IVY. QUINCY MOUTON.    REMOVAL OF CIVIL ACTION**
12 | LUIS OSUNA. RICHARD RANKIN. HECTOR
RODRIGUEZ. MARTIN SANDOVAL. HENRY
13 | TAYLOR. LLOYD THIBEAUX. MICHAEL
BROWN. ASTRIAN CAEL. ARNULFO
14 | CARRANZA-RIVAS. APOLINAR CORNEJO.
ROY EDWARDS. VICTOR HAMPTON. RANDY
15 | KEYS. ANDRE LARRIMORE. TERRY
MACKEY. DOUGLAS TURNER. JEFF WEST.
16 | ROBERT WHITE. MARQUEZ BOYD.

17 |                 Plaintiffs.

18 |                 v.

19 | APARTMENT INVESTMENT AND
MANAGEMENT COMPANY. AIMCO CAPITAL.
20 | INC.. FORTNEY & WEYGANDT. INC.. IMR
CONTRACTOR CORPORATION. BAY
21 | BUILDING SERVICES. BAY AREA
CONSTRUCTION FRAMERS. INC. and DOES 1-
22 | 50.

23 |                 Defendants

24 |

25 |

26 |

27 |

28 |

JCLIENT FILES 3962 1 00000066 DOC

NOTICE TO STATE COURT OF REMOVAL OF CIVIL ACTION

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that Defendant IMR CONTRACTOR CORPORATION has, on July 17, 2008, filed a Notice To Federal Court Of Removal Of Civil Action From State Court (Federal Question), a copy of which is attached hereto, in the Office of the Clerk of the United States District Court for the Northern District of California.

PLEASE TAKE FURTHER NOTICE that pursuant to 28 U.S.C. Section 1446, the filing of said Notice To Federal Court Of Removal Of Civil Action From State Court (Federal Question) in the United States District Court, together with the filing of this Notice To State Court Of Removal Of Civil Action with this Court, effects the removal of this action, and this Court may proceed no further unless and until the case is remanded.

Date: July 17, 2008

Respectfully submitted,

SIMPSON, GARRITY & INNES
Professional Corporation

By: _____
PAUL V. SIMPSON
TIMOTHY P. O'DONNELL
Attorneys for Defendant
IMR CONTRACTOR CORPORATION

1
2

## PROOF OF SERVICE BY U.S. MAIL

3      I, the undersigned, hereby declare that I am over the age of eighteen years and not a party

4  to the within action. My business address is 601 Gateway Boulevard, Suite 950, South San

5  Francisco, California 94080.

6      On the date indicated below, I served by First Class U.S. Mail a true copy of the following

7  documents:

8

9      ## NOTICE TO STATE COURT OF REMOVAL OF CIVIL ACTION

10

11     I am readily familiar with the practice of this business for collection and processing of

12  documents for mailing with the United States Postal Service. Documents so collected and

13  processed are placed for collection and deposit with the United States Postal Service that same day

14  in the ordinary course of business. The above-referenced document(s) were placed in (a) sealed

15  envelope(s) with postage thereon fully prepaid, addressed to each of the below listed parties and

16  such envelope(s) was (were) placed for collection and deposit with the United States Postal

17

18  Service on the date listed below at South San Francisco, California.

19

20     ## SEE PROOF OF SERVICE LIST ATTACHED

21     I declare under penalty of perjury under the laws of the State of California that the

22  foregoing is true and correct.

23

24     Executed on July 17, 2008, at South San Francisco, California.

25

26     Diana L. Prisk

27

28

## PROOF OF SERVICE LIST

Hall et al. v. Apartment Investment and Management Company et. al.

Superior Court of California, County of San Francisco Case No.: CGC-07-470047

Robert Salinas, Esq.
Pamela Kong, Esq.
Jorge Aguilar II, Esq.
SUNDEEN SALINAS & PYLE
1330 Broadway, Suite 1830
Oakland, CA 94612
Attorneys for Plaintiffs

Stephen Thomas Davenport, Jr., Esq
Jeffrey G. McClure, Esq.
DAVENPORT GERSTNER & MCCLURE
1990 N. California Blvd., Suite 650
Walnut Creek, CA 94596
Attorneys for Defendants Apartment Investment and Management Company, AIMCO Capital, Inc
and Fortney & Weygandt, Inc..

Christopher A. Brose, Esq.
400 Geary Blvd., Suite 201
San Francisco, CA 94118
Attorney for Defendant Bay Building Services, Inc.

Joseph E. Powell, Esq.
Paul Michael Vuksich, Esq.
LAW OFFICES OF JOSEPH E. POWELL
582 Market Street, Suite 2001
San Francisco, CA 94104
Attorneys for Defendant Bay Area Construction Framers, Inc.

# EXHIBIT N

1  PAUL V. SIMPSON, BAR NO. 83878
   TIMOTHY P. O'DONNELL, BAR NO. 185492
2  SIMPSON, GARRITY & INNES
   Professional Corporation
3  601 Gateway Boulevard, Suite 950
   South San Francisco, CA  94080
4  Telephone: (650) 615-4860
   Fax: (650) 615-4861
5
   Attorneys for Defendant
6  IMR Contractor Corporation

7
                SUPERIOR COURT OF THE STATE OF CALIFORNIA
8
                        COUNTY OF SAN FRANCISCO
9

10 GREGORY HALL, FAUSTO AGUILAR,        | Case No. CGC-07-470047
   GONZALO AGUILAR, CHARLES CHILTON,    |
11 FELIX CORTES, OMAR FRANCO, DOUGLAS   | **NOTICE TO PLAINTIFFS OF FILING**
   GIVENS, ROBERT IVY, QUINCY MOUTON,   | **OF NOTICE TO FEDERAL COURT**
12 LUIS OSUNA, RICHARD RANKIN, HECTOR   | **OF REMOVAL OF CIVIL ACTION**
   RODRIGUEZ, MARTIN SANDOVAL, HENRY    | **FROM STATE COURT (FEDERAL**
13 TAYLOR, LLOYD THIBEAUX, MICHAEL      | **QUESTION)**
   BROWN, ASTRIAN CAEL, ARNULFO         |
14 CARRANZA-RIVAS, APOLINAR CORNEJO,    |
   ROY EDWARDS, VICTOR HAMPTON, RANDY   |
15 KEYS, ANDRE LARRIMORE, TERRY         |
   MACKEY, DOUGLAS TURNER, JEFF WEST,   |
16 ROBERT WHITE, MARQUEZ BOYD,          |

17                Plaintiffs,

18      v.

