**United States District Court**
For the Northern District of California

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4    GREGORY HALL, et al.,                No. C 08-03447 CW

5            Plaintiffs,                  ORDER GRANTING
                                          PLAINTIFFS'
6        v.                               MOTION FOR LEAVE
                                          TO FILE
7    APARTMENT INVESTMENT AND MANAGEMENT  SUPPLEMENTAL
     COMPANY, et al.,                     BRIEF AND
8                                         DECLARATIONS,
                                          GRANTING IN PART
9            Defendants.                  AND DENYING IN
     _____/ PART AIMCO
10                                        DEFENDANTS'
                                          MOTION FOR
11                                        SUMMARY JUDGMENT,
                                          AND GRANTING
12                                        FORTNEY &
                                          WEYGANDT, INC.'S
13                                        MOTION FOR
                                          SUMMARY JUDGMENT
14                                        (Docket Nos. 130,
                                          131 and 167)
15

16       Defendants Apartment Investment and Management Company; AIMCO

17   Capital, Inc.; All Hallows Preservation, L.P.; Bayview

18   Preservation, L.P.; La Salle Preservation, L.P.; and Shoreview

19   Preservation, L.P. (collectively, AIMCO) and Defendant Fortney &

20   Weygandt, Inc. (F&W) move for summary judgment on the claims

21   brought against them.  Only Plaintiffs Gregory Hall, Charles

22   Chilton, Douglas Givens, Quincy Mouton and Richard Rankin

23   (collectively, Plaintiffs) currently assert claims against AIMCO

24   and F&W; they oppose the motions.[1]  The motions were heard on

25   _____

26       [1] At the time AIMCO's and F&W's motions were filed, Plaintiffs
     Fausto Aguilar, Gonzalo Aguilar, and Terry Mackey also had claims
27   against AIMCO and F&W.  Thereafter, these claims were dismissed
     pursuant to stipulation.  Further, Plaintiffs' papers offer
28   alternate spellings of Richard Rankin's last name.  Compare 4th Am.

January 20, 2011.  Thereafter, Plaintiffs moved for leave to file a supplemental brief and declarations in light of oral argument. Having considered oral argument and the papers submitted by the parties,[2] the Court GRANTS Plaintiffs' motion for leave to file a supplemental brief and declarations, GRANTS in part AIMCO's motion for summary judgment and DENIES it in part and GRANTS F&W's motion for summary judgment.

BACKGROUND

This action arises from the alleged unlawful labor and employment practices of entities involved in the rehabilitation of four apartment communities in the Bayview-Hunter's Point neighborhood of San Francisco, California.  Construction on the Hunter's Point Project spanned from 2007 through late 2008.  All Hallows Preservation, L.P.; Bayview Preservation, L.P.; La Salle Preservation, L.P.; and Shoreview Preservation, L.P. owned the apartment communities involved in the Project.  Apartment Investment and Management Company was involved in a "joint venture" with these limited partnerships and provided staff that represented them on the Project.  Aguilar Decl., Ex. 206, Maloy Depo. 17:5-7; Maloy Decl. ¶¶ 4-5 and 8.  AIMCO retained F&W to be the general contractor for the project.

Hiring and employment at the Project were governed, in part, by "Borrower-City Agreements" between AIMCO and the City and County

Compl. (4AC) ¶ 62 with Rankins Supp. Decl. in Light of Oral Argument.  The Court uses the spelling in Plaintiffs' 4AC.

[2] AIMCO and F&W cite unpublished decisions by California state courts, in violation of Civil L.R. 3-4(e).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

of San Francisco.  <u>See generally</u> Johnson Decl., Ex. 7.  These
agreements arose from a voluntary settlement of a lawsuit against
AIMCO, in which the City alleged that AIMCO did not timely respond
to notices of violations at the four apartment communities,
violated state and local building codes, "maintained the Properties
as a public nuisance" and engaged in unfair business practices.
Aguilar Decl., Ex. 209, at AIMCO000001.  Under these agreements,
AIMCO promised, among other things, not to discriminate based on
various protected statuses, to pay a minimum of $10.77 per hour to
all employees performing work on the Project, and to offer health
benefits.  Johnson Decl., Ex. 7, §§ 3-6.  AIMCO also agreed to
require F&W to

> participate in, and include in subcontracts a provision
> that all of its subcontractors participate in, the City's
> First Source hiring and training program with a goal that
> 50% of the individuals hired be residents of San
> Francisco, and with a first preference for residents of
> the Bayview Hunters Point Project Area . . . .