19 APARTMENT INVESTMENT AND
   MANAGEMENT COMPANY, AIMCO CAPITAL,
20 INC., FORTNEY & WEYGANDT, INC., IMR
   CONTRACTOR CORPORATION, BAY
21 BUILDING SERVICES, BAY AREA
   CONSTRUCTION FRAMERS, INC. and DOES 1-
22 50,

23                Defendants

24

25

26

27

28

NOTICE TO PLAINTIFFS OF FILING OF NOTICE TO FEDERAL COURT OF REMOVAL OF CIVIL ACTION FROM STATE COURT
(FEDERAL QUESTION)

TO PLAINTIFFS GREGORY HALL, FAUSTO AGUILAR, GONZALO AGUILAR, CHARLES CHILTON, FELIX CORTES, OMAR FRANCO, DOUGLAS GIVENS, ROBERT IVY, QUINCY MOUTON, LUIS OSUNA, RICHARD RANKIN, HECTOR RODRIGUEZ, MARTIN SANDOVAL, HENRY TAYLOR, LLOYD THIBEAUX, MICHAEL BROWN, ASTRIAN CAEL, ARNULFO CARRANZA-RIVAS, APOLINAR CORNEJO, ROY EDWARDS, VICTOR HAMPTON, RANDY KEYS, ANDRE LARRIMORE, TERRY MACKEY, DOUGLAS TURNER, JEFF WEST, ROBERT WHITE, MARQUEZ BOYD AND THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN, pursuant to 28 U.S.C. Section 1446, that Defendant IMR Contractor Corporation in Case Number CGC-07-470047 in the Superior Court of the State of California, has filed a Notice To Federal Court Of Removal Of Civil Action From State Court (Federal Question) in the Office of the Clerk of the United States District Court for the Northern District of California.

Attached hereto are copies of the Notice To Federal Court Of Removal Of Civil Action From State Court (Federal Question) and exhibits thereto filed in the United States District Court. Also attached hereto is the Notice to State Court of Removal of Civil Action and attachments thereto filed with the Clerk of the San Francisco County Superior Court.

Date: July 17, 2008

Respectfully submitted,

SIMPSON, GARRITY & INNES
Professional Corporation

By _____
PAUL V. SIMPSON
TIMOTHY P. O'DONNELL
Attorneys for Defendant
IMR CONTRACTOR CORPORATION

## PROOF OF SERVICE BY U.S. MAIL

1

2

3      I, the undersigned, hereby declare that I am over the age of eighteen years and not a party

4  to the within action. My business address is 601 Gateway Boulevard, Suite 950, South San

5  Francisco, California 94080.

6      On the date indicated below, I served by First Class U.S. Mail a true copy of the following

7  documents

8

9      **NOTICE TO PLAINTIFFS OF FILING OF NOTICE TO FEDERAL COURT
       OF REMOVAL OF CIVIL ACTION FROM STATE COURT (FEDERAL
10     QUESTION)**

11

12     I am readily familiar with the practice of this business for collection and processing of

13  documents for mailing with the United States Postal Service. Documents so collected and

14  processed are placed for collection and deposit with the United States Postal Service that same day

15  in the ordinary course of business. The above-referenced document(s) were placed in (a) sealed

16  envelope(s) with postage thereon fully prepaid, addressed to each of the below listed parties and

17  such envelope(s) was (were) placed for collection and deposit with the United States Postal

18  Service on the date listed below at South San Francisco, California.

19

20           **SEE PROOF OF SERVICE LIST ATTACHED**

21

22     I declare under penalty of perjury under the laws of the State of California that the

23  foregoing is true and correct.

24     Executed on July 17, 2008, at South San Francisco, California.

25

26                                              _____
                                                Diana L. Prisk
27

28

## PROOF OF SERVICE LIST

Hall et. al. v. Apartment Investment and Management Company et. al.

Superior Court of California, County of San Francisco Case No.: CGC-07-470047

Robert Salinas, Esq.
Pamela Kong, Esq.
Jorge Aguilar II, Esq.
SUNDEEN SALINAS & PYLE
1330 Broadway, Suite 1830
Oakland, CA 94612
Attorneys for Plaintiffs

Stephen Thomas Davenport, Jr., Esq.
Jeffrey G. McClure, Esq.
DAVENPORT GERSTNER & MCCLURE
1990 N. California Blvd., Suite 650
Walnut Creek, CA 94596
Attorneys for Defendants Apartment Investment and Management Company, AIMCO Capital, Inc. and Fortney & Weygandt, Inc.

Christopher A. Brose, Esq.
400 Geary Blvd., Suite 201
San Francisco, CA 94118
Attorney for Defendant Bay Building Services, Inc.

Joseph E. Powell, Esq.
Paul Michael Vuksich, Esq.
LAW OFFICES OF JOSEPH E. POWELL
582 Market Street, Suite 2001
San Francisco, CA 94104
Attorneys for Defendant Bay Area Construction Framers, Inc.