<u>Id.</u> § 8(a).  The First Source Hiring Agreement, which F&W signed,
specifically provided,

> In the event that Contractor Subcontracts a portion of
> the work under this Contract, Contractor shall determine
> how many, if any, of the Entry Level Positions are to be
> employed by its Subcontractor(s), provided, however, that
> Contractor shall retain the primary responsibility for
> meeting the requirements imposed under this Agreement.
> Contractor shall ensure that this Agreement is
> incorporated into and made applicable to such
> Subcontract.

<u>Id.</u>, Annex A.  To ensure that it complied with its hiring
obligations to the City, AIMCO retained Laura Luster, who, in turn,
subcontracted with John Scott.  Luster testified that AIMCO hired
her to engage in "EEO monitoring," which she explained entailed

United States District Court
For the Northern District of California

tracking and reporting "the number of San Francisco residents and complex residents that were hired . . . as part of the construction skill trades labor force for" the Project.  Aguilar Decl., Ex. 234, Luster Depo. 45:2-7.  As part of her duties, Luster filed reports with AIMCO.  Scott testified that his role was to "provide day-to-day services to AIMCO for the project," which included "identifying local contractors who could come in and continue to do work on the AIMCO project" and assisting existing contractors "to identify local workforce to participate on the project."  Aguilar Decl., Ex. 217, Scott Depo. 34:14-24.

F&W did not perform any of the construction on the Project. Instead, it engaged several subcontractors, including IMR Contractor Corporation.  F&W contracted with IMR to perform roofing and siding work.  IMR, in turn, subcontracted the siding work to Bay Building Services, Inc. (BBS).  Plaintiffs maintain, and AIMCO and F&W do not dispute, that IMR and BBS effectively operated as a single entity.  For the purposes of this motion, the Court assumes this to be true and collectively refers to both entities as IMR. Plaintiffs were employed by IMR.

IMR's employment practices attracted scrutiny by community activists, local residents and IMR employees from the "start of the job."  Aguilar Decl., Ex. 206, Maloy Depo. 101:23-102:8.  In particular, IMR was accused of preferring Latinos to African American workers.  Further, IMR maintained segregated work crews, comprised entirely of either Latino or African American workers. AIMCO and F&W were aware of this practice and "encouraged" IMR to "integrate their work crews," but IMR "resisted these efforts."

4

Maloy Decl. ¶ 19; Fortney Decl. ¶ 23.  In a July 26, 2007 email to AIMCO's Senior Directors of Construction, Scott suggested that F&W "needs to accept the responsibility to have [IMR] make this simple change in its workforce" and that AIMCO needed to "convince Fortney to get the message across to IMR."  Aguilar Decl., Ex. 216, Scott Depo. Ex. 23.  AIMCO was also aware that Marshall Hornstein, BBS's principal, claimed that African American workers were less productive than Latino workers.  <u>See</u> Aguilar Decl., Ex. 255 (Aug. 1, 2007 email from Hornstein stating that "our experience with resident carpenters that we have kept on to do siding, is that those resident crews are operating at 25% of the productivity of our core siders").

On or about August 14, 2007, IMR laid off Hall, Chilton and Givens.  Hall suggested at his deposition that, after IMR employees saw him, after his layoff, speaking with Rick Ingram, one of AIMCO's Senior Directors of Construction, they invited him back to work.  On August 15, Hornstein wrote Ingram about the layoff, stating,

> These men were laid off as of Tues night 8/14/07.  Their checks and layoff notices along with the attached letters were taken to the Union Hall last evening for their pickup this morning the 15th.  They showed up onsite and Fortney directed my men to put them to work on the Garlington windows.  I beleive [sic] you may have been involved in this direction.

Aguilar Decl., Ex. 229.

In or about late August, 2007, Hall and Chilton attended a meeting at AIMCO's offices that was convened to discuss Hornstein's concerns and IMR's employment practices.  The meeting was led by Maloy, and Ingram and representatives of F&W and IMR were in

5

United States District Court
For the Northern District of California

attendance.  Hall testified that, in response to Hornstein's comments, Maloy stated that the matter would be resolved through comparing the productivity of a work crew comprised of Latinos with one comprised of African Americans.  At his deposition, Ingram confirmed that Maloy proposed this comparison.  Ingram stated that he believed that "what Don was asking for was that if, in fact, the . . . remarks that Marshall had made were not valid, that he expected to see more resident workers."  Aguilar Decl., Ex. 214, Ingram Depo. 230:18-21.  The comparison, which Plaintiffs term a "siding contest," took place in or about late August, 2007.[3] Hornstein testified that, although the work of an African American work crew was observed, there was no direct comparison between the work of that crew and a crew consisting of Latinos.  Aguilar Decl., Ex. 205, Hornstein Depo. 203:23-204:11.

---

[3] Plaintiffs concede that there is no direct evidence as to when the contest took place.  Plaintiffs and AIMCO and F&W, however, agree that the contest took place at around the time of the meeting purportedly run by Maloy.  See, e.g., Pls.' Supp. Br. 2 (citing portions of depositions discussing the date of the meeting); AIMCO & F&W's Response to Pls.' Supp Br 3 n.5 (citing the same).  Chilton testified that the meeting took place in late August, 2007.  Johnson Decl., Ex. 70, Chilton Depo. 18:10-11.  Givens suggested that the meeting occurred in August, 2007.  Id., Ex. 71, Givens Depo. 11:5-7.  And Hall, who had initially stated that the meeting occurred a month before he was laid off, answered finally that the meeting took place two months before November 9, 2007.  Id., Ex. 33, Hall Depo. 65:22.  Plaintiffs insist that the "late August date is not possible given the certified payroll produced by the Defendants."  Pls.' Supp. Reply 6 n.2.  This contradicts their representation at the hearing in which they unequivocally stated that the contest took place at "the end of August."  Tr. of Jan. 20, 2011 Hrg. 54:25.  Further, this argument is not consistent with Plaintiffs' challenge to the accuracy of the payroll records in this action.  Finally, Plaintiffs maintain that IMR recalled Hall from a layoff in mid-August, 2007, which suggests that he could have participated in such a contest at the end of that month.

United States District Court
For the Northern District of California

Thereafter, IMR informed AIMCO that it would not hire "local residents" unless AIMCO paid a surcharge; IMR apparently believed that the surcharge was necessary "because [it was] losing money with the productivity [it] had." Aguilar Decl., Ex. 206, Maloy Depo. 148:15-18.  In November, 2007, F&W lobbied AIMCO to approve payment of the surcharge "to use local residents on site."  Aguilar Decl., Ex. 204, Fortney Depo. Ex. 35.  AIMCO approved of the surcharge, which Maloy characterized to be "additional compensation because of the perceived lack of production by the local labor force."  Aguilar Decl., Ex. 204, Fortney Depo. Ex. 36.  In an email to F&W, Maloy noted that, in the future, he expected "to see local residents" performing work because this was "one of the conditions of the approval."  Id.

In early 2008, AIMCO ordered the cessation of work at the Project and consulted with F&W regarding IMR's contract.  AIMCO also met with IMR on at least two occasions to address its employment practices.  In or about April, 2008, IMR was terminated from the Project.

This lawsuit was initiated in San Francisco County Superior Court on December 14, 2007, with AIMCO, F&W, IMR and BBS named as Defendants.  IMR, with the consent of the other Defendants, removed the action to federal court.  Since then, the claims of several Plaintiffs, either in part or in full, have been dismissed with prejudice.[4]

---

[4] Although not apparently subject to any of the parties' stipulations, the claims of Randy Keys no longer appear to be at issue in this case.  The parties' most recent stipulation dismissing claims does not list him as a Plaintiff.  Further, AIMCO

7

United States District Court
For the Northern District of California

1    On April 22, 2010, the Clerk entered default against BBS.

2  Default judgment has not been sought against BBS, which, according

3  to Plaintiffs, is "apparently defunct."  Opp'n 15.

4    The current motions concern only Plaintiffs' claims against

5  AIMCO and F&W.  Although they filed separate briefs, AIMCO and F&W

6  join the arguments asserted in each other's briefs.  IMR has not

7  moved for summary judgment.

8                           LEGAL STANDARD

9    Summary judgment is properly granted when no genuine and

10  disputed issues of material fact remain, and when, viewing the

11  evidence most favorably to the non-moving party, the movant is

12  clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

13  56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

14  Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir.

15  1987).

16    The moving party bears the burden of showing that there is no

17  material factual dispute.  Therefore, the court must regard as true

18  the opposing party's evidence, if supported by affidavits or other

19  evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815

20  F.2d at 1289.  The court must draw all reasonable inferences in

21  favor of the party against whom summary judgment is sought.

22  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

23  587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d

24  1551, 1558 (9th Cir. 1991).

25    Material facts which would preclude entry of summary judgment

26  ─────────────────────

27  does not mention his claims in its motion for summary judgment.
    See AIMCO Mot. for Summ. J. at 1.

28                                  8

are those which, under applicable substantive law, may affect the outcome of the case.   The substantive law will identify which facts are material.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods:

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc., 210 F.3d 1099, 1106 (9th Cir. 2000).

If the moving party discharges its burden by showing an absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.   Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).   If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."   Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it

United States District Court
For the Northern District of California

9

must produce affirmative evidence of such negation.  <u>Nissan</u>, 210
F.3d at 1105.  If the moving party produces such evidence, the
burden then shifts to the non-moving party to produce specific
evidence to show that a dispute of material fact exists.  <u>Id.</u>

If the moving party does not meet its initial burden of
production by either method, the non-moving party is under no
obligation to offer any evidence in support of its opposition.  <u>Id.</u>
This is true even though the non-moving party bears the ultimate
burden of persuasion at trial.  <u>Id.</u> at 1107.

DISCUSSION

Plaintiffs do not contend that AIMCO or F&W were their direct
employers.  Instead, Plaintiffs seek liability against AIMCO and
F&W based on two theories.  First, Plaintiffs maintain that AIMCO
and F&W could be held liable on their claims for retaliation under
the Labor Code, discrimination under the FEHA, and wrongful
termination, because AIMCO and F&W were their indirect, or joint,
employers.  Second, Plaintiffs assert that AIMCO and F&W can be
held liable as aiders and abettors for IMR's FEHA violations.
AIMCO and F&W assert that Plaintiffs fail to create a genuine issue
of material fact with respect to either of these theories of
liability.  In addition, AIMCO and F&W argue that Plaintiffs failed
to exhaust their administrative remedies with respect to their
aiding and abetting claim.

I.   Liability as Joint Employers

Generally, employees may bring claims for retaliation under
the California Labor Code, discrimination under the FEHA, and
wrongful termination only against their employers.  <u>See</u> Cal. Lab.

10

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Code § 1102.5(c); <u>Reno v. Baird</u>, 18 Cal. 4th 640, 644 (1998)

(FEHA); <u>Milosky v. Regents of Univ. of Cal.</u>, 44 Cal. 4th 876, 900

(2008) (wrongful termination).  However, under certain

circumstances, an individual or entity can be held liable for such

claims as an indirect, or joint, employer.[5]  <u>See</u> <u>Vernon v. State</u>,

116 Cal. App. 4th 114, 123 (2004) (noting that the FEHA requires

"'some connection with an employment relationship,' although the

connection 'need not necessarily be direct'") (citation omitted).

    There "'is no magic formula for determining whether an

organization is a joint employer.'"  <u>Id.</u> at 124-25 (quoting <u>Choe-</u>

<u>Rively v. Vietnam Veterans of Am.</u>, 135 F. Supp. 2d 462, 470 (D.

Del. 2001)).  In <u>Vernon</u>, a California court of appeal considered

the standard, under the FEHA,[6] used to determine whether an

individual or entity could be considered an employee's joint

employer.  To interpret the term "employer," the state court relied

heavily on federal court decisions interpreting Title VII, noting

that the objectives and wording of that law "'are similar to those

of the FEHA.'"  <u>Vernon</u>, 116 Cal. App. 4th at 125 n.6 (quoting

<u>Richards v. CH2M Hill, Inc.</u>, 26 Cal. 4th 798, 812 (2001)).  After

observing that various tests have been adopted by other courts,[7]

_____

    [5] <u>Vernon</u> uses the terms "indirect" and "joint"
interchangeably.  For clarity, the Court hereinafter refers to
these employers as "joint employers."

    [6] AIMCO and F&W do not argue that Plaintiffs' Labor Code and
wrongful termination claims are subject to a different analysis.

    [7] <u>Vernon</u> noted that "courts have 'wrestled with the
appropriate test to be applied' to determine whether a defendant is
an employer for purposes of an action for discriminatory employment
practices." 116 Cal. App. 4th at 125 n.7.  It identified four
tests adopted by other courts: (1) "the traditional common law test

11

United States District Court
For the Northern District of California

the <u>Vernon</u> court concluded that common among each of them was a "totality of the circumstances" analysis of "the nature of the work relationship of the parties, with emphasis upon the extent to which the defendant controls the plaintiff's performance of employment duties." <u>Vernon</u>, 116 Cal. App. 4th at 124 (citing <u>Lambertsen v. Utah Dep't of Corr.</u>, 79 F.3d 1024, 1028 (10th Cir. 1996)); <u>see also</u> <u>Bradley v. Cal. Dep't of Corr. & Rehab.</u>, 158 Cal. App. 4th 1612, 1626 (2008). This analysis requires a careful inquiry into the "myriad facts surrounding the employment relationship in question." <u>Vernon</u>, 116 Cal. App. 4th at 125 (citation and internal quotation marks omitted).

In evaluating the relationship between an employee and a putative joint employer, courts may take several factors into account, including the

> payment of salary or other employment benefits and Social Security taxes, the ownership of the equipment necessary to performance of the job, the location where the work is performed, the obligation of the defendant to train the employee, the authority of the defendant to hire, transfer, promote, discipline or discharge the employee, the authority to establish work schedules and assignments, the defendant's discretion to determine the amount of compensation earned by the employee, the skill required of the work performed and the extent to which it is done under the direction of a supervisor, whether the work is part of the defendant's regular business operations, the skill required in the particular occupation, the duration of the relationship of the parties, and the duration of the plaintiff's employment.

<u>Id.</u> at 125 (citations omitted). Although none of these factors is

of 'agency;'" (2) "the 'interference test,' which examines the authority of the defendant to affirmatively interfere with or adversely affect the plaintiff's access to employment opportunities;" (3) "the 'economic realities' test;" and (4) "the 'hybrid test,' which combines elements of the other tests." <u>Id.</u> (citations omitted).

United States District Court
For the Northern District of California

decisive, "'the extent of the defendant's right to control the means and manner of the workers' performance is the most important.'" Id. (quoting Lee v. Mobile Cnty. Comm'n, 954 F. Supp. 1540, 1546 (S.D. Ala. 1995)). An "'employer must be an individual or entity who extends a certain degree of control over the plaintiff.'" Vernon, 116 Cal. App. 4th at 126 (quoting Lee, 954 F. Supp. at 1545). The individual or entity alleged to be a joint employer must have asserted "'significant'" control over the employee plaintiff and there must be "'sufficient indicia of an interrelationship . . . to justify the belief on the part of an aggrieved employee that the [alleged co-employer] is jointly responsible for the acts of the immediate employer.'" Vernon, 116 Cal. App. 4th at 126 (quoting Choe-Rively, 135 F. Supp. 2d at 470) (alterations by Vernon court).

Here, it is undisputed that AIMCO and F&W did not pay Plaintiffs' wages; although not dispositive, this "is at least strong evidence that an employment relationship did not exist." Vernon, 116 Cal. App. 4th at 127 (citation omitted). Further, Plaintiffs do not offer evidence that AIMCO and F&W controlled the manner or means of the performance of their jobs, or that AIMCO and F&W could "discipline, promote, transfer, or terminate" them. Id. The record shows that AIMCO and F&W did not set Plaintiffs' schedules, nor did they specify Plaintiffs' daily responsibilities.

Plaintiffs instead focus on the amount of control AIMCO and F&W had over IMR. Considering the totality of the circumstances, AIMCO's and F&W's authority over IMR, F&W's subcontractor, did not transform them into Plaintiffs' joint employers. Plaintiffs point

13

United States District Court
For the Northern District of California

to AIMCO's requirement that F&W comply with the hiring obligations imposed by AIMCO's settlement with the City and the fact that F&W, in turn, obliged IMR to comply with the City's First Source Hiring Agreement.  However, AIMCO and F&W's conduct was aimed at ensuring that their subcontractors complied with their obligations to the City.  This is no different from a contractor requiring a subcontractor to comply with government regulations, which, on its own, does not trigger joint employer liability.  See Moreau v. Air France, 356 F.3d 942, 951 (9th Cir. 2004).  It is immaterial that AIMCO voluntarily undertook these obligations pursuant to its settlement with the City or that it monitored compliance with them.  Any business choosing to operate in a jurisdiction must comply with various regulations; that the business requires its subcontractors also to follow these regulations does not render it a joint employer.  Id.

Plaintiffs also note that AIMCO and F&W agreed that fifteen employees would be hired and that AIMCO and F&W played a role in recalling Hall, Chilton and Givens from two layoffs.  However, the evidence on which Plaintiffs rely with respect to the hiring of the fifteen individuals does not suggest that AIMCO and F&W exercised the general authority to hire and fire employees like them.  Also, that AIMCO and F&W officials may have, on two occasions, directed IMR to provide Hall, Chilton and Givens with work does not suggest that AIMCO and F&W managed Plaintiffs' employment.  These three incidents, under the circumstances of the Bayview-Hunter's Point work site, do not support a finding that AIMCO and F&W had significant control over Plaintiffs.

14

United States District Court
For the Northern District of California

Plaintiffs next point to the meeting led by Maloy to discuss IMR's employment practices, and analogize their case to Graves v. Lowery, 117 F.3d 723 (3d Cir. 1997). This analogy is inapt. In Graves, the court found significant to the joint employer analysis the fact that the plaintiffs were subject to the defendant county's sexual harassment complaint policy. Id. at 728-29. Under the policy, the plaintiffs were to file complaints with the county, which would then conduct an investigation and offer counselling services. Id. at 728-29. These factual allegations, along with allegations that the plaintiffs "were told that they were County employees, that the County investigated their allegation of sexual harassment, that they were subject to termination and/or reinstatement by the County and that two of them were hired by the County," suggested that the county was their co-employer. Id. at 729. Here, Plaintiffs do not offer any evidence that AIMCO or F&W established a labor relations complaint procedure, nor does the record show that AIMCO or F&W subjected Plaintiffs to other personnel policies.

Plaintiffs also cite AIMCO's decision to close the Project in January, 2008 and the subsequent termination of IMR's contract. This conduct, however, is not probative of whether AIMCO and F&W's exercised substantial control over the manner and means of Plaintiffs' performance of their jobs. An owner's ability to suspend work on its property or to discharge a subcontractor does not, absent other factors, render the owner a joint employer of the subcontractor's employees working on the property. See Sheetmetal Workers Union v. Pub. Serv. Co. of Ind., Inc., 771 F.2d 1071, 1075

15

United States District Court
For the Northern District of California

1   (7th Cir. 1985).

2       Finally, Plaintiffs rely on <u>Sibley Memorial Hospital v.</u>

3   <u>Wilson</u>, 488 F.2d 1338 (D.C. Cir. 1973), and <u>Association of Mexican-</u>

4   <u>American Educators v. California</u> (<u>AMAE</u>), 231 F.3d 572 (9th Cir.

5   2000), to argue that AIMCO and F&W interfered with their employment

6   opportunities and, therefore, could be held liable as joint

7   employers.  This case, however, is not analogous to either <u>Sibley</u>

8   or <u>AMAE</u>.  In <u>Sibley</u>, although the defendant hospital did not employ

9   the plaintiff, it fell within the purview of Title VII because it

10  controlled access to a job market.  488 F.2d at 1341.  In <u>AMAE</u>,

11  relying on <u>Sibley</u>, the Ninth Circuit reasoned that California was

12  susceptible to Title VII liability because it required teachers to

13  pass a basic skills examination that school districts would use to

14  make hiring decisions, which "interfered" with the plaintiffs'

15  employment opportunities.  231 F.3d at 581-82.  The Ninth Circuit

16  later summarized <u>Sibley</u> and its progeny to apply to "instances

17  where the indirect employer was the entity performing the

18  discriminatory act." <u>Anderson v. Pac. Maritime Ass'n</u>, 336 F.3d

19  924, 931 (9th Cir. 2003).  Here, the record does not suggest that

20  AIMCO and F&W performed discriminatory acts that limited

21  Plaintiffs' access to the job market.

22      Plaintiffs do not create a genuine issue of material fact with

23  respect to whether AIMCO and F&W exercised substantial control over

24  them so that AIMCO and F&W could be considered joint employers for

25  the purposes of liability on their FEHA claims.  Accordingly, the

26  Court summarily adjudicates that AIMCO and F&W cannot be held

27  liable on Plaintiffs' claims on a joint employer theory of

28                                    16

liability.

II.  Liability as Aiders and Abettors

Under the FEHA, it is unlawful for "any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so."  Cal. Gov't Code § 12940(i).  To prevail under this section, plaintiffs must offer evidence of acts by two separate persons: (1) the aider and abettor and (2) the person committing the prohibited act.  See Reno v. Baird, 18 Cal. 4th 640, 655-56 (1998) (discussing Janken v. GM Hughes Elecs., 46 Cal. App. 4th 55, 77-78 (1996)).[8]

Because the FEHA does not define aiding or abetting, California courts have adopted the common law definition.  See, e.g., Vernon, 116 Cal. App. 4th at 131; Fiol v. Doellstedt, 50 Cal. App. 4th 1318, 1325 (1996).  Under this definition, a party may be held liable for a FEHA violation if the party

(a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person

Fiol, 50 Cal. App. 4th at 1325-26.  Knowledge that a FEHA violation "is being committed and the failure to prevent it does not constitute aiding and abetting."  Id. at 1326.  A "mere failure to act does not constitute the giving of 'substantial assistance or

_____

[8] Plaintiffs complain that AIMCO and F&W are requiring them to satisfy an evidentiary burden concerning IMR's alleged FEHA violations, which Plaintiffs argue are not at issue in AIMCO's and F&W's motions.  Plaintiffs' objection is not well taken.  To prevail on their section 12940(i) claims, they have the burden to show both aiding and abetting conduct and a substantive violation of the FEHA.

17

encouragement' to the tortfeasor." <u>Id.</u>

Plaintiffs argue primarily that AIMCO and F&W substantially assisted IMR by not terminating IMR's contract and continuing to provide it with materials, space and access to the Project location. However, this argument suggests that Plaintiffs seek to impose liability based on AIMCO and F&W's failure to prevent IMR's violations. As noted above, liability under section 12940(i) cannot be based on a failure to prevent a FEHA violation. Further, this contention does not link particular acts of assistance or encouragement to alleged FEHA violations. <u>See, e.q.</u>, <u>id.</u> at 1325 (stating that "substantial assistance" must be given to the other "to so act"); <u>Alch v. Superior Court</u>, 122 Cal. App. 4th 339, 390 (2004) (discussing particular acts undertaken by aider and abettor directed at giving substantial assistance to violator's discriminatory scheme).

The only act Plaintiffs identify that could be reasonably interpreted to have encouraged FEHA violations is Maloy's suggestion that Hornstein compare the productivity of a work crew comprised of Latinos with one comprised of African Americans. As noted above, Maloy worked for AIMCO; Plaintiffs offer no evidence that F&W contributed to Maloy's suggestion. Maloy's suggestion may have led to the so-called siding contest. Plaintiffs do not offer direct evidence that this contest encouraged IMR to subject them to adverse employment actions based on impermissible grounds. Instead, Plaintiffs seek to demonstrate causation through temporal

18

proximity.[9]

The siding contest took place sometime in or about late August, 2007. Hall, Chilton, Givens, Mouton and Rankin were laid off on or about November 9, 2007. A jury could infer that these layoffs were based on the results of the allegedly race-based siding contest, which took place no more than three months earlier and was encouraged by AIMCO's Maloy. That IMR may have reduced its workforce from forty-nine employees for the week ending November 6, 2007 to six and then three employees for the weeks ending November 13 and 20, 2007 respectively weakens, but does not negate, this causal inference as a matter of law. The record contains no evidence as to the racial make-up of IMR's workforce at that time or the reasons for the workforce reduction. Further, evidence that IMR laid off Hall, Chilton, Givens, Mouton and Rankin on multiple occasions does not mean that their November, 2007 layoffs were for permissible reasons. Finally, that Chilton, Givens, Mouton and Rankin were recalled approximately two-and-a-half weeks thereafter does not extinguish all liability; these Plaintiffs could seek damages attributable to those two-and-a-half they did not work, if their layoffs resulted from FEHA violations.

Plaintiffs also contend that the siding contest led IMR to assign Chilton, Givens, Mouton and Rankin to change order work

---

[9] The use of temporal proximity to satisfy the causal element of a prima facie case is generally seen in cases involving retaliation. See, e.g., Villiarimo v. Aloha Isl. Air, Inc., 281 F.3d 1054, 1064-65 (9th Cir. 2002). Although this case focuses on race-based disparate treatment, Plaintiffs' theory is that the so-called contest, a particular event, caused them to suffer adverse employment actions based on their race.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

after they were recalled from their layoffs.  Change orders, according to Plaintiffs, required less than full-time work on an intermittent basis.  Although these alleged reassignments may have constituted a FEHA violation on IMR's part, Plaintiffs offer no evidence that they were encouraged by Maloy's suggestion.  The recall of these Plaintiffs from their layoffs severs whatever causal link may exist between IMR's conduct and the August, 2007 meeting.  Indeed, Plaintiffs proffer Scott's November 6, 2007 email, which could be read to suggest that, because of the siding contest, AIMCO had the option of paying the surcharge sought by IMR or agreeing to IMR's termination of Hall's siding crew; the email does not suggest that, because of the contest, Plaintiffs were to be assigned to change order work.  In their supplemental brief, Plaintiffs suggest that AIMCO's agreement to pay the surcharge caused them to be reassigned to change order work.  However, Plaintiffs' opposition belies this argument by stating that the "30% mark-up was charged across the board for African Americans irrespective of the type of work involved."  Opp'n 24 (citing Aguilar Decl., Ex. 242, M. Avila Depo. 325:21-326:14).  Moreover, the testimony Plaintiffs cite in their opposition suggests that IMR's African American employees performed work other than change order work during the period the surcharge was paid.

AIMCO asserts that Plaintiffs' section 12940(i) claims fail because they did not exhaust their administrative remedies. However, Plaintiffs' administrative complaints described incidents that would have led to the discovery of AIMCO's alleged aiding and abetting conduct; thus, Plaintiffs exhausted their administrative

20

1    remedies.   Soldinger v. Nw. Airlines, Inc., 51 Cal. App. 4th 345,

2    381 (1996).

3         Accordingly, the Court grants F&W's motion for summary

4    judgment with respect to Plaintiffs' FEHA claims under section

5    12940(i).  Plaintiffs offer no evidence of acts by F&W that aided

6    and abetted any particular FEHA violations, nor does the record

7    suggest that F&W played a role in Maloy's suggestion.  However,

8    AIMCO's motion for summary judgment is denied to the extent that it

9    concerns Plaintiffs' section 12940(i) claims; there is a genuine

10   issue of material fact with respect to whether Maloy's suggestion

11   encouraged IMR to lay Plaintiffs off in November, 2007.  In all

12   other respects, AIMCO's motion for summary judgment on Plaintiffs'

13   section 12940(i) claims is granted.

14                            CONCLUSION

15        For the foregoing reasons, the Court GRANTS Plaintiffs' motion

16   for leave to file a supplemental brief (Docket No. 167), GRANTS in

17   part AIMCO's motion for summary judgment and DENIES it in part

18   (Docket No. 131) and GRANTS F&W's motion for summary judgment

19   (Docket No. 130).  AIMCO's motion for summary judgment is denied

20   with respect to Plaintiffs' FEHA claims under section 12940(i) to

21   the extent they are based on Maloy's suggestion at the August, 2007

22   meeting.  In all other respects, AIMCO's and F&W's motions are

23   granted.

24        The Court did not rely on any evidence to which the parties

25   objected.  To the extent that it did, those objections are

26   overruled as moot.

27        A settlement conference will be held before Magistrate Judge

28                                  21

United States District Court
For the Northern District of California

Donna Ryu on March 7, 2011 at 11:00 a.m.  A pretrial conference is
set for April 12, 2011.

The Court is unavailable for trial from May 9 until May 20,
2011, and thus a twenty-day trial cannot begin as scheduled on
April 25, 2011.  If the parties are unable to settle at their March
7 settlement conference, they should discuss the trial length
estimate in light of this order, and the possibility of
bifurcation.  The Court could begin an eight-day trial on April 25,
2011, assuming two days of jury deliberation.  A twenty-day trial
could tentatively begin on May 23, 2011, subject to a tentatively
set criminal trial.  The next available date for a twenty-day trial
would be August 22, 2011.  If the parties are unable to settle and
unable to agree on a trial plan, a further case management
conference will be held on March 15, 2011 at 2:00 p.m., with a
joint case management statement due March 11, 2011.

IT IS SO ORDERED.

Dated: 2/18/2011

CLAUDIA WILKEN
United States District Judge

